# EXHIBIT A

# MASTER EXCLUSIVE SUPPLY AGREEMENT

**THIS MASTER EXCLUSIVE SUPPLY AGREEMENT** (this "**Agreement**") is dated effective as of _____, 2018 (the "**Effective Date**") and is entered into by and between **SAGE FULFILLMENT, LLC**, an Oregon limited liability company ("**Seller**") and **EARTH ANIMAL VENTURES, LLC**, a Delaware corporation ("**Purchaser**"; together with Seller, collectively sometimes the "**parties**", individually each a "**party**").

## RECITALS:

A.  Seller is engaged in the business of manufacturing, and the wholesale distribution of, certain cannabinoid products.

B.  Purchaser is engaged in the business of the wholesale marketing, selling and distributing various animal products.

C.  Seller desires to manufacture and distribute to Purchaser, and Purchaser desires to purchase from Seller, on an exclusive basis, certain cannabinoid with Uptake (as defined below) chemistry products for Purchaser's marketing, sale and distribution for animal use.

## AGREEMENT:

**NOW, THEREFORE**, in consideration of the foregoing recitals, the mutual promises set forth below, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, Seller and Purchaser agree as follows:

1.  **PRODUCTS**.

    1.1  Seller shall exclusively manufacture and deliver to Purchaser, and Purchaser shall exclusively purchase from Seller, certain products, generally described as cannabinoid ("**CBD**") for Animal Use (the "**Products**"), which are more specifically defined in a Statement of Work (as defined below). For purposes hereof, "Animal Use" shall mean all non-human applications of Seller's Products, except that Seller may manufacture and sell CBD products for use or resale to Dr. Shoemaker for equine veterinary purposes and such manufacture and sales shall not constitute Animal Use under this Agreement. Seller shall deliver exclusively to Purchaser, and Purchaser shall exclusively purchase from Seller, the Products for Animal Use pursuant to this Agreement and a Statement of Work. Such exclusivity shall be in exchange and consideration for the pricing and Product delivery terms as set forth in a Statement of Work.

    1.2  All Products manufactured and delivered by Seller to Purchaser hereunder shall (a) be delivered in accordance with the terms of this Agreement and a Statement of Work, (b) conform to the standards set forth in a Statement of Work, (c) be subject to the warranties set forth in this Agreement, and (d) adhere to all laws and regulations applicable to the Products where such Products are being manufactured.

1.3     All Products to be delivered by Seller shall be described in a statement of work mutually agreed to by the parties in writing from time to time (each a "**Statement of Work**"). The format and contents of a Statement of Work shall generally conform to the statement of work format attached hereto as **Exhibit "A"**. Each Statement of Work may be accompanied by one or more product orders (each a "**Product Order**") which shall set forth the mutually agreed to terms upon which the Products set forth in a Statement of Work shall be purchased and delivered. In the absence of Product Orders, a Statement of Work shall serve the same purpose and for purposes hereof, reference to a Statement of Work herein shall include the applicable Product Order, if any. Each Statement of Work shall incorporate the terms of this Agreement as if fully set forth therein.

1.4     (a) The Products shall contain additives, formulations or other technologies designed to increase the absorption or effectiveness of the CBD (herein "**Uptake**"). Uptake shall be included in the definition of "Products" for purposes of this Agreement, including the exclusivity provisions hereof. Notwithstanding the foregoing, the Parties agree that Uptake may have applications to items Purchaser sells that do not contain CBD. Therefore, Purchaser shall have the right to purchase Uptake for use in Purchaser's animal products separate from this Agreement, so long as such separately purchased Uptake is not purchased and/or sold by Purchaser in combination with any products that contain CBD.

(b) In the event that Purchaser wishes to include CBD in any item not then currently subject to a Statement of Work, Purchaser shall offer a Statement of Work for such item to Seller. If Seller either declines or fails to accept said Statement of Work within 30 days, Purchaser shall nonetheless purchase CBD with Uptake materials only from Seller for use with other production partners without affecting this Agreement, unless the Parties fail to agree on the price or quantity offered in the Statement of Work. If the Parties fail to agree on price and quantity, Purchaser may purchase CBD from any other supplier. This paragraph shall apply individually to each specific Statement of Work offered to Seller, and Seller shall have the same rights to accept or reject future products offered under subsequent Statements of Work. This paragraph shall not apply to tinctures, tablets and capsules, and Purchaser shall not purchase tinctures, tables or capsules from any third party during the Term including any extension thereof.

(c) If Purchaser fails to purchase during calendar year 2019, $7,000,000.00 worth of Products from Seller, during calendar year 2020, $10,000,000.00 worth of Products from Seller, and during calendar year 2021, $15,000,000.00 worth of Products from Seller, and, if the Term of this Agreement is extended, during calendar year 2022, $15,000,000.00 worth of Products from Seller, and during calendar year 2023, $15,000,000.00 worth of Products from Seller, Seller may terminate this Agreement by giving notice to Purchaser at any time before January 15th of the following year. Such termination shall not constitute a breach by Purchaser but shall absolutely terminate all rights and obligations of the parties under this Agreement, except for those rights of Seller under paragraphs 13.7 and 13.8 hereof..

