# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| SAGE FULFILLMENT, LLC, | : Civil Action No. 20-CV-444-VAB |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | : |
|  | : |
| EARTH ANIMAL VENTURES, INC., | : |
|  | : |
| Defendant. | : JULY 21, 2020 |
|  | : |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## APPLICATION FOR PREJUDGMENT REMEDY

Plaintiff Sage Fulfillment, LLC ("Sage" or "Plaintiff") respectfully submits this

Memorandum of Law in support of its application, pursuant to Rule 64 of the Federal Rules of

Civil Procedure, Rule 4(c) of the Local Rules of Civil Procedure for the District of Connecticut,

and Sections 52-278a *et seq.* of the Connecticut General Statutes, for a prejudgment remedy as

described below.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 2

    A.   Sage's Formation and the Agreements between the Parties ............................... 2

    B.   EAV's Short and Erratic History of Issuing Product Orders under SOW1 ....................... 5

    C.   EAV's Breaches and Repudiation of the Agreements ....................................... 7

    D.   Sage's Lost Profits ........................................................................................ 8

ARGUMENT ..................................................................................................................... 11

    A.   To Obtain a Pre-Judgment Remedy, Sage Need Only Show Probable Cause ................. 11

    B.   Probable Cause Exists that a Judgment of At Least $10,359,320 Will Enter in Sage's Favor ........................................................................................... 12

        1.   Probable cause exists to conclude that EAV breached the Agreements and violated CUTPA ............................................................................... 13

        2.   Probable cause exists to conclude that Sage will be entitled to recover its lost profits ................................................................................. 14

        3.   Probable cause exists that a judgment will enter in favor of Sage in an amount of at least $10,359,320 ................................................................ 21

        4.   EAV's defenses are without merit ........................................................ 22

    CONCLUSION ............................................................................................................ 34

105936077.3

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Wholesale Prod. v. Allstate Ins. Co.*,
    288 Or. App. 418, 406 P.3d 163 (2017)..................................................................18

*Anderson v. Jensen Racing, Inc.*,
    324 Or. 570, 931 P.2d 763 (1997) ........................................................................32

*Axiall Corp. v. Descote S.A.S.*,
    No. CV 15-250, 2017 WL 2608618 (W.D. Pa. June 16, 2017)............................19

*Bank of Boston Conn. v. Schlesinger*,
    220 Conn. 152 (1991) .........................................................................................12

*Calbag Metals Co. v. Guy F. Atkinson Co.*,
    95 Or. App. 514, 770 P.2d 600 (1989)................................................................17

*CompuSpa, Inc. v. IBM*,
    228 F.Supp.2d 613 (D. Md. 2002) .......................................................................21

*Davis v. Overland Contracting, Inc.*,
    No. 19-2531-DDC-KGG, 2020 WL 1974259(D. Kan. Apr. 24, 2020)...........16, 20

*Geiger v. C&G of Groton, Inc.*,
    424 F. Supp. 3d 276 (D. Conn. 2019)..................................................................14

*Grove City Veterinary Serv., LLC v. Charter Practices Int'l, LLC*, No. 3:13-cv-02276-AC, 2016
    WL 8731781, at *12 (D. Or. Feb. 5, 2016), *report and recommendation adopted* 2016 WL
    8711508 (D. Or. Mar. 11, 2016) ..........................................................................19

*Horn v. Med. Marijuana, Inc.*,
    383 F. Supp. 3d 114 (W.D.N.Y. 2019), *appeal dismissed* (Oct. 25, 2019) ..............................1

*Hunter v. Woodburn Fertilizer, Inc.*,
    208 Or. App. 242, 144 P.3d 970 (Or. App. 2006) ................................................25

*Imaging Sys. Intern., Inc. v. Magnetic Resonance Plus, Inc.*,
    227 Ga.App. 641,  S.E.2d 124 (1997)..................................................................20

*K-Lines, Inc. v. Roberts Motor Co.*,
    273 Or. 242 (1975)...............................................................................................18

*Loverin v. Paulus*,
    160 Or. App. 605 (1999).......................................................................................28

*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
No. 14CV03103SRNFLN, 2017 WL 1064887 (D. Minn. Feb. 27, 2017) .............................16

*M & G Polymers USA, LLC v. Carestream Health, Inc.*,
No. CIV.A.07C-11-242PLA, 2010 WL 1611042 (Del. Super. Ct. Apr. 21, 2010), *aff'd sub nom. Carestream Health, Inc. v. M&G Polymers USA, LLC*, 9 A.3d 475 (Del. 2010).....15, 16

*N. England Land Co. v. DeMarkey*,
213 Conn. 612 (1990) ...........................................................................................................12

*Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*,
499 F.3d 115 (10th Cir. 2007)( ...........................................................................................20

*Purina Mills, L.L.C. v. Less*,
295 F. Supp. 2d 1017 (N.D. Iowa 2003) ..............................................................................14

*Roberts v. TriPlanet Partners, LLC*,
950 F. Supp. 2d 418 (D. Conn. 2013) ..................................................................................22

*SEC Am., LLC v. Marine Elec. Sys., Inc.*,
191 Vt. 541, 39 A.3d 1054 (2011) .......................................................................................16

*SEI Fuel Servs., Inc. v. A&J Gas & Convenience, LLC*,
No. 3:18-CV-1553(AWT), 2019 WL 6828431 (D. Conn. Dec. 13, 2019)......................16, 17

*Semo Grain Co. v. Oliver Farms, Inc.*,
530 S.W.2d 256 (Mo. App. 1975) .......................................................................................33

*Shaumyan v. O'Neill*,
987 F.2d 122 (2d Cir. 1993)..................................................................................................12

*TES Franchising, LLC v. Feldman*,
286 Conn. 123 (2008) .....................................................................................................11, 34

*Tigg Corp. v. Dow Corning Corp.*,
962 F.2d 1119 (3d Cir. 1992)................................................................................................14

*Tokyo Ohka Kogyo Am., Inc. v. Huntsman Propylene Oxide LLC*,
35 F. Supp. 3d 1316 (D. Or. 2014) ......................................................................................21

*Torch v. Windsor Surry Co.*,
No. 3:17-CV-00918-AA, 2019 WL 6709379 (D. Or. Dec. 9, 2019)....................................25

*Tripwire, Inc. v. Murchison*,
No. 3:17-CV-00180-SB, 2018 WL 1369912 (D. Or. Mar. 16, 2018) ...................................20

*United of Omaha Life Ins. Co. v. Conn. Student Loan Found.*,
718 F. Supp. 2d 277 (D. Conn. 2010)...................................................................................12

105936077.3

*Welfare Fund v. iCare Mgmt., LLC,*
     792 F. Supp. 2d 269 (D. Conn. 2011) ................................................................. 11

**Statutes**

Conn. Gen. Stat. § 41-110b(a) .......................................................................... 14

Conn. Gen. Stat., §§ 42-110a et seq. ................................................................. 7

Conn. Gen. Stat. § 52-278d .............................................................................. 11

Conn. Gen. Stat. § 52-278d(a) ......................................................................... 11

Or. Rev. Stat. § 41.740 ..................................................................................... 27

Or. Rev. Stat. § 72.1020 ................................................................................... 14

Or. Rev. Stat. § 72.6100 ............................................................................ 13, 14

OR. Rev. Stat. § 72.7080(1) .............................................................................. 14

Or. Rev. Stat. § 72.7080(2) ................................................................................ 8

Or. Rev. Stat. § 72.7080(2) ......................................................................... 14, 16

Or. Rev. Stat. § 72.7250(2) ............................................................................... 25

UCC § 2-708(2) ................................................................................................. 8

**Rules**

D. Conn. L. Civ. R. 4(c) ................................................................................... 11

Fed. R. Civ. P. 64(a) ........................................................................................ 11

Local Rule 4(c) ................................................................................................ 11

**Other Authorities**

1 White, Summers, & Hillman, *Uniform Commercial Code* § 8:21 (6th ed.) ................ 8

Anderson, *U.C.C.* § 2-708:50 (3D. ED.) ........................................................ 15, 17

Boris M. Smirnov and R. Stephen Berry, *Growth of bubbles in liquid* ...................... 30

CHEM. CENT. J. (Sept. 21, 2015), *available at*
     https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4576410/pdf/13065_2015_Article_127.pdf
     (last visited July 6, 2020) .............................................................................. 30

105936077.3

*Degassing a Liquid for Your Syringe Pump*, CHEMYX (Feb. 2, 2018), *available at* https://www.chemyx.com/support/knowledge-base/technical-support/degassing-liquid-syringe-pump/ (last visited July 6, 2020)..................................................................30

Ed Good, *Preposition*, GRAMMAR, *available at* https://www.grammar.com/preposition (last visited July 6, 2020)................................................................................................20

Kristine Owram, *Hemp Prices Plunge as CBD Demand Falls Short: Cannabis Weekly*, BLOOMBERG (Jan. 26, 2020), https://www.bloomberg.com/news/articles/2020-01-26/hemp-prices-plunge-as-cbd-demand-falls-short-cannabis-weekly ......................................................9

No-Hide Chews, EARTH ANIMAL, *available at* https://www.earthanimal.com/our-products/uk-no-hide-natural-treats (last accessed July 9, 2020) ......................................................................2

R.R. Anderson, 1 *Damages Under UCC* § 5:09 (Aug. 2019 update).............................................9

R.R. Anderson, 1 *Damages Under UCC* § 5:11 (Aug. 2019 update)........................................8, 9

*Removing Bubbles from Epoxy*, EPOTEK (2009), *available at* http://www.epotek.com/site/files/Techtips/pdfs/tip4.pdf (last visited July 6, 2020)...............29

105936077.3

## PRELIMINARY STATEMENT

This dispute arises from a three-year contract for the sale of legal, cannabinoid ("CBD") oil[1] in dispensing applicators. Sage agreed to sell, and Earth Animal Ventures, Inc. ("EAV" or "Defendant") committed to buy, at least 1.2 million units of these specialized products, generating estimated revenues of almost $18 million. During the first year of the contract, however, EAV breached on multiple occasions by failing to purchase minimum amounts it committed to buy. In the fifteenth month of this thirty-six month contract, EAV wrongfully attempted to terminate the agreement and, thereby, repudiated its obligations. While EAV was breaching and repudiating it, this contract was becoming increasingly profitable to Sage because of sharp declines in the price of the highest-cost ingredient in these products, CBD oil. Where, as here, a buyer breaches and repudiates a contract for the sale of specialty goods, the UCC allows the seller to recover its lost profits and overhead. Consistent with applicable law, Sage now seeks a prejudgment remedy in the amount of $10,359,320 to secure the potential recovery of these compensable and substantial damages.

Connecticut applies a low threshold for the issuance of a prejudgment remedy. Sage must show only that probable cause exists to believe that it will prevail and obtain a judgment in at least the amount of the requested prejudgment remedy. As demonstrated below, Sage more than meets this standard. Moreover, EAV's anticipated defenses are factually and legally without merit. Accordingly, the plaintiff respectfully requests that the Court grant this motion for a prejudgment remedy.

---

[1] For a discussion of the legality of CBD oil, including the Agricultural Act of 2014 and the 2018 amendment to the Controlled Substances Act (CSA), *see Horn v. Med. Marijuana, Inc.*, 383 F. Supp. 3d 114, 124 (W.D.N.Y. 2019), *appeal dismissed* (Oct. 25, 2019) (noting that CBD oil is made from hemp and that "it appears that the CSA now excludes from the definition of marijuana any part, derivative, or extract of the Cannabis sativa plant if its THC concentration falls below that threshold level.").

<u>**STATEMENT OF FACTS**</u>

The Declaration of Richard Calafiore, including exhibits, substantiates the facts described

below.

**A.      Sage's Formation and the Agreements between the Parties**

Sage's principals, Richard Calafiore and John Thornton, are in the business of making

CBD and other hemp products.  (Calafiore Decl. ¶ 4.)  EAV sells pet foods and supplements.

(*Id.* ¶ 5.)[2]  In the spring of 2018, EAV approached Messrs. Calafiore and Thornton about

supplying CBD products to EAV for use on animals ("CBD Animal Products").  (*Id.* ¶ 6.)

Responding positively, Messrs. Calafiore and Thornton formed Sage Fulfillment for the specific

purpose of becoming EAV's exclusive supplier of CBD Animal Products.[3]  (*Id.* ¶ 8.)  One of the

CBD Animal Products that EAV wanted was a "metered applicator for an over-the-counter

packaged proprietary strain with Certificate of Analysis full spectrum cannabinoid oil

transdermal gel with 'Uptake' delivery"[4] (the "Product" or "Products").  (*Id.* ¶ 12; Ex. B at

¶ 1.1.)  Thus, the Product consists of two major components:  (1) an applicator -- a syringe-like

device or pen (the "Pen"), and (2) CBD transdermal gel with "Uptake" ("CBD Gel").  (*Id.* ¶ 16.)

Sage did not and does not make applicators or other medical devices.  (*Id.* ¶ 18.)

Nevertheless, EAV asked Sage for assistance in finding an applicator to use with the CBD Gel

---

[2] According to its website, EAV was formed over forty years ago and operates in the United States and United Kingdom.  No-Hide Chews, EARTH ANIMAL, *available at* https://www.earthanimal.com/our-products/uk-no-hide-natural-treats (last accessed July 9, 2020).

[3] Actions taken before Sage was officially formed are attributed to Sage herein for the sake of simplicity and brevity.

[4] "Uptake," a proprietary ingredient made by a separate manufacturer, improves absorption of the CBD Gel.  (Calafiore Dec. ¶ 13.)  Sage entered into a separate arrangement in which it paid Uptake's manufacturer a percentage of the gross revenues from the sales of the Products to EAV.  (*Id.*)  Sage refers to this percentage payment as a "royalty."  (*Id.*)

105936077.3

that Sage would provide.  (*Id.*)  Sage proposed several existing applicators available from medical device manufacturers.  (*Id.*)  Sage also proposed a particular formula of CBD Gel to be paired with the applicators, which Sage modified as requested by EAV.  (*Id.* ¶ 20.)  EAV and Sage each tested the various applicators and formulae that Sage proposed.  (*Id.* ¶ 21.)  After EAV chose the applicator and formula of CBD Gel that it wanted, Sage began to gear up for production.  (*Id.* ¶¶ 22-23.)  EAV changed its mind, however, and announced that it wanted a different applicator.  (*Id.* ¶¶ 24-25.)  The new applicator EAV wanted was not available on the market for medical devices – it combined certain features from different, existing applicators. (*Id.* ¶ 26.)  Sage located a medical device manufacturer that was willing to provide the customized applicator that EAV wanted.  (*Id.* ¶ 27.)  Sage also provided a proposed formula of CBD Gel to be paired with the new applicator.  (*Id.*)  EAV and Sage each tested the new applicator and CBD Gel, though EAV's change of mind compressed the period for development of the Products.  (*Id.* ¶ 28.)  Ultimately, EAV approved a final version of the Pen as well as a particular formula of CBD Gel for the Pen it had selected.  (*Id.* ¶ 29.)  In supplying the Products under the Agreements, Sage used the final Pen and formula of CBD Gel that EAV had selected. (*Id.* ¶ 31.)

Effective November 13, 2018, the parties entered into a Master Exclusive Supply Agreement ("MESA") for Sage to supply CBD Animal Products to EAV.  (*Id.* ¶ 9, Ex. A.)  The MESA contains numerous terms and conditions governing the parties' contractual relationship. (*Id.* Ex. A.)  Among other things, the MESA addresses:  Products, Term, Pricing, Payment, Taxes, Intellectual Property, Indemnification, Termination, and Exclusivity.  The initial term of the MESA ran through and including December 31, 2021.  (*Id.* Ex. A at ¶ 2.)  In addition to prescribing elements governing the parties' overall relationship, the MESA contemplates that the

parties would use statements of work ("SOW") to specify the terms that would apply to Sage's supplying particular types of CBD Animal Products. MESA Paragraph 1.3 states, in part, that "[a]ll Products to be delivered by Seller shall be described in a statement of work mutually agreed to by the parties in writing from time to time (each a 'Statement of Work')." (*Id.* ¶ 10, Ex. A at ¶ 1.3.)

Among other clauses, the MESA includes a limitation on the types of damages the parties can recover. In particular, MESA Paragraph 12 states, in part, as follows:

> 12. LIABILITY. NEITHER PARTY SHALL BE LIABLE IN CONTRACT, TORT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, GOODWILL, TIME, SAVINGS OR REVENUE. The provisions of this Section shall survive the expiration or earlier termination of this Agreement.

(*Id.* Ex. A at ¶ 12.)

On or about December 6, 2018, the parties executed Statement of Work No. 1 ("SOW1"), with an Effective Date of January 1, 2019 (the MESA and SOW1 are collectively referred to as the "Agreements"). (*Id.* ¶ 11, Ex. B.) SOW1 concerned the supply of CBD Gel with Uptake in the Pens -- the "Products." (*Id.* ¶ 12, Ex. B at ¶ 1.1.) Under SOW1, EAV committed to purchase the Products in certain minimum quantities: (a) 400,000 units each year; and (b) 40,000 units each quarter (collectively, the "Minimum Purchase Requirements") for a total of 1,200,000 units over the term of the Agreements. (*Id.* ¶ 33, Ex. B at ¶ 2.) In particular, SOW1 provides in part as follows:

> Pricing: [EAV] shall order a minimum of 400,000 units annually commencing on the Effective Date at (a) $11.25 for 2 mg. units, and (b) $18.50 for 10 mg. units. Without affecting the foregoing requirement of a total unit order minimum of 400,000 annually, [EAV] shall order no less than 40,000 units in every calendar quarter beginning January 1, 2019 during the Term and any extension thereof.

(*Id.* Ex. B at ¶ 2.)

The Minimum Purchase Requirements and the parties' commitments to exclusivity were crucial parts of the parties' Agreements. (*Id.* ¶ 34.) By creating a mutual commitment to a base level of exclusive sales, these terms established the scale of the parties' contractual arrangement. (*Id.* ¶ 35.) These elements gave Sage, as a new company supplying specialized goods to one buyer, a guaranteed amount of productivity and corresponding revenues in each quarter. (*Id.* ¶ 36.) These terms also provided a foundation for Sage to apply its capital, including investments in facilities and equipment, to develop the capacity to manufacture the Products at this scale. (*Id.*) Sage would not have entered into SOW1 without the Minimum Purchase Requirements and EAV's commitment to exclusivity. (*Id.* ¶ 37.) Likewise, EAV pushed for exclusivity on Sage's part, which freed EAV from competing with other pet product suppliers to obtain Sage's business. (*Id.* ¶ 38.)

The annual Minimum Purchase Requirement of 400,000 units under the SOW1 yields estimated annual revenues to Sage of $5,950,000 (for a total of $17,850,000 in minimum revenues over the three-year SOW1 Term).[5]

**B.      EAV's Short and Erratic History of Issuing Product Orders under SOW1**

EAV submitted eight Product Orders ("P.O.s") requesting deliveries of the Products during the term of SOW1. (Calafiore Decl. ¶¶40-41, Ex. C.)[6] EAV issued the first of these P.O.s on December 6, 2018 and last on April 25, 2019. (*Id.* ¶ 41, Ex. C.) Moreover, EAV revised, postponed, or canceled five of the eight P.O.s it issued. (*Id.* ¶ 44, Ex. C.) Indeed, EAV postponed indefinitely and/or canceled all of the deliveries requested in P.O.s that it issued in

---

[5] The estimate of $5,950,000 in annual sales assumes that EAV would purchase the same number of units of each size: 200,000 units of 2 mg at $11.25 per unit = $2,250,000; 200,000 units of 10 mg at $18.50 = $3,700,000. (*See* Calafiore Decl. ¶ 60, Ex. B at ¶ 2, Ex. G.)

[6] On December 6, 2018, EAV also requested for delivery in December 2018 – before the effective date of SOW1 -- a small number of units (666 units of 10 mg and 133 units of 2 mg). (Calafiore Decl. ¶ 41 n.2, Ex. C.)

March or April and part of the units it ordered on February 25, 2019. (*Id.* ¶ 42, Ex. C.) Thus, EAV issued the last P.O. that resulted in an actual sale on February 25, 2019. (*Id.* ¶ 43, Ex. C.) In contrast to its commitment to purchase 400,000 units each year from 2019-2021 for a total of 1,200,000 units, EAV purchased only 75,000 units. (*Id.* ¶ 46.)

The following chart from the Calafiore Declaration summarizes the history of EAV's P.O.s under SOW1:

| P.O. date and requested delivery | $ Total for all units | # 10 mg units | # 2 mg units | What Happened |
|---|---|---|---|---|
| 12/6/2018 (January delivery requested) | $205,000.00 | 5,000 | 10,000 | Sage delivered all units in tranches on 1/25/19, 2/1/19, and 2/13/19.[7] |
| 12/6/18 (February delivery requested) | $136,664.25 | 3,333 | 6,667 | EAV superseded this P.O. by issuing the February Revised P.O. |
| Undated Feb. Revised | $241,250.00 | 10,000 | 5,000 | Sage delivered all units in tranches on 3/4/19, 3/5/19, and 3/6/19. |
| 12/6/2018 (March delivery requested) | $205,000.00 | 5,000 | 10,000 | Sage delivered all units in tranches on 4/6/19 and 4/12/19. |
| 2/26/19 # 4116 (Q2 delivery requested) | $668,000.00 | 30,000 | 10,000 | EAV postponed delivery of 10,000 units of 10 mg Products in this order (and never requested those units later); Sage delivered all of the other units in this P.O in tranches on 5/8/19, 5/13/19, 5/21/19, 7/1/19, and 7/11/19. |
| 3/4/19 # 4118 (Q3 delivery requested) | $668,000.00 | 30,000 | 10,000 | EAV canceled |
| 3/4/19 #4119 (Q4 delivery requested) | $668,000.00 | 30,000 | 10,000 | EAV canceled |
| 4/25/19 #4138 (Q2 ADDL requested) | $74,926.00 | 2,496 | 2,496 | EAV canceled |
| **TOTALS PURCHASED** | $1,133,750.00 | 40,000 | 35,000 | Except for one quarter of 2019, EAV met none of the quarterly or annual Minimum Purchase Requirements. |

(*Id.* ¶ 45.)

---

[7] Sage's practice was to prepare invoices either on or soon after the date of delivery. The dates of delivery shown on this chart reflect the dates of invoices that Sage prepared. Thus, some of the actual deliveries may have preceded the dates shown. (Calafiore Decl. ¶ 42.b.)

## C.     EAV's Breaches and Repudiation of the Agreements

Within a few months of entering into these exclusive and substantial Agreements, EAV committed several breaches of the Minimum Purchase Requirements. (*Id.* ¶ 48) As shown above, in the first two quarters of the SOW1 Term, EAV purchased less than the minimum of 80,000 units (40,000 units per quarter). In each subsequent quarter, EAV breached the Minimum Purchase Requirements. (*Id.*) Furthermore, EAV breached the annual Minimum Purchase Requirement of 400,000 in 2019. (*Id.*) Indeed, although it issued P.O.s in March and April 2019, EAV canceled those orders and never issued any new orders after April 25, 2019. (*Id.* ¶¶ 45-46, Ex. C.)

By letter dated November 16, 2019, Sage notified EAV that it was in material breach of the Agreements by failing to meet the Minimum Purchase Requirements and by EAV's statements that it would not meet those requirements throughout the remainder of the SOW1 Term. (*Id.* ¶ 54, Ex. D.) EAV not only failed to cure these breaches, it retaliated by falsely accusing Sage of breach in a letter dated December 6, 2019. (*Id.* ¶ 55, Ex. E.) After sending the letter in December 2019, EAV proceeded to breach SOW1 again by failing to meet the Minimum Purchase Requirements for the fourth quarter of 2019, the first quarter of 2020, as well as the annual Minimum Purchase Requirement for 2019. (*Id.* ¶ 48.)

In a letter dated March 11, 2020, EAV purported to terminate the Agreements. (*Id.* ¶ 56, Ex. F.) EAV declared unilaterally at the end of this letter that "any further dealings between the parties will occur under a different arrangement." (*Id.*)

On April 1, 2020, Sage filed this action. (Doc. #1.) The Complaint includes claims for breaches of contract, anticipatory repudiation, and violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a et seq. (*Id.*)

**D.    Sage's Lost Profits**

Sage prepared a spreadsheet to show the past and anticipated revenues and costs that make up its lost profits.  (Calafiore Decl, ¶ 60, Ex. G.)[8]  The spreadsheet divides the presentation chronologically into two categories:  actual revenues and costs through July 2019, and projected revenues and costs through the remainder of the Agreements.  (*Id.*)

**Revenues**:  The revenue portion of the spreadsheet is almost self-explanatory. The actual revenues of $1,133,750 reflect the 75,000 units that EAV purchased through July 2019:  40,000 units of 10 mg at $18.50 per unit = $740,000, plus 35,000 units of 2 mg at $11.25 per unit = $393,750; $740,000 plus $393,750 equals $1,133,750.  (*Id.* ¶ 60.a.)  The *projected* revenues begin in August 2019 and reflect the annual Minimum Purchase Requirement of 400,000 units, divided evenly between 10 mg and 2 mg units.  (*Id.* ¶ 60.b.)  Thus, in projecting revenues based upon expected purchases, the spreadsheet relies on two reasonable/conservative assumptions:  (a) the amount of Products that EAV would buy would be equal to, but not greater than, the Minimum Purchase Requirements; and (b) EAV would purchase an equal number of units of each size, 2 mg and 10 mg.  The first assumption rests on the language of Paragraph 2 of SOW1.  (*Id.* ¶ 33, Ex. B at ¶ 2.)  The second assumption rests on the fact that, despite EAV's brief and erratic history of ordering Products, the actual number of each sized unit that EAV received was fairly close – *i.e.*, 40,000 units of 10 mg and 35,000 units of 2 mg.  (*Id.* ¶ 60.a.)

---

[8] Under Or. Rev. Stat. § 72.7080(2), a seller of specialty goods is entitled, upon the buyer's breach of contract, to recover "the profit (including reasonable overhead) which the seller would have made from full performance by the buyer . . . ."  The wording of this section of the UCC § 2-708(2), has caused confusion in some, but it means "profit without subtracting overhead."  1 White, Summers, & Hillman, *Uniform Commercial Code* § 8:21 (6th ed.).  In other words, this provision allows the seller to recover the "contract price less variable expenses." R.R. Anderson, 1 *Damages Under UCC* § 5:11 (Aug. 2019 update).

**Uptake Royalty**:  The "royalty" portion of the spreadsheet reflects the arrangement in which Sage paid the supplier of Uptake a percentage of the gross revenues from its sales to EAV.  (*Id.* ¶¶ 60.c.)  The "royalty" covers the costs of this ingredient; EAV owns the name "Uptake," which it trademarked.  (*Id.* ¶¶ 13, 60.c.)  Through July 2019, the royalty portion shows the actual amounts that Sage paid based on actual revenues it received; for the period beginning August 2019, the royalty entry identifies the projected amounts Sage would have had to pay based on the projected revenues.  (*Id.* ¶ 60.c.)

**Variable and Direct Costs**:[9]  The "cost of goods sold" and "other costs" sections of the spreadsheet identify the variable and direct costs associated with producing the Products for delivery to EAV.  (*Id.* ¶ 60.d.)  Through July 2019, the amounts shown are the "actual' costs associated with the Products delivered to EAV, plus a small amount of unused materials.  (*Id.* ¶ 60.e.)  The projected costs extrapolate from the actual costs with one exception:  the costs of the most-expensive ingredient, CBD oil, have been adjusted to reflect information known at the times of EAV's breaches and repudiation of the Agreements.  (*Id.* ¶ 60.f.)  In particular, the cost of CBD oil dropped precipitously in the later part of 2019 through the time of EAV's attempt to terminate the Agreements in March 2020.  (*Id.* ¶ 60.g.)[10]  Accordingly, in estimating Sage's lost profits for the 4th quarter of 2019, the spreadsheet uses a price of $3,000 per kg for CBD oil, and

---

[9] *See* R.R. Anderson, 1 *Damages Under UCC* § 5:11 (Aug. 2019 update) ("The calculation of the profit portion of the Section 2-708(2) formula, then, is contract price less variable expenses."); *id.* § 5:09 ("A computation of the contract price less the total variable or direct expenses will produce the profit (including reasonable overhead) figure contemplated by the formula.").

[10] *See, e.g.,* Kristine Owram, *Hemp Prices Plunge as CBD Demand Falls Short: Cannabis Weekly*, Bloomberg (Jan. 26, 2020), https://www.bloomberg.com/news/articles/2020-01-26/hemp-prices-plunge-as-cbd-demand-falls-short-cannabis-weekly ("Hemp biomass prices reached a high of over $40 a pound in July, just before the 2019 harvest came in, according to PanXchange Chief Executive Officer Julie Lerner. Today, it's trading under $10 a pound following a quadrupling of supply from 2018 to 2019.").

thereafter it uses a price of $1,500 per kg for CBD oil. (*Id.* ¶ 60.h.)  These are conservative

estimates:  Sage likely could have obtained CBD oil from suppliers at lower prices at these

times.  (*Id.*)

One other item shown on the spreadsheet warrants specific mention.  As reflected in

paragraph 4 of SOW1, EAV advanced $250,000 to Sage in return for a credit equal to the

$250,000 principal amount plus an additional $62,500.  (*Id.* ¶ 60.i.)  The spreadsheet shows the

effect of $62,500 credit as reducing Sage's lost profits in Q3 and Q4 of 2019; since the advance

and repayment of the $250,000 in principal effectively cancel each other out, they have no effect

on Sage's lost profits and appear only in a footnote on the spreadsheet.  (*Id.* ¶ 60.j.)

Based on the more detailed spreadsheet, an annual summary of the profits that Sage lost

because of EAV's breaches and repudiation is as follows:

|  | Aug.-Dec. 2019 | 2020 | 2021 |
|---|---|---|---|
| **Revenues**[11] | $4,816,250 | $5,950,000 | $5,950,000 |
| **Uptake Royalties** | $240,812 | $297,500 | $297,500 |
| **Variable and Direct Costs** | $1,745,876 | $1,856,372 | $1,856,372 |
| **Credit to EAV (SOW1)** | $62,500 | | |
| **Lost Profit** | $2,767,062 | $3,796,128 | $3,796,128 |

To secure the relief sought in the Complaint, plaintiff respectfully requests that the Court

award a prejudgment remedy in the amount of $10,359,320.[12]

----

[11] In all years, the projected Revenues reflect the minimum purchase requirements
(400,000 units per year), divided evenly between 2 mg units and 10 mg units.  The Revenues
projected from August through December 2019 also reflect the difference between the minimum
purchase requirements and the actual revenues from January through July 2019.

[12] The total of $10,359,320 appears in the spreadsheet attached to the Calafiore
Declaration.  Differences in rounding may result in immaterial differences in this total.  For
example, the total of the rounded numbers in the annualized chart shown above for all three
years is $10,359,318.

# ARGUMENT

## A.    To Obtain a Pre-Judgment Remedy, Sage Need Only Show Probable Cause

Rule 64 of the Federal Rules of Civil Procedure provides in part that "[a]t the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64(a). Likewise, Local Rule 4(c) further provides, in relevant part, that "a party may secure a pre-judgment remedy ("PJR"), as permitted by, and in accordance with, the law of the State of Connecticut." D. Conn. L. Civ. R. 4(c). Accordingly, the Connecticut prejudgment remedy statute applies in Connecticut federal courts. *See, e.g.*, *New Eng. Health Care Emps.' Welfare Fund v. iCare Mgmt., LLC*, 792 F. Supp. 2d 269, 274 (D. Conn. 2011).

"[T]he purpose of a prejudgment remedy . . . is to serve as security for the satisfaction of the plaintiff's judgment, should he obtain one." *TES Franchising, LLC v. Feldman*, 286 Conn. 123, 148 (2008) (citations and internal quotations omitted). Thus, the Connecticut prejudgment remedy statute is "primarily designed to forestall any dissipation of assets by the defendant and to bring them into the custody of the law to be held as security for the satisfaction of such judgment as the plaintiff may recover." *Id*. The statute provides:

> If the court, upon consideration of the facts before it and taking into account any defenses, counterclaims or set-offs, claims of exemption and claims of adequate insurance, finds that the plaintiff has shown probable cause that such a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought and finds that a prejudgment remedy securing the judgment should be granted, the prejudgment remedy applied for shall be granted as requested or as modified by the court.

Conn. Gen. Stat. § 52-278d. Thus, applications for prejudgment remedies "shall be granted" whenever there is "probable cause that . . . a judgment will be rendered in the matter in the

plaintiff's favor in the amount of the prejudgment remedy sought." Conn. Gen. Stat. § 52-278d(a).

Probable cause is a "low standard." *Shaumyan v. O'Neill*, 987 F.2d 122, 125 (2d Cir. 1993). To establish probable cause is "not as demanding as proof by a fair preponderance of the evidence." *United of Omaha Life Ins. Co. v. Conn. Student Loan Found.*, 718 F. Supp. 2d 277, 285 (D. Conn. 2010). The plaintiff need only show that there is a ***probability*** that it will prevail; not that it is certain to prevail. The Court's role, therefore, is to "determine probable success by weighing probabilities." *Bank of Boston Conn. v. Schlesinger*, 220 Conn. 152, 156 (1991). A probable cause finding requires only "a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." *N. England Land Co. v. DeMarkey*, 213 Conn. 612, 620 (1990).

## B. Probable Cause Exists that a Judgment of At Least $10,359,320 Will Enter in Sage's Favor

The Declaration and exhibits supporting this application show that (a) EAV breached the Minimum Purchase Requirements, (b) EAV repudiated the Agreements, and (c) EAV's misconduct has seriously damaged Sage. At EAV's urging and based on the Agreements, Sage ramped up and built the capacity to satisfy the Minimum Purchase Requirements. (Calafiore Decl. ¶ 37.) Within a matter of months of signing these written contracts, however, EAV abandoned its obligations and threw Sage into financial distress. (*Id.* ¶ 48.) Then, instead of curing its breaches, EAV compounded them by wrongly attempting to terminate the Agreements and declaring that "any further dealings between the parties will occur under a different arrangement." (*Id.* ¶ 56, Ex. F.)

### 1. Probable cause exists to conclude that EAV breached the Agreements and violated CUTPA

EAV first breached the Agreements by failing to meet its commitments under the Minimum Purchase Requirements. Indeed, the evidence is irrefutable that EAV failed to meet its obligation to purchase: (a) a minimum of 40,000 units of the Products every quarter; and (b) a minimum of 400,000 each year in 2019, 2020, and 2021. EAV purchased only 75,000 units in the first part of 2019, and then nothing. (Calafiore Decl. ¶ 46.) By failing to meet the Minimum Purchase Requirements in three out of four quarters in 2019 as well as that year's annual minimum, EAV materially breached the Agreements four times in the first year of the three-year term.

In March 2020, EAV compounded its ongoing breaches of the Agreements by purporting to send a notice of termination without proper cause under the Agreements. (*Id.* ¶ 56, Ex. F.) EAV's notice letter does not identify any section of the MESA or SOW1 to support this action, and no provision in those Agreements applies. Unlike some contracts, nothing in the Agreements allowed EAV to terminate without cause or for its own convenience. Paragraph 13 of the MESA addresses termination. Paragraph 13.1 allows either party to terminate for material breach, after the non-breaching party sends a notice specifying the breach and allowing the other party to cure. Sage did not breach the Agreements, however. Moreover, even if EAV's December 6, 2019 letter had met the requirements of paragraph 13.1 (it did not), the cure period would have been intact when EAV purported to terminate. Furthermore, as discussed more fully below, none of the triggering events specified in Paragraph 13.2(b)-(f) took place.

Thus, EAV beached and then anticipatorily repudiated the Agreements. *See* Or. Rev. Stat. § 72.6100. EAV also sought to leverage Sage's financial distress to restructure the parties' commercial relationship on terms more favorable to EAV by purporting to terminate the MESA

and informing Sage "that any further dealings between the parties will occur under a different arrangement." (Calafiore Decl. ¶ 56, Ex. F.))  In so doing, EAV has anticipatorily repudiated the Agreements. *See* Or. Rev. Stat. § 72.6100.

Moreover, by inducing Sage to invest substantial capital in reliance on the Minimum Purchase Requirements, abandoning its obligations, asserting non-existent rights to terminate, and attempting to force Sage to accept a "different agreement," EAV acted unethically in the course of its trade or business, and thereby violated the Connecticut Unfair Trade Practices Act. Conn. Gen. Stat.  Conn. Gen. Stat. § 41-110b(a); *see Geiger v. C&G of Groton, Inc.*, 424 F. Supp. 3d 276, 295 (D. Conn. 2019).  Accordingly, probable cause exists for Sage's breach of contract and CUTPA claims against EAV.

> **2.      Probable cause exists to conclude that Sage will be entitled to recover its lost profits**

The Agreements provide that Oregon law governs.  (Calafiore Decl., Ex. A ¶ 15.9)  Oregon has adopted Article 2 of the Uniform Commercial Code ("UCC") for contracts for the sale of goods.  Or. Rev. Stat. § 72.1020.  Under the UCC, the usual measure of damages to a seller of goods consists of the difference between the contract price and the market price.  OR. Rev. Stat. § 72.7080(1).  The UCC applies a different measure of damages, however, to contracts like the Agreements that provide for the sale of specialty goods – namely, the seller is entitled to recover the profits lost as a result of the buyer's breach and/or repudiation.  Or. Rev. Stat. § 72.7080(2).  As the Third Circuit explained:

> Contract market damages are inadequate in cases involving specialty items because of the difficulty in reselling unique products that have been manufactured for and have special value to certain buyers.

*Tigg Corp. v. Dow Corning Corp.*, 962 F.2d 1119, 1130 (3d Cir. 1992); *see also Purina Mills, L.L.C. v. Less*, 295 F. Supp. 2d 1017, 1047-48 (N.D. Iowa 2003).  Moreover, lost profits also measure the damages where the goods remain to be made, as one leading treatise explained:

> When the buyer repudiates a contract for goods which have not yet been manufactured by the seller, the latter's damages are determined by U.C.C. § 2-708(2), which provides broadly that the measure of damages is the net profit that the seller would have made from full performance if there had been no anticipatory repudiation.

*Anderson U.C.C.* § 2-708:50 (3d. ed.) (footnote omitted).

For example, in *M & G Polymers USA, LLC v. Carestream Health, Inc.*, No. CIV.A.07C-11-242PLA, 2010 WL 1611042, at *43 (Del. Super. Ct. Apr. 21, 2010), *aff'd sub nom. Carestream Health, Inc. v. M&G Polymers USA, LLC*, 9 A.3d 475 (Del. 2010), the plaintiff produced a resin to the defendants' specifications, and the parties agreed that the plaintiff would supply an annual volume of the resin in a range between set minimum and maximum amounts. 2010 WL 1611042, at *4 (the agreement "created both a ceiling and a floor for demand for each year of the contract").  The defendant-buyer breached by failing to purchase the minimum quantities required in the contract.  After a jury awarded the plaintiff-seller $15.5 million in lost profits, the defendant complained that the plaintiff failed to introduce evidence of the difference between the contract price and the market price.  The Court rejected this post-judgment challenge, noting lost profits were the appropriate measure of damages because the resin unquestionably was a specialty good.  *Id.*, at *43.  Furthermore, the Court added a second reason that lost profits was the proper measure of damages:  "this was an incomplete or unfinished goods situation in which [the buyer] breached the Supply Agreement before production of the PET resin was completed or undertaken."  *Id.*

Similarly, the appropriate measure of Sage's damages consists of its lost profits, because the Products are unquestionably specialty goods and because EAV breached the Agreements

before Sage completed production of the vast majority of the Products.[13]  EAV specifically chose

the type of applicator and formula for CBD oil with Uptake that it wanted to use for the

Products.  (Calafiore Dec. ¶¶ 25, 28-29.)  Thus, like the resins at issue in *M & G Polymers*, the

products were custom-made, specialty goods, not commodities easily sold to others.  *Id.* *43-*44

(resin produced under a formulation the buyer specified was a specialty good); *see also SEC*

*Am., LLC v. Marine Elec. Sys., Inc.*, 191 Vt. 541, 544, 39 A.3d 1054, 1058 (2011) (where the

contract required the seller to provide an electronic component for use in military jamming

devices, "[t]here was ample evidence . . . [the products were] sufficiently unique that there was

no standard resale market, so that the court's reliance on § 2–708(2) was justified.) (citation

omitted).  Accordingly, the appropriate measure of Sage's damages consist of its lost profits.  Or.

Rev. Stat. § 72.7080(2).

　　　In *SEI Fuel Servs., Inc. v. A&J Gas & Convenience, LLC*, No. 3:18-CV-1553(AWT),

2019 WL 6828431 (D. Conn. Dec. 13, 2019), Magistrate Judge Richardson addressed a similar

request by a seller of goods for a prejudgment remedy against a defaulting buyer, measured by

the seller's lost profits – though lost profits were the appropriate measure in that case for a

different reason.  Judge Richardson determined that it was appropriate to measure the plaintiff's

damages in that case based on its lost profits for the undelivered petroleum, because of the

pricing structure of the parties' agreement meant that "the difference between the market price, if

one is even calculable given the circumstances, and the unpaid contract price would be

inadequate to place the plaintiff in as good a position as performance would have done."  *Id.* at

*8.  Having contracted to purchase 9,000,000 gallons of petroleum, the buyer defaulted with

---

[13] Lost profits are also appropriate measure of damages for a third reason:  the
Agreements are "requirements contracts," where the buyer agreed that the seller would be its
exclusive supplier of these goods.  *See Luminara Worldwide, LLC v. Liown Elecs. Co.*, No.
14CV03103SRNFLN, 2017 WL 1064887, at *4 (D. Minn. Feb. 27, 2017).

1,374,752 gallons remaining on its commitment. *Id.* at *5. Accordingly, Judge Richardson granted a prejudgment remedy in favor of the plaintiff for the profits it lost from the buyer's failure to meet its purchase commitments, attorney's fees, and other relief. *Id.* at *10. Likewise, Sage should receive a prejudgment remedy to secure its claims for lost profits in this action.

In its Motion to Dismiss, however, EAV argues that MESA Paragraph 12 proscribes liability for lost profits. Doc. #19 at 17. Sage demonstrated in its opposition memorandum that EAV's arguments rely on a misreading of MESA Paragraph 12 and a misunderstanding of the difference between direct and consequential damages. Doc. #24. To avoid duplication, Sage incorporates the arguments it presented in pages 12-24 of its opposition memorandum, which made the following points:

- Lost profits can measure either the direct damages awarded to a seller under UCC § 2-708(2) or consequential damages to a buyer under UCC 2-715.[14] Under the UCC and Oregon common law, the lost profits that the seller would have earned as the benefit of the bargain in the primary contract constitute direct, not consequential damages (*see* Doc. #24 at 12-16);

- MESA Paragraph 12 proscribes liability for five categories of damages (incidental, consequential, special, exemplary, and punitive damages). Paragraph 12 creates no immunity from direct, statutory, or other damages not included in the five categories. The wording and syntax of Paragraph 12 make clear the parties' intent to exclude liability for lost profits only insofar as they reflect consequential or other excluded damages, not when lost profits constitute direct damages. (Doc. #24 at 17-24) (*citing, inter alia, Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151 (10th Cir. 2007) (Gorsuch, J.));

- Nothing in MESA Paragraph 12 proscribes Sage's right to recover the lost profits that measure its direct damages under Or. Rev. Stat. § 72.7080(2).

Doc. #24 at 12-24.

---

[14] *Calbag Metals Co. v. Guy F. Atkinson Co.*, 95 Or. App. 514, 518, 770 P.2d 600, 602 (1989) ("Buyer seeks the profits that it allegedly lost because it was unable to obtain the scrap for resale. Lost profits are consequential damages under ORS 72.7150(2).").

In its Reply Memorandum in Support of Dismissal, EAV attempted to respond to Sage's points by offering a series of unpersuasive arguments. *See* Doc. #25. First, EAV contended that Oregon law permits parties to agree by contract to restrict liability to each other. *Id.* at 4 (citing *K-Lines, Inc. v. Roberts Motor Co.*, 273 Or. 242, 248 (1975).) The case EAV invokes, *K-Lines*, does stand for the proposition that, depending "upon the subject and terms of the agreement and the relationship of the parties," parties may contractually restrict their liability in tort. *Id.* at 248; *see also Am. Wholesale Prod. v. Allstate Ins. Co.*, 288 Or. App. 418, 423, 406 P.3d 163, 166 (2017) (emphasizing the need for the parties to express their intent clearly and unequivocally for a disclaimer of tort liability to be effective). The issue, however, is not whether the parties were able by agreement to exclude liability for lost profits, but whether they actually did.

Sage's Brief in Opposition to the Motion to Dismiss discussed the language and meaning of MESA Paragraph 12 in detail, including then Judge Gorsuch's textual analysis in *Penncro* of a nearly identical provision; by contrast, EAV relies only on its own, conclusory say-so. *Compare* Doc. #24 at 17-24 *with* Doc. #25 at 4. The wording of MESA Paragraph 12 makes clear that it excludes liability for five categories of damages; lost profits fall within the scope of the exclusion only when measuring an excluded category of damage. MESA Paragraph 12 creates no categorical exclusion for lost profits or any other type of loss.

In its reply in support of the Motion to Dismiss, EAV also advanced a novel and untenable syllogism that runs as follows: (a) because Sage had no other customers, the only damages it could ever suffer were direct, not consequential; (b) MESA Paragraph 12 expressly covers both parties and refers, among other things, to loss of profits; therefore (c) EAV must be exculpated from Sage's lost profits, even where, as here, they measure *direct* damages, because

otherwise the exclusion would not benefit EAV and, thus, be meaningless. *See* Doc. #25 at 4. There are too many holes in this argument to list them all, but a few will suffice.

First, regardless of whether it had only one customer or many, Sage certainly could suffer consequential damages. For example, if Sage claimed it needed to borrow money because of EAV's breaches and sought to recover as damages the interest it paid to the lender, EAV would be the first to contend that Paragraph 12 excludes those consequential damages. *See, e.g.*, *Axiall Corp. v. Descote S.A.S.*, No. CV 15-250, 2017 WL 2608618, at \*5 (W.D. Pa. June 16, 2017) (discussing interest paid to a third party as consequential damages). Similarly, if Sage claimed that EAV's breaches and repudiation impaired Sage's ability to expand into the market for CBD products for humans, once again EAV would rely on Paragraph 12 to disclaim liability for those consequential damages.

Second, no rule of construction or basic logic dictates that, just because an exculpatory clause covers both parties and lists multiple elements, each and every item mentioned in that clause must apply to each party. MESA Paragraph 12 identifies five categories of excluded damages ("incidental, special, consequential, exemplary, and punitive"). All that is needed for this provision to have meaning and effect is for each category of damages to apply to at least one of parties in some circumstance. Moreover, the supposed rule of contractual symmetry that would require the Court to read Paragraph 12 expansively to benefit EAV by adding an exclusion for lost profits as direct damages does not exist. Indeed, EAV's attempt to read into Paragraph 12 an implied exclusion for Sage's direct damages conflicts directly with Oregon public policy, which disfavors limitations of liability and, accordingly, requires clear and explicit language. *Grove City Veterinary Serv., LLC v. Charter Practices Int'l, LLC*, No. 3:13-cv-02276-

AC, 2016 WL 8731781, at *12 (D. Or. Feb. 5, 2016), *report and recommendation adopted* 2016

WL 8711508 (D. Or. Mar. 11, 2016).

       Third, grammar and syntax eviscerate EAV's argument.  EAV completely reverses the

significance and roles of the clauses and phrases in Paragraph 12, causing the tail to wag the dog.

The grammatical structure of Paragraph 12 is as follows:

| Independent clause (key noun highlighted) | "neither party shall be liable . . . for incidental, special, consequential, exemplary or punitive **damages**" |
|---|---|
| Dependent prepositional phrases that serve as adjectives by modifying "damages" (with the prepositions italicized and objects highlighted) | "*of* any **kind**"<br><br>"*including*,[15] without limitation, **loss** of profits, goodwill, time, savings or revenue." |

Thus, the language of Paragraph 12 inextricably connects the dependent prepositional phrase

"including . . . loss" to "damages," the word that phrase modifies.  EAV, however, separates

"loss" from the five categories of "damages" and even converts this phrase into an independent

clause that expands the categories of excluded damages to encompass *direct* damages.  *See* Doc.

#25 at 4.  By severing the object of a prepositional phrase, "loss," from the noun the phrase

modifies, "damages," EAV "violates basic grammar rules."  *Tripwire, Inc. v. Murchison*, No.

3:17-CV-00180-SB, 2018 WL 1369912, at *2 (D. Or. Mar. 16, 2018).  To exclude lost profits

categorically, the parties would have used a parallel, not dependent, structure (*e.g.*, "neither party

shall be liable . . . for incidental . . . and punitive damages of any kind <u>or</u> loss of profits . . . .").[16]

---

[15] The word "including" is a marginal preposition, formed from the verb "include."  Ed Good, *Preposition*, GRAMMAR, *available at* https://www.grammar.com/preposition (last visited July 6, 2020).  Like every preposition, it "serves as a dab of glue, sticking a noun, a group of words acting as a noun, or a pronoun onto the sentence."  *Id.*

[16] *See, e.g., Davis v. Overland Contracting, Inc.*, No. 19-2531-DDC-KGG, 2020 WL 1974259, at *13-*14 (D. Kan. Apr. 24, 2020) (where limitation on liability listed lost profits in

Fourth, if, as EAV contends, Paragraph 12 categorically excludes liability for all lost profits, it would also exclude liability for *every* type of loss, because Paragraph 12 expressly covers all types of loss ("including, *without limitation*, loss of profits, goodwill, time, savings or revenue"). (Calaifore Decl. Ex. A at ¶ 12.) (italics added). Thus, EAV's interpretation of "loss of profits" as part of a categorical exclusion for "loss" in Paragraph 12 would eliminate the ability of either party to recover for any loss. However appealing that comprehensive immunity may now appear to EAV, as the party that breached the Agreements repeatedly, this reading finds no support in the language of Paragraph 12 or elsewhere. To interpret Paragraph 12 as a barricade against liability for any loss would deprive Sage of every benefit of this bargain, making the contract fail of its essential purpose. *See, e.g.*, *Tokyo Ohka Kogyo Am., Inc. v. Huntsman Propylene Oxide LLC*, 35 F. Supp. 3d 1316, 1327 (D. Or. 2014) ("Where . . . one party has been deprived of the substantial value of its bargain, the limitation on remedy fails of its essential purpose, and Section 7–219(2) operates to void that limitation.").

For all of these reasons and those set forth in Sage's Opposition to the Motion to Dismiss, EAV's contention that MESA Paragraph 12 immunizes it from liability for Sage's lost profits is entirely without merit.

### 3. Probable cause exists that a judgment will enter in favor of Sage in an amount of at least $10,359,320

EAV's obligations under the Agreements remain largely unfulfilled, because EAV breached early and often and then entirely disclaimed its promises. Of its commitment to buy

---

parallel to other types of damages, separated by the word "or," the provision applied to "loss of profits generally, and not merely as a form of consequential damages."); *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1158 & n. 8 (10th Cir. 2007)(distinguishing, among other cases, "*Imaging Sys. Intern., Inc. v. Magnetic Resonance Plus, Inc*., 227 Ga.App. 641, 490 S.E.2d 124, 127 (1997) (lost profits set off from consequential damages by disjunctive 'or'); *CompuSpa, Inc. v. IBM*, 228 F.Supp.2d 613, 626 (D .Md. 2002) (same).")

105936077.3

1,200,000 units (the annual Minimum Purchase Requirement of 400,000 units for each of the 3 years), EAV purchased only 75,000 units, leaving almost 94% of its obligations unfulfilled. Moreover, while EAV was breaching and wrongly repudiating them, the Agreements became increasingly profitable to Sage, because of sharp declines in the price of CBD oil.  (Caliafiore Decl. ¶ 60.g.)  Consequently, Sage's lost profits from EAV's breach are substantial.

As described above and in the Declaration of Richard Calafiore and the attached exhibits, EAV's breaches coincided with a glut in the market for CBD oil and a corresponding drop in Sage's costs of goods sold.  (*Id.*)  Indeed, at a point when the Agreements became even more profitable to Sage, EAV anticipatorily repudiated all of its purchasing commitments.  Attached to the Calafiore Declaration is a spreadsheet showing Sage's lost profits in detail for each quarter of the term of the Agreements.  (*Id.* ¶ 60, Ex. G.)  As shown in the spreadsheet and summarized in the Statement of Facts above, Sage suffered substantial lost profits.

Based on the foregoing, there is probable cause that EAV will be held liable to Sage in an amount not less than $10,359,320.

### 4.     EAV's defenses are without merit

In considering an application for a prejudgment remedy, "the court must evaluate not only the plaintiff's claim but also any defenses raised by the defendant." *Roberts v. TriPlanet Partners, LLC*, 950 F. Supp. 2d 418, 421 (D. Conn. 2013) (quoting *Haxhi v. Moss*, 25 Conn. App. 16, 20 (1991)).  Like its claimed immunity from lost profits, EAV's attempted justifications for its breaches and repudiation of the parties' Agreements cannot withstand scrutiny.  EAV asserted these defenses in a letter to Sage dated December 6, 2019, which it cited in its March 11, 2020 letter to support a supposed right to terminate the Agreements.  (Calafiore Decl. ¶¶ 55-56, Exs. E & F.)  For example, EAV claims that the Products were defective in that some

unstated number of them, at some point developed air bubbles that impeded the Pen from dispensing the CBD Gel. (*Id.*, Ex. E.)  Along similar lines, EAV claims Sage breached Paragraph 13.2(b) by failing to introduce a "version 2" of the Pen within six months of executing the MESA. (*Id.*)  EAV also claims that Sage delivered the products with sell-by dates that were not commercially viable and that it failed to deliver 85% of the 10 mg units within six months. (*Id.*)  Factually, none of these allegations are true, and contractually none justifies EAV's purported termination of the Agreements.

The Agreements provide for a minimum three-year term, with the possibility of extension, and with no right to terminate in advance for convenience.  (*Id.*, Ex. A at ¶¶ 2, 13.)  MESA Paragraph 13(b) does allow an earlier termination for cause, but only under narrow and specific circumstances.  EAV contended in its December 6, 2019 letter that Sage "violated the provisions of the [MESA] regarding quality," thus, warranting termination under MESA Paragraph 13(b).  (*Id.*, Ex. E.)  Contrary to EAV's selective paraphrasing, however, Paragraph 13(b) actually provides:

> Where Seller has adulterated any Product sold to Purchaser or has **otherwise willfully violated** the provisions of this Agreement regarding quality, or, without Purchaser's permission, has substituted or added, with respect to any instruction, specification, formula, manufacturing process or quality control standard or any procedure set forth in this Agreement or any Statement of Work, an ingredient, component, process or procedure not called for thereby, or has altered or omitted an ingredient, component, process or procedure called for thereby which, in any such case, results in a Products being sold to Purchaser that is not in compliance with a Statement of Work.

(*Id.*, Ex. A at ¶ 13(b).) (emphasis added).  Accordingly, to justify early termination for cause under MESA Paragraph 13(b), EAV would need to establish a <u>willful</u> violation on Sage's part. Unable to meet this exacting standard, EAV simply ignores the adverb "willfully" in Paragraph 13(b).  And, instead of citing to any *contractual* standards of quality, EAV's December 6, 2019 letter points merely to certain correspondence exchanged between the parties.  (*Id.*, Ex. E.)  The

reason for EAV's selectivity is simple: EAV cannot meet its burden of showing that Sage has

willfully violated any provision of the Agreements concerning quality.

Two sections of the MESA potentially address the quality of the CBD Animal Products

that Sage provides: (a) paragraph 10, in which Sage warrants that the products will be free of

defects as of the date of delivery; and (b) certain provisions in Paragraph 7 that refer to possible

product specifications.[17]  As discussed below, the provisions in Paragraph 7 are designed to

incorporate by reference specifications that would be located in certain other documents, but

those documents do not include any specifications.

Paragraph 10 of the MESA provides in part as follows:

> **WARRANTIES**. Seller warrants that all Products shall be free from defects in material
> and workmanship and shall conform to the standards set forth in a Statement of Work.
> Seller warrants that there are no third-party intellectual property rights, including but not
> limited to patent, trade secret, or copyright rights, that would be infringed upon by the
> manufacture, use, and sale of the Products to be supplied to Purchaser hereunder.
> **EXCEPT AS PROVIDED HEREIN, THE PRODUCTS ARE PROVIDED "AS IS,"
> WITHOUT ANY WARRANTIES OR REPRESENTATIONS, EXPRESS,
> IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION,
> WARRANTIES OF QUALITY, PERFORMANCE, MERCHANTABILITY OR
> FITNESS FOR A PARTICULAR PURPOSE, NOR ARE THERE ANY
> WARRANTIES CREATED BY A COURSE OF DEALING, COURSE OF
> PERFORMANCE OR TRADE USAGE. THE FOREGOING EXCLUSIONS AND
> DISCLAIMERS ARE AN ESSENTIAL PART OF THIS AGREEMENT AND
> FORM THE BASIS FOR DETERMINING THE UNIT PRICES FOR THE
> PRODUCTS**. . . .

(*Id.*, Ex. A at ¶ 10.) (emphasis in original).  Aside from containing significant limitations,

including eliminating any implied warranties and indicating that the Products are otherwise sold

"as is," this paragraph expresses only two warranties: (a) that the CBD Animal Products would

be free of defects on delivery; and (b) that the manufacture, sale, and use of the CBD Animal

---

[17] MESA Paragraph 7.9, which is not a warranty, does impose obligations on Sage under
certain circumstances involving a governmental recall or seizure of the Products. (Calafiore
Decl., Ex. A at ¶ 7.9.)

Products would not infringe on the intellectual property rights of others.  EAV has not and cannot claim that the Products infringe the intellectual property rights of others.  Although EAV has asserted that Sage violated the warranty that the products will be free of defects on delivery, EAV cannot substantiate that accusation.

The timing of the warranty that the CBD Animal Products "shall be free from defects" is important.  This provision does not guaranty any type of performance after delivery or refer to any period of duration or future event or date.[18]  Thus, as a matter of law, this warranty applies only as of the date of delivery.  Or. Rev. Stat. § 72.7250(2) ("A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to *future* performance of the goods and discovery of the breach must await the time of such performance . . .") (emphasis added); *see, e.g.*, *Torch v. Windsor Surry Co.*, No. 3:17-CV-00918-AA, 2019 WL 6709379, at *9 (D. Or. Dec. 9, 2019) (seller's "representation that a product 'provides durability and long term performance' is too vague to warrant future performance," because it did not "denote a specific point in the future through which the product should be expected to perform."); *Hunter v. Woodburn Fertilizer, Inc.*, 208 Or. App. 242, 247, 144 P.3d 970, 974 (Or. App. 2006) (explaining earlier cases holding that warranties that grapes were "Phylloxera Free" and that wood products were "free from defects" were not warranties of future performance).  Moreover, Paragraph 10's warranty about the status of the goods upon delivery corresponds to EAV's right, as "Purchaser," under Paragraph 6.6 to reject the CBD Animal Products "that have not been delivered in accordance with the terms and conditions of this Agreement and any Statement of Work ('**Nonconforming Product**')."  (Calafiore Decl., Ex. A ¶ 6.6.)  Thus, Sage

---

[18] Arguably, the warranty that the goods will not infringe intellectual property rights of others operates differently, because it refers to an event after the delivery date – namely, the "use" of the products.

warranted the condition of the Products only on the date of delivery and made no warranties regarding the quality, performance, or other characteristics of the Products at any subsequent time.

In addition to Paragraph 10, the parties' contractual documents left open the possibility that some product specifications or standards might apply, but the parties never actually filled that opening.[19] The path to any potential standards or specifications begins in three paragraphs of the MESA:

- MESA Paragraph 6.6 refers "Products that have not been delivered in accordance with the terms and conditions of this Agreement and any Statement of Work ('Nonconforming Product')."

- MESA Paragraph 7.2 provides that "the Products shall be in compliance in all material respects with the specifications and formulas set forth in a Statement of Work."

- MESA Paragraph 7.8 requires Sage to give notice to EAV of delivery of any Nonconforming Products (as defined in MESA Paragraph 6.6).

(*Id.*, Ex. A ¶¶ 6.6, 7.2, 7.8.) Although these provisions refer to the statement of work, the only portion of SOW1 that refers to product specifications or standards, including as to quality, is Paragraph 3, which provides: "Product Standards: Product Standards shall be agreed to in a Product Order." (*Id.*, Ex. A ¶ 3.) EAV's Product Orders are silent about any product standards, specifications, or qualities, however. The Product Orders list only the quantity and price of the goods in each respective size (2 mg and 10 mg), as well as the requested timeframe for delivery. (*See id.*, Ex. C.) Accordingly, aside from MESA Paragraph 10 discussed above, the contractual documents do not identify any product specifications or standards. In other words, EAV's

---

[19] MESA Paragraph 1.3 provides: "Each Statement of Work may be accompanied by one or more product orders (each a 'Product Order') which shall set forth the mutually agreed to terms upon which the Products set forth in a Statement of Work shall be purchased and delivered."

complaints about quality have no contractual footing, which explains why it cites to extraneous correspondence in its letter in hopes of importing non-contractual elements into the Agreements.

Furthermore, the product complaints that EAV presents in its December 6, 2019 letter are without merit. EAV contends in particular that: (a) the sell-by dates of some of the Products were not "commercially viable;" (b) Sage supposedly should have offered a redesigned applicator; and (c) over time air bubbles could develop in some Products and impede the operation of the Pen. (*See id.*, Ex. E.) The Agreements say nothing about any of these purported obligations on Sage's part. If EAV wanted to include these supposed requirements in the parties' Agreements, it should have raised these points *before* it signed SOW1, not after it had breached the Agreements and wanted a pretext to terminate the parties' contract. Sage made no warranties about the future performance of the Products; the only warranties that Sage made apply to the condition of the Products at the time of delivery, with EAV having the corresponding opportunity to inspect and return any non-conforming goods. Indeed, the parties expressly agreed that otherwise the goods were sold "as is," and that all of the terms of their agreement were in the contractual documents. (*See id.*, Ex. A at ¶¶ 6.6, 10.)

The limitations of Sage's obligations and warranties are critically important because, among other reasons, SOW1 and the MESA form "the entire and exclusive agreement between the parties" relating to the Products. (*Id.*, Ex. A at ¶ 15.7.) Moreover, MESA Paragraph 10 – quoted above – expressly disclaims any warranties, express or implied, arising by law or "created by a course of dealing, course of performance or trade usage." (*Id.*, Ex. A at ¶ 10.) Accordingly, EAV cannot attempt, as it did repeatedly in the December 6, 2019 letter, to supplement the express terms of the Parties' written agreement with supposed obligations arising in connection with extra-contractual communications and other parol evidence. Or. Rev. Stat. § 41.740;

*Loverin v. Paulus*, 160 Or. App. 605, 610 (1999) ("The parol evidence rule normally bars consideration of extrinsic evidence when the terms of an agreement are fully expressed in writing."). Thus, even if EAV could meet the high bar of proving that Sage acted willfully, the alleged issues concerning the operation and design of the Pen, air bubbles, and the Products' shelf life do not and cannot impose contractual obligations. Thus, EAV's complaints do not and cannot trigger a right to terminate under Paragraph 13.2(b), as a matter of law.

EAV tries to invoke MESA Paragraph 13.2(f), which permits termination "[w]here Seller has failed to inform Purchaser of any known deficiency in the Products if Seller is required to give Purchaser such notice under this Agreement." (*See id.*, Ex. E)  To that end, EAV argues that the prospect some units could develop air bubbles over time was a "known deficiency" of which Sage should have given it notice. (*Id.*)  EAV further cites to MESA Paragraph 7.8, which requires Sage to notify EAV's designated quality assurance representative of "any Nonconforming Products that have been delivered to Purchaser . . . ." (*Id.*)  EAV's arguments rest on a convenient but false assumption:  it *assumes* that the potential some units could later develop air bubbles made these units (or all units) "Nonconforming Products."  In fact, Sage made no warranties whatsoever about the future performance of the Products, which is consistent with the fact that Sage had no control over how the Products were stored or handled after delivery, all of which could affect their performance.  Thus, even if some units under certain conditions could develop air bubbles over time, and those bubbles could interfere with the operation of the applicators, the Products were not "Nonconforming," because Sage made no warranty about the future condition of the Products.

As delivered, the Products complied fully with all of the requirements in the Agreements; if they did not, EAV would have rejected them as non-conforming.  Moreover, EAV's

complaints about not receiving notice of this potential condition ring particularly hollow: EAV was fully aware of the air bubble issue, which was a topic of frequent discussions between the parties. (Calafiore Dec. ¶ 49.) Accordingly, EAV's attempt to terminate based on non-existent obligations of future performance and complaints about notice it actually received fail as a matter of law.

Aside from not triggering the termination provisions, EAV's claims of deficiencies and defects are also factually inaccurate. As to the shelf life, not only do the Agreements impose no obligation on Sage, EAV continues to offer Zen Pens on its website to this day, even though Sage last delivered the Products to Sage one year ago. (*Id.* ¶ 58.) Nor can EAV blame Sage for the air bubble issue, much less use it as a basis to justify terminating the Agreements. EAV selected, tested, and approved the exact applicator and formula of CBD oil that Sage supplied. (*Id.* ¶¶ 25, 27-29, 31.) If some units built to EAV's specific requirements later developed air bubbles, then EAV has only itself to blame. Furthermore, EAV also bears responsibility for compressing the product development time that might have been useful in mitigating this issue. (*Id.* ¶ 28.)

Other facts also belie EAV's contention that the Products were "defective," because some units developed air bubbles after delivery. Sage raised this issue with the medical device manufacturer that made the applicator to EAV's specifications. (*Id.* ¶ 50.) The manufacturer pointed out that (a) it is possible for gas bubbles to develop in any liquid contained in an applicator or syringe, and (b) this condition can be resolved easily by releasing the bubbles and resetting the applicator with a paper clip or similar tool. (*Id.*) Other manufacturers provide this same advice publicly to their customers and others. *See, e.g.*, *Removing Bubbles from Epoxy*, EPOTEK (2009), *available at* <u>http://www.epotek.com/site/files/Techtips/pdfs/tip4.pdf</u> (last visited

July 6, 2020) ("Air entrapment is an inevitable occurrence when any product, regardless of its rheology, is mixed."); *Degassing a Liquid for Your Syringe Pump*, CHEMYX (Feb. 2, 2018), *available at* https://www.chemyx.com/support/knowledge-base/technical-support/degassing-liquid-syringe-pump/ (last visited July 6, 2020) ("All solutions equilibrated at room temperature and pressure will contain dissolved gases. . . . Removal of these gases may be necessary because the gases may escape from the solution and form air bubbles in your syringe, which can negatively affect the performance of your syringe pump.").[20]  Based on advice from the Pen's manufacturer, Sage prepared a video, which it provided to EAV, describing how to release the bubbles and reset the applicator.  (*Id.* ¶ 51)  EAV refused, however, to implement this solution. (*Id.* ¶ 52.)  Sage also offered to work with the manufacturer to develop a 2.0 version of the applicator, but EAV also insisted that it wanted to postpone any changes to the Pen until 2020. (*Id.* ¶ 53.)  Thus, EAV's claimed "defect" consists of a well-recognized and easily-solved condition that might develop in some units after delivery.  EAV cannot complain about the consequences of its own refusals to implement available solutions to this condition.  Most importantly, none of EAV's complaints and self-imposed restrictions gave it any legal right to terminate the Agreements.

EAV also contends that Sage breached Paragraph 13.2(e) by failing to deliver 85% of the 10mg units of the Products to EAV for the first six months of 2019.  (*Id.*, Ex. E.)  Paragraph 13.2(e) provides:

> (e) Where the Seller fails to deliver at least 85% of Products required by Statements of Work or Product Orders in any six-month period.

---

[20] *See also* Boris M. Smirnov and R. Stephen Berry, *Growth of bubbles in liquid*, CHEM. CENT. J. (Sept. 21, 2015), at 2, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4576410/pdf/13065_2015_Article_127.pdf (last visited July 6, 2020) ("Formation of gas bubbles in a liquid is possible for any liquid system.").

105936077.3

(*Id.*, Ex. A at ¶ 13.2(e).)  EAV cannot prove this accusation, because it is false.

As a necessary predicate to complaining about the timing of Sage's deliveries, EAV needed to comply with terms of the Agreements regarding Product Orders.  EAV failed repeatedly to meet those requirements, however, including MESA Paragraph 5.1, which provides:

> In order to assist Seller in meeting the delivery needs of the Products for Purchaser, Purchaser shall provide Seller with a forecast for each coming calendar quarter 90 days prior to the commencement of such calendar quarter. Thereafter, Purchaser shall provide rolling Product Orders pursuant to a Statement of Work **no less than 90 days in advance of Purchaser's required delivery**. Purchaser shall cause packaging and labelling materials sufficient to allow Seller to package the Products required by any Product Order to be delivered to Seller not less than 60 days prior to the delivery date set forth in a Product Order. Seller shall deliver the Products to Purchaser as per the delivery dates and quantities set forth in a Product Order.

(*Id.*, Ex. A at ¶ 5.1.) (emphasis added).  Tellingly, EAV has not claimed, much less shown, that Sage violated the 85% delivery requirement with respect to Product Orders that EAV issued "no less than 90 days in advance of Purchaser's required delivery."  *Id.*

On December 6, 2018, EAV signed SOW1 with an Effective Date of January 1, 2019. (*Id.* ¶ 11, Ex. B.)  Thus, the earliest delivery date in a Product Order that EAV could have requested was March 5, 2019 (*i.e.*, 90 days from December 6, 2018), and the first six-month period that could possibly measure Sage's performance in delivering Products under the Agreements ran from March 5, 2019 through September 5, 2019.[21]  EAV submitted three

---

[21] Under Oregon law, the Court should interpret the Agreements as a whole and evaluate Sage's delivery obligations under MESA Paragraph 13.2(e) in relation to EAV's obligation to give at least 90 days' advance notice in issuing Product Orders under MESA Paragraph 5.1.  As the Oregon Supreme Court has explained:

> [I]n deciding whether the terms of a contract are ambiguous and in deciding what those terms mean, the court must consider the context in which they appear.  [*Pacific First Bank v. New Morgan Park Corp.*, 319 Or. 342, 348, 876 P.2d 761 (1994).]  *See also Miller v. Miller*, 276 Or. 639, 645–48, 555 P.2d 1246 (1976) (entire agreement, including recitals, should be considered as a whole); *Strandholm v. Barbey*, 145 Or. 427, 441, 26

105936077.3

Product Orders on December 6, 2018 under SOW1 with the following requested delivery periods: "January delivery," "February delivery," and "March delivery." (*Id.* ¶ 45, Ex. C.) Thus, two-out-of-three of these Product Orders from EAV did not comply with MESA Paragraph 5.1, because they sought delivery in under 90 days. Moreover, Sage delivered 100% of the Products that EAV ordered by July 11, 2019,[22] well before the expiration of first six- month period that could comply with the terms of the Agreements. (*Id.* ¶ 47.)

Even if one were to start the six-month period as of the first delivery date that EAV actually requested (despite the 90-day requirement in MESA Paragraph 5.1), Sage would still meet the 85% test. As shown in the chart in the Statement of Facts and the Calafiore Declaration, the first order in which EAV requested delivery after the Effective Date of SOW1 (January 1, 2019), included the following information:[23]

| Date | Requested Delivery | # 10 mg units | # 2 mg units | Total $ Amount |
|------|--------------------|--------------|--------------|----------------|
| 12/6/18 | "For January Delivery" | 5,000 | 10,000 | $205,000.00 |

---

P.2d 46 (1933) ("The courts construe the whole mass of words and not merely some of them."). The court's goal is to give effect to the intention of the contracting parties. *Investment Service Co. v. Smither*, 276 Or. 837, 843, 556 P.2d 955 (1976). *See also* ORS 42.240 (in the construction of a written instrument the intention of the parties is to be pursued if possible).

*Anderson v. Jensen Racing, Inc.*, 324 Or. 570, 575–76, 931 P.2d 763, 765 (1997).

[22] EAV frequently changed, cancelled, and postpone requested deliveries. (Calafiore Decl. ¶ 44.) EAV never requested that Sage complete the deliveries of those parts of its Product Orders that it had postponed and/or canceled. *Id.*

[23] On December 6, 2018, EAV also issued a small Product Order (666 units of 10 mg, and 333 units of 2 mg) with a requested delivery date in December 2018. (Calafiore Decl., ¶ 41 n.1.) This small order falls outside of SOW1, because it requests delivery before the effective date of SOW1.

(*Id.* ¶ 45)  By referring to "January delivery" without identifying a particular day, this P.O. effectively requested that Sage provide these products by January 31, 2019.[24]  Moreover, since this P.O. failed to provide at least 90 days advance notice as required by MESA Paragraph 5.1, EAV's identification of January as the period for delivery was merely a request and created no contractual obligation on Sage's part.  Nevertheless, assuming for the sake of argument that EAV's non-binding request for delivery by January 31, 2019 somehow triggered the start of the six-month time period for the 85% delivery test under MESA Paragraph 13.2(e), then the six-month period would have run from January 31, 2019 to July 31, 2019.  Thus, even making the favorable assumption to EAV that its mere request for a January delivery could start the six-month period, Sage still met the 85% test, because it delivered <u>all</u> 75,000 units that EAV ordered under SOW1 by July 11, 2019.  (Calafiore Decl. ¶ 46.)

EAV nevertheless attempts to rig the 85% delivery test under MESA Paragraph 13.2(e) and SOW1.  First, EAV skews the six-month period by starting the clock on January 1, 2019 – *i.e.*, more than three months *before* it could properly request any deliveries under MESA Paragraph 5.1 and also thirty days *before* its own, non-binding request to Sage to deliver by January 31, 2019.  In other words, EAV counted against Sage's compliance with the obligation to make timely deliveries, thirty days in January when Sage had no obligation of any kind (contractual or otherwise) to deliver any Products.  EAV's December 6, 2019 letter also tries to game the 85% test in MESA Paragraph 13.2(e) and SOW1 by counting the deliveries of only 10 mg units, and omitting the 2 mg units.  MESA Paragraph 13.2(e), however, refers to delivery of "at least 85% of Products required by Statements of Work or Product Orders," not "some" or "a

---

[24] *See, e.g., Semo Grain Co. v. Oliver Farms, Inc.*, 530 S.W.2d 256, 260 (Mo. App. 1975) (noting that where "the contract called for January delivery. . . the breach did not occur until January 31, 1973").

portion" of these "Products."  EAV's P.O.s under SOW1 sought both 10 mg and 2 mg units.

When measured accurately – by counting all of the Products EAV actually ordered and using a

six-month period when deliveries were actually due -- Sage more than met the 85% test.

Accordingly, EAV had no legitimate basis to accuse Sage of violating MESA Paragraph 13.2(e)

and SOW1.  EAV's reliance on these groundless accusations to support its attempt to terminate

the Agreements in March 2020 is entirely without merit.[25]

Although ineffective, EAV's strained efforts to fabricate various grounds for termination

are revealing:  they show not only EAV's willingness to assert false accusations and embrace

untenable positions, but also its ultimate goal of evading the serious, contractual commitments it

made.  These tactics were part of EAV's larger scheme to pressure Sage into a "new

arrangement," one more advantageous to EAV.  Upon scrutiny, EAV's unsubstantiated and

groundless "defenses" do not detract from but actually enhance Sage's request for a prejudgment

remedy to secure its potential recovery in this action.

## CONCLUSION

For the foregoing reasons, the Court should grant Sage's Application for Prejudgment

Remedy and issue an order directing that the following prejudgment remedy be granted to secure

the sum of $10,359,320:[26]

---

[25] Furthermore, even if EAV had possessed the right to terminate in July 2019 based on
MESA Paragraph 13.2(e) or otherwise (which it did not), EAV waived that right by failing to
send a termination notice until March 11, 2020.  Sage relied on the Agreements to its detriment
during the intervening months, including honoring its commitment to maintain EAV as its
exclusive customer.  (Calafiore Decl. ¶ 59.)

[26] Under MESA Paragraph 15.8 and under the Connecticut Unfair Trade Practices Act, if
Sage prevails it will be entitled to recover its attorneys' fees and costs, in addition to its lost
profits.  Thus, Sage has the right to include in this request for prejudgment security a reasonable
amount sufficient to cover these costs.  *See TES Franchising, LLC v. Feldman*, 286 Conn. 123,
148 (2008).  Sage defers that request for now, but fully reserves the right to request an increase

a.    To attach sufficient property of EAV to secure such sum;

b.    To garnish other sufficient property or assets of EAV to secure such sum; and

c.    Such other type of prejudgment remedy as the Court deems appropriate.


**PLAINTIFF,**
**SAGE FULFILLMENT, LLC**

By  /s/  Daniel L. FitzMaurice
Daniel L. FitzMaurice (ct05331)
Day Pitney LLP
242 Trumbull Street
Hartford, CT 06103
(860) 275-0100
(860) 275-0343 (fax)
dlfitzmaurice@daypitney.com
Its Attorneys

---

in the amount of security in the event this litigation drags on and its costs and fees become more substantial.

105936077.3

## <u>CERTIFICATE OF ELECTRONIC FILING</u>

I hereby certify that on July 21, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Daniel FitzMaurice*
Daniel L. FitzMaurice

105936077.3