## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SAGE FULFILLMENT, LLC | : | |
| | : | |
| Plaintiff, | : | CASE NO. 3:20-CV-00444-VAB |
| | : | |
| V. | : | |
| | : | |
| EARTH ANIMAL VENTURES, INC., | : | |
| | : | |
| Defendant. | : | SEPTEMBER 1, 2020 |

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PREJUDGMENT REMEDY

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................. 1

FACTUAL BACKGROUND ............................................... 4

    A.    EAV and Sage Negotiated the Terms of a Business Relationship in 2018 .......... 4

    B.    During the Contract Negotiations, Sage's Member and Principal Made Several Misrepresentations Designed to Fraudulently Induce EAV to Enter Into the Contract ................................................ 6

    C.    EAV and Sage Executed the Agreement .............................. 7

    D.    EAV Fully Performed Its Obligations During the First Two Quarters of 2019, but Experienced Untimely Deliveries by Sage .......................... 9

    E.    EAV Experienced Labelling Issues With the CBD Animal Products Produced by Sage............................................... 10

    F.    EAV and Sage Agreed to Suspend Certain Obligations ..................... 11

    G.    Starting in May of 2019, EAV Began Receiving Complaints of a Product Defect in the CBD Animal Products................................... 12

    H.    Sage Informed EAV of its Dire Financial Condition and Sought EAV's Help....................................................... 15

    I.    Despite Sage's Ongoing Material Breaches of the Agreement, Sage Demanded That EAV Continue Ordering the CBD Animal Products ............... 15

    J.    EAV Placed Sage On Notice of its Various Material Breaches of the Agreement and Properly Terminated the Agreement ......................... 15

PROCEDURAL HISTORY................................................ 16

LEGAL STANDARD................................................... 17

ARGUMENT ....................................................... 18

    A.    Sage Cannot Prove Probable Cause That It Is Entitled to Judgment on its Breach of Contract Claim .................................... 18

        1.    Sage cannot prove that it fully and timely performed and did not materially breach the Agreement ........................... 18

        2.    Sage cannot prove that EAV breached the Agreement........................... 21

    B.    Sage Cannot Prove Probable Cause that it Is Entitled to Judgment on its Anticipatory Repudiation Claim ...................................... 28

    C.    Sage Cannot Prove Probable Cause that it Is Entitled to Judgment on Either its Breach of Contract Claim or Anticipatory Repudiation Claim Because the Agreement Is Unenforceable ......................... 30

D.      Sage Cannot Prove Probable Cause that it Is Entitled to Judgment on its
        CUTPA Claim.................................................................................................... 34

E.      Sage Cannot Prove Probable Cause that it Is Entitled to Judgment in the
        Amount of $10 Million ...................................................................................... 35

CONCLUSION........................................................................................................................ 39

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AEL Indus., Inc. v. Loral Fairchild Corp.,*
  882 F. Supp. 1477 (E.D. Pa. 1995) ........................................................................27

*AMF, Inc. v. McDonald's Corp.,*
  536 F.2d 1167 (7th Cir.1976) ...............................................................23, 24, 29

*ARB (Am. Research Bureau), Inc. v. E-Sys., Inc.,*
  663 F.2d 189 (D.C. Cir. 1980) .............................................................................23

*Baltas v. Frenis,*
  No. 3:18 CV 1168 (WWE), 2019 WL 1552915 (D. Conn. April 10, 2019) ........17, 18, 35, 36

*Calfee v. Usman,*
  616 A.2d 250 (Conn. 1992) ..................................................................................17

*Decor by Nikkei Int'l, Inc. v. Fed. Republic of Nigeria,*
  497 F. Supp. 893 (S.D.N.Y. 1980), aff'd sub nom. *Texas Trading & Mill.*
  *Corp. v. Fed. Republic of Nigeria,* 647 F.2d 300 (2d Cir. 1981), cert. denied
  sub nom. *Fed. Republic of Nigeria v. Texas Trading & Milling Corp.,* 454
  U.S. 1148 (1982).....................................................................................................30

*Gov't of Republic of China v. Compass Communications Corp.,*
  473 F. Supp. 1306 (D.D.C. 1979) ........................................................................28

*Holmes v. W. Title & Escrow Co.,*
  No. 6:09-CV-6023-AA, 2012 WL 6680382 (D. Or. Dec. 18, 2012), aff'd, 692
  Fed. Appx. 809 (9th Cir. 2017).............................................................................22

*Hunter v. Woodburn Fertilizer, Inc.,*
  208 Or. App. 242, 144 P.3d 970 (Or. App. 2006) ...............................................21

*Levitz, Lyons and Kesselman v. Reardon Law Firm, P.C.,*
  3:20-cv-00444-VAB, 2005 WL 8166987 (D. Conn. Mar. 31, 2005) ....................35

*LNS Inv. Co. v. Phillips 66 Co.,*
  731 F. Supp. 1484 (D. Kan. 1990).......................................................................23

*Madsen v. Murrey & Sons Co., Inc.,*
  743 P.2d 1212 (Utah 1987)..................................................................................38

*McGinnis v. Wentworth Chevrolet Co.,*
  668 P.2d 365 (Or. 1983) ......................................................................................39

*Mullai v. Mullai,*
    468 A.2d 1240 (Conn. App. Ct. 1983) (per curiam)................................................18

*Roberts v. Caton,*
    619 A.2d 844 (1993) ...........................................................................................17

*Rocheux Int'l, Inc. v. U.S. Merchants Fin. Grp., Inc.,*
    741 F. Supp. 2d 651 (D.N.J. 2010) .....................................................................24

*Slover v. Oregon State Bd. of Clinical Soc. Workers,*
    927 P.2d 1098 (Or. Ct. App. 1996).....................................................................18

*SS & C Techs., Inc. v. Providence Inv. Mgmt.,*
    582 F. Supp. 2d 255 (D. Conn. 2008) ............................................................17, 18

*State by & through Bus. Dev. Dep't v. Huttenbauer,*
    456 P.3d 340 (Or. Ct. App. 2019).......................................................................30

*State v. Ham,*
    755 A.2d 176 (Conn. 2000) .................................................................................18

*T & S Brass & Bronze Works, Inc. v. Pic–Air, Inc.,*
    790 F.2d 1098 (4th Cir.1986) .............................................................................23

*Taylor v. Ramsay-Gerding Const. Co.,*
    226 P.3d 45, opinion adhered to as modified on reconsideration, 234 P.3d 129
    (Or. Ct. App. 2010).............................................................................................39

*Tigg Corp. v. Dow Corning Corp.,*
    962 F.2d 1119 (3d Cir. 1992), cert. dismissed, 506 U.S. 1042 (1992) ............37, 38

*Torch v. Windsor Surry Co.,*
    No. 3:17-CV-00918-AA, 2019 WL 6709379 (D. Or. Dec. 9, 2019).....................21

*Weishampel v. Circle of Children,*
    No. 6:18-CV-00429-AA, 2019 WL 4544269 (D. Or. Sept. 19, 2019) ..................18

**Statutes**

Conn. Gen Stat. § 52–278d(a)..................................................................4, 17, 38

Connecticut Unfair Trade Practices Act (CUTPA) .........................3, 4, 16, 34, 35, 38

Or. Rev. Stat. § 72.3050....................................................................................34

Or. Rev. Stat. § 72.6090.............................................................22, 24, 25, 26, 27

Or. Rev. Stat. § 72.6100...................................................................25, 26, 27, 29

Or. Rev. Stat. § 72.6120 .................................................................................... 19, 20

Or. Rev. Stat. § 72.7080 ......................................................................................... 37

Or. Rev. Stat. § 72.7110 .................................................................................. 3, 28, 29

Or. Rev. Stat. § 72.7130 ......................................................................................... 39

Or. Rev. Stat. § 72.7140 ......................................................................................... 38

Or. Rev. Stat § 72.7150 ........................................................................................... 39

Or. Rev. Stat. § 72.7250 ......................................................................................... 20

U.C.C. § 2-609 ............................................................................................. 23, 24, 30

U.C.C. § 2-610 ........................................................................................................ 30

U.C.C. § 2-708 ................................................................................................... 37, 38

U.C.C. § 2-711 ........................................................................................................ 30

**Other Authorities**

Local Rule of Civil Procedure 7(a) ............................................................................. 1

Rule 12(b)(6) ........................................................................................................... 16

Pursuant to Local Rule of Civil Procedure 7(a), Defendant Earth Animal Ventures, Inc. ("EAV" or "Defendant") respectfully submits this memorandum of law in opposition to Plaintiff Sage Fulfillment, LLC's ("Sage" or "Plaintiff") Motion for a Prejudgment Remedy (ECF No. 28) ("Sage's Motion").

## PRELIMINARY STATEMENT

This case involves a breach of contract dispute related to the manufacture and sale of two versions of a cannabinoid ("CBD") oil product. The products were designed specifically for pets. The products consisted of an applicator pen containing 10 mg or 2 mg of CBD oil. Each pen was intended to dispense 30 equal metered doses of a CBD oil to the animal and was designed to relieve a variety of symptoms. Sage claims that it had an exclusive three-year contract to sell millions of dollars of product to EAV, but that EAV breached the contract by failing to purchase the minimum quantity of products.

Nearly five months after commencing this action, Sage filed a motion for a prejudgment remedy. By such motion, Sage seeks a prejudgment attachment to secure the sum of $10,359,320. While Sage's Motion suggests this case involves a simple breach of contract, the actual story is quite to the contrary. In fact, Sage will eventually recover nothing in this litigation and will be held accountable for its own breaches and misbehavior.

Put simply, Sage warranted that the pens would work. In fact, they did not. Yet, Sage now claims EAV was obligated to continue to buy the defective products in the face of not only uncured product defects, but also delivery delays, Sage's mislabeling of the products and other material breaches by Sage. That is not the law – not in Oregon, not anywhere. EAV was not bound to continue purchasing a product that Sage could not – and did not – deliver in compliance with its warranty and other performance obligations.

Plaintiff's Motion is without merit for a number of independent reasons, any one of which compels denial of its motion.

First, Sage cannot prove probable cause that it fully and timely performed its obligations under the contract. Sage breached the contract in several material respects. For instance, it labelled and shipped thousands of units of product in early 2019 with expiration dates that were not supported by any testing or verifiable data. It breached its warranty by delivering products that failed to work as intended, often times jamming or clogging after several uses. And Sage undeniably failed or refused to repay EAV for a $250,000 advance payment, the repayment of which was made a material term of the contract.

Second, even assuming Sage could prove that it performed under the contract, Sage repudiated the contract many times over, including by (1) notifying EAV that it would not timely deliver products containing  a commercially viable and substantiated sell-by date, (2) refusing to bear any of the costs associated with relabeling product labelled with unsubstantiated sell-by dates, despite having been the direct cause of the issue, (3) notifying EAV that it would not timely deliver non-defective products that would not jam or clog prior to dispensing 30 equal metered doses per pen (as expressly warranted on the product packaging), (4) informing EAV in August 2019 that Sage was in dire financial straits and unable to perform the contract without an infusion of capital, and (5) failing to provide timely and adequate assurances to EAV that it could timely deliver a non-defective product that contained a properly supported sell-by date and would not jam or clog prior to dispensing 30 equal metered doses per pen.

Third, EAV met the minimum order requirements under the contract for the first two quarters of 2019. As for the second half of 2019 and first quarter of 2020, EAV properly suspended its performance when confronted with the product defects, mislabeling, untimely deliveries and Sage's failure to provide adequate assurance to EAV that it could and would timely and fully

perform its obligations. Ultimately, EAV terminated the contract pursuant to its terms and/or cancelled the contract, as permitted under Oregon's U.C.C.

Fourth, Sage cannot prove probable cause that EAV anticipatorily repudiated the contract. EAV's March 11, 2020 "termination" letter was not a repudiation of the contract, but a proper termination of the agreement pursuant to the terms of the contract and a proper cancellation of the contract pursuant to Or. Rev. Stat. § 72.7110. Moreover, even if Sage could prove that EAV repudiated the contract, Sage must prove that it was ready, willing and able to fully and timely perform its end of the contract, which it cannot do.

Fifth, Sage cannot prove probable cause of a valid and enforceable contract in the first instance. Motivated by an opportunity in 2018 to secure a potential multi-million-dollar contract with EAV, Sage made several misrepresentations to EAV that were designed to, and did, fraudulently induce EAV to enter into the parties' contract. None of these statements turned out to be true or non-misleading. Accordingly, the contract is voidable and/or unenforceable under Oregon law.

Sixth, Sage cannot prove probable cause that EAV violated the Connecticut Unfair Trade Practices Act ("CUTPA"). As discussed in EAV's pending Motion to Dismiss, Sage's CUTPA claim fails because, at most, it has alleged a mere breach of contract claim. It is well-settled law that a mere breach of contract does not amount to a CUTPA violation.

Seventh, even if Sage could prove probable cause that EAV breached the contract, anticipatorily repudiated the contract or violated CUTPA, Sage cannot meet the probable cause standard as to its purported damages. In particular, the contract contains a limitation of damages clause, which precludes Sage from recovering "lost profits" or "incidental damages." Moreover, even if that limitation does not apply to Sage's purported damages, EAV is entitled to setoffs and recoupments for its yet to be pled affirmative defenses and counterclaims sounding in breach of

contract, breach of the implied covenant of good faith and fair dealing, fraud, and CUTPA. *See* Conn. Gen Stat. § 52–278d(a)). In addition, Sage's lost profits damage claim does not take proper or full account for (1) all of the costs Sage would have incurred to timely supply EAV with non-defective products under the contract, (2) the fact that the parties would have negotiated a new statement of work and pricing for the new customized version of the pen, which prices would have reflected the significant drop in the price of CBD biomass and oils that took place in 2019, or (3) the fact that given its lack of necessary capital, which Sage acknowledged in August 2019, Sage lacked the resources to produce 200,000 units in any two quarters, which forms the basis for its damages calculation.

Accordingly, Sage cannot demonstrate, after consideration of Sage's claims and EAV's offsets, defenses and counterclaims, probable cause that judgment will be entered in Sage's favor in the vastly overstated amount of $ 10,359,320 – or for any net amount.

**FACTUAL BACKGROUND[1]**

**A.** *EAV and Sage Negotiated the Terms of a Business Relationship in 2018*

In or around April 2018, EAV and The Sage Door, LLC ("Sage Door"), Sage's parent entity, first began discussing the terms of a potential business relationship whereby Sage would manufacture and sell to EAV a CBD oil medical product designed specifically for use on pets. Inasmuch as Sage and its members had no prior experience with manufacturing products for pets and EAV had no prior experience selling products containing CBD oil, the parties relied upon each other's purported respective knowledge, experience and expertise to launch a new product in a nascent market.

---

[1] Sage's "Statement of Facts" contains many misstatements and outright falsehoods. EAV includes its recitation of the factual background of the parties' dispute to correct many of Sage's various misstatements.

In or around June 2018, Sage Door proposed to manufacture and deliver a product that was comprised of a metered applicator pen (the "Pen") preloaded with Sage's own proprietary blend of CBD oil and other ingredients (the "Gel") (collectively, the "CBD Animal Product"). The Pen had a plunger. The plunger was designed to be depressed to dispense multiple doses of the Gel in equal, metered quantities. The Pen was intended to dispense 30 doses per pen for both the 10 mg CBD pen and the 2 mg CBD pen. EAV made it clear that the end product would need to: (1) have a commercially viable shelf life and expiration date, (2) be functional for the end-user (i.e., pet owners), (3) dispense 30 equal metered doses per applicator, and (4) otherwise be free from any defects. EAV expressly informed Sage that the intended use of the CBD Animal Product was for pet owners to be able to easily dispense to their pet 30 equal doses of CBD oil per applicator through the duration of the product's stated expiration date.

With these requirements and the intended use in mind, Sage developed the formulation for the Gel. Sage also identified several sourcing options for the Pen from third-party medical device manufacturers. Sage and/or its affiliated entities developed the Gel, which contained a proprietary blend of ingredients. The Gel also utilized a certain "Uptake Technology". Such technology was intended to improve the absorption of the CBD oil when it was applied to the pet's skin.

While EAV performed tests to confirm the efficacy and safety of the Gel for use on animals, it relied entirely on Sage's purported industry experience and expertise. EAV also reasonably relied on Sage's representations and assurances that the Gel formulation was appropriate for its intended use, had a commercially viable shelf-life, and could be dispensed by the Pen for 30 equal metered doses through the product's expiration date.

Sage sourced several applicator pen options from third-party medical device manufacturers. The applicator pen options were "off-the-shelf" stop-gap items and were not customized or modified in any way. The parties acknowledged and agreed that the off-the-shelf

pen would be utilized only on a temporary basis to enable EAV to be the first company in the nascent CBD pet market to launch a pen product. The parties agreed that Sage, within 6 to 9 months, would design, develop, produce and/or procure a suitable customized pen for EAV's use, at which time a new statement of work ("SOW") and new pricing would need to be negotiated between the parties.

Sage represented that <u>all</u> of the pen options it presented were appropriate for the intended use in the CBD Animal Products and would work with the Gel to dispense 30 equal metered doses through the product's expiration date.  EAV's evaluation of the pen options presented to it by Sage was based solely on its form, comfort and ease of use.

Accordingly, in 2018, it was Sage's exclusive obligation, as the manufacturer and supplier, to test the functionality of the Pen in combination with the Gel, determine if the Pen was properly labeled and appropriate for use in an over-the-counter retail product, and confirm that the Pen could properly dispense 30 equal metered doses of the Gel without clogging, jamming or otherwise failing to work as intended through the product's specified expiration date.

**B.**     ***During the Contract Negotiations, Sage's Member and Principal Made Several Misrepresentations Designed to Fraudulently Induce EAV to Enter Into the Contract***

In or around September and October of 2018, EAV and Sage began to negotiate the terms of a master supply agreement that would govern the purchase and sale of the CBD Animal Products. In order to induce EAV to enter into a contractual agreement with Sage, Sage's principal and manager, Richard Calafiore, on behalf of Sage, made several misrepresentations to EAV which he either knew to be false at the time or could not verify or substantiate.

Among the misrepresentations of fact made by Richard Calafiore, both individually and on behalf of Sage or Sage Door in 2018, were his promises and/or assurances that: (a) Sage was "engaged in the business of manufacturing and the wholesale distribution of certain cannabinoid

products" and was a well-funded and capitalized company with adequate resources and industry experience to meet EAV's needs, (b) EAV needed to pay Sage a $250,000 advance payment that was necessary to secure "biomass" for the CBD Animal Products, (c) such advance payment would be credited or otherwise returned to EAV with interest, (d) Sage would design, develop and/or procure a customized new version of the Pen for EAV within six to nine months, (e) Sage needed the parties' contract to specify aggressive, artificially-high annual and quarterly purchase minimums to allow Sage to secure an adequate or guaranteed supply of pens at an attractive price, but Sage understood that EAV would likely need more time, particularly at the beginning, to launch, promote and sell the new product in a nascent market, (f) Sage would charge EAV prices below market for pens and CBD gels, in exchange for exclusivity, and (g) Sage would ensure that the CBD Animal Products were functional, satisfied their intended use (including dispensing 30 equal metered doses per pen), were properly labeled and otherwise were in compliance with all industry standards, laws, rules, and regulations.

## C.    *EAV and Sage Executed the Agreement*

In late 2018, EAV and Sage entered into a contract to purchase and sell the CBD Animal Products. The contractual relationship was governed by a Master Exclusive Supply Agreement (the "MESA") and an initial Statement of Work No. 1 for the temporary, stop gap version of the Pen (the "SOW 1") (collectively, the "Agreement"). Pursuant to the Agreement (and assuming the parties fully and timely performed and otherwise complied with the Agreement and successfully negotiated a subsequent SOW covering the customized new version of the Pen), Sage agreed to exclusively sell and EAV agreed to exclusively buy the CBD Animal Products, which were described as a "metered applicator for an over the counter packaged proprietary strain with certificate of analysis full spectrum cannabinoid oil transdermal gel with 'uptake' delivery." Under SOW 1 (assuming the parties fully and timely performed and complied with the Agreement

and successfully negotiated a subsequent SOW covering the customized new version of the Pen), EAV agreed to purchase a minimum of 400,000 units annually, and at least 40,000 units per calendar quarter, commencing on the effective date of January 1, 2019 and continuing for three years until December 31, 2021.

Leading up to the MESA, Sage assured EAV that the CBD Animal Products would be free of defects, conform to the requirements of the parties (including the requirement to dispense 30 equal, metered doses per pen), and satisfy all applicable industry standards, federal and state laws, rules, and regulations.

Sage specifically agreed and warranted that:

- "all Products shall be free from defects in material and workmanship and shall conform to the standards set forth in a Statement of Work." *See* MESA, ¶ 10;

- "[Sage] shall conduct all necessary quality inspections to ensure that all Products conform to the specifications set forth in a Statement of Work," that it "agrees to produce and deliver the Products in accordance with applicable federal, state and local laws, rules and regulations, and that the Products shall be in compliance in all material respects with the specifications and formulas set forth in the Statement of Work." *See* MESA, ¶ 7.1 & 7.2;

- "[Sage] shall perform mock recalls and quality and pathogen testing of the Products ingredients and finished Products in accordance with usual and customary testing methods, procedures and standards." *See* MESA, ¶ 7.4;

- If "any portion of [Sage's] facility, or any of [Sage's] processes, inventories or equipment do not comply with all applicable laws and regulations or with the terms and conditions of this Agreement, [Sage] shall take such action to correct such deficiencies and bring such processes, inventories and/or equipment into compliance with applicable laws and regulations and with the material terms and conditions of this Agreement promptly but in no case more than 10 business days following delivery of a written notice of such deficiency by [EAV]." *See* MESA, ¶ 7.6;

- "[U]se commercially reasonable efforts to supply Products to [EAV]." *See* MESA, ¶ 16.4; and

- Sage's performance of the Agreement was subject to a time of the essence provision. *See* MESA, ¶ 15.14.

Under the initial SOW 1, Sage was required to deliver the CBD Animal Products each calendar month based on a production schedule set forth in Product Orders. Time was also of the essence, in part, because EAV sought to be an industry leader and innovator, as well as be first to market in the nascent CBD pet market with a pen applicator type medical device.

The initial SOW 1 also memorialized the terms of EAV's advance of $250,000 to Sage and the obligation that Sage reimburse EAV through credits applied to EAV's purchases of CBD Animal Products. Specifically, Sage was required to provide a total credit in the amount of $312,500, applied equally over a six-month period (from May 2019 through October 2019). SOW, ¶ 4.

Finally, the MESA provided the parties with certain rights to terminate the contractual relationship if the other party breached and then failed to cure the breach within 30 days of receipt of written notice. *See* MESA, ¶ 13.1; *see also* MESA, ¶ 13.2(b), (c), (e), and (f) (providing instances where the right to termination was immediate).

**D.** ***EAV Fully Performed Its Obligations During the First Two Quarters of 2019, but Experienced Untimely Deliveries by Sage***

During the first and second quarters of 2019, EAV purchased a total of 85,000 units thereby satisfying the minimum purchase requirements under the Agreement. However, while EAV hit the ground running with various marketing and sales efforts, Sage's performance was riddled with problems from the start.

During the first quarter of 2019, Sage struggled to deliver the units to EAV in a timely manner and was unable to fully satisfy the initial first quarter orders until May 21, 2019. As was the case during the first quarter of 2019, Sage continued to struggle to ramp up production and timely deliver the CBD Animal Products in the second quarter of 2019. Sage made deliveries to EAV in small piecemeal orders over the course of several months. In fact, Sage could not fully

satisfy EAV's purchase orders from the second quarter of 2019 until the very end of the third quarter on or about September 25, 2019. Such late deliveries occurred notwithstanding the fact that time was of the essence.

By way of contrast, EAV made substantial efforts to market the CBD Animal Products, including presenting the CBD Animal Products at various trade shows, delivering samples of the product to trade partners and retail partners, and creating advertising and marketing information to educate the marketplace on the benefits of CBD oil for pets. EAV marketed and sold the CBD Animal Products as the "Zen-Pen" under its "Nature's Comfort" brand name.

**E.**     ***EAV Experienced Labelling Issues With the CBD Animal Products Produced by Sage***

When EAV began receiving product from Sage, it learned that Sage had been labelling all delivered products with only a twelve-month expiration date. Such an artificially short period greatly impeded the products' marketability, given the products' placement within EAV's traditional channels of distribution and the timing required to launch a new product, particularly an innovative product in a nascent industry.

More critically, in or around April 2019, EAV discovered that Sage had not conducted <u>any</u> shelf-life stability testing or any other analysis to substantiate the 12-month expiration date. Stated differently, Sage's claim that the CBD Animal Products were shelf-stable was entirely speculative and not substantiated by any data whatsoever. Indeed, on April 1, 2019, Sage's own scientist, Dr. Lauri Schultz, stated that she was only "looking into" whether the CBD Animal Products "required stability data," clearly indicating that no such testing had been performed to date. In response, Steven Kushner, who was advising on the project, informed Dr. Schultz that "***You must do stability testing in order to make any shelf life statement***." Mr. Kushner further directed that "[i]f you try to go into the marketplace before you have the studies done you would usually put 12 months as a shelf life with the understanding that *you must have documentation to back this up should the*

*FDA ask you to verify how you came to the expiration date*." Dr. Schultz responded to the outside consultant that "[i]t sounds like we need to do stability testing."

This was not the first time Sage had been placed on notice by Mr. Kushner that stability testing was necessary to comply with the industry standard of care and the legal regulatory requirements for over-the-counter topical products such as the CBD Animal Products. Specifically, on December 18, 2018 (prior to the effective date of the SOW), Mr. Kushner instructed Sage, by email to Richard Calafiore, that Sage could label the CBD Animal Products with a 1-year expiration date, but "you must be doing stability studies on [the products]." In response to the December 18th correspondence, Brian Sward of Sage stated that "[i]f Earth Animal wants a year [shelf life] we can do that. If the formula becomes unusable we can always take action." The plain implication of Mr. Sward's statement is that Sage should label the products with a twelve-month shelf life, conduct no stability testing, and then address the issue only if the Gel "becomes unusable." On December 19, 2018, Mr. Kushner again repeated that Sage "will have to do ongoing stability [testing] as the mfg [manufacturer] which would mean accelerated and real time studies to demonstrate stability. These records have to be kept in case FDA or other[s] requests to see proof of stated shelf life." Despite this clear and repeated advice, no such shelf life stability testing was performed. Sage delivered tens of thousands of units of product to EAV in 2019 that were labelled with expiration dates that were entirely unsubstantiated by data and could not be substantiated if the FDA or other regulators asked to verify the shelf-life.

## F.     *EAV and Sage Agreed to Suspend Certain Obligations*

Upon learning that Sage had been labelling all delivered products with only a twelve-month expiration date and that Sage had not conducted any shelf-life stability testing to support the 12-month claim, EAV notified Sage that it required that all products contain commercially viable and supportable sell-by dates of at least eighteen months. In May of 2019, the parties met to discuss

various issues with the products, including that Sage was struggling to deliver the products in a timely manner and the expiration dates on the labels were unsupported by any data. In order to address these various issues, the parties agreed to suspend several contractual obligations, including EAV's obligation to place minimum purchase orders, until 2020.

Indeed, for the next several months, Sage did not issue any demand for EAV to purchase the required minimums. Instead, Sage engaged a company called Advanced Laboratories, Inc. to perform shelf-life stability testing, but was otherwise unable to provide any assurance that it could timely deliver properly labelled and substantiated products until such testing was completed. In fact, Sage's shelf-life stability testing was not fully completed until October 2019 (ten months after the effective date of SOW 1). Even worse, Sage refused to bear any of the costs required to print new labels and engage a third-party company to relabel approximately 50,000 units of the CBD Animal Products previously delivered by Sage to EAV. Instead, EAV arranged for and paid all the costs associated with the relabeling, despite Sage having been the direct cause of the issue.

**G.**    ***Starting in May of 2019, EAV Began Receiving Complaints of a Product Defect in the CBD Animal Products***

In or around May of 2019, EAV started to receive multiple complaints from customers, vital trade partners and key retailers that the CBD Animal Products did not work as intended and that users were unable to dispense Gel from the Pen for 30 metered doses per pen, as represented on the packaging of the products. For example, one customer reported that the "pens broke & started oozing the dose inside the pen mechanism, not allowing them to administer the dosage." Another customer stated that her CBD Animal Product "jammed and stopped working after [only] 3 uses [doses]."  On or about June 25, 2019, EAV reported to Sage in writing that it had received several defective Zen-Pen units that were returned to EAV's Customer Service Department with

the same issues. EAV requested that Sage evaluate the problem to ensure that it could timely deliver non-defective products.

EAV continued to receive similar complaints and feedback from its customers and trade partners throughout 2019 and 2020. Several key trade partners decided to either delist the product or cease selling it specifically because of the jamming / clogging issue. EAV notified Sage in writing of these issues. In total, EAV received complaints or returns for approximately 4% of all CBD Animal Products sold in 2019, which by comparison is a complaint rate 4000x higher than the complaint rate of EAV's bestselling product.

Sage refused to take any action that would eliminate the jamming, clogging or other issues with the CBD Animal Products. The only "solution" that Sage offered was to provide EAV with a video whereby customers were instructed to unfold a paperclip and stick the paperclip into the back of the Pen. The purported concept was that the paperclip would release an air bubble or other pressure that had built up in the Pen and would restore functionality, at least in the short term. Regardless of whether the paperclip solution actually worked, it was entirely unfeasible as a solution since EAV was selling the product at a premium price (between $50 and $80). To suggest that customers would pay such a substantial price for a product that often needed to be unclogged with an unfolded paperclip simply ignored the realities of the marketplace and the clear expectation of the parties that Sage would provide a product free from defect.

In response to these various problems, EAV took a series of actions in good faith performance of the Agreement. EAV immediately initiated a promotion whereby it provided retailers and trade partners with free CBD Animal Products to that they would have sufficient stock on hand to replace any broken or defective products returned by customers. Sage never reimbursed EAV or provided any credit to EAV for such costs. EAV also increased its marketing efforts by increasing its digital marketing presence, promoting the CBD Animal Products online, and

beginning a free gift promotion with every purchase online. EAV also held monthly meetings with Sage's key employees to evaluate what could be done to resolve the outstanding product issues, relabel product with accurate expiration dates, and increase sales and marketing of the products.

Additionally, in 2019, after Sage had failed to address the problems with the CBD Animal Products, EAV conducted its own internal investigation into performance and functionality. EAV provided sample products to 261 customers and asked that they provide feedback on their experiences. Approximately 20% of the customers reported that the CBD Animal Products failed to properly dispense 30 doses per pen, as expressly represented on the packaging of the product.

In 2020, EAV conducted its own in-house testing of the CBD Animal Products. EAV performed tests of both the 2 mg and 10 mg versions of the product and tested fail rates when the pen was (a) pumped consecutively non-stop for 30 doses in a row, (b) pumped once per day for 30 days, and (c) pumped once per week for 30 weeks. In total, EAV tested 30 units of each version of the CBD Animal Products for each of the three scenarios (180 units tested in total). The result of the internal study was that few of the products were able to dispense the full thirty (30) doses without malfunctioning. In fact, a substantial number of the CBD Animal Products failed after less than 20 doses. The fail rates increased the longer the product was used (i.e., the failure rates for weekly testing were higher than daily testing and the failure rates for daily testing were higher than consecutive testing).

EAV's trade partners and retailers also conducted tests and studies of the CBD Animal Products. They similarly concluded that many of the products malfunctioned or failed after less than the intended number of doses. Specifically, Pet Food Express, a trade partner of EAV, performed an internal test which revealed a 36% failure rate for the CBD Animal Products. Upon conclusion of these findings, Pet Food Express decided not to sell the product. Pet People, another trade partner of EAV, experienced a high rate of complaints and returns from the CBD Animal

Products and demanded a 38% credit of their order in order to account for the fact that several of the products were faulty or malfunctioning. Pet People also delisted the product. PetValu, another trade partner of EAV, made the decision not to sell the CBD Animal Products, citing the product's reputation in the industry that it was unreliable and prone to failure. Centinela, another trade partner of EAV, submitted several returns and credit requests to EAV related to purchases of the CBD Animal Products. Centinela also decided to discontinue purchasing the product in early 2020.

**H.**    ***Sage Informed EAV of its Dire Financial Condition and Sought EAV's Help***

In August 2019, Sage informed EAV that it was in dire financial straits and would not be able to meet its contractual obligations, including producing 200,00 units every two quarters, without an infusion of capital. Sage asked EAV for its help. EAV requested a business plan from Sage and additional clarity on what specifically Sage required from EAV. After initially agreeing, Sage went silent and then issued a "notice of breach" letter in November 2019.

**I.**    ***Despite Sage's Ongoing Material Breaches of the Agreement, Sage Demanded That EAV Continue Ordering the CBD Animal Products***

On November 13, 2019, despite the parties' May agreement, Sage audaciously informed EAV in writing that it was in "material breach" of the Agreement because it supposedly had failed to purchase the minimum number of units during the first three quarters of 2019 and purportedly indicated an intention not to purchase the minimum number of units during the remainder of the Agreement's term.

**J.**    ***EAV Placed Sage On Notice of its Various Material Breaches of the Agreement and Properly Terminated the Agreement***

After repeated efforts by EAV to cooperate and work with Sage in good faith to resolve the various labelling and product quality issues, on or about December 6, 2019, EAV issued a written notice of material breach outlining Sage's various breaches under the Agreement.

Specifically, EAV notified Sage that it had materially breached the Agreement by failing and/or refusing to:

(a)     Provide credits or other reimbursements for the Advance Payment as required by the initial SOW;

(b)     Deliver a product that was free from defects in materials and workmanship;

(c)     Deliver a customized "version 2" of the Pen within six months;

(d)     Test the product's shelf-life and deliver a product with a commercially viable and substantiated expiration date;

(e)     Notify EAV of known defects or performance issues with the products; and

(f)     Deliver at least 85% of the products required by the SOW and Product Orders in any six-month period.

EAV stated in the notice of breach letter that it would exercise its rights to terminate the Agreement if Sage did not timely cure and resolve the above breaches. In response, Sage did not address or cure any of the above breaches. Accordingly, on March 11, 2020, EAV formally terminated the Agreement with Sage by way of a written letter.

## PROCEDURAL HISTORY

Sage's Complaint asserts four causes of action against EAV: (1) breach of contract; (2) declaratory judgment; (3) anticipatory repudiation; and (4) violation of CUTPA. EAV moved pursuant to Rule 12(b)(6) to dismiss Counts II, III, and IV of the Complaint for failure to state a valid claim upon which relief may be granted. *See* EAV's Motion to Dismiss (ECF Nos. 18-19). EAV's Motion to Dismiss remains pending before the Court. In response to EAV's Motion to Dismiss, Sage conceded that its declaratory judgment count is unnecessary and agreed to withdraw Count II. On July 21, 2020 – five months into this case – Sage filed its Motion for Prejudgment Remedy.

## LEGAL STANDARD

Under Connecticut law, a prejudgment remedy is intended to secure the satisfaction of a judgment should the movant prevail. *SS & C Techs., Inc. v. Providence Inv. Mgmt.*, 582 F. Supp. 2d 255, 257–58 (D. Conn. 2008). A court may award a prejudgment remedy if the movant demonstrates probable cause to sustain the validity of its claims. *Id.* Specifically, a prejudgment remedy is appropriate only "[i]f the court, upon consideration of the facts before it and taking into account any defenses, counterclaims or set-offs, claims of exemption and claims of adequate insurance, finds that the [movant] has shown probable cause that such a judgment will be rendered in the matter in the [movant's] favor in the amount of the prejudgment remedy sought...." *Id.* (quoting Conn. Gen Stat. § 52–278d(a)).

Connecticut courts have defined "probable cause" in this context as: "a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." *Baltas v. Frenis*, No. 3:18 CV 1168 (WWE), 2019 WL 1552915, at *7 (D. Conn. April 10, 2019) (internal citations omitted). In assessing whether a prejudgment remedy should issue under this standard, the Court must consider not only the substantiality of the evidence underlying the movant's claims, but also the apparent strength of the evidence underlying the opponent's defenses and set-offs. *SS & C Techs., Inc.*, 582 F. Supp. 2d at 257–58 (citing *Roberts v. Caton,* 619 A.2d 844 n. 4 (1993) ("[A] valid defense may defeat probable cause.")). The Court, therefore, must balance the arguments and the evidence produced by both sides. *Id.*

The Court must "consider not only the validity of the plaintiff's claim but also the amount that is being sought." *Baltas v. Frenis*, No. 3:18 CV 1168 (WWE), 2019 WL 1552915, at *6–7 (D. Conn. April 10, 2019) (quoting *Calfee v. Usman*, 616 A.2d 250, 254 (Conn. 1992). A plaintiff is "bound to furnish proof of his damage with reasonable probability, and not leave the trial court to

speculation and conjecture." *Id.* (quoting *Mullai v. Mullai*, 468 A.2d 1240, 1242 (Conn. App. Ct. 1983) (*per curiam*)). It is within this Court's "broad discretion to deny or grant a prejudgment remedy." *Id.* (quoting *State v. Ham*, 755 A.2d 176, 178 (Conn. 2000)).

In the instant case, in light of the competing claims, defenses and counterclaims, Sage has not proven with any degree of probability that a judgment will enter it its favor, let alone in the grossly overstated amount it seeks. *See SS & C Techs., Inc.*, 582 F. Supp. 2d at 257–58 (denying motions for prejudgment remedy); *Baltas v. Frenis*, 2019 WL 1552915, at *13 (same).

## ARGUMENT

### A. Sage Cannot Prove Probable Cause That It Is Entitled to Judgment on its Breach of Contract Claim

To state a claim for breach of contract under Oregon law, a plaintiff must allege the existence of a valid and enforceable contract, its relevant terms, plaintiff's full performance and lack of breach, and defendant's breach proximately resulting in damage to plaintiff. *Slover v. Oregon State Bd. of Clinical Soc. Workers*, 927 P.2d 1098, 1101 (Or. Ct. App. 1996); *see also Weishampel v. Circle of Children*, No. 6:18-CV-00429-AA, 2019 WL 4544269, at *3 (D. Or. Sept. 19, 2019) (dismissing breach contract claim). Sage will not be able to prove each of the elements of its breach of contract claim.

#### 1. Sage cannot prove that it fully and timely performed and did not materially breach the Agreement

Sage did not perform its obligations under the Agreement and materially breached the Agreement in several ways.

First, Sage delivered products that did not comply with either industry standards of care and/or state and/or federal laws, regulations or rules, thereby breaching its warranties under the Agreement. As discussed above, it was Sage's contractual obligation and responsibility to ensure that the CBD Animal Products were delivered in compliance with all applicable laws and

regulations, and in accordance with the warranties set forth in the Agreement. *See* MESA, ¶¶ 1.2, 6.3, 7.1, 7.2., 7.4, & 7.6.

Sage breached these provisions of the Agreement by labelling and delivering tens of thousands of units of the CBD Animal Products with shelf life and/or expiration dates that were unsubstantiated by any testing or analysis whatsoever. If the FDA or other regulators asked to verify the shelf-life, Sage would not have been able to do so. Representing that a product has a certain shelf life without substantiation and support for the representation is a violation of state and/or federal laws, regulations, or rules.

Second, despite time being of the essence (*see* MESA, ¶ 15.14), Sage failed to timely deliver the products to EAV, as required by the Agreement.

Third, Sage delivered defective products to EAV in breach of its warranties under the Agreement. Sage specifically warranted that "all Products shall be free from defects in material and workmanship and shall conform to the standards set forth in a Statement of Work." *See* MESA, ¶ 10. Moreover, the product packaging expressly stated it would dispense CBD oil from the applicator pen for 30 metered doses per applicator. As discussed above, a substantial number of the pens jammed up and clogged after less than 30 doses, in breach of Sage's express warranties.

Sage's untimely delivery of defective and nonconforming products constitutes breaches of installments that substantially impaired the value of the Agreement as a whole. *See* Or. Rev. Stat. § 72.6120. As discussed, the products delivered by Sage to EAV in 2019 suffered from cumulative defects and did not conform to the terms of the Agreement. Such nonconformity and/or defects substantially impaired the value of the Agreement in that the noted defects demonstrated Sage's inability to timely produce and deliver goods of the quality required by the terms of the Agreement and reasonably contemplated by the parties. Whether the defects specified could not be cured by Sage or Sage simply refused or failed to cure the defects is ultimately irrelevant. What is

undisputed is that Sage never addressed the jamming or clogging issues related to the products or provided any adequate assurance to EAV that it would address the problems. As a result of Sage's breaches of installments substantially impairing the value of the Agreement as a whole, EAV was authorized to cancel the Agreement after a commercially reasonable amount of time negotiating in good faith with Sage. *See* § 72.6120, *comment 7* ("A reasonable time for notifying of cancellation, judged by commercial standards under the section on good faith, extends of course to include the time covered by any reasonable negotiation in good faith.").

Sage does not argue that the products it sold were free from defects. Instead, Sage argues that it had no duty to provide a working product and that the express warranty "that all Products shall be free from defects in material and workmanship" somehow does not apply to the defects at issue. *See* Sage's Motion, at p. 25. Sage's argument for why its delivery of defective and nonconforming products did not breach its warranty is disingenuous and entirely without merit. In support of its position, Sage cites to Or. Rev. Stat. § 72.7250(2), the U.C.C. statute of limitations, and cases interpreting it. *See id*. All that provision provides is that a cause of action for breach of warranty accrues upon delivery of a defective product even if the buyer does not discover the defect until some later date, unless the warranty expressly extends to future performance. Sage, however, makes no claim that EAV's breach of warranty claim would be untimely. Under Sage's reading of Or. Rev. Stat. § 72.7250(2), a *timely* breach of warranty claim would be barred if the defect was not discovered until after delivery, unless the warranty expressly extended to future performance. That is <u>not</u> the law and Sage has cited to no case to support that unprecedented position. Accordingly, Sage's reliance on Or. Rev. Stat. § 72.7250(2) and the cases interpreting it are completely misplaced.

Even assuming Sage was correct, the products sold by Sage suffered from latent defects upon delivery, which were only discovered when purchased and used by consumers. Moreover,

Sage's warranties expressly extended to future performance. In particular, the product's packaging expressly states that it will dispense CBD oil from the Pen for up to the specified 30 metered doses per applicator throughout the period of time between sale and the products' specified expiration date. The products contained a guaranteed shelf life, although it is now known that, at least for the first 10 months, such expiration dates were completely unsubstantiated. Accordingly, even if the cases relied upon by Sage, *Torch v. Windsor Surry Co.,* No. 3:17-CV-00918-AA, 2019 WL 6709379, at *9 (D. Or. Dec. 9, 2019) and *Hunter v. Woodburn Fertilizer, Inc.,* 208 Or. App. 242, 247, 144 P.3d 970, 974 (Or. App. 2006), were applicable, they are clearly distinguishable.

Fourth, Sage breached the Agreement by failing or refusing to provide EAV with a credit for the $250,000 Advance Payment that EAV provided to Sage. The SOW specifically acknowledges that EAV advanced $250,000.00 to Sage to assist Sage in building the capacity necessary to comply with this Agreement. SOW, ¶ 4. The SOW provides that "the $250,000.00 advance shall be a credit in favor of Purchaser and shall be applied to reduce Purchaser's payments due to Seller over 6 months beginning May 2019." *Id.* EAV did not receive any credit between May and October of 2019. In December 2019, EAV served its notice of breach letter to Sage which, in part, demanded repayment or other consideration for the $250,000 advance. To date, Sage has not provided EAV with any credit. Indeed, Sage concedes as much in its Motion for a Prejudgment Remedy. *See* Sage's Motion, at p. 10. This material breach under the SOW began in May 2019 and continued until EAV terminated the Agreement in March of 2020.

### 2.    *Sage cannot prove that EAV breached the Agreement*

Sage claims that EAV breached the Agreement by failing to meet the minimum purchase requirements in quarters two, three and four of 2019, and in quarter one of 2020. *See* Complaint, ¶ 58. To the contrary, by the end of the second quarter of 2019, EAV had placed orders for 85,000 units in full compliance with the minimum purchase requirements. As for the second half of 2019

and the first quarter of 2020, EAV does not dispute that it did not place orders for the minimum

purchases. However, even assuming Sage could make out a *prima facie* breach of contract claim

for the second half of 2019 and first quarter of 2020 (it cannot), EAV's defenses defeat Sage's

claim.

First, in May 2020, given the ongoing issues with the products (complaints of clogging,

unsupported expiration dates, and delays in Sage's delivery), the parties agreed that additional

purchase orders would be placed on hold until 2020. Accordingly, Sage waived the argument that

EAV did not meet the minimum purchase requirements in the second half of 2019. *See Holmes v.

W. Title & Escrow Co.*, No. 6:09-CV-6023-AA, 2012 WL 6680382, at *6 (D. Or. Dec. 18, 2012),

*aff'd*, 692 Fed. Appx. 809 (9th Cir. 2017) ("Waiver is an intentional relinquishment of a known

right.").

Second, EAV rightfully suspended its performance under the Agreement beginning in May

2019 up to and until EAV cancelled the Agreement on March 11, 2020 because of Sage's failures

to provide adequate assurances. Or. Rev. Stat. § 72.6090 provides, in pertinent part:

> (1) . . .When reasonable grounds for insecurity arise with respect to the performance
> of either party the other may in writing demand adequate assurance of due
> performance and until that party receives such assurance may if commercially
> reasonable suspend any performance for which that party has not already received
> the agreed return.

Therefore, § 72.6090 provides three rights: (1) the aggrieved party is permitted to suspend his own

performance – "suspend performance" means to hold up performance pending the outcome of the

demand; (2) the aggrieved party is given the right to require adequate assurance that the other

party's performance will be duly forthcoming; and (3) this section provides the means by which

the aggrieved party may treat the contract as broken if his reasonable grounds for insecurity are

not cleared up within a reasonable time. *See* Or. Rev. Stat. § 72.6090, *comment 2*.

Here, EAV had reasonable grounds for insecurity that Sage would – or could – timely perform its obligations under the Agreement. The delayed delivery of defective and nonconforming products outlined above, including the fact that the product jammed or clogged after only a handful of uses and contained commercially unviable and unsupported sell-by dates, provided ample reasonable grounds for insecurity. Courts applying substantially similar or identical versions of U.C.C. § 2-609 have routinely found that delivery of defective or nonconforming goods is reasonable grounds for insecurity. *See, e.g.*, *AMF, Inc. v. McDonald's Corp.,* 536 F.2d 1167, 1170 (7th Cir.1976) (holding evidence sufficient to support a finding of reasonable grounds for insecurity where a prototype machine never performed properly, the seller failed to meet its delivery projections, and the seller's own personnel had reservations about the design); *LNS Inv. Co. v. Phillips 66 Co.,* 731 F. Supp. 1484 (D. Kan. 1990) (finding a combination of poor quality and insufficient quantity enough to give the buyer reasonable grounds for insecurity under U.C.C. § 2-609); *ARB (Am. Research Bureau), Inc. v. E-Sys., Inc.*, 663 F.2d 189 (D.C. Cir. 1980) (holding that a buyer had reasonable grounds for insecurity where the products at issue suffered from performance issues and defects); In *T & S Brass & Bronze Works, Inc. v. Pic–Air, Inc.,* 790 F.2d 1098, 1105 (4th Cir.1986) (finding that the buyer had reasonable grounds for insecurity because about half of the faucet handles delivered under the installment in question were unacceptably scratched and therefore defective). Therefore, by April 2019, when EAV learned that Sage had delivered products that contained commercially unviable and unsupported sell-by dates, EAV had reasonable grounds to believe, and did believe, that Sage's performance of the contract had become uncertain.

Upon learning that Sage had been labelling all delivered products with only a twelve-month expiration date and that Sage had not conducted any shelf-life stability testing to support even the 12-month claim, EAV notified Sage and sought assurance that Sage would be able to timely or

fully deliver product with a shelf-life stability that was commercially viable and substantiated. *See*

*Rocheux Int'l, Inc. v. U.S. Merchants Fin. Grp., Inc.*, 741 F. Supp. 2d 651, 674 (D.N.J. 2010)

("courts have generally eschewed applying formalistic requirements for the demand of adequate

assurances, instead opting for a case-specific approach that considers a party's demands in the

context of its course of dealings with the adverse party"); *see also AMF, Inc.*, 536 F.2d at 1170-71

(finding that the required liberal construction of U.C.C. supported court dispensing with § 2-609

writing requirement where context of parties' communications made it clear that the insecure party

was suspending its performance until receipt of adequate assurance). At the time EAV demanded

adequate assurance from Sage, EAV had performed all of its material obligations under the

Agreement, including, but not limited to, purchasing the required minimum number of CBD

Animal Products during the first two quarters of 2019.

Pursuant to § 72.6090, EAV properly suspended its performance under the Agreement in

May 2019 pending receipt of adequate assurance from Sage that it could timely deliver product

with commercially viable and supported sell-by dates. In response, Sage did not timely provide

adequate assurance. *See* Or. Rev. Stat. § 72.6090, *comment 4* ("[W]here a delivery has defects,

even though easily curable, which interfere with easy use by the buyer, no verbal assurance can be

deemed adequate which is not accompanied by replacement, repair, money-allowance, or [an]other

commercially reasonable cure. . . ."). Sage not only failed to assure EAV, but also refused to bear

any of the costs associated with relabeling approximately 50,000 units of the CBD Animal

Products. Moreover, testing on the shelf-life stability was not completed until October 2019,

almost ten months after the Agreement's effective date. As a result of Sage's failure to timely

provide adequate assurance of due performance of the Agreement, Sage thereby repudiated the

Agreement. *See* § 72.6090(4) ("After receipt of a justified demand failure to provide within a

reasonable time not exceeding 30 days such assurance of due performance as is adequate under

the circumstances of the particular case is a repudiation of the contract."). Accordingly, in or around May or June of 2019, EAV had the option to cancel the Agreement. *See* §§ 72.6100 and 72.7110.

Notwithstanding EAV's right to cancel the Agreement because of Sage's repudiation, EAV continued to negotiate with Sage. It did so in a good faith effort to continue the relationship with Sage and allow Sage time to solve the problems with the products that Sage was delivering. However, in or around the same time that EAV exercised its right to suspend its performance, EAV learned of additional product defects. In particular, starting in May of 2019, EAV began to receive multiple complaints from customers, trade partners, and retailers that the products did not work as intended and that users were unable to dispense CBD oil from the applicator pen. EAV continued to receive similar complaints and feedback from its customers and trade partners throughout 2019 and 2020.

As discussed above, the product defects and non-conformities presented reasonable grounds for insecurity. This is especially true where there were multiple defects and nonconformities with the product, as is the case here. *See* § 72.6090, *comment 4* ("This Act recognizes that repeated delinquencies must be viewed as cumulative."). Accordingly, by May 2019, at the latest, EAV had additional grounds to believe, and did believe, that Sage's performance of the contract had become uncertain. Again, EAV sought assurance from Sage that it could timely deliver products free from defects. Specifically, EAV reported to Sage in writing that it had received 2 Zen-Pen units that were returned to EAV's Customer Service Department with the same issue and demanded assurance from Sage that it would be able to timely deliver product that was free from defects. At the time of EAV's demand for adequate assurance from Sage, EAV was not in breach of the Agreement, including the minimum purchase requirements. Accordingly, EAV continued to properly suspend its performance under the Agreement, including

the purchase of additional products, pending receipt of adequate assurance that Sage could timely perform its end of the contract, including delivering products that were free from defects. *See* § 72.6090

Sage refused to provide adequate assurances that it could deliver non-defective products that would not jam or clog. The only "fix" that Sage offered was to provide EAV with a video whereby customers were instructed to unfold a paperclip and stick the paperclip into the back of the applicator. The purported concept was that the paperclip would release an air bubble or other pressure that had built up in the Pen and would restore functionality. Sage's proposed paperclip video was an inappropriate make-shift "fix" that was not a proper cure or commercially viable solution given that EAV sold its CBD product as a high-end premium product for between $50 and $80 to its retail customers. It was commercially untenable and unreasonable for EAV to ask customers to conduct a make-shift repair of the CBD Animal Products themselves after they had already spent substantial money on a product that was marketed to dispense 30 equal metered doses of CBD oil. *See* § 72.6090(2). "Between merchants the reasonableness of . . . the adequacy of any assurance offered shall be determined according to commercial standards"; *id.*, *comment 4* ("What constitutes 'adequate' assurance of due performance is subject to the same test of factual conditions.").

Moreover, in August of 2019, Sage informed EAV it was in dire financial straits and would not be able to meet its contractual obligations without a new infusion of capital. Sage sought an infusion from EAV. EAV requested a business plan from Sage and additional specifics on how it could Sage. Sage initially agreed to provide this information, but then went silent. This fact conclusively proves a lack of adequate assurance on Sage's part. As a result of Sage's failure to timely provide adequate assurance of due performance of the Agreement, Sage thereby repudiated the Agreement and gave EAV the right to cancel the Agreement. *See* §§ 72.6100 and 72.7110.

After repeated good faith, albeit unsuccessful, efforts by EAV to cooperate and work with Sage to resolve the various labelling and product quality issues, on or about December 6, 2019, EAV issued a written notice to Sage outlining Sage's various material breaches under the Agreement. EAV stated in the notice letter that it would exercise its right to terminate the Agreement if Sage did not fully and timely cure and resolve the product defects and Sage's various breaches of the Agreement. At the time of the December 6, 2019 written notice to Sage, EAV had fully complied with its obligations under the Agreement, including the minimum purchase requirements, because it had previously exercised its right to suspend performance pending the receipt of adequate assurances from Sage. Sage did not adequately address or cure any of the product defects or its various material breaches of the Agreement. As a result of Sage's failure to timely and fully cure any of the produce defects or otherwise adequately assure EAV, Sage repudiated the Agreement for the final time. *See* § 72.6090(4). On March 11, 2020, EAV formally cancelled the Agreement with Sage pursuant to §§ 72.6100 and 72.7110 because of Sage's repeated repudiations.

Third, even assuming Sage did not repudiate the agreement by failing to provide adequate assurances, Sage overtly repudiated the agreement. *See* Or. Rev. Stat. § 72.6100. Although the U.C.C. does not define what constitutes an "anticipatory repudiation," the comments to that section and the case law make it clear that an anticipatory repudiation is when a party clearly manifests it intent in advance of the time for performance that the required performance will not be rendered or tendered at the required time. In particular, *comment 1* provides that an anticipatory repudiation is "an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." Similarly, *comment 2* provides "repudiation can result from action which reasonably indicates a rejection of the continuing obligation." *See also AEL Indus., Inc. v. Loral Fairchild Corp.*, 882 F. Supp. 1477,

1486 (E.D. Pa. 1995) ("An anticipatory repudiation occurs whenever there is an overt communication of a 'positive and unequivocal' intention not to perform."). Here, Sage overtly communicated its intention not to timely perform its obligations by (1) notifying EAV that it would not timely deliver products containing a commercially viable and substantiated sell-by date, (2) refusing to bear any of the costs associated with relabeling products labelled with commercially unviable and unsubstantiated sell-by dates, despite having been the direct cause of the issue, (3) notifying EAV that it would not timely deliver non-defective products that would not jam or clog prior to dispensing 30 equal metered doses per pen (as expressly warranted on the product packaging), and/or (4) informing EAV in August 2019 that Sage was in dire financial straits and unable to perform the Agreement without an infusion of capital. *See, e.g.*, *Gov't of Republic of China v. Compass Communications Corp.*, 473 F. Supp. 1306, 1309 (D.D.C. 1979) ("In the instant case, there can be little question that defendant's notice of inability to perform by September, 1975, coupled with its June, 1975, admissions to plaintiff of its bad financial condition were sufficient to repudiate its performance."). As a result of Sage's repudiations, EAV was authorized to suspend its performance and cancel the Agreement, which, as discussed above, it did on March 11, 2020. *See* Or. Rev. Stat. §§ 72.6100 and 72.7110.

**B.** **Sage Cannot Prove Probable Cause that it Is Entitled to Judgment on its Anticipatory Repudiation Claim[2]**

Sage alleges that EAV repudiated the Agreement when it "expressly and unequivocally advised Sage that EAV has no intention of meeting the Minimum Purchase Requirements through the duration of the Agreements." *See* Compl., ¶¶ 58-60. EAV's March 11, 2020 letter was not a repudiation of the Agreement, but, instead a proper termination of the Agreement pursuant to

---

[2] This claim is the subject of EAV's Motion to Dismiss (ECF Nos. 18-19), which is currently pending before the Court.

Paragraph 13 and/or a proper cancellation of the Agreement pursuant to Or. Rev. Stat. §§ 72.6100 and 72.7110.

First, EAV had the contractual right to the terminate the Agreement. The MESA provided the parties with the express right to terminate the contractual relationship if the other party materially breached and then failed to cure the breach within 30 days of receipt of written notice.[3] Specifically, the MESA provides that "[i]n the event that either party materially breaches this Agreement, the other party may give such party written notice specifying such breach. Should the breaching party fail to cure such breach within 30 days (except where another cure period is specifically provided herein, and in which case such other cure period shall control), of receipt of such notice, the other party may terminate this Agreement and pursue all rights and remedies available at law and in equity." *See* MESA, ¶ 13.1. As discussed above, Sage materially breached the Agreement in several respects, including breaching its express warranty to deliver products free from defects. As a result, EAV terminated the Agreement on March 11, 2020 after providing written notice to Sage on December 6, 2019.

Second, even assuming *arguendo* that EAV did not have the contractual right to terminate the Agreement (it did), EAV had the statutory right to cancel the Agreement under the Oregon U.C.C. *See* §§ 72.6100 and 72.7110; *see AMF, Inc.*, 536 F.2d at 1171 ("Since AMF did not provide

---

[3] The MESA also provided specific instances where the right of termination was immediate. For instance, EAV had the right to terminate immediately if Sage:

- "adulterated any Product sold … or has otherwise willfully violated the provisions of this Agreement regarding quality, or … has altered or omitted an ingredient, component, process or procedure called for thereby which, in any such case, results in Products being sold to [EAV] that is not in compliance with a Statement of Work." MESA, ¶ 13.2(b);
- "misbranded Products which are subject to regulatory agency recommended or ordered seizure, destruction, or recall not timely cured by [Sage]." MESA, ¶ 13.2(c);
- "fails to deliver at least 85% of Products required by the Statement of Work or Product Orders in any six-month period." MESA, ¶ 13.2(e);
- "failed to inform [Sage] of any known deficiency in the Products." MESA, ¶ 13.2(f).

adequate assurance of performance after McDonald's March 18th demand, U.C.C. Section 2-609(1) permitted McDonald's to suspend performance. When AMF did not furnish adequate assurance of due performance at the May 1st meeting, it thereby repudiated the contract under Section 2-609(4). At that point, Section 2-610(b) permitted McDonald's to cancel the orders pursuant to Section 2-711, as it finally did on July 29, 1969.").

Third, even assuming *arguendo* that EAV repudiated the Agreement on March 11, 2020 (it did not), Sage must prove that it was ready, willing, and able to timely perform its obligations under the Agreement. *See, e.g.*, *Decor by Nikkei Int'l, Inc. v. Fed. Republic of Nigeria*, 497 F. Supp. 893, 908 (S.D.N.Y. 1980), *aff'd sub nom. Texas Trading & Mill. Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981), *cert. denied sub nom. Fed. Republic of Nigeria v. Texas Trading & Milling Corp.*, 454 U.S. 1148 (1982) (holding that under the U.C.C. "[plaintiffs] have the burden of proving that they would have been ready, willing, and able to perform under the contracts in dispute"). Here, for the reasons discussed above, Sage cannot demonstrate that it could timely deliver non-defective products that contained commercially viable and supported sell-by dates and would not jam or clog prior to dispensing 30 equal metered doses per pen. Accordingly, Sage was not ready, willing, and able to perform under the Agreement.

### C. Sage Cannot Prove Probable Cause that it Is Entitled to Judgment on Either its Breach of Contract Claim or Anticipatory Repudiation Claim Because the Agreement Is Unenforceable

In addition to the various issues addressed above, the Agreement is separately unenforceable because Sage fraudulently induced EAV to agree to its terms. Under Oregon law, a party can avoid a contract by proving that (1) the other party made a false representation of material fact and (2) the person to whom the representation was made was induced to enter the agreement in reliance upon the misrepresentation. *See State by & through Bus. Dev. Dep't v. Huttenbauer*, 456 P.3d 340, 347 (Or. Ct. App. 2019).

First, Mr. Calafiore, on behalf of Sage and Sage Door, represented that Sage was a company "engaged in the business of manufacturing, and the wholesale distribution of certain cannabinoid products" and was an experienced, well-financed and capitalized manufacturer and producer of CBD oil products for human use, which wanted to expand into CBD pet products and would bring its full experience, expertise, staff, and resources to support EAV's proposed product line. In truth and in fact, and unbeknownst to EAV, Mr. Calafiore intended, for liability purposes, to create a new separate Sage limited liability company that was under-funded, under-staffed and therefore lacked the capital and resources to fully and/or timely meet the demands of the EAV contract.

Second, in or around September 2018, Mr. Calafiore represented to EAV that Sage required an advance payment of $250,000 prior to or contemporaneous with the signing of the contract (the "Advance Payment"). Mr. Calafiore expressly stated that the need for the Advance Payment was for Sage to "secure biomass for CBD extraction" in order to supply EAV with the CBD Animal Products. On or around October 2, 2018, prior to execution of the Agreement, Mr. Calafiore again demanded that EAV pay more than half of the Advance Payment ($135,000) for "securing biomass for CBD extraction". He threatened that "[i]f we miss the deposit, I cannot guarantee the availability of the biomass and would be in a very tough spot to find the material."

Based solely in reliance upon Mr. Calafiore's representations, EAV agreed to provide Sage with the Advance Payment by transferring $125,000 to Sage prior to the signing of the contract and then providing an additional $125,000 upon the signing of the contract. In return, Sage agreed that it would use the Advance Payment to secure the biomass needed and would provide a credit to EAV against future purchases of CBD Animal Products in the amount of the Advance Payment, plus interest of $62,500. However, Sage has stated in sworn interrogatory responses that it never used the Advance Payment for biomass and has admitted in its Prejudgment Remedy Motion that

it never provided any credit or compensation to EAV for the Advance Payment. This constitutes a material breach of the SOW, which required repayment of the Advance Payment, plus interest, for each month between May and October of 2019. In fact, in its December 2019 notice of breach letter, EAV demanded that Sage repay the Advance Payment and when Sage refused to do so within thirty days, EAV had every right to terminate the contract.

Third, between August and October of 2018, Mr. Calafiore repeatedly represented that the Pen Sage had sourced from the third-party manufacturer for use in the CBD Animal Products was only a temporary, stop-gap solution and Sage would design, develop and/or procure a fully-customized pen for EAV's intended usage within six (6) months after the signing of the contract. Upon information and belief, Sage never designed, developed or procured a customized new version of the Pen or made any meaningful effort in 2018 or 2019 to secure a new customized Pen for EAV. It appears that, notwithstanding that time was of the essence, Mr. Calafiore and Sage had no intention of securing a customized Pen for EAV within the above time frame and made the misrepresentations with the sole intent of inducing EAV to enter into a contract with Sage and make the Advance Payment.

Fourth, Mr. Calafiore, on behalf of Sage, also pushed EAV to include very aggressive, artificially-high minimum purchase requirements in the EAV contract as an accommodation to Sage in order, according to Mr. Calafiore, to secure an adequate or guaranteed supply of pens or applicators from a third-party manufacturer at an attractive price. In response to Sage's request, EAV relied upon Mr. Calafiore's representation that he understood the "minimums" were aggressive and would likely not be met, particularly in the near term during EAV's initial promotion and product launch of a new product in a nascent market, and that the minimums would likely need to be adjusted by the parties. In truth and in fact and unbeknownst to EAV, Mr.

Calafiore sought to include the minimum purchase requirement in the contract as leverage against EAV.

Fifth, during the course of the parties' negotiation of the contract, Mr. Calafiore assured EAV that Sage's prices to EAV would be discounted and be favorably below market prices for both pens and CBD oils, in consideration for the exclusivity conferred on Sage. Mr. Calafiore represented such favorable pricing was possible in part because of the $250,000 advance, which would secure an adequate supply of CBD biomass and the contractual purchase minimums, which would secure an adequate supply of pens at an attractive price. Mr. Calafiore represented such savings would be passed on and reflected in the prices Sage would charge to EAV for the pens and other CBD products. The parties' contract called for the parties to negotiate unit prices over the course of the contract's term pursuant to subsequent statements of work. A new SOW and renegotiation of unit price would have necessarily been required for the newer customized version of the pen, which Sage had promised to design, develop and procure within six months. In truth and in fact, Mr. Calafiore and Sage did not intend to charge EAV prices that reflected discounts below the going market rate for either pens or CBD gel and instead planned to charge EAV premium prices.

Mr. Calafiore made these false and misleading representations to EAV prior to the formation of the Agreement. Mr. Calafiore made these representations knowing that they were false at the time and/or that Sage had no intention of fulfilling the promises. Mr. Calafiore made these representations with the sole intent of inducing EAV to enter into the Agreement, which was an exclusive three-year contract potentially "committing" EAV to purchase millions of dollars in products from Sage. EAV reasonably relied upon these representations in entering into the

Agreement. As a result of Mr. Calafiore's and Sage's fraudulent inducement, the Agreement, including the minimum purchase requirements thereunder, is voidable and/or unenforceable.[4]

### D. Sage Cannot Prove Probable Cause that it Is Entitled to Judgment on its CUTPA Claim

As argued in EAV's Motion to Dismiss (ECF Nos. 18-19, 25), which remains pending before the Court, Sage's CUTPA claim is insufficient as a matter of law because it is based solely on a mere breach of contract, which is insufficient to rise to the level of a CUTPA violation absent "aggravating circumstances" surrounding the breach. Here, Sage has not alleged any aggravating circumstances in the Complaint.

In its opposition to the motion to dismiss, Sage argues that (a) Sage was formed at EAV's "urging" to "fulfill under an exclusive arrangement a multi-million dollar contract", (b) EAV "intentionally and repeatedly breach[ed] its commitments", and (c) EAV "us[ed] the financial pressure it created to force [Sage] into accepting 'a different arrangement'". *See* Sage's Memorandum in Opposition to Motion to Dismiss. at pp. 27–28 (ECF No. 24). As discussed in EAV's reply brief (ECF No. 25), each of these arguments is insufficient to survive a motion to dismiss. Notwithstanding, even assuming *arguendo* Sage's CUTPA claim survives, Sage cannot demonstrate probable cause that it is entitled to judgment on this claim.

---

[4] Even if EAV was not fraudulently induced to agree to the terms of the MESA, the MESA is an unenforceable agreement to agree. The purchase price for future purchases of units during the term of the MESA is an omitted material term, which the parties were obligated to negotiate in good faith via subsequent "statements of work", subject to Sage's obligation to provide EAV with favorable, below-market prices in consideration for the exclusivity conferred on Sage under the MESA. Or. Rev. Stat. § 72.3050 provides that "[t]he parties *if they so intend* can conclude a contract for sale even though the price is not settled." Subsection (4) provides "[w]here, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract." Comment 2 to this provision makes clear that "[u]nder some circumstances the postponement of agreement on price will mean that no deal has really been concluded, and this is made express in the preamble of subsection (1) ("The parties *if they so intend*") and in subsection (4)." (emphasis original). Here, the parties did not intend to be bound by the minimum purchase requirements where the price was not agreed upon, particularly with respect to the new customized version of the Pen which would have entailed a to-be negotiated subsequent SOW with newly-negotiated pricing. Accordingly, EAV is not bound by the minimum purchase requirements.

First, contrary to Sage's claim that Sage was formed at EAV's "urging" to "fulfill under an exclusive arrangement a multi-million dollar contract", EAV did not even learn that a new separate Sage limited liability company was created until this litigation was commenced.

Second, as discussed herein, EAV has not breached the Agreement, let alone "repeatedly" or "intentionally". Even if EAV had breached the minimum purchase requirement, Sage disingenuously attempts to parse out each quarterly obligation to purchase as a separate and independent breach. Sage has alleged only one true breach of contract (EAV's purported failure to purchase the minimum required amount of Sage's products). Moreover, even if EAV's purported failure to meet the minimum purchase requirement constituted multiple breaches, multiplicity of breaches alone is not sufficient grounds for establishing a CUTPA violation. *See* EAV's Reply Memorandum in Support of Motion to Dismiss, at pp. 8-10 (ECF No. 25).

Third, an attempt to renegotiate after a breach does not qualify as an aggravating circumstance as it only "goes to defendants' conduct subsequent to the breach." *Levitz, Lyons and Kesselman v. Reardon Law Firm, P.C.*, 3:20-cv-00444-VAB, 2005 WL 8166987, at *4-5 (D. Conn. Mar. 31, 2005) (Arterton, J.). Moreover, there is no evidence to support the conclusory claim that EAV used the financial pressure it created to force Sage into accepting "a different arrangement." Indeed, the Complaint lacks any alleged conduct occurring <u>after</u> EAV terminated the Agreement on March 10, 2020.

### E. Sage Cannot Prove Probable Cause that it Is Entitled to Judgment in the Amount of $10 Million

Sage cannot prove that it is entitled to a judgment in the sum of $10,359,320. In ruling on Sage's application, the Court must "consider not only the validity of the plaintiff's claim but also the amount that is being sought." *Baltas*, 2019 WL 1552915, at *6–7. A plaintiff is "bound to

furnish proof of his damage with reasonable probability, and not leave the trial court to speculation and conjecture." *Id.*

As discussed above, Sage is not entitled to any damages during the first two quarters of 2019 because EAV fully complied with the minimum purchase requirements. Additionally, Sage is not entitled to any damages in respect of the third and fourth quarters of 2019, or the first quarter of 2020 because EAV properly suspended its performance pursuant to the Oregon's U.C.C. in response to Sage's repudiations and/or Sage waived the minimum purchase requirements. Finally, Sage is not entitled to any damages from March 11, 2020 through the end of the term of the Agreement (December 31, 2021) because EAV rightfully terminated the agreement pursuant to the termination clause in the agreement and/or cancelled the agreement pursuant to Oregon's U.C.C.

Nonetheless, assuming the Court were to conclude that EAV did not properly suspend its performance or terminate and/or cancel the Agreement, Sage cannot prove its damages. First, Sage is still not entitled to damages because of the Agreement's limitation on liability and remedies provision.[5] In particular, the MESA contains a mutual limitation of damages clause, which applies equally to both parties. Specifically, Paragraph 12 (titled "LIABILITY") states as follows:

> **NEITHER PARTY SHALL BE LIABLE IN CONTRACT, TORT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, GOODWILL, TIME, SAVINGS OR REVENUE**. The provisions of this Section shall survive the expiration or earlier termination of this Agreement.

---

[5] This argument is the subject of EAV's Motion to Dismiss (ECF Nos. 18-19), which is currently pending before the Court.

*See* MESA, ¶ 12 (bold font and capitalizations in original). Therefore, as discussed in EAV's Motion to Dismiss, Paragraph 12 of the MESA precludes Sage from recovering "lost profit," or "incidental damages."

Second, even assuming Sage could recover its lost profits, Sage's damages are dramatically overstated. For example, Sage's calculation improperly assumes that the price would have remained constant throughout the entire three-year term of the agreement. The MESA required Sage to negotiate in good faith the purchase price for future purchases of units (specifically including for the new version of the pen) via subsequent "statements of work", subject to Sage's obligation to provide EAV with favorable, below-market prices in consideration for the exclusivity conferred on Sage under the MESA. Sage failed and/or refused to deliver a newly-designed, customized pen for EAV within six months of executing the Agreement, as promised, which would have necessarily required a new SOW to cover the new version of the pen. A new SOW would have included new pricing terms reflecting the massive drop in the price of CBD biomass and oils that occurred in 2019. Paragraph 1.4(b) of the MESA permitted EAV to purchase CBD from any other supplier if the parties failed to agree on price.

Sage relies on *Tigg Corp. v. Dow Corning Corp.*, 962 F.2d 1119, 1129 (3d Cir. 1992), *cert. dismissed*, 506 U.S. 1042 (1992) to support its claim that its purported damages should be calculated under Or. Rev. Stat. § 72.7080(2). The Third Circuit in *Tigg Corp.*, however, reversed the trial court's damages award on the basis that the court improperly instructed the jury on lost profit damages under U.C.C. 2-708(2). As the court stated, "[a] seller's damages for non-acceptance or repudiation are generally measured by 'the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in [U.C.C. Article 2], but less expenses saved in consequence of the buyer's breach." *Tigg Corp.*, 962 F.2d at 1129 (citing corresponding to U.C.C. § 2–708(1)). Section 72.7080(2)

provides for damages measured by "the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in [U.C.C. Article 2], due allowance for costs reasonably incurred and due credit for payments or proceeds of resale." "[T]his remedy, however, is available only '[i]f the measure of damages provided in subsection (1) [contract/market damages] is inadequate to put the seller in as good a position as performance would have done...." *Tigg Corp.*, 962 F.2d at 1129 (citing corresponding to U.C.C. § 2–708(2)).

Here, Sage has not met, and cannot meet, its burden of showing that § 72.7080(1) is inadequate. In *Madsen v. Murrey & Sons Co., Inc.*, 743 P.2d 1212, 1216 (Utah 1987), for example, the court stated that the general rule requires application of U.C.C. 2-708(1) "where the trial court finds that a reasonably accessible market exists wherein the aggrieved seller can market its goods." Utah's Supreme Court affirmed the trial court's conclusion "that seller failed to perform its duty to mitigate its damages by not marketing or attempting to sell [product at issue] on the open market. Having found that a market existed, seller's damages must be determined under section [2–708(1)]." *Id.* Here too, Sage has not demonstrated that it has made any effort to sell the CBD Animal Product on the market or otherwise mitigate its purported damages. The mere fact that the parties had an exclusive agreement does not relieve Sage of its duty to mitigate.

Third, to the extent lost profits are available under the Agreement, EAV would be permitted to set-off its own lost profits for its yet to be pled breach of contract counterclaim, as well as for damages resulting from its breach of implied covenant of good faith and fair dealing, fraud, and CUTPA counterclaims. *See* Conn. Gen Stat. § 52–278d(a)). For example, under Or. Re. Stat. § 72.7140, where a buyer has accepted goods that are not as warranted by the seller, as is the case here, the buyer may recover as damages the loss resulting in the ordinary course of events from the seller's breach, measured as the difference between the value of the goods accepted and the

value they would have had if they had been as warranted together with any incidental and consequential damages under Or. Rev. Stat § 72.7150. *See Taylor v. Ramsay-Gerding Const. Co.*, 226 P.3d 45, 55, *opinion adhered to as modified on reconsideration*, 234 P.3d 129 (Or. Ct. App. 2010). Additionally, EAV is entitled to damages computed through the "market price" formula under Or. Rev. Stat. § 72.7130 for seller's repudiation of the agreement together with any incidental and consequential damages. *See McGinnis v. Wentworth Chevrolet Co.*, 668 P.2d 365, 370 (Or. 1983).

Fourth, Sage's calculation of its lost profits also does not take proper or full account of the costs it would have incurred in supplying products to EAV over the balance of the contract term.

Lastly, Sage's damages calculation wholly ignores the fact that in August of 2019, Sage acknowledged it lacked the resources and capital to produce 200,000 units every two quarters, which is a core assumption underlying such calculation.

## CONCLUSION

For the foregoing reasons, EAV respectfully requests that this Court deny Plaintiff's Motion for Prejudgment Remedy.

DEFENDANT
**EARTH ANIMAL VENTURES, INC.**

/s/ *Brian E. Moran*
Brian E. Moran (ct05058)
Andrew A. DePeau (ct30051)
Trevor L. Bradley (ct29993)
ROBINSON & COLE LLP
1055 Washington Blvd., 9th Floor
Stamford, Connecticut 06901
Phone: 203-462-7512
Fax: 203-462-7599
Email: bmoran@rc.com
adepeau@rc.com
tbradley@rc.com

*Attorneys for Defendant*

## <u>CERTIFICATION</u>

I hereby certify that on September 1, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent via e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing though the Court's CM/ECF System.

*/s/ Trevor L. Bradley*
Trevor L. Bradley