# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| SAGE FULFILLMENT, LLC, | Civil Action No. 20-CV-444-VAB |
| Plaintiff, | |
| v. | |
| EARTH ANIMAL VENTURES, INC., | |
| Defendant. | SEPTEMBER 15, 2020 |

## PLAINTIFF'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS APPLICATION FOR A PREJUDGMENT REMEDY

In response to Sage's motion for a prejudgment remedy, EAV filed a brief that is revealing but in ways EAV never intended. By failing to counter Sage's proof of breach and by flogging entirely new contentions, it divulges that EAV's defenses are hollow. EAV ignores the material elements of Sage's claim of breach – namely, that EAV failed to meet the minimum purchase requirements of 40,000 units in Q2, Q3, and Q4 of 2019 and Q1 of 2020, and of 400,000 units in 2019. Moreover, by displaying a Hydra-like capacity to fabricate new defenses, EAV tacitly admits the inadequacy of its earlier claims – so many heads lopped off, only to be replaced with other meritless arguments. In sum, the probable cause that Sage established in its initial papers remains fully intact and warrants the requested relief.

EAV's brief is unsupported. By contrast, Sage supplied by a declaration and exhibits to account for, among other things, the exact history and timing of the purchase orders that EAV submitted, including the ones Sage filled and when, and those EAV cancelled. (Calafiore Decl., Doc. 29, ¶¶45-48, & Ex. C.) That history shows EAV's breaches of the minimum purchase requirements with mathematical precision. Sage also identified the revenues associated with

106426863.2

106461075.1

EAV's actual and unfulfilled purchases. (*Id.* ¶ 60 & Ex. G.) EAV contests none of those facts. Instead, it invents new defenses even more detached from the facts and law in an effort to avoid its obligations. Page limitations prevent Sage from identifying and refuting all of the many misstatements of fact and law in EAV's opposition. This reply brief will focus on what appear to be EAV's core arguments; Sage denies the rest.

## I. EAV's "New" Defenses Are Fundamentally Flawed and Demonstrate the Weakness of EAV's Claimed Defenses

In search of some better excuses, EAV's opposition floats several, newly-minted defenses. The most stunning of these inventions appears on pages 11-12, where EAV contends that in May 2019 "the parties agreed to suspend several contractual obligations, including EAV's obligation to place minimum purchase orders, until 2020." The evidence flatly refutes that canard. To alter the Agreements would require a written amendment signed by both parties; EAV offers none. (Doc. 29, Ex. A, ¶ 15.1.) Moreover, the parties' correspondence in late 2019 belies EAV's claim. On November 16, 2019, Sage wrote advising that EAV breached the minimum purchase requirements. (*Id.*, Ex. D.) Twenty days later, EAV responded by cataloging every argument EAV could imagine to claim Sage was in breach. (*Id.,* Ex. E.) And yet, what clearly would have been the leading and dispositive point to refute Sage's claim of breach – an agreement reached in May to suspend the minimum purchase requirements – appears nowhere in the three-plus, single-spaced pages of EAV's letter. (*Id.*) By offering such a demonstrably false claim now, EAV effectively admits that its earlier defenses are untenable.

EAV presents a second new defense that, like the first, rests on something that never happened. Without providing any evidence, EAV claims that it "sought assurance that Sage would be able to timely or fully deliver product with a shelf-life stability that was commercially viable or substantiated." (Doc. #43 at 29-30.) The absence of any details – much less
106426863.2
106461075.1
-2-

documentation – of this supposed request is telling.  Nevertheless, EAV contends it was entitled to suspend its performance in accordance with Or. Rev. Stat. § 72.6090, which provides:  "When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until that party receives such assurance may if commercially reasonable suspend any performance for which that party has not already received the agreed return."  In fact, EAV never demanded adequate assurance, which explains why this supposed justification appears nowhere in its December 2019 letter.

Lacking the necessary written demand for assurances, EAV cites two cases from outside of Oregon to evade the statutory requirement.  These cases are factually inapposite, legally outmoded, or both.  In one case, the court construed a *seller's* letter, in the context of other communications, to suffice as a demand for assurances the buyer would pay for undelivered goods, despite absence of the word "assurance" in the letter.  *Rocheux Int'l of N.J., Inc. v. U.S. Merchants Fin. Grp., Inc.,* 741 F. Supp. 2d 651, 673 (D.N.J. 2010).  By contrast, EAV identifies no letter -- with or without the word "assurance."  In the other case – which dates to 1976 – the Seventh Circuit made an *Erie* prediction of Illinois law that an oral demand would suffice in the context of the facts at issue.  *AMF, Inc. v. McDonald's Corp.*, 536 F.2d 1167, 1170–71 (7th Cir. 1976).  Nearly twenty years after *AMF*, however, the Seventh Circuit acknowledged that "the most recent Illinois cases insist on strict compliance with the terms of the section."  *Chronister Oil Co. v. Unocal Ref. & Mktg.*, 34 F.3d 462, 464 (7th Cir. 1994).  Courts in and outside the Seventh Circuit recognize that *AMF* is not good law in Illinois or elsewhere.  *Koursa, Inc. v. manroland, Inc.*, 971 F. Supp. 2d 765, 792 (N.D. Ill. 2013) (applying Illinois law and holding that the party must "meet the now-strictly interpreted writing requirement under UCC Section 2–609(1)."); *Beijing Auto. Indus. Imp. & Exp. Corp. v. Indian Indus., Inc.*, 105 F. Supp. 3d 879, 899-900

(S.D. Ind. 2015) (predicting despite *AMF* that Indiana would require a written demand); *see also Scotts Co. v. Cent. Garden & Pet Co.*, No. 2:00-CV-755, 2002 WL 1578781, at *4 (S.D. Ohio Apr. 22, 2002) (rejecting *AMF* under Ohio law as "contrary to the language of the statute which requires evidence of a written demand for assurance of performance."). Thus, EAV cannot justify its breach by calling it a "suspension" of performance while awaiting supposed "assurances" that EAV never properly sought (if at all).

EAV's new excuse about demanding assurances of a longer shelf-life is particularly pernicious in light of what actually happened. For months, EAV accepted the Products marked with a one-year life. By May 2019, however, shelf-life took on much greater significance to EAV, because it had been selling far fewer units than expected, resulting in a large inventory of aging products. EAV's solutions to the inventory build-up were to cancel existing orders, stop placing new orders, and push Sage for a longer shelf-life. Sage had already engaged a laboratory to conduct stability studies. The study's results arrived in October and confirmed a two-year shelf-life, which allowed the parties to change the expiration dates on the inventory. Despite receiving this "assurance" of a longer shelf-life, however, EAV did not "un-suspend" its performance and order any new products. The truth is that EAV suspended its performance in May because of its poor sales. Weak sales and EAV's willingness to welch on its commitments continued even after the study's results. EAV's carping about sell-by dates was and is a pretext.

The entire shelf-life charade is also an example of EAV's straining to accuse Sage of breaching non-existent, contractual obligations. The MESA and SOW1 are silent about shelf-life or sell-by dates. EAV pretends it can rewrite the agreements and impose these obligations retroactively on Sage. Furthermore, EAV's accusations that Sage violated the law are also unsupported and false. In May 2019, EAV asked Sage about how it chose the twelve-month sell-

by date and any plans for setting a longer shelf-life. Dr. Lauri Schultz, a PhD in Organic Chemistry, who worked at Sage and led the shelf-life issue, explained to EAV's Chris Moore on May 9, 2019 that the initial sell-by dates were set based on the properties of the ingredients. She also advised that stability studies were underway to assess whether the dates could be extended. Moore's response: "Your reply and explanation is exactly what we were hoping for and speaks to your commitment for getting it right . . . ." EAV cannot convert "precisely what we were hoping for" into a breach of the Agreements; nor can it show that Sage violated any law by reasonably choosing a conservative period of one year based on the ingredients.

In another new argument, EAV declares that Sage "fraudulently induced" EAV to enter into the contracts. EAV claims that it was misled about the experience of a Sage affiliate in the human CBD market and about the prices that Sage could offer. These arguments cannot withstand even mild scrutiny, much less meet the heavy burdens of proving fraud. EAV was represented at all times by counsel and should have incorporated into the agreements any representations it believed were material. Moreover, EAV knew in advance the prices Sage would charge for the Products, because SOW1 – which EAV received *before* it signed and became bound – accurately identifies the prices of the two versions of the Products. (Doc. 29, Ex. B ¶ 2.) Moreover, the alleged misstatements that EAV attributes to Sage would constitute puffery, at most, not actionable fraud. *See, e.g.*, *Gordon & Breach Science Publishers S.A. v. Am. Inst. of Physics,* 905 F. Supp. 169, 182 (S.D.N.Y. 1995) (holding that statements such as "most cost-effective prices" and "subscription prices as low as possible" were mere puffery); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 399 (S.D.N.Y.) (statement that company is "a leader in developing and commercializing a broad and diverse portfolio of cancer

therapies and deliver therapeutic outcomes that dramatically changed patients' lives" was puffery), *aff'd*, 757 F. App'x 35 (2d Cir. 2018).[1]

EAV also claims misrepresentations about Sage's intent to secure a custom Pen designed within six months of signing the Agreements. Aside from failing to include that supposed obligation in the agreements, EAV intentionally omits several other important facts that undermine this argument. First, by the six-month point in SOW1, EAV was already in breach and awash with unsold inventory. EAV made clear in May 2019 that it wanted to suspend purchasing any new units until 2020 (a proposition Sage *rejected*). Second, while Sage was ready, willing, and able to search for a new pen, that process would not have been completed until 2020. Neither party wanted to repeat what happened before: EAV's impatience to rush to market in early 2019 and its fickleness in selecting pens had compressed the development time for the pen currently in use. Third, for these same reasons, even if Sage had intentionally misled EAV about the possibility of finding a new pen (which it did not), those alleged misstatements did not harm EAV. What harmed EAV was its own failures to market the products and its overestimation of the market response. Sage had no part in either.

EAV presents its final new argument in a footnote. It contends, without factual or legal support, that the Agreements were precatory agreements to later reach actual agreements. Doc. #43 at 40 n.4. This specious argument is worth noting only to provide a complete picture of

---

[1] EAV also suggests that the Minimum Purchase Requirements were "aggressive" and foisted upon it by Sage. Doc. #43 at 48. This is yet another tale that the facts belie. EAV initially projected *600,000* units of sales each year. As the time came to close the Agreements approached, however, EAV sought to reduce the minimum order quantity to 330,000 per year. Sage responded that it could not go below 400,000 without raising per-unit pricing. The parties settled on 400,000. Thus, EAV chose to accept a greater level of risk that its estimated sales were high for the certainty of the pricing it wanted. EAV's hindsight and regret about that choice neither void its commitments nor license it to blame others.

EAV's shotgun approach and ever-shifting defenses, which are hallmarks of bad faith. *See Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 42 (1st Cir. 2000) (referring to the defendant's "obstructionist strategy" and "constantly shifting" rationales to avoid payment). EAV appears to argue that the parties intended SOW1 to be only some sort of trial agreement, which would give EAV the "do-over" it later wanted. To be sure, the parties were free to negotiate amendments to these contracts, as is always true. The parties' recognition of the possibility of later amendments, however, does nothing to negate the fact they entered into a binding contract, nor does it relieve EAV of its obligation to honor that contact.

Another of EAV's new claims is that Sage breached the time-is-of-the-essence provision by making certain unspecified late deliveries. Even a material breach of that provision is curable and does not trigger a right of immediate termination. (Doc. # 29, Ex. A, ¶¶ 6.1, 13.1, 13.2(e), and 15.7.) Moreover, EAV waived any breach by accepting any late deliveries. *See, e.g.*, *Zamoiski Co. v. Tenavision, Inc.*, 1986 WL 10274, at *4 (S.D.N.Y. Sept. 9, 1986).

Finally, EAV contends Sage could not perform its obligations. EAV attributes to Sage statements in August 2019 cash flow difficulties – caused by EAV's breaches. Sage never said it was not ready, willing, and able to perform. Sage had the capacity to fill any purchase order, provided that EAV met its obligations to provide a forecast and adequate lead time under Paragraph 5.1 of the MESA. In fact, Sage continued to make other CBD Animal Products for EAV throughout the course of 2019. To be sure, EAV's breaches hurt Sage, but it retained the core capacity to manufacture and to supply the Products pursuant to the Agreements.

## II.   EAV Cannot Legally or Factually Support Its Claims that Sage Breached the Agreements

EAV's cynical attempts to gin up support for its allegations of breach confirm the weakness of EAV's claims and defenses. EAV repeats its mantra that the Products were

defective because some units "jammed" or "clogged" before dispensing thirty doses of CBD Gel. (Doc. #43 at 25.) As explicated in Sage's initial brief, the possibility of bubbles is a natural phenomenon in any liquid in a syringe. Bubbles can be easily remedied by simple user intervention, *i.e.*, by releasing the bubbles. EAV cannot point to a single warranty or representation by Sage regarding the performance of the Products after delivery, much less that they all must dispense 30 doses without *any* user intervention. As with the shelf-life issue, if EAV's projections for demand had matched it expectations, EAV would have had no problem implementing the simple user intervention. EAV found this solution unacceptable not because it would not work, but because it would not solve the real problem: EAV's anemic sales.

Although EAV declares that the air bubbles in some units caused its poor sales, it fails to provide any of the details necessary to support that conclusion. Precisely how many complaints did EAV receive and when? EAV never says. How could a supposedly large and certainly new market quickly discover and react to this problem, even while EAV itself was accepting new units delivered through July? Instead of answering these questions, EAV refers to in-house testing that it did in 2020, months *after* Sage put EAV on notice of breach and EAV began looking to evade its commitments. EAV attempts to bolster its argument by comparing the rates of complaints regarding the Products with those of its best-selling product. (Doc. #43 at 19.) Thus, EAV compares an applicator with gel to No-Hide, a chewable, flavored meatless "rawhide."[2] EAV makes no effort to account for several critical differences, including the length each product was in development, the time the product was on the market, and the fact that one product includes a mechanical element and the other does not. Comparing a brand new,

---

[2] *No-Hide Wholesome Chews*, EARTH ANIMAL https://www.earthanimal.com/our-products/no-hide-wholesome-chews (last accessed Sept. 12, 2020).

mechanical device with a novel topical ointment to a well-established chew is neither fair nor particularly meaningful. And EAV never says whether it has been in a contractual dispute with the manufacturer of the meatless rawhide.

EAV also claims that Sage breached by failing to apply credits for the $250,000 EAV advanced. This argument fails for two reasons. First, the credits were not scheduled to be applied until, at soonest, May 2019, and by then EAV had ceased placing orders and began cancelling them. Second, the SOW1 explains that "any credit not used in the month to which it was allocated shall carry over and be deducted from future amounts due [from] Seller until the entire credit is depleted." (Doc. #29-2, SOW1 ¶ 4.) Once again, EAV is not entitled to impose new terms and declare Sage in breach for failing to meet those terms.

### III. Sage Is Entitled to a Prejudgment Remedy in the Amount of $10,359,320

EAV ignores Sage's core arguments that it is entitled to lost profits under Or. Rev. Stat. § 72.7080(2), because the Products are specialty goods manufactured to EAV's specifications and because Sage held no inventory of unsold units. *See, e.g.*, *M & G Polymers USA, LLC v. Carestream Health, Inc.*, No. CIV.A.07C- 11-242PLA, 2010 WL 1611042, at *43 (Del. Super. Ct. Apr. 21, 2010), *aff'd*, 9 A.3d 475 (Del. 2010). Sage considered trying to market the Products in mid-2019, but that idea died on the vine for several practical reasons – including that Sage had no sales force and the goods were unique to EAV. Moreover, Sage would not have been able to sell CBD Animal Products with Uptake to anyone other than EAV.[3]

EAV also contends that Sage's costs were higher than Sage presented in the papers supporting the motion for a prejudgment remedy, but EAV fails to elaborate on or support this

---

[3] Uptake is a key proprietary ingredient that enhances the bioavailability of CBD. Put simply, it improves the efficacy of CBD. EAV uses Uptake in other products and holds the rights to this name.

contention. Sage carefully and accurately presented the costs it incurred and would incur to produce the Products consistent with the Minimum Purchase Requirements under the Agreements.

EAV's remaining arguments essentially rehash contentions raised in its motion to dismiss. Sage has addressed these arguments before and incorporates by reference those arguments. (*See, e.g.*, Doc. #24 at 14-33; Doc. #28 at 19-27.) EAV has also implicitly refuted these arguments by presenting other entirely new defenses in its opposition brief.

## CONCLUSION

Sage has more than met its burden to establish probable cause to support its motion for a prejudgment remedy. Despite EAV's "kitchen-sink" approach of asserting, in waves, a litany of ever-varying defenses,[4] the simple facts remain: (a) EAV contractually committed to meet specific minimum purchase requirements each quarter (40,000 units) and year (400,000 units); (b) when its early sales proved to be disappointing, EAV breached by cancelling some outstanding orders, issuing no new orders, and repudiating its obligations – all while trying to shift the blame Sage; and (c) EAV's breaches caused Sage to lose profits exceeding $10 million.

For the foregoing reasons and those stated in its opening brief, as well as the evidence to be adduced at the hearing on this motion on October 13, 2020, Sage respectfully requests that this Court grant its motion for a pre-judgment remedy in the amount of **$10,359,320**.

---

[4] Courts recognize and reject similar efforts to assert "seemingly every defense and privilege under the sun, as surely at least one sticks." *Westgate Resorts, Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1349 (M.D. Fla. 2019); *see also Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, No. 01 CIV. 6600 (RLC), 2005 WL 3370542, at *6 (S.D.N.Y. Dec. 12, 2005), *aff'd sub nom. ITIS Holdings Inc. v. Southridge Capital Mgmt. LLC*, 329 F. App'x 299 (2d Cir. 2009) (criticizing a party for invoking "an everything-but-the-kitchen-sink list of affirmative defenses").

**PLAINTIFF,**
**SAGE FULFILLMENT, LLC**

By /s/ Daniel L. FitzMaurice
    Daniel L. FitzMaurice (ct05331)
    Nicholas M. Lombard (ct30928)
    Day Pitney LLP
    242 Trumbull Street
    Hartford, CT 06103
    (860) 275-0100
    (860) 275-0343 (fax)
    dlfitzmaurice@daypitney.com
    Its Attorneys

## **CERTIFICATE OF ELECTRONIC FILING**

      I hereby certify that on September 15, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                          */s/ Daniel L. FitzMaurice*
                                            Daniel L. FitzMaurice