1.5     (a) Seller acknowledges that Purchaser has an interest in maintaining the quality of products sold under Purchaser's trademarks and brand names. Seller will provide, subject to the NDA (as defined below), the names of Seller's suppliers and samples of all ingredients that

Seller uses in manufacturing the Products. Purchaser shall not disclose any information about the suppliers or ingredients without prior written permission from Seller. Purchaser shall have the opportunity to visit and inspect the facilities of Seller's suppliers following prior written approval by Seller, and Seller shall request that such suppliers allow reasonable visits by Purchaser.

(b) In the event that a third party accuses Purchaser of misstating the contents of the Products, including without limitation claiming that the ingredients fail to meet the quality standards asserted by Purchaser, Seller shall provide, subject to the NDA, all information in its possession to Purchaser that will assist Purchaser in rebutting such claims, and will further use Seller's all reasonable efforts to contact Seller's suppliers and obtain information from Seller's suppliers to rebut such claims. If disclosure of any information by Purchaser is required by any legal process, Purchaser shall provide prompt notice of such legal process to Seller and Seller shall have the right to seek protection or other appropriate remedy from the disclosure of such information from any appropriate tribunal. Notwithstanding anything else herein: (i) Seller shall provide to Purchaser all such information required by this paragraph, and (ii) Purchaser shall not disclose such information without the written consent of Seller, except that Purchaser shall be permitted to disclose any such information pursuant to any legal process requiring disclosure should Seller fail to obtain protection or other appropriate remedy from such disclosure.

(c) Purchaser shall include Seller's name or logo and/or such other information as the Parties may agree in any Product advertising and packaging identifying Seller as the source of the Products.

(d) Seller shall maintain and retain complete and accurate books and records relating to the production (including but not limited to lot / batch samples), packaging, testing, storage and delivery of all Products, as well as all packaging and labelling supplies that have been provided by Purchaser. Seller shall also prepare, maintain and retain any other records required to be kept and maintained under this Agreement or required to be kept by pursuant to federal, state and local laws and regulations. All books and records prepared, maintained and retained by Seller pursuant to this Agreement shall be made available for inspection by Purchaser and its representatives no more than once per calendar year during the Term and for three (3) years thereafter, upon reasonable prior written notice at times agreed to by the parties during Seller's regular business hours and without disruption to Seller's ongoing business operations.

2. **TERM**. Unless earlier terminated as provided for herein, this Agreement shall be effective from the Effective Date through and including December 31, 2021 (the "**Term**"). The Term may be extended at either party's option for one additional 24-month period by written notice to the other party delivered on or before October 1, 2021. Such notice shall only be effective if the Party giving notice is not then the cause of a material breach. If the Term, including any extension thereof, expires while a Statement of Work is still outstanding, the Term shall be extended until the completion of the Parties' performance under the Statement of Work, but shall not extend the time for notice for the election of any extension of the Term.

3. **PRICING; PAYMENT**.

The unit prices for the Products are set forth in a Statement of Work. Changes to pricing shall be by way of a new or amended Statement of Work. Payment for all Products shall be due in full at the time of delivery of the Products to Purchaser. No written notice for payment or notice to cure late payment shall be required hereunder.

4. **TAXES**. Each Party shall bear the burden of reporting and paying any and all taxes (including without limitation income, excise, sales and use, value added, and property) as may be imposed primarily upon such Party by law. A Party who fails to pay such taxes shall indemnify, defend and hold harmless the other Party from any claim for such taxes should the burden for paying the same fall secondarily upon the other Party. The provisions of this Section shall survive the expiration or earlier termination of this Agreement.

5. **FORECAST**.

5.1 In order to assist Seller in meeting the delivery needs of the Products for Purchaser, Purchaser shall provide Seller with a forecast for each coming calendar quarter 90 days prior to the commencement of such calendar quarter. Thereafter, Purchaser shall provide rolling Product Orders pursuant to a Statement of Work no less than 90 days in advance of Purchaser's required delivery. Purchaser shall cause packaging and labelling materials sufficient to allow Seller to package the Products required by any Product Order to be delivered to Seller not less than 60 days prior to the delivery date set forth in a Product Order. Seller shall deliver the Products to Purchaser as per the delivery dates and quantities set forth in a Product Order.

5.2 In the event of any dispute or in the event of any conflict or inconsistency between the terms of any Product Orders, any Statement of Work and/or this Agreement, the terms of this Agreement shall govern and control, then any applicable Statement of Work. No pre-printed language on any Product Order shall add, modify or delete any terms or conditions to this Agreement.

5.3 Products shall be delivered by Seller pursuant to Product Orders. Product Orders shall specify the dates by which the Products ordered must be delivered. Purchaser shall have the right to reschedule any Product delivery date to slow delivery provided that Purchaser gives Seller written notice of such rescheduled delivery date at least 48 hours prior to the previously scheduled delivery date and further provided that such rescheduled delivery date is no more than 2 business days after the date of previously scheduled delivery date.

5.4 Prior to the commencement of each calendar month, Seller shall electronically provide Purchaser with its inventory of finished Product.

5.5 Seller shall cause to be maintained sufficient ingredient inventories to meet the delivery requirements of each Product Order. On the first day of each calendar month, Seller shall electronically provide Purchaser with inventory information concerning the quantity of such ingredients and of labelling and packaging supplies on hand or on order so that Purchaser may keep Seller adequately stocked for its forecasted Product needs and to satisfy all Product Orders. In addition, Seller and Purchaser shall perform a quarterly volume review of Purchaser's upcoming Product needs and Seller's production capacity to meet such needs.

5.6     Seller shall deliver all Products on pallets in good structural and sanitary condition.

5.7     Seller shall be responsible for permitting the safe and proper loading of Products onto all shipping vehicles by Purchaser.

5.9     Seller will store all finished Products free of charge for 30 days. Thereafter, with 10 days prior notice to Purchaser, Seller may charge a reasonable fee for storage equal to Seller's actual costs to store the Products.

6.      **DELIVERY**.

6.1     Delivery of the Products shall be made by Seller to Purchaser Freight on Board (F.O.B.) Seller's loading dock with Purchaser's arranged carrier at the date set forth in a Statement of Work. Purchaser shall be responsible for all costs of shipment. Title and risk of loss of the Product shall pass to Purchaser upon delivery of the Products to Purchaser's carrier at Seller's loading dock. All shipments must be accompanied by Seller's packing slip documenting the applicable Product Order reference number, Product batch codes and Product unit quantity. Any bill of lading or way bill prepared by Purchaser's carrier shall not govern the delivery of the Products to such carrier and Purchaser and shall be void *ab initio* for purposes of the transactions contemplated in this Agreement irrespective of any Seller or its agent's signature affixed thereto. If at any time Seller has reason to believe that delivery of the Products will not be delivered by the date specified in a Statement of Work, Seller shall promptly notify Purchaser of the cause and duration of the anticipated delay, and the action plan to resolve such delay that Seller shall pursue expeditiously.

6.2     Seller will package and label the Products substantially in accordance with the packaging and labeling specifications provided by Purchaser in a Statement of Work. Purchaser will be responsible for securing, at its cost and expense, the approval if necessary of any governmental agency, as may be appropriate, for such packaging and labeling and Seller will make reasonable efforts to assist Purchaser in obtaining all such appropriate governmental approvals.

6.3     Purchaser shall order, pay for and supply to Seller all packaging and labeling materials related to the Products and have such packaging and labeling materials delivered to Seller F.O.B. destination Seller's loading dock. Seller agrees to maintain a running inventory of the packaging and labeling materials that it has received from Purchaser at its loading dock and notify Purchaser at least 30 days in advance of the need for more packaging and labeling materials. Seller will store all packaging and labeling materials free of charge. Upon receipt, all packaging and labeling for the Products will be inspected by Seller. Any packaging or labeling not satisfying Purchaser's specifications will be withheld from use by Seller, and Purchaser will be promptly notified so that Purchaser can arrange for the disposition of such materials at Purchaser's sole cost and expense. Seller may submit samples of packaging materials to Purchaser for review. If packaging is rendered unusable while in Seller's custody due to such things as moisture, tearing, crushing, etc., Seller shall promptly notify Purchaser following discovery of the specific damaged materials and the quantities thereof. Purchaser shall invoice

Seller for the actual cost of such damaged packaging materials, and also for any freight, handling and other actual third party disposition costs or expenses incurred by Purchaser in connection with such damaged packaging materials. Seller shall, at Purchaser's election, either pay Purchaser or issue Purchaser a credit in the sum of such invoice amount on Seller's next Product invoice. Should Seller comply with the provisions of this paragraph, Seller shall not be responsible for a failure to deliver Products due to a lack of packaging and labeling materials.

6.4     Purchaser shall be responsible for the content and accuracy of all packaging materials and labels for the Products, including the ingredients legend. In the event that any claim is made against Seller by any customer, third party or governmental entity alleging that the content of the label or packaging of the Products was or is defective, illegal or inaccurate, or otherwise infringes the intellectual property rights of another person, Purchaser shall defend, indemnify and hold harmless Seller from and against any and all liability, losses, costs and expenses (including reasonable attorneys' fees') incurred by Seller as a result of such claims, unless such claims are based upon Seller's failure to manufacture the Products in accordance with the specifications set forth in a Statement of Work.

6.5     Seller shall be solely responsible for designating, identifying, recording, tracking, and in all other ways accounting for all lots and/or batches of Products until the time such Products are delivered to Purchaser as set forth herein. Seller shall provide copies of accounting to Purchaser with all lots and batches of Products delivered, within five business days of written request from Purchaser.

6.6     Purchaser shall have the right, in addition to all other rights and remedies available to it under applicable law and regulations to reject the Products that have not been delivered in accordance with the terms and conditions of this Agreement and any Statement of Work ("**Nonconforming Product**"). Purchaser may reject and refuse to pay for any Nonconforming Product that is damaged at or before the time of delivery hereunder or is not produced in accordance with applicable law. Any Products validly rejected by Purchaser and reasonably determined by Purchaser not to be re-conditionable or salvageable shall be disposed of by Seller at Seller's cost and expense in a manner which shall absolutely preclude any re-use for human or animal consumption. If Purchaser and Seller mutually determine that such Nonconforming Products are re-conditionable or salvageable, Seller shall remove all Purchaser identification and dispose of the same as agreed to in writing by the Parties. Should such Nonconforming Product be destroyed, it shall be done under Purchaser's direction and any government inspections, if applicable, with commercially reasonable proof of the destruction provided to Purchaser. If Purchaser has paid Seller for Product which is rejected by Purchaser as permitted hereunder, Purchaser shall invoice Seller for the invoiced cost paid to Seller of such Nonconforming Product and Seller shall, at Purchaser's election, either refund Purchaser or give Purchaser a credit in the sum of such invoice amount on Seller's next invoice. In the event that Nonconforming Product has been delivered to third parties by Purchaser, Seller shall recall the Product produced during the applicable production run, or if requested or demanded by any government agency, and at Purchaser's request, at any time thereafter, order Seller to suspend the production and packaging of such Products until such time as Seller has corrected the nonconformity.

7. **QUALITY ASSURANCE**.

7.1     Seller shall conduct all necessary quality inspections to ensure that all Products conform to the specifications set forth in a Statement of Work, failing which Seller shall use commercially reasonable efforts to promptly take appropriate corrective action to remedy such failure.

7.2     Seller agrees to produce and deliver the Products in accordance with applicable federal, state and local laws, rules and regulations, and that the Products shall be in compliance in all material respects with the specifications and formulas set forth in a Statement of Work. Any changes to the specifications shall be as agreed to in a Statement of Work.

7.3     Seller warrants that its facility is in compliance with applicable law. Seller agrees to maintain any registrations, certifications and approvals required by applicable law. Seller agrees that it will provide such information to Purchaser in its possession and not subject to confidentiality agreements within 10 business days of receipt of written request from Purchaser for such information with any and all registration numbers, license numbers, certifications, approvals, ingredient origin and ingredient purity information, and any other Products and Product composition information that may be requested or required by federal, state, or local or foreign agency or non-governmental authority having jurisdiction over the Products and their manufacture.

7.4     Seller shall on a monthly basis prepare and submit to Purchaser quality control records, and shall also furnish to Purchaser on reasonable request from Purchaser and without charge a reasonable number of samples from each production run or lot. Seller shall perform mock recalls and quality and pathogen testing of the Products ingredients and finished Products in accordance with usual and customary testing methods, procedures and standards.

7.5     Purchaser shall have the right to send, no more frequently then 2 times per calendar year, on not less than 10 business days' advance written notice, and without disruption to Seller's ongoing business operations, one or more of its authorized employees and/or representatives to observe and inspect, during Seller's regular business hours, and in Seller's presence and at Seller's direction, all areas, including without limitation, manufacturing, warehousing and other facilities, of Seller's facility, used to produce, package and store Products or used to store Products supplies. Purchaser's representatives shall have the right to take a reasonable number of samples of Products and Product supplies during such inspection. All such representatives and employees shall be subject to non-disclosure terms equal to the terms that the Parties hereunder are bound to.

7.6     If any portion of Seller's facility, or any of Seller's processes, inventories or equipment do comply with all applicable laws and regulations or with the terms and conditions of this Agreement, Seller shall take such action to correct such deficiencies and bring such processes, inventories and/or equipment into compliance with applicable laws and regulations and with the material terms and conditions of this Agreement promptly but in no case more than 10 business days following delivery of a written notice of such deficiency by Purchaser.

7.7     Seller shall make available, within 10 business days of Purchaser's written request, the results of all federal, state and local governmental inspections and sanitation audits, conducted during the period from 30 days before to 30 days after the Term and relating to or affecting Seller's facility or any equipment, raw materials, ingredients, packaging materials, work in progress, or the Products located therein. Seller shall provide such documentation and reports within 10 business days of receipt of such request from Purchaser. Seller shall notify Purchaser's designated quality assurance representative promptly by telephone of the occurrence and results of any such inspections or audits. If any governmental authority issues any reprimands, sanctions, warnings, advisories or takes any enforcement actions against Seller or its facility or any Products, Seller shall notify Purchaser within 72 hours of receiving such notification.

7.8     Seller shall notify Purchaser's designated quality assurance representative by phone of any Nonconforming Products that have been delivered to Purchaser within 48 hours of the time that Seller becomes aware of same. Seller shall promptly identify to Purchaser's quality assurance representative any Products (Non-conforming or otherwise) on "hold" beyond normal periods of time, and shall comply with Purchaser's directions regarding the disposition of same.

7.9     Unless the nonconformity or defect in the Products subject to seizure, recall, withdrawal or destruction is not attributable to any act or omission on the part of Seller, at Purchaser's request, Seller shall, at Seller's sole cost and expense promptly perform: (a) any recall or withdrawal of Nonconforming Product initiated by Purchaser; and (b) any seizure, destruction, recall or withdrawal of Nonconforming Product requested or demanded by any ordered or recommended by federal, state or local governmental authorities. Seller shall obtain sufficient insurance to protect against such costs and expense. Seller shall promptly notify Purchaser's designated quality assurance officer by telephone, followed up promptly by an email, of any situation which, to the knowledge of Seller, could result in the seizure, destruction, recall or withdrawal of Products or of the need for any seizure, destruction, recall or withdrawal of Products. Seller shall cooperate fully with Purchaser in implementing any seizure, destruction, recall or withdrawal of Product, including without limitation, assisting Purchaser in determining the scope and cause of the Products problem and the location of any shipments of Products. If the nonconformity or defect in the Products subject to seizure, recall, withdrawal or destruction is attributable to an act or omission on the part of Seller, Seller shall reimburse Purchaser upon demand for all actual losses, damages, costs and expenses incurred by Purchaser in connection with such seizure, destruction, recall or withdrawal of such Nonconforming Product, all amounts paid by Purchaser for Products so seized, destroyed, recalled or withdrawn and Purchaser's actual cost of Products supplies (if any) furnished by Purchaser to Seller and incorporated into such seized, destroyed, recalled or withdrawn Product.

8.      **INTELLECTUAL PROPERTY**.

8.1     "**Intellectual Property**" shall be defined as, whether existing as of the Effective Date or hereinafter developed, all ideas, processes, inventions (whether patentable or not patentable), trade secrets, recipes, formulas, compounds, mixtures, works of authorship, trademarks and materials associated with the manufacture and supply of the Products, including all intermediate and partial versions thereof, as well as all integration of such Products into the

finished product delivered to the end user retail customer by Purchaser as contemplated in the transactions hereunder. Purchaser acknowledges that all Intellectual Property is either the sole property of Seller, or Seller has the right and license to use the Intellectual Property in its manufacture and delivery of the Products to Purchaser hereunder. Notwithstanding the foregoing, the Parties acknowledge that Purchaser owns and uses certain trademarks and brand names, and will market the Products under such trademarks and brand names and potentially other trademarks and brand names that Purchaser creates for the Products, and that Seller shall have no right to any such trademarks or brand names previously used by or created by Purchaser. Purchaser warrants that there are no third-party intellectual property rights, including but not limited to patent, trade secret, or copyright rights, that would be infringed upon by such Product branding, marketing, packaging, labeling and supplies. The provisions of this Section shall survive the expiration or earlier termination of this Agreement.

8.2     Seller acknowledges that, provided minimum order quantities are hit by Purchaser, Purchaser may use such trademarks and copyrights of Seller in Purchaser's advertising and marketing subject to a separate agreement between the parties, and that Seller shall not allow any other person or entity (other than Dr. Shoemaker, discussed herein) to use such trademarks or copyrights for Animal Use. The Parties may exchange licenses for the purpose of accomplishing this paragraph, but the failure to do so shall not affect its validity. If either Party becomes aware of any violation of the other party's intellectual property rights by a third party, that Party shall inform the other and the Parties shall work collaboratively to enforce such rights.

9.      **CONFIDENTIAL INFORMATION**. The parties have entered into a non-disclosure agreement dated May 1, 2018 (the "**NDA**"), a copy of which is attached hereto as **Exhibit "B."** The terms of the NDA shall govern the exchange of Confidential Information (as defined in the NDA) between the parties and pursuant to this Agreement. The provisions of this Section shall survive the expiration or earlier termination of this Agreement.

10.     **WARRANTIES**. Seller warrants that all Products shall be free from defects in material and workmanship and shall conform to the standards set forth in a Statement of Work. Seller warrants that there are no third-party intellectual property rights, including but not limited to patent, trade secret, or copyright rights, that would be infringed upon by the manufacture, use, and sale of the Products to be supplied to Purchaser hereunder. **EXCEPT AS PROVIDED HEREIN, THE PRODUCTS ARE PROVIDED "AS IS," WITHOUT ANY WARRANTIES OR REPRESENTATIONS, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF QUALITY, PERFORMANCE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, NOR ARE THERE ANY WARRANTIES CREATED BY A COURSE OF DEALING, COURSE OF PERFORMANCE OR TRADE USAGE. THE FOREGOING EXCLUSIONS AND DISCLAIMERS ARE AN ESSENTIAL PART OF THIS AGREEMENT AND FORM THE BASIS FOR DETERMINING THE UNIT PRICES FOR THE PRODUCTS.** The provisions of this Section shall survive the expiration or earlier termination of this Agreement.

11. **INDEMNIFICATION**. Each Party shall indemnify, defend and hold harmless the other Party, its members, managers, employees, agents, consultants and representatives from and against any and all claims, demands, losses, suits, liabilities, expenses or costs (including court costs and reasonable attorneys' fees) for any damage or harm arising out of or in connection with such Party's performance or failure to perform under this Agreement. The indemnifying Party shall provide the indemnified Party with an opportunity to provide input in the selection of counsel, the formulation of proposed settlement terms and to consent to any settlement entered on its behalf. The provisions of this Section shall survive the expiration or earlier termination of this Agreement.

12. **LIABILITY**. **NEITHER PARTY SHALL BE LIABLE IN CONTRACT, TORT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, GOODWILL, TIME, SAVINGS OR REVENUE.** The provisions of this Section shall survive the expiration or earlier termination of this Agreement.

13. **TERMINATION**.

13.1 In the event that either party materially breaches this Agreement, the other party may give such party written notice specifying such breach. Should the breaching party fail to cure such breach within 30 days (except where another cure period is specifically provided herein, and in which case such other cure period shall control), of receipt of such notice, the other party may terminate this Agreement and pursue all rights and remedies available at law and in equity. All remedies may be concurrently pursued and granted. The cure period may be extended up to 120 days if the cure cannot reasonably be effectuated within 30 days and the curing party undertakes and continues to undertake good faith efforts to effectuate the cure.

13.2 Notwithstanding anything to the contrary in this Agreement, Purchaser reserves and Seller hereby agrees that Purchaser shall have the right to immediately terminate this Agreement under the following circumstances:
  (a) Where:
    (i) Seller fails to vacate an involuntary bankruptcy, insolvency or reorganization petition or petition for an arrangement or composition with creditors filed against Seller within sixty (60) days after the date of such filing, or files such a petition on a voluntary basis,
    (ii) Seller makes an assignment for the benefit of creditors, other than an assignment, pledge, lien or hypothecation for purposes of financing,
    (iii) Seller fails to vacate the appointment of a receiver or trustee for Seller or for any interest in Seller's business within sixty (60) days after such appointment,
    (iv) Seller permits an attachment to be levied against and remain outstanding on any of its equipment or its Facility for more than thirty (30) days, other than an assignment, pledge, lien or hypothecation for purposes of financing;
    (v) Seller's interests or rights under this Agreement, or any part thereof, pass to another by operation of law,

(vi) Seller ceases to do business as a going concern or ceases to conduct its operations in the normal course of business, or

(vii) Seller substantially changes the nature of its business or there is a change in control in the ownership of Seller such that a majority of the ownership is held by a major competitor of Purchaser's.

(b) Where Seller has adulterated any Product sold to Purchaser or has otherwise willfully violated the provisions of this Agreement regarding quality, or, without Purchaser's permission, has substituted or added, with respect to any instruction, specification, formula, manufacturing process or quality control standard or any procedure set forth in this Agreement or any Statement of Work, an ingredient, component, process or procedure not called for thereby, or has altered or omitted an ingredient, component, process or procedure called for thereby which, in any such case, results in a Products being sold to Purchaser that is not in compliance with a Statement of Work.

(c) Where Seller has produced and sold to Purchaser, in violation of the terms of this Agreement, any adulterated or misbranded Products which are subject to regulatory agency recommended or ordered seizure, destruction or recall not timely cured by Seller.

(d) Where the price charged by Seller for the Products increases by more than [20% per annum,] above the price set forth in the initial Statement of Work No. 1 entered into between the parties; except where (i) Seller can show that Seller's costs to produce the Product have increased such that Seller cannot reasonably afford to continue to provide the Products under such Statement of Work without increasing Seller's price in excess of the [20% per annum] increases provided herein, and (ii) Purchaser determines after reasonable inquiry that it can continue to maintain its sales of the Product at the same levels if Purchaser raises its price to account for Seller's price increase.

(e) Where the Seller fails to deliver at least 85% of Products required by Statements of Work or Product Orders in any six-month period.

(f) Where Seller has failed to inform Purchaser of any known deficiency in the Products if Seller is required to give Purchaser such notice under this Agreement.

The termination rights granted under this Section are cumulative with and in addition to any other rights or remedies to which Purchaser may be entitled arising from any violation, default or breach of this Agreement.

13.3 Seller reserves and Purchaser hereby agrees that Seller shall have the right to immediately terminate this Agreement under the following circumstances:

(a) Where Purchaser fails to make any payment due to Seller hereunder within 10 days after receipt of the Products, unless the amount in issue is subject to a bona fide dispute between the parties.

(b) Where:

(i) Purchaser fails to vacate an involuntary bankruptcy, insolvency or reorganization petition or petition for an arrangement or composition with creditors filed against Purchaser within sixty (60) days after the date of such filing, or files such a petition on a voluntary basis,

(ii) Purchaser makes an assignment for the benefit of creditors, other than an assignment, pledge, lien or hypothecation for purposes of financing

(iii) Purchaser fails to vacate the appointment of a receiver or trustee for Purchaser within thirty (30) days after such appointment,

(iv) Purchaser permits an attachment to be levied against and remain outstanding on a substantial portion of its assets for more than 30 days, other than an assignment, pledge, lien or hypothecation for purposes of financing

(v) Purchaser's interests or rights under this Agreement, or any part thereof, pass to another by operation of law, or

(vi) Purchaser ceases to do business as a going concern or ceases to conduct its operations in the normal course of business.

The termination rights granted under this section are cumulative with and in addition to any other rights or remedies to which the Seller may be entitled arising from any violation, default or breach of the Agreement.

13.4   Any failure by either party to notify the other party of a violation, default or breach of this Agreement, or to terminate this Agreement on account thereof, shall not constitute a waiver of such violation, default or breach or a consent, acquiescence or waiver of any later violation, default or breach, whether of the same or a different character.

13.5   Upon termination of this Agreement pursuant to the terms hereof, the rights granted hereunder shall immediately become null and void, and the parties shall immediately discontinue all use of the intellectual property rights being used by the other Party and shall return to each other all originals and copies of the Confidential Information, but such termination or cancellation shall not affect any obligation of, or liability incurred by, Seller or Purchaser prior to such termination or cancellation to the extent that the nature and context of such obligation or liability should reasonably be considered to have survived such termination or cancellation.

13.6   In addition to such other rights as the Parties may have in law, equity or under this Agreement, if this Agreement is terminated by a Party pursuant to the terms hereof, the Party terminating this Agreement shall have the right to enjoin the non-terminating Party from purchasing or selling, as the case may be, CBD based products for Animal Use for the shorter of (1) a period of one year or (2) the remainder of the then-current Term, including any extensions thereof. The Parties agree that such an injunction is reasonable temporally and geographically based upon their expected course of dealings.

13.7   Upon termination of this Agreement by Seller pursuant to the terms hereof, Seller shall immediately cease performing any and all services hereunder, except with respect to Product Orders and work in progress which Seller may complete and deliver to Purchaser, subject to a Product Order, and for which Purchaser shall pay pursuant to the terms of the Product Order. Upon termination of this Agreement by Purchaser pursuant to the terms hereof, Seller shall immediately cease performing any and all services hereunder, except with respect to Product Orders and work in progress, which Purchaser may request that Seller complete and deliver to Purchaser such Products, subject to a Product Order, and for which Purchaser shall pay pursuant to the terms of the Product Order. Upon termination of this Agreement pursuant to the terms hereof by either party, all packaging and labeling materials and other property of Purchaser

in the possession, custody or control of Seller shall be held by Seller for a reasonable period of time (but not to exceed thirty (30) days) for retrieval by Purchaser at Purchaser's sole cost and expense, after which time Seller may dispose of said property as Seller's sole cost and expense.

    13.8    At the termination of the Agreement, other than arising out of breach by Seller, Purchaser agrees to pay Seller for any unused Product supplies on hand and purchased by Seller, that the Seller purchased in reliance on Purchaser's production forecasts, upon delivery of the unused Product supplies to Purchaser.

    14.    **NOTICES**. Whenever under the provisions of this Agreement it shall be necessary or desirable for one party to serve any notice to the other party, such notice shall be addressed as follows:

| | |
|---|---|
| If to Seller: | Sage Fulfillment, LLC<br>2905 Fourth Avenue South<br>Seattle, WA 98134<br>Attn: Richard Calafiore, Chief Executive Officer<br>Phone: (720) 442-2426<br>E-mail: richard@sagedoorholdings.com |
| In case of dispute<br>with a copy to: | Sage Fulfillment, LLC<br>2905 Fourth Avenue South<br>Seattle, WA 98134<br>Attn: General Counsel<br>Phone: (303) 888-1812<br>E-mail: generalcounsel@sagedoorholdings.com |
| If to Purchaser: | Earth Animal Ventures, LLC<br><br>49 John St.<br>Southport, CT 06890<br>Attn: Dr. Robert Goldstein, VMD<br>Phone (203) 557-3322<br>E-mail: drbobvmd@earthanimal.com |
| In case of dispute<br>with a copy to: | Anthony J. Musto<br>One Eliot Place, 3rd Floor<br>Fairfield, CT 06824<br>(203) 259-4488<br>anthony@mustolawfirm.com |

Any notice, request, demand, report or other communication served personally shall be deemed delivered upon receipt, if served by mail or independent courier shall be deemed delivered on the date of receipt as shown by the addressee's registry or certification receipt, and if served by

facsimile transmission shall be deemed delivered on the date of receipt as shown on the received facsimile (provided the original is thereafter delivered as aforesaid).

15. **MISCELLANEOUS**.

    15.1 **Relationship**. The parties are each independent contractors. No agency relationship between Purchaser and Seller is made by this Agreement. Neither party shall have any right or authority to act on behalf of the other and neither party will represent that it has such right or authority.

    15.2 **Joint Work Product**. This Agreement was negotiated jointly by authorized representatives of each party; accordingly, no article, section, clause of sub-clause shall be interpreted against a party on the basis of such party drafting any particular article, section, clause or sub-clause.

    15.3 **Authority**. Each party represents and warrants to the other that it has the requisite power and authority or has obtained such requisite power and authority to enter into this Agreement and perform the obligations required of it herein, and this Agreement has been signed by an authorized representative of such party.

    15.4 **Binding Effect**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns.

    15.5 **Severability**. If any term or provision of this Agreement, the deletion of which would not adversely affect the receipt of any material benefit by either party hereunder, shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby and each other term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

    15.6 **Conflict of Terms**. In the event of a conflict between the terms of this Agreement and any attachments or other documents incorporated herein, the conflict shall be resolved in the following order of precedence: (a) the terms of this Agreement; (b) the terms of any Statement of Work; and (c) the terms of any other attached exhibits or documents attached thereto in no particular order.

    15.7 **Entire Agreement; Amendment**. This Agreement, including all exhibits hereto, constitutes the entire and exclusive agreement between the parties relating to the specific matters covered in this Agreement. This Agreement may be altered, amended or revoked only by a writing signed by each party hereto.

    15.8 **Prevailing Party**. In the event of any dispute arising from or related to the a party's performance or failure to perform under this Agreement, the prevailing party shall be entitled to recovery of all reasonable costs incurred in connection therewith, including, without limitation, court costs, reasonable attorneys' fees and other related expenses.

    15.9 **Governing Law**. This Agreement shall be governed and construed in

accordance with the laws of the State of Oregon without regard to choice of law rules. Litigation respecting the terms or enforcement of this Agreement shall be brought in the state or federal courts for the jurisdiction in which the defendant has its principal place of business.

15.10 **Headings; Recitals**. The captions of each section of this Agreement are inserted only as a matter of convenience and for reference and in no way shall be deemed to define, limit, enlarge, or describe the scope of this Agreement and the relationship of the parties hereto, and shall not in any way affect this Agreement or the construction of any provisions herein. The recitals to this Agreement shall be deemed material terms hereof.

15.11 **Force Majeure**. Neither party to this Agreement shall be liable to the other party for any delay in performance or failure to perform, in whole or in part, due to war or act of war (whether an actual declaration is made or not), riot, civil commotion, act of public enemy, fire, flood, or other act of God, act of any governmental authority, or other causes beyond the reasonable control of such party, which could not have been foreseen or prevented (each a "**Force Majeure Event**"). If a Force Majeure Event occurs, the party affected by such event shall promptly notify the other party in writing of such event and take all reasonable actions to avoid the effect of such event.

15.12 **Waiver**. No waiver by any party of any right or remedy under this Agreement shall be deemed to be a waiver of any other or subsequent right or remedy under this Agreement. No waiver of any term, covenant or condition of this Agreement shall be valid unless affirmed in writing.

15.13 **Counterparts**. This Agreement may be executed in counterparts, each of which, which together, shall constitute a single agreement.

15.14 **Time of the Essence**. Time is of the essence in each Party's performance under this Agreement.

16. **EXCLUSIVITY**.

16.1 Except as otherwise stated herein, Seller agrees that it will not sell any products containing CBD to any party for Animal Use (other than Purchaser) during the Term (or any extension thereof) of this Agreement. Except as otherwise stated herein, Purchaser agrees that it will not purchase any products containing CBD from any party (other than Seller) during the Term (or any extension thereof) of this Agreement, unless expressly agreed upon to the contrary by both parties.

16.2 The exclusivity provisions of this Agreement shall apply to Seller so long as Purchaser is in compliance with this Agreement and any Statement of Work. The exclusivity provisions of this Agreement shall apply to Purchaser so long as Seller is in compliance with this Agreement and any Statement of Work. Should either Party be in material breach of its obligations under this Agreement or any Statement of Work, the other Party may sell or purchase, as the case may be, products containing CBD to/from third parties without breaching such exclusivity requirements. Purchaser will notify Seller of any purchase of CBD from third parties.

16.3    Purchaser intends that all of the Products will contain Uptake. Seller acknowledges that Purchaser may purchase Uptake for use in items that do not contain CBD. Purchaser shall not purchase Uptake or any items containing Uptake for use in Purchaser's CBD products intended for sale from any person other than Seller. Purchaser may purchase Uptake for use in any non-CBD items from any person without limitation. Seller has contracted with Steve Kushner and obtained from Kushner the exclusive right to purchase Uptake for Animal Use. Seller represents that it has the exclusive right to combine Uptake with CBD for Animal Use, that Seller will provide Purchaser with proof of such right, and that Seller will allow Purchaser to contact Kushner regarding for purposes of confirming said rights as well as in order to develop an exclusive license agreement for purchasing Uptake directly from Steve Kushner for non-CBD use with animal related products.

16.4    Seller agrees to use commercially reasonable efforts to supply Products to Purchaser, and Purchaser agrees to use commercially reasonable efforts to promote the sale of the Products.

16.5    The Parties intend that the exclusivity provisions of this Agreement shall apply world-wide. The Parties nonetheless acknowledge that circumstances may exist where one Party may not be desirous of or able to participate in a given market outside of the United States. Therefore, subject to the terms of this Agreement, the Parties agree that the exclusivity provisions of this Agreement shall apply as follows:

(a) In the United States, as written.

(b) In a jurisdiction outside of the United States where one Party is prohibited by applicable law from complying with the provisions of this Agreement (e.g., a country that requires all CBD to be sourced from within its borders, or requires CBD sellers to be citizens of such country), the other Party may sell or purchase CBD free from the exclusivity restrictions of this Agreement.

(c) In a jurisdiction outside of the United States where Seller has an opportunity to sell CBD products in a market in which Purchaser does not make sales of CBD products, and Purchaser, upon 45 days' notice from Seller, fails to contract with Seller on terms substantially similar to those available to Seller, Seller may sell CBD in such market free of the exclusivity restrictions of this Agreement.

(d) In a jurisdiction outside of the United States where Purchaser has an opportunity to purchase CBD products for a per-unit cost to Purchaser less than that of Seller's Products (including all costs of shipping, customs, and other charges), and Seller, upon 45 days' notice, fails to price the Product to match the per-unit cost or fails to commit to producing products on substantially similar terms to those available to Purchaser, Purchaser may purchase CBD free of the exclusivity restrictions of this Agreement.

Should either Party contract with a third party under the exceptions to exclusivity herein, said Party shall use commercially reasonable efforts to ensure that no CBD products sold outside the jurisdictions for which exclusivity exists are diverted or channeled, either directly or indirectly, to jurisdictions in which exclusivity exists.

**IN WITNESS WHEREOF**, the parties entered into this Agreement effective as of the Effective Date.

SELLER:                                         PURCHASER:

**SAGE FULFILLMENT, LLC**                       **EARTH ANIMAL VENTURES, LLC**

By: ___[signature]___                           By: ___[signature]___
Name: _____                            Name: STUART STANLEY
Title: _____                           Title: CEO

# EXHIBIT "A"

## Statement of Work - Format

**THIS STATEMENT OF WORK** (this "**Statement of Work**") is dated effective as of _____, 20__ (the "**Effective Date**") and is entered into by and between **SAGE FULFILLMENT, LLC**, an Oregon limited liability company ("**Seller**") and **EARTH ANIMAL VENTURES, LLC**, a _____ ("**Purchaser**"; together with Seller, collectively sometimes the "**parties**", individually each a "**party**"). This Statement of Work incorporates the terms of that that certain Master Supply Agreement between the parties dated September __, 2018. In the event of any inconsistency between the terms of this Statement of Work and the terms of the Agreement, the terms of the Agreement shall in all cases govern and control.

1. **Description of Products**:

2. **Pricing**:

3. **Product Standards**:

4. **Delivery**:

**IN WITNESS WHEREOF**, the parties entered into this Agreement effective as of the Effective Date.

| | |
|---|---|
| **SELLER:** | **PURCHASER:** |
| **SAGE FULFILLMENT, LLC** | **EARTH ANIMAL VENTURES, LLC** |
| By: _____ | By: _____ |
|     Richard Calafiore, Chief Executive Officer | Name: _____ |
| | Title: _____ |