| | | |
|---|---|---|
| SAGE FULFILLMENT, LLC | : | |
| | : | |
|     Plaintiff, | : | |
| V. | : | |
| | : | CIVIL NO. 3:20-CV-00444 (VAB) |
| EARTH ANIMAL VENTURES, INC., | : | |
| | : | |
|     Defendant. | : | NOVEMBER 6, 2020 |

## DEFENDANT'S ANSWER,
## AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Defendant Earth Animal Ventures, Inc. ("EAV," "Defendant" or "Counterclaimant"), by and through its undersigned attorneys of record, for its Answer, Affirmative Defenses and Counterclaims in response to the Complaint in this action and against Plaintiff Sage Fulfillment, LLC ("Sage or "Plaintiff") and Counterclaim Defendants The Sage Door, LLC and Richard Calafiore (collectively, the "Counterclaim Defendants"), responds and alleges as follows:

## ANSWER

## THE PARTIES

1.　　Defendant lacks sufficient knowledge or information to admit or deny the allegations of paragraph 1 of Sage's Complaint and therefore leaves Plaintiff to its proof.

2.　　Defendant lacks sufficient knowledge or information to admit or deny the allegations of paragraph 2 of the Complaint and therefore leaves Plaintiff to its proof.

3.　　Defendant admits the allegations of paragraph 3 of the Complaint.

4.　　Defendant denies the allegations of paragraph 4 of the Complaint. Earth Animal Ventures, LLC is no longer in existence and has since been removed as a party defendant in this action. *See* Order (Doc. Entry No. 21).

## JURISDICTION AND VENUE

5.     Defendant lacks sufficient knowledge or information to admit or deny the allegations of paragraph 5 of the Complaint and therefore leaves Plaintiff to its proof.

6.     Defendant lacks sufficient knowledge or information to admit or deny the allegations of paragraph 6 of the Complaint and therefore leaves Plaintiff to its proof.

7.     Defendant lacks sufficient knowledge or information to admit or deny the allegations of paragraph 7 of the Complaint and therefore leaves Plaintiff to its proof.

8.     Defendant admits the allegations of paragraph 8 of the Complaint.

9.     Defendant admits the allegations of paragraph 9 of the Complaint.

10.     Defendant admits the allegations of paragraph 10 of the Complaint.

11.     Defendant admits the allegations of paragraph 11 of the Complaint.

12.     Defendant admits the allegations of paragraph 12 of the Complaint.

13.     Defendant admits to allegations of paragraph 13 of the Complaint.

14.     Defendant lacks sufficient knowledge or information to admit or deny the allegations of paragraph 14 of the Complaint and therefore leaves Plaintiff to its proof.

15.     Defendant admits the allegations of paragraph 15 of the Complaint.

16.     Defendant denies the allegations of paragraph 16 of the Complaint, but admits EAV commenced discussions with Richard Calafiore ("Calafiore") and John Thornton about The Sage Door LLC ("Sage Door") possibly supplying EAV with a cannabinoid ("CBD") gel product for use on pets, which product contemplated the use of an ingredient known as "Uptake."

17.     Defendant denies the allegations of paragraph 17 of the Complaint, but admits that the parties discussed Sage Door becoming EAV's exclusive supplier for the CBD pet product.

18.     Defendant lacks sufficient knowledge or information to admit or deny the allegations of paragraph 18 of the Complaint and therefore leaves Plaintiff to its proof.  At all relevant times, Defendant was led by Sage, Sage Door and Calafiore to believe, prior to the formation of the Agreement, that Sage was a well-funded and capitalized company that was experienced in the CBD oil marketplace.

19.     Defendant admits the allegations of paragraph 19 of the Complaint.

20.     Defendant admits the allegations of paragraph 20 of the Complaint.

21.     Defendant admits the allegations of paragraph 21 of the Complaint.

22.     Defendant admits the allegations of paragraph 22 of the Complaint.

23.     Defendant denies the allegations of paragraph 23 of the Complaint, but admits that the SOW1 is effective from January 1, 2019 through December 31, 2021 unless the Agreements are properly terminated or if the parties reached an agreement on superseding Statements of Work, including one based on the substitution of a new customized applicator Pen.

24.     Defendant admits the allegations of paragraph 24 of the Complaint.

25.     Defendant denies the allegations of paragraph 25 of the Complaint.  Defendant markets the Products under the name Earth Animal Nature's Comfort CBD Gel Pen.

26.     Defendant denies the allegations of paragraph 26 of the Complaint, but admits that SOW 1 provides that EAV shall exclusively purchase the CBD pet products from Sage and Sage shall exclusively supply the CBD pet products to EAV during the term of the parties'

agreement, subject to future to-be negotiated terms (including volume and price) in subsequent statements of work, assuming both parties fully comply with said Agreement.

27.     Defendant lacks sufficient knowledge or information to admit or deny the allegations of paragraph 27 of the Complaint and therefore leaves Plaintiff to its proof.

28.     Defendant denies the allegations of paragraph 28 of the Complaint, but admits that the Pen and CBD Gel are not the only key components of the Products. The Products had other key components, including packaging, labelling, and expiration date information.

29.     Defendant denies the allegations of paragraph 29 of the Complaint, but admits that, prior to Sage supplying the CBD pet product to EAV, Sage Door and Calafiore presented to EAV certain purchase options that Sage Door represented it could supply to EAV in fulfillment of the parties' eventual Agreement. EAV's testing was limited to testing for efficacy (i.e., whether it had a positive effect on animals by changing symptoms) and for form factor and ease of use.

30.     Defendant denies the allegations of paragraph 30 of the Complaint, but admits that, in or around May 2018, Sage Door provided to EAV certain CBD gel samples that Sage Door and Calafiore represented satisfied the intended use of the CBD pet products that eventually were the subject of the parties' eventual Agreement.

31.     Defendant denies the allegations of paragraph 31 of the Complaint, but admits that Sage Door provided EAV with certain samples of metered pens or applicators that Sage Door and Calafiore represented satisfied the intended use of the CBD pet products that eventually were the subject of the parties' eventual Agreement.

32.     Defendant denies the allegations of paragraph 32 of the Complaint, but admits that EAV initially expressed a preference for one of the applicators or pens that Sage Door and

Calafiore represented were appropriate for the parties' intended use and initially expressed a preference for one of the CBD gel formulations that Sage Door and Calafiore represented were appropriate for the parties' intended use, but that EAV subsequently disclaimed such preference and explained to Sage that the pen options Sage presented were, at best, only a stopgap or temporary design to enable EAV to launch a product, but that a new customized design or version would need to be developed and supplied in the near term. Sage (through Calafiore), in turn, acknowledged the need to develop a new version of a customized pen for EAV and agreed to design, develop and/or procure a customized pen for EAV and represented such a pen could be designed, developed, tested and supplied within a matter of months. Sage's performance of its contractual obligations, including the development of customized pen upgrades (laser edge labelled pen and customized, premium form factor pen), were made time of the essence.

33.     Defendant denies the allegations of paragraph 33 of the Complaint, but admits that EAV provided Sage with information as to the intended use of the pens and CBD gel to treat pets and Sage (through Calafiore) assured EAV that it could provide both a pen applicator and a CBD gel that would satisfy such intended use and further that Sage would commit to developing a customized or newer version of the pen in the near future to satisfy EAV's intended use.

34.     Defendant lacks sufficient knowledge or information to admit or deny the allegations of paragraph 34 of the Complaint and therefore leaves the Plaintiff to its proof.

35.     Defendant denies the allegations of paragraph 35 of the Complaint, but admits that EAV received samples of the pens and CBD gels from Sage Door that Sage (through Calafiore) represented and warranted satisfied the parties' intended use of the CBD pet products.

36.     Defendant lacks sufficient knowledge or information to admit or deny the allegations of paragraph 36 of the Complaint and therefore leaves Plaintiff to its proof.

37.     Defendant denies the allegations of paragraph 37 of the Complaint.  Sage did not agree to supply the Products in different size units.  Instead, Sage supplied the same size units containing two different quantities of CBD Gel.

38.     Defendant denies the allegations of paragraph 38 of the Complaint, but admits that, at Sage's behest and upon Sage's representation (through Calafiore) that the contractual recitation of the annual and quarterly purchase minimums was necessary for Sage to obtain better pricing and an adequate or guaranteed source of supply of pens, the SOW 1 recited certain annual and quarterly minimums, but it was understood by the parties that such "minimums" were aggressive and not likely to be met, particularly early on, in view of the fact that the CBD pet products were new and would need some time to be launched, promoted and sold.  Indeed, both parties understood that the market for CBD products for animals was relatively nascent and there was little industry information from which to forecast future sales.  The parties also agreed that, if the minimums were not met, Sage's sole remedy would be for EAV to pay Sage for any unsold inventory and/or the cost of any pens or gel actually purchased and held on hand by Sage at the time of any breach.  EAV did engage in efforts to forecast potential sales by considering the number of retail stores of its Trade Partners, the potential number of sales by those Trade Partners, and the overall size and growth of the CBD oil pet industry during the contract term.

39.     Defendant denies the allegations of paragraph 39 of the Complaint, but admits that the minimum purchase requirements were included as an accommodation to Sage and at Sage's request to enable Sage to obtain better pricing and an adequate or guaranteed supply of the pens.

40.     Defendant denies the allegations of paragraph 40 of the Complaint in that Sage never indicated that, without such minimums, it would not have entered into the Agreement;

rather, such minimums were included at Sage's behest and as an accommodation to Sage in keeping with its desire to obtain better pricing and an adequate or guaranteed source of supply of the pens.

41.     Defendant lacks sufficient knowledge or information to admit or deny the allegations of paragraph 41 of the Complaint and therefore leaves Plaintiff to its proof.  As set forth in Defendant's Affirmative Defenses and Counterclaims, Plaintiff represented itself as an established, well-capitalized company that did not need new capital or funds to manufacture the CBD Gel and other the Products.

42.     Defendant lacks sufficient knowledge or information to admit or deny the allegations of paragraph 42 of the Complaint and therefore leaves Plaintiff to its proof.

43.     Defendant denies the allegations of paragraph 43 of the Complaint, but admits that the Agreement includes minimum unit purchases (not minimum dollar purchases) of pens (without specifying either the price for or any mix or quantity of 2 mg and 10 mg pens); in addition, the future price of the pens was to be negotiated by both parties in connection with subsequent statements of work, including negotiations relative to any new, authorized version of the pens.

44.     Defendant denies the allegations of paragraph 44 of the Complaint, but admits that, from December 2018 through the end of June 2019, EAV placed orders of more than 80,000 units, thereby fully satisfying the minimum order requirements under the SOW for the first and second quarter of 2019.

45.     Defendant denies the allegations of paragraph 45 of the Complaint, but admits that EAV ordered more than 80,000 pens prior to July 1, 2019, thereby meeting its minimum order requirements under the SOW for the first and second quarter of 2019.

46.     Defendant denies the allegations of paragraph 46 of the Complaint, but admits that Sage sent a letter, dated November 16, 2018, by which it alleged EAV was in material breach of the parties' Agreement by reason of EAV's supposed failure to have met the minimum purchase requirements.

47.     Defendant denies the allegations of paragraph 47 of the Complaint, but admits that EAV sent a letter, dated December 6, 2019, to Sage notifying Sage that it was in material breach of the parties' Agreement and seeking assurance that Sage would cure such breaches.

48.     Defendant denies the allegations of paragraph 48 of the Complaint.

49.     Defendant denies the allegations of paragraph 49 of the Complaint, but admits EAV sent a letter, dated March 11, 2020, pursuant to which EAV terminated the parties' Agreement for cause after Sage failed to cure its various material breaches.

50.     Defendant denies the allegations of paragraph 50 of the Complaint.

51.     Defendant denies the allegations of paragraph 51 of the Complaint.

52.     Defendant admits the allegations of paragraph 52 of the Complaint.

53.     Defendant denies the allegations of paragraph 53 of the Complaint.

54.     Defendant denies the allegations of paragraph 54 of the Complaint.

55.     Defendant denies the allegations of paragraph 55 of the Complaint.

56.     Defendant denies the allegations of paragraph 56 of the Complaint.

## COUNT I
### (Breach of Contract – Minimum Purchase Requirements)

57.     Defendant repeats and realleges, as if fully set forth and realleged herein, its above responses to paragraphs 1 through 56 of the Complaint.

58.     Defendant denies the allegations of paragraph 58 of the Complaint.

59.    Defendant denies the allegations of paragraph 59 of the Complaint.

60.    Defendant denies the allegations of paragraph 60 of the Complaint.

61.    Defendant denies the allegations of paragraph 61 of the Complaint.

62.    Defendant denies the allegations of paragraph 62 of the Complaint.

## COUNT II
## (Anticipatory Repudiation)

63.    No response is necessary as Count II has been dismissed by the Court.

64.    No response is necessary as Count II has been dismissed by the Court.

65.    No response is necessary as Count II has been dismissed by the Court.

66.    No response is necessary as Count II has been dismissed by the Court.

67.    No response is necessary as Count II has been dismissed by the Court.

## COUNT III
## (Violation of the Connecticut Unfair Trade Practices Act)

68.    Defendant repeats and realleges, as if fully set forth and realleged herein, its above responses to paragraphs 1 through 67 of the Complaint.

69.    Defendant denies the allegations of paragraph 69 of the Complaint, but admits that, at Sage's behest and as an accommodation to Sage's interest in enhancing its ability to secure an adequate or guaranteed supply of pens at an attractive price, the minimum purchase requirements were put into the parties' eventual Agreement, but it was understood, that such minimums were aggressive and were not likely to be met in the short term and would likely need to be adjusted to allow EAV adequate time to promote and introduce the new CBD pet products to the marketplace and ramp up sales.  Additionally, Plaintiff promised to secure a version 2 of

the applicator pen by mid-2019, which would have triggered negotiations and agreement on a new, superseding Statement of Work and new price terms.

70.  Defendant denies the allegations of paragraph 70 of the Complaint.

71.  Defendant denies the allegations of paragraph 71 of the Complaint.

72.  Defendant denies the allegations of paragraph 72 of the Complaint.

73.  Defendant denies the allegations of paragraph 73 of the Complaint.

74.  Defendant denies the allegations of paragraph 74 of the Complaint.

75.  Defendant denies the allegations of paragraph 75 of the Complaint.

76.  Defendant denies the allegations of paragraph 76 of the Complaint.

77.  Defendant denies the allegations of paragraph 77 of the Complaint.

78.  Defendant denies the allegations of paragraph 78 of the Complaint.

79.  Defendant denies the allegations of paragraph 79 of the Complaint.

80.  Defendant denies the allegations of paragraph 80 of the Complaint.

81.  Defendant denies the allegations of paragraph 81 of the Complaint.

82.  Defendant denies the allegations of paragraph 82 of the Complaint.

## PRAYER FOR RELIEF

Defendant denies Plaintiff's entitlement to any of the relief and/or remedies it seeks in its Complaint.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE
### Failure to State a Valid Claim

As and for its first affirmative defense, EAV states Sage's claims are barred, in whole or in part, by Sage's failure to state a valid claim upon which it is entitled to any relief.

## SECOND AFFIRMATIVE DEFENSE
### Failure to Provide Adequate Assurance
### (Or. Rev. Stat. § 72.6090)

As and for its second affirmative defense, EAV states Sage's claims are barred, in whole or in part, by Sage's failure to provide timely and adequate assurance, as detailed both in the Counterclaims and set forth hereinbelow and as evidenced by the following:

1.      By April 2019, at the latest, EAV had reasonable grounds to believe, and did believe, that Sage's performance of the contract had become uncertain, in that EAV learned, prior to that date, Sage had untimely delivered products that Sage had labelled with commercially unviable and entirely unsubstantiated sell-by dates.   Sage had labelled thousands of units of product with sell-by dates (i.e., expiration dates) without conducting any testing or other analysis to determine the actual shelf-life of the product.

2.      Upon learning that Sage had been labelling all delivered products with only a twelve-month expiration date and that Sage had not conducted any shelf-life stability testing to support even the 12-month claim, EAV requested that Sage take steps to assure EAV that Sage could deliver conforming and non-defective products with commercially viable and sustainable sell-by dates, including conducting shelf-life testing and assisting EAV in relabeling of the products to reflect the correct shelf-life of the products.

3.      At the time EAV demanded assurances from Sage, EAV had fully performed all of its obligations under the Agreement, including fulfilling its minimum purchase requirements.

4.      In response to EAV's communications, Sage informed EAV that it had engaged Advance Laboratories Inc. to perform shelf-life stability testing on the products.   Until this testing was completed, which did not occur until October 2019, Sage could not timely provide EAV with non-defective products with commercially viable and supported sell-by dates.

5.      As a result of Sage's failure to timely provide adequate assurance of due performance of the Agreement, Sage thereby repudiated the Agreement affording EAV the right to cancel the Agreement.

6.      Notwithstanding EAV's right to cancel the agreement in or around May or June of 2019 and despite Sage's repudiation of the Agreement, EAV continued to negotiate with Sage, in good faith and in an effort to continue the relationship with Sage and allow Sage to solve the problems with the products that Sage was delivering.

7.      However, in or around May 2019, EAV began to receive multiple complaints from customers, trade partners, and retailers that the products did not work as intended and that users were unable to dispense CBD oil from the applicator pen for up to the specified 30 doses per applicator (as expressly stated on the product's packaging).  EAV continued to receive similar complaints and feedback from its customers, trade partners and retailers throughout 2019 and 2020.

8.      Accordingly, by May 2019, at the latest, EAV had additional grounds to believe, and did believe, that Sage's performance of the contract had become uncertain, as a result of Sage's continued untimely delivery of defective products.

9.      EAV notified Sage of these issues as it received word of the problems from its customers. For example, on or about June 25, 2019, EAV reported to Sage in writing that it had received several defective Zen-Pen units that were returned to EAV's Customer Service Department with the same issues.  EAV requested that Sage evaluate the problem to ensure that it could timely deliver non-defective products.

10.      At the time of EAV's June correspondence with Sage, EAV had fulfilled its obligation by purchasing at least 80,000 units under the SOW for the first and second quarter of

2019, and because it had previously exercised its right to suspend performance pending the receipt of adequate assurance that Sage could timely deliver a product that contained a commercially viable and sustainable sell-by date and would not jam or clog prior to dispensing 30 doses per pen (as expressly stated on the product's packaging).

11.     EAV continued to properly suspend its performance under the Agreement, including the purchase of additional products, pending receipt of adequate assurance that Sage could timely perform its end of the contract, including delivering products timely, with proper sell-by dates and free from defects.

12.     In response to EAV's communications, Sage noted that it would investigate the jamming / clogging problem and would discuss the issue with its third-party applicator pen supplier.

13.     Ultimately, Sage refused to provide any resolution or other adequate assurance that it could timely deliver non-defective products that would not jam or clog prior to dispensing 30 metered doses per pen. The only "solution" Sage offered was to provide EAV with a brief video whereby end users were instructed to unfold a paperclip and stick the paperclip into the back of the product.  The purported "fix" concept was that the paperclip would release an air bubble or other pressure that had built up in the Pen and would restore functionality, at least in the short term.  However, Sage never modified the products in anyway or identified a permanent solution that would prevent the Pen from jamming or clogging.

14.     Sage's proposed paperclip video was not a proper cure or a commercially viable solution given that Sage was readily aware that EAV sold its CBD product as a premium high-end item for between $50 and $80 to its retail customers.  It was entirely unreasonable for Sage to take the position that no modifications to the product were warranted and instead suggest that

EAV should ask customers to self-repair the product with Sage's make-shift "fix" after they had already spent substantial money on a product that was marketed to dispense 30 metered doses of CBD oil per applicator (as expressly stated on the product's packaging).

15.     As a result of Sage's failure to timely provide adequate assurance of due performance of the Agreement, Sage thereby again repudiated the Agreement affording EAV the right to suspend its performance and/or cancel the Agreement.

16.     After repeated good faith efforts by EAV to resolve the various labelling and product quality issues with Sage, on or about December 6, 2019, EAV issued a written notice to Sage notifying Sage of its various material breaches under the Agreement.

17.     EAV stated in the notice letter that it would exercise its right to terminate the Agreement if Sage did not timely cure and resolve the product defects and Sage's various other material breaches of the Agreement.

18.     At the time of the December 6, 2019 written notice to Sage, EAV was not in material breach of the Agreement, including the minimum purchase requirements, because it had previously exercised its right to suspend performance pending the receipt of adequate assurance that Sage could deliver a product timely that was free of defects, including a product that (a) contained a commercially-viable and supported sell-by date and (b) would not jam or clog prior to dispensing 30 metered doses per pen. Additionally, EAV was not in breach at the time because Sage in May of 2019 had expressly agreed to waive the minimum order quantities for the remainder of 2019.

19.     Sage did not adequately address or cure any of the product defects or its various material breaches of the Agreement.

20.     Accordingly, on March 11, 2020, EAV formally cancelled the Agreement with Sage by way of a written letter, which letter was sent after repeated, good faith negotiations with Sage and after providing Sage with ample opportunity and time to cure the various product defects and other material breaches.

### THIRD AFFIRAMTIVE DEFENSE
**Repudiation**
**(Or. Rev. Stat. § 72.6100)**

As and for its third affirmative defense, EAV states Sage's claims are barred, in whole or in part, by Sage's repudiation of the Agreement, as detailed both above and in the Counterclaims set forth hereinbelow and as evidenced by the following:

1.     Sage repudiated the Agreement through its actions and its words, including by (a) notifying EAV that it would not or could not timely deliver products containing a commercially viable and substantiated sell-by date, (b) refusing to bear any of the costs associated with relabeling products labelled with commercially unviable and unsubstantiated sell-by dates, despite having been the direct cause of the issue, (c) notifying EAV that it would not or could not timely deliver non-defective products that would not jam or clog prior to dispensing 30 equal metered doses per pen (as expressly warranted on the product packaging), (d) informing EAV in August 2019 that Sage was in dire financial straits and unable to perform the Agreement without an infusion of capital, and/or (e) failing to provide timely and adequate assurance to EAV that it could timely deliver a non-defective product that contained a commercially viable and supported sell-by date and would not jam or clog prior to dispensing 30 metered doses per pen (as expressly stated on the product's packaging).

2.     Sage's refusal to cure the nonconformity and/or defects in the product substantially impaired the value of the Agreement as a whole, in that the noted defects demonstrated Sage's inability to timely produce goods of the quality required by the terms of the

Agreement. The defects specified could not be cured by Sage and/or Sage refused or failed to timely cure the defects and other material breaches.

3. As a result of Sage's repudiation, EAV rightly suspended its performance under the Agreement.

**FOURTH AFFIRAMTIVE DEFENSE**
**Cancellation**
**(Or. Rev. Stat. § 72.7110)**

As and for its fourth affirmative defense, EAV states Sage's claims are barred, in whole or in part, by EAV's cancellation of the Agreement, as detailed both above and in the Counterclaims set forth hereinbelow and as evidenced by the following:

1. Sage breached and repudiated the Agreement through its actions and its words, including by (a) notifying EAV that it would not or could not timely deliver products containing a commercially viable and substantiated sell-by date, (b) refusing to bear any of the costs associated with relabeling products labelled with commercially unviable and unsubstantiated sell-by dates, despite having been the direct cause of the issue, (c) notifying EAV that it would not or could not timely deliver non-defective products that would not jam or clog prior to dispensing 30 equal metered doses per pen (as expressly warranted on the product packaging), (d) informing EAV in August 2019 that Sage was in dire financial straits and unable to perform the Agreement without an infusion of capital, (e) failing to provide timely and adequate assurance to EAV that it could timely deliver a non-defective product that contained a commercially viable and supported sell-by date and would not jam or clog prior to dispensing 30 metered doses per pen (as expressly stated on the product's packaging), (f) refusing to credit, refund, or otherwise compensate EAV for the $250,000 advance deposit EAV made to Sage (as required by the SOW), and/or (g) failing to properly deliver at least 85% of the products ordered by EAV within the first six months of 2019.

2.     As a result of Sage's repudiations, EAV served Sage with a letter dated December 6, 2019 outlining Sage's material breaches and demanding that Sage cure those breaches.  When Sage refused to cure the breaches, EAV formally cancelled the Agreement with Sage by way of a written letter on March 11, 2020, which letter was sent after repeated, good faith negotiations with Sage and providing Sage with ample opportunity and time to cure the various product defects and other material breaches.

**FIFTH AFFIRMATIVE DEFENSE**
**Breach of Installment Substantially Impairing Value of the Agreement as a Whole**
**(Or. Rev. Stat. § 72.6120)**

As and for its fifth affirmative defense, EAV states Sage's claims are barred, in whole or in part, by Sage's breach of installments under the Agreement that substantially impaired the value of the Agreement as a whole, as detailed both in the Counterclaims set forth hereinbelow and as evidenced by the following:

1.     The Agreement, which requires minimum unit purchases of products over the course of three years (assuming the parties' continued compliance with the Agreement and their agreement on terms (including prices) in future statements of work), is an installment agreement, as that term is defined in Oregon Rev. Stat. § 72.6120(1).

2.     The products delivered by Sage to EAV in the first two quarters of 2019 suffered from cumulative defects and did not conform to the terms of the Agreement in that they contained a commercially-unviable and unsupported sell-by dates and would jam or clog prior to dispensing 30 metered doses per pen (as expressly stated on the product's packaging).

3.     Such nonconformity and/or defects substantially impaired the value of the Agreement as a whole, in that the noted defects demonstrated Sage's inability to timely produce goods of the quality required by the terms of the Agreement and reasonably contemplated by the

parties. The defects specified could not be cured by Sage, and/or Sage refused or failed to timely cure the defects and/or Sage refused or failed to provide any adequate assurance to EAV.

4. As a result of Sage's delivery of defective and nonconforming products substantially impairing the value of the Agreement as a whole, EAV formally cancelled the Agreement with Sage by way of a written letter on March 11, 2020, which letter was sent after repeated, good faith negotiations with Sage and providing Sage with ample opportunity and time to cure the various product defects and other material breaches.

### SIXTH AFFIRMATIVE DEFENSE
**Recoupment**

As and for its sixth affirmative defense, EAV states Sage's claims are barred, in whole or in part, by EAV's rights under the doctrine of recoupment. Specifically, as set forth in the Counterclaims below, EAV holds valid claims against Sage, which can be used to setoff or recoup against any damages claimed by Sage.

### SEVENTH AFFIRMATIVE DEFENSE
**Material Breaches of the Agreement by Sage**

As and for its seventh affirmative defense, EAV states Sage's claims are barred, in whole or in part, by Sage's material breaches of the Agreement, as detailed both in the Counterclaims set forth hereinbelow and by failing and/or refusing to:

(a) Provide credits or other reimbursement for the Advance Payment as required by the initial Statement of Work;

(b) Deliver a product that was free from defects in materials and workmanship;

(c) Deliver a new customized "version 2" of the Pen within six months;

(d) Test the product's shelf-life and deliver a product with a commercially-viable and properly-substantiated expiration date;

(e) Notify EAV of known defects or performance issues with the products;

(f)     Deliver at least 85% of the products required by the Statement of Work and Product Orders in any six-month period.

(g)     Perform the Agreement in a manner compliant with the "time of the essence" provision; and

(h)     Use commercially reasonable efforts to timely supply non-defective products to EAV at favorable prices relative to the market rate, which prices were to be negotiated in future statements of work.

### EIGHTH AFFIRMATIVE DEFENSE
**(Failure to Mitigate Damages)**

As and for its eighth affirmative defense, EAV states Sage's claims are barred, in whole or in part, by Sage's failure to mitigate its damages.

### NINTH AFFIRMATIVE DEFENSE
**(Termination)**

As and for its ninth affirmative defense, EAV states Sage's claims are barred, in whole or in part, by EAV's proper termination of the Agreement, as detailed both above and in the Counterclaims set forth hereinbelow and as evidenced by the following:

1.     The MESA provided the parties with certain rights to terminate the contractual relationship if the other party material breached and then failed to cure the breach within 30 days of receipt of written notice. Specifically, the MESA provides that "[i]n the event that either party materially breaches this Agreement, the other party may give such party written notice specifying such breach. Should the breaching party fail to cure such breach within 30 days (except where another cure period is specifically provided herein, in which case such other cure period shall control), of receipt of such notice, the other party may terminate this Agreement and pursue all rights and remedies available at law and in equity." *See* MESA, ¶ 13.1.

2.     The MESA provided specific instances where the right of termination was immediate. For instance, EAV had the right to terminate immediately if Sage "adulterated any Product sold … or has otherwise willfully violated the provisions of this Agreement regarding

quality, or … has altered or omitted an ingredient, component, process or procedure called for thereby which, in any such case, results in Products being sold to [EAV] that is not in compliance with a Statement of Work." MESA, ¶ 13.2(b).

3.     EAV also had the right to immediately terminate the Agreement if Sage "misbranded Products which are subject to regulatory agency recommended or ordered seizure, destruction, or recall not timely cured by [Sage]." MESA, ¶ 13.2(c).

4.     EAV also had the right to immediately terminate the Agreement if Sage "fails to deliver at least 85% of Products required by the Statement of Work or Product Orders in any six-month period." MESA, ¶ 13.2(e).

5.     EAV also had the right to immediately terminate the Agreement if Sage "failed to inform [Sage] of any known deficiency in the Products." MESA, ¶ 13.2(f).

6.     After repeated efforts by EAV to resolve the various labelling and product quality issues with Sage, on or about December 6, 2019, EAV issued a written notice to Sage outlining Sage's various material breaches under the Agreement.

7.     EAV stated in the notice letter that it would exercise its rights to terminate the Agreement if Sage did not timely cure and resolve the product defects and Sage's various material breaches of the Agreement.

8.      Sage did not adequately or timely address or cure any of the product defects or its various material breaches of the Agreement.

9.     Accordingly, on March 11, 2020, EAV formally terminated the Agreement with Sage by way of a written letter, after repeated, good faith negotiations with Sage and providing Sage with ample opportunity and time to cure the various product defects and other material breaches.

## TENTH AFFIRMATIVE DEFENSE
### (Limitation on Liability)

As and for its tenth affirmative defense, EAV states Sage's claims are barred, in whole or in part, by the Agreement's limitation on liability and remedies provision. In particular, the MESA contains a limitation of damages clause, which applies equally to both parties. Specifically, Paragraph 12 (titled "LIABILITY") states as follows:

**NEITHER PARTY SHALL BE LIABLE IN CONTRACT, TORT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, GOODWILL, TIME, SAVINGS OR REVENUE.** The provisions of this Section shall survive the expiration or earlier termination of this Agreement.

*See* MESA, ¶ 12 (bold font and capitalizations in original).

## ELEVENTH AFFIRMATIVE DEFENSE
### The MESA is an Unenforceable Agreement to Agree
### (Or. Rev. Stat. § 72.3050(4))

As and for its eleventh affirmative defense, EAV states that the MESA is unenforceable, in part, because the purchase price for future purchases of units (specifically including for the new version of the pen) during the term of the MESA is an omitted material term, which the parties were obligated to negotiate in good faith via subsequent "statements of work", subject to Sage's obligation to provide EAV with favorable, below-market prices in consideration for the exclusivity conferred on Sage under the MESA. The parties did not intend to be bound by the minimum purchase requirements unless and until the price was agreed to and since price was not agreed to, the parties are not so bound.

## TWELFTH AFFIRMATIVE DEFENSE
### Bad Faith

As and for its twelfth affirmative defense, EAV states Sage's claims are barred, in whole or in part, by Sage's bad faith, as detailed both above and in the Counterclaims set forth hereinbelow and as evidenced by:

     (a)    Sage's material breaches of the Agreement, including its material breaches of its warranties;

     (b)    Sage's false promises and misrepresentations to induce EAV to enter into the Agreement, including, but not limited to, misrepresenting both its industry experience and capabilities to provide the CBD product to EAV, mispresenting that it would use a $250,000 advance payment from EAV to secure "biomass" for the contract and that it would reimburse EAV for the advance via credits, misrepresenting that it needed aggressive artificially-high annual and quarterly purchase minimums in the Agreement to secure or lock down an adequate or guaranteed supply of pens at an attractive price, misrepresenting that it would limit its remedy if the purchase minimums were not met to a recovery of its out-of-pocket costs of inventory and raw materials on hand, misrepresenting that its prices would be favorably below market prices for pens and CBD gels in consideration of the exclusivity conferred on Sage, and misrepresenting that the applicator pen initially selected for the product was only a temporary stop gap and that Sage would design, develop and/or procure a newly-designed customized pen for EAV within six months;

     (c)    Sage's failure to conduct proper testing before sending the product to EAV;

     (d)    Sage ignoring explicit advice from a consultant on the project that it must conduct proper shelf life stability tests in order to substantiate any claimed expiration date on the new products;

     (e)    Sage's delivery of approximately 70,000 units of product without conducting sufficient or customary testing and/or analysis to support the sell-by dates;

     (f)    Sage's delivery of applicator pens that clogged and/or gummed up after less than 30 metered doses when it had prior knowledge of the problem and refused to disclose the issue to EAV;

     (g)    Sage's failure to deliver 85% of products required by the SOW and Work Orders in any six-month period;

     (h)    Sage's intentional failure to disclose the known clogging or jamming defect prior to shipping product to EAV;

(i)     Sage's failure to cure any of the product defects and/or other various material breaches; and/or

(j)     Sage's refusal to cure the product that was jamming and clogging prior to dispensing 30 metered doses per pen, and, instead suggesting to EAV that end-users should themselves employ an inadequate make-shift "fix" by sticking a paper clip into the product in hope that it would solve the product defects for the short term.

## THIRTEENTH AFFIRMATIVE DEFENSE
### Unclean Hands

As and for its thirteenth affirmative defense, EAV states Sage's claims are barred, in whole or in part, by Sage's unclean hands, as detailed both above and in the Counterclaims set forth hereinbelow and as evidenced by:

(a)     Sage's material breaches of the Agreement, including material breaches of its warranties;

(b)     Sage's false promises and representations to induce EAV to enter into the Agreement, including, but not limited to, misrepresenting both its funding, capital, and resources and its industry experience and capabilities to provide CBD, misrepresenting that it would use a $250,000 advance payment from EAV to secure "biomass" for the contract and that it would reimburse EAV for the advance via credits, misrepresenting that it needed aggressive artificially-high annual and quarterly purchase minimum so it could secure or lock down an adequate or guaranteed supply of pens at an attractive price, misrepresenting that, in the event that the purchase minimums were not met, Sage would limit its remedy to the out-of-pocket costs of inventory and raw materials it had on hand, misrepresenting to EAV that its prices would be favorably below market rate for pens and CBD gels in consideration for the exclusivity conferred on Sage, and misrepresenting that the applicator pen initially selected for the product was only temporary and Sage would design, develop and/or procure a newly-designed customized pen within six months;

(c)     Sage's failure to conduct proper testing before sending the product to EAV;

(d)     Sage ignoring explicit advice from its consultant that it must conduct shelf life stability tests in order to substantiate any claimed expiration date on the new products;

(e)     Sage's delivery of approximately 70,000 units of product without conducting sufficient or customary testing and/or analysis to support the sell-by dates;

(f)     Sage's delivery of applicator pens with a known, but undisclosed, defect, namely that they clogged and/or gummed up after less than 30 doses;

(g)     Sage's failure to deliver 85% of products required by the SOW and Work Orders in any six-month period;

(h)     Sage's failure to cure any of the product defects and/or the other various material breaches; and/or

(i)     Sage's refusal to cure the product that was jamming and clogging prior to dispensing 30 doses per pen, and, instead suggesting to EAV that end-users should themselves employ an inadequate make-shift "fix" by sticking a paper clip into the product in hope that it would solve the product defects for the short term.

**FOURTEENTH AFFIRMATIVE DEFENSE**
**Fraudulent Inducement**

As and for its fourteenth affirmative defense, EAV states Sage's claims are barred, in whole or in part, by Sage's fraudulent misrepresentations, as detailed both above and in the Counterclaims set forth hereinbelow and as evidenced by:

1.     Calafiore, both individually and on behalf of Sage, made several misrepresentations of fact in 2018, including but not limited to, his promises, and/or assurances that: (a) Sage was experienced in the business of manufacturing and the wholesale distribution of certain cannabinoid products and was a well-funded and capitalized company with adequate resources and industry experience to meet EAV's needs, (b) the $250,000 Advance Payment was required to secure "biomass" exclusively for EAV and the CBD Animal Products, (c) the Advance Payment would be credited or otherwise returned to EAV with interest, (d) Sage would design, develop and/or procure a new customized applicator pen for EAV within six months, (e) Sage needed the contract to specify aggressive, artificially-high annual and quarterly purchase minimums to allow Sage to secure an adequate or guaranteed supply of pens at an attractive price, but understood that EAV was likely to need time, particularly at the beginning, to launch, promote and sell the new product (f) in the event that the purchase minimums were not met, Sage would limit its remedy to the recovery of its out-of-pocket costs for inventory and raw materials on hand; (g) Sage, in consideration for exclusivity, would charge EAV prices below their market

price for pens and CBD gels, and (h) Sage, in consideration and exchange for exclusivity, would ensure that the CBD Animal Products were functional, satisfied their intended use (including dispensing 30 metered doses per pen, as expressly stated on the product's packaging), and were in compliance with all laws, rules, and regulations.

2.      Calafiore made these false and misleading representations to EAV's officers and employees prior to the formation of the Agreement.

3.      Calafiore made these representations knowing that they were false at the time and/or that Sage had no intention of fulfilling the promises.

4.      Calafiore made these representations with the sole intent of inducing EAV to enter into the Agreement, which was an exclusive three-year contract "committing" EAV to potentially purchase millions of dollars in products from Sage (assuming the parties reached agreement on the terms, including price, of further statements of work).

5.      EAV reasonably and detrimentally relied upon these representations in entering into the Agreement.

6.      As a result of Calafiore's and/or Sage's fraudulent inducement, the contract is invalid and/or illegal and cannot be enforced by Sage.

**FIFTEENTH AFFIRMATIVE DEFENSE**
**Innocent and/or Negligent Misrepresentations**

As and for its fifteenth affirmative defense, EAV states Sage's claims are barred, in whole or in part, by Sage's innocent and/or negligent misrepresentations, as detailed both above and in the Counterclaims set forth hereinbelow.

**SIXTEENTH AFFIRMATIVE DEFENSE**
**Breach of Express Warranty**

As and for its sixteenth affirmative defense, EAV states Sage's claims are barred, in whole or in part, by Sage's breaches of warranty, as detailed both above and in the Counterclaims set forth hereinbelow and as evidenced by:

1.      In the MESA, Sage expressly "warrants that all Products shall be free from defects in material and workmanship and shall conform to the standards set forth in a Statement of Work." *See* MESA, ¶ 10.

2.      Additionally, the product packaging provided that the Pen would dispense 30 equal metered doses per applicator. EAV expressly warranted that the Pens would comply with this representation.

2.      Sage breached its warranties by delivering products that did not conform to the terms of the Agreement in that they contained a commercially-unviable and unsupported sell-by dates and would jam or clog prior to dispensing 30 metered doses per pen (as represented on the product's packaging).

3.      After repeated efforts by EAV to resolve the various labelling and product quality issues with Sage, on or about December 6, 2019, EAV issued a written notice to Sage outlining Sage's various material breaches of warranty.

4.      EAV stated in the notice letter that it would exercise its rights to terminate the Agreement if Sage did not timely cure and resolve the product defects and Sage's various other material breaches of the Agreement.

5.       Sage did not adequately address or cure any of the product defects or its various material breaches.

6.      Accordingly, on March 11, 2020, EAV properly terminated the Agreement with Sage by way of a written letter, after repeated, good faith negotiations with Sage and providing

Sage with ample time and opportunity to cure the various product defects and other material breaches.

## SEVENTEENTH AFFIRMATIVE DEFENSE
### Waiver

As and for its seventeenth affirmative defense, EAV states Sage's claims are barred, in whole or in part, by Sage's waiver of the minimum purchase requirements, as detailed both in the Counterclaims set forth hereinbelow and as evidenced by:

1.     Upon learning that Sage had been labelling all delivered products with only a twelve-month expiration date and that Sage had not conducted any shelf-life stability testing to support the 12-month claim, EAV notified Sage that it required that all products contain commercially viable and supportable sell-by dates of at least eighteen months.

2.     In May of 2019, the parties met to discuss various issues with the products, including the fact that Sage was struggling to deliver the products in a timely manner and the expiration dates on the labels were unsubstantiated by any data and EAV was starting to receive customer complaints that the pens were malfunctioning.

3.     In order to address these various issues, the parties agreed to suspend several contractual obligations, including EAV's obligation to place minimum purchase orders, until 2020.

4.     Following that meeting, on May 23, 2019, EAV's CEO emailed Mr. Calafiore and others documenting the parties' agreement to suspend purchase orders for the remainder of 2019.

5.     Consistent with the parties agreement, on May 31, 2019, Mr. Calafiore emailed Sage's third-party pen supplier to ███████████████████████████████████████ ███████████████████████████████████████████ .

6.      Indeed, for the next several months, Sage did not issue any demand for EAV to purchase the required minimums.

## EIGHTEENTH AFFIRMATIVE DEFENSE
### Estoppel

As and for its eighteenth affirmative defense, EAV states Sage's claims are barred, in whole or in part, because Sage is estopped from asserting the minimum purchase requirements, as detailed both above and in the Counterclaims set forth hereinbelow.

## NINETEENTH AFFIRMATIVE DEFENSE
### Failure to Agree on Price

As and for its nineteenth affirmative defense, EAV states that Sage's claims are barred, in whole or in part, by Section 1.4(b) of the MESA, which permitted EAV to purchase CBD from any other supplier if the parties failed to agree on price. The MESA further required Sage to negotiate in good faith the purchase price for future purchases of units (specifically including for the new version of the pen) via subsequent "statements of work", subject to Sage's obligation to provide EAV with favorable, below-market prices in consideration for the exclusivity conferred on Sage under the MESA. Sage failed and/or refused to deliver a newly-designed, customized pen for EAV within six months of executing the Agreement, as promised, which would have necessarily required a new SOW to cover the new version of the pen.

## TWENTIETH AFFIRMATIVE DEFENSE
### Illegal Contract

As and for its twentieth affirmative defense, EAV states that Sage's claims are barred, in whole or in part, to the extent the Agreement is an illegal contract to sell CBD oil products, in violation of state and/or federal law.

## COUNTERCLAIMS

By and through its undersigned counsel of record, Defendant/Counterclaimant EAV, as and for its counterclaims against the Counterclaim Defendants Sage Fulfillment, LLC ("Sage"), The Sage Door, LLC ("Sage Door") and Richard Calafiore ("Calafiore") alleges as follows:

## NATURE OF THE ACTION

1.      This case involves a breach of contract dispute related to the manufacturing and sale of two cannabinoid ("CBD") oil products designed specifically for pets, a 10 mg pen applicator and a 2 mg pen applicator, each of which was intended to dispense 30 metered doses of a CBD oil per applicator to the animal for medical purposes (as expressly stated on the product's packaging).  Sage claims that it had an exclusive three-year contract to sell millions of dollars of product to EAV, but that EAV breached the contract by failing to purchase the minimum quantity of products.  The actual story is quite to the contrary.

2.      First, motivated by an opportunity in 2018 to secure a potential multi-million dollar contract with EAV, Sage made several misrepresentations to EAV that were designed to induce EAV to enter into a contract.  Calafiore, on behalf of Sage and/or Sage Door, misrepresented both Sage's industry experience and capabilities to provide CDB oil for use with pets, which was a new product for it.  Calafiore, on behalf of Sage and/or Sage Door, represented that Sage was a well-funded, capitalized company experienced in manufacturing and supplying CBD oils, when in reality, it was a recently-formed and underfunded startup entity. Calafiore claimed that EAV needed to advance $250,000 to Sage for "biomass" necessary for the contract and that Sage would credit or reimburse EAV, with interest, in 2019 for the advance. No such credit or reimbursement was ever provided. No proof was ever provided that biomass was secured exclusively for EAV and the CBD Animal Products. Calafiore promised that the applicator pen initially selected for the product was only a temporary stop gap and that Sage

and/or Sage Door would design, develop or procure a newly-designed, customized pen for EAV with a laser etched label within six months. Sage never procured the new version. Calafiore also represented Sage needed aggressive, artificially-high annual and quarterly purchase minimums in the contract, so it could secure an adequate or guaranteed supply of applicators at an attractive price, which minimums Calafiore acknowledged EAV was not likely to meet during the initial product launch, promotion and sales effort. Because of the high minimums, the parties reached an understanding on a remedy for failure to meet the minimum, namely that EAV would pay Sage for any out-of-pocket costs for excess inventory and raw materials on hand, such as Pens or Gel but would not be liable for any further damages. Calafiore, on behalf of Sage, also represented and assured EAV that Sage, in consideration for exclusivity, would provide EAV with favorable pricing, below the market price for applicators and CBD oils. None of these statements turned out to be true or non-misleading.

3.      Second, after executing the contract documents in late 2018, Sage ignored explicit advice from a consultant on the project that it *must* conduct shelf life stability tests in order to substantiate any claimed expiration date on the products to be delivered to EAV. Without conducting any testing or analysis, Sage nevertheless labelled and delivered to EAV approximately 70,000 units in early 2019 containing expiration date information that could not be supported by any data. As soon as EAV learned that the products were labelled with unsubstantiated expiration dates, it had every right to suspend its performance until the shelf life stability studies could be completed, which did not occur until October of 2019. In order to address these and other issues, in a May 2019 meeting, the parties agreed to suspend the minimum purchase requirements for the remainder of 2019.

4.     Third, despite time being of the essence, Sage also failed to deliver products in a timely manner and that were free from defects.  Sage struggled to deliver products, often resulting in delays between the dates promised and the actual dates of delivery.  Further, EAV experienced substantial issues with the products received.  Beginning in the spring of 2019 and in connection with the first deliverance of products by Sage, EAV began to receive numerous complaints from trade partners, retailers, and customers that the product was not working as intended.  Many customers complained that the applicator pen would (a) become stuck or gum up after less than 30 metered doses per applicator (despite the wording on the package that the pens would dispense 30 metered doses) and (b) cease dispensing CBD oil.  As a result, many of EAV's key trade partners and retail pet stores began to demand credits to account for customer complaints and product returns and some even refused to continue listing and selling the product. While EAV engaged in additional marketing efforts to salvage the product line (including arming its salesforce with free samples and replacement product), Sage's only response to these issues was to provide EAV with a short video that explained how a customer could employ an inadequate make-shift "fix" by unfolding a paperclip and inserting it into the end of the applicator pen.  Sage took no other action to cure the problem. As it turned out, Sage knew of the product defect as early as December 2018 and had the paperclip "fix" at the ready before it shipped any products to EAV, but never disclosed either the defects or the supposed "fix" until EAV's customers started to complain about the defect in the Spring of 2019.  Instead, Sage accepted EAV's purchase orders and payments and allowed EAV to launch a new product to its trusted distributors and customer base that it knew was doomed to fail.

5.     Even without the parties' May 2019 agreement to suspend purchase orders for the remainder of 2019, EAV had every right to suspend its performance (including its purchasing

obligations) in light of the multitude of material breaches by Sage. As a direct and proximate result of said breaches, EAV lost revenue and profits. It also lost the "first mover" advantage inherent in bringing a product to market before competitors. Lastly, it suffered reputational harm and damage to its good will with its customers and trade partners.

6. EAV exercised good faith in providing Sage with a meaningful and generous opportunity to address the defects and remedy the problems. It spent a substantial portion of 2019 attempting to work through these issues and reclarifying objectives and work streams for moving forward. In late 2019, Sage refused and/or was unable to cure any of its material breaches or adequately prepare for and actively participate in relationship governance sessions. Instead, it sent a notice of breach letter in November demanding that EAV resume purchases under the contract. In December EAV served its own notice of breach letter. Thereafter, EAV provided approximately three months for Sage to cure and, when Sage did not cure, EAV terminated the contract in March 2020.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over EAV's Counterclaims against Sage under the provisions of 28 U.S.C. §§ 2201 and 2202, and under 28 U.S.C. § 1332(a) in that complete diversity of citizenship exists as between the parties and the matter in controversy exceeds the value of $75,000, exclusive of costs. There is jurisdiction ancillary or pendent to the Complaint as well. This Court has supplemental jurisdiction of the state law claims under 28 U.S.C. § 1367. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b).

## THE PARTIES

8. EAV is a corporation organized and existing under the laws of Delaware with a principal place of business at 49 John Street, Southport, CT 06890. EAV was originally founded in 2011 by veterinarian Dr. Bob Goldstein and his wife, Susan Goldstein. It is in the business of

marketing, selling and distributing pet foods, treats, supplements and holistic remedies. EAV is considered a premium brand in the pet industry. It is known for providing healthy, all-natural products that contain only the highest quality ingredients.

9. Sage is a limited liability company organized and existing under the laws of Oregon with a principal place of business at 2905 4th Avenue S, Seattle, WA 98134. Sage was recently formed in 2018. Upon information and belief, Sage's sole member is Sage Door.

10. Sage Door is a limited liability company organized and existing under the laws of Washington with a principal place of business at 2905 4th Avenue S, Seattle, WA 98134. Upon information and belief, Sage Door has two members, Calafiore and John Thornton, neither of whom reside in Connecticut or Delaware.

11. Upon information and belief, Calafiore is an individual whose principal place of residence is Medford, Oregon.

**FACTS**
**Allegations Common to All Causes of Action**

**A.** ***EAV and Sage Negotiate the Terms of a Business Relationship in 2018***

12. In early 2018, EAV and Sage Door, Sage's parent company, began discussing a potential business relationship whereby Sage would manufacture and sell to EAV CBD oil products designed specifically for use on pets, including pens, tabs and potions ("collectively, the CBD Animal Products").

13. At the time of these discussions, sales of CBD oil products for human use were growing substantially. Both EAV and Sage saw an opportunity to sell similar CBD oil products designed and marketed for the pet industry.

14. As Sage and its members had no prior experience with manufacturing products for pets and EAV had no prior experience selling products with CBD oil, the parties relied upon

each other's purported respective knowledge, experience and expertise to launch a new product in a nascent market.

15.     The parties decided that Sage would leverage its supposed knowledge and experience as a manufacturer and seller of CBD oil products for human use to create a commercially viable CDB product for pets. In turn, EAV would leverage its knowledge and experience as a marketer, seller, and distributor of high-quality pet products to successfully market and sell the CBD product through its established retail and wholesale channels.

16.     In or around June 2018, Sage Door proposed to manufacture and deliver a product that was comprised of a metered applicator pen (the "Pen") preloaded with Sage's own proprietary blend of CBD oil and other ingredients (the "Gel") (collectively, the "Zen Pen"). The Pen contemplated the use of a plunger. The plunger was designed to be depressed by the end-user to dispense multiple doses of the Gel in equal, metered quantities. The Pen was specifically intended to dispense 30 doses.

17.     EAV was interested in the proposed product, but made it clear that the end product would need to: (1) be shelf stable with a specified expiration date, (2) have an aesthetically desirable consumer form factor, (3) dispense 30 equal metered doses per applicator, and (4) otherwise be free from any defects.

18.     EAV expressly informed Sage that the intended use of the Zen Pen was to enable families with animals to be able to easily dispense to their pet thirty (30) equal doses of CBD oil per applicator into the inner ear of the pet through the duration of the product's shelf life.  The doses would be applied to the pet's ear, where it could then be absorbed into the animal's bloodstream.

19.     With these requirements and the intended use in mind, Sage presented several Pen options from third-party medical device manufacturers.

20.     Sage and or its affiliated entities developed the Gel, which contained a proprietary blend of ingredients, including full spectrum CBD oil, organic beeswax, organic shea butter, organic MCT oil, Lecithin, magnesium chloride and organic natural fragrances.  The Gel also utilized a certain "Uptake Technology", which was supposed to improve the absorption of the CBD oil when it was applied to the pet's skin.

21.     While EAV performed tests to confirm the efficacy and safety of the Gel for use on animals, it relied entirely on Sage's purported industry experience and expertise to develop the Gel. EAV also relied on Sage's representations and assurances that the Gel formulation was appropriate for its intended use, had a commercially viable shelf-life, and could be dispensed by the Pen for 30 equal metered doses through the product's stated shelf-life.

22.     Sage represented that all of the Pen options it presented to EAV were appropriate for the intended use in the Zen Pens and would work with the Gel to dispense 30 metered doses through the product's stated shelf-life.

23.     EAV's pre-contract evaluation of the Pen options presented to it by Sage was based solely on its form, comfort and ease of use.

24.     Accordingly, in 2018, it was Sage's exclusive obligation, as the manufacturer and supplier, to test the functionality of the Pen in combination with the Gel, determine if the Pen was appropriate for use in an over-the-counter retail product, and confirm that the Pen could properly dispense thirty (30) equal metered doses of the Gel without clogging, jamming or otherwise failing to work as intended through the product's expiration date.

**B.** ***During the Contract Negotiations, Sage's Member and Principal Made Several Misrepresentations Designed to Induce EAV to Enter Into the Contract.***

25.     In or around September and October of 2018, EAV and Sage began to negotiate the terms of a master supply agreement that would govern the purchase and sale of the CBD Animal Products.

26.     In order to induce EAV to enter into a contractual agreement with Sage, Sage's principal and managing member, Calafiore, on behalf of Sage and/or Sage Door, made several misrepresentations to EAV which he either knew to be false or misleading at the time or could not verify or substantiate.

27.     First, in or around September 2018, Calafiore represented to EAV that Sage needed an advance of $250,000 prior to or contemporaneous with the signing of the contract (the "Advance Payment").

28.     On or around October 2, 2018, prior to the execution of the contract, Calafiore again demanded that EAV pay more than half of the Advance Payment ($135,000) for "███████ ██████████████████████" and stressed that "████████████████████████████ ████████████████████████████████████████████████"

29.     In express reliance upon Calafiore's representation, EAV agreed to provide Sage with the Advance Payment by transferring $125,000 to Sage prior to the signing of the contract and then transferring another $125,000 upon the signing of the contract.  EAV specifically conditioned the Advance Payment upon Sage using the proceeds for the stated need of securing biomass.

30.     In return, Sage agreed that it would utilize the biomass for EAV's exclusive use and provide a credit to EAV against future purchases of CBD Animal Products in the amount of the Advance Payment, plus interest.

31. Despite demands to do so, Sage never provided any such credit to EAV for the $250,000 advance (plus interest). Sage also refused to return the Advance Payment or otherwise compensate EAV for the Advance Payment.

32. Upon information and belief, Sage did not solely use, and never intended to solely use, the Advance Payment to secure biomass for the CBD Animal Products or exclusively utilize it in support of Sage's contract with EAV. Upon information and belief, instead, Sage diverted some of the biomass and/or funds to Sage's affiliated entities or its members.

33. Second, between August and October of 2018, Calafiore repeatedly represented that the Pen Sage sourced from the third-party manufacturer for use in the CBD Animal Products was only a temporary stop-gap solution and Sage would design, develop and/or procure an improved, fully-customized Pen for EAV's intended usage within six (6) months after the signing of the contract.

34. Specifically, in August of 2018, Calafiore represented that Sage would only require "████████████████████████████████████████."

35. On or around October 5, 2018, Calafiore stated to EAV that the Pen "████████ ████████████████████████████████████████."

36. On or around October 8, 2018, Calafiore repeated to EAV that the "████████ ████████████████████████."

37. Upon information and belief, Calafiore and Sage never designed, developed or procured a customized Pen and never made any meaningful effort in 2018 or 2019 to secure a customized pen for EAV.

38.     Upon further information and belief, Calafiore and Sage had no intention of securing a customized Pen for EAV within the above time frame and made the misrepresentations with the sole intent of inducing EAV to enter into a contract with Sage.

39.     Third, Calafiore, on behalf of Sage and Sage Door, represented that Sage was a company in the business of manufacturing, and the wholesale distribution of certain cannabinoid products and was an experienced, well-financed and capitalized producer of CBD oil products for human use which wanted to expand into CBD pet products and that Sage would bring its full experience, expertise, staff, and resources to support EAV's proposed product line.

40.     In truth and in fact, and unbeknownst to EAV, Calafiore and Sage Door intended to create a new separate Sage limited liability company (i.e., Sage) to perform its contract with EAV. Calafiore did not disclose that the newly created company was under-funded, under-staffed and therefore lacked the capital and resources to fully and/or timely meet the demands of the EAV contract or that the new entity was solely reliant on payments from EAV to cover its capital needs, purchase the Pens, and procure suppliers of the Gel.

41.     Fourth, Calafiore, on behalf of Sage and Sage Door, pushed EAV to include very aggressive, artificially-high minimum purchase requirements in the EAV contract as an accommodation to Sage in order, according to Calafiore, to secure an adequate or guaranteed supply of pens or applicators from a third-party manufacturer at an attractive price.  In response to Sage's request, EAV relied upon Calafiore's representation that he understood the "minimums" were aggressive and that EAV would likely need more time to ramp up sales and achieve the quarterly and annual purchase minimums, particularly in the beginning, as EAV launched, promoted and initially sold a new product in a nascent market. Because of these high minimum purchase requirements, the parties reached an understanding on a remedy for any

failure to meet the minimums, namely that EAV would pay Sage for any inventory or the out-of-pocket cost of supplies on hand, such as the Pens or the Gel.

42.     Upon information and belief, Calafiore sought to include the minimum purchase requirement in the contract as leverage against EAV.

43.     Fifth, Calafiore assured EAV that Sage's prices to EAV would be favorably below market prices for both the Pens and CBD oils, in consideration for the exclusivity conferred on Sage. Calafiore represented that such favorable pricing was possible in part because of the $250,000 Advance Payment, which would secure an adequate supply of CBD biomass, and the contractual purchase minimums, which would secure an adequate supply of Pens at an attractive price. Calafiore represented such savings would be passed on and reflected in the prices Sage would charge to EAV for the Pens and other CBD Animal Products.

44.     In truth and in fact, Calafiore and Sage did not intend to charge EAV prices that reflected discounts below the going or market rate for either the Pens or the Gel and instead planned to charge EAV premium prices.

**C.      EAV and Sage Execute the Agreement**

45.     In late 2018, EAV and Sage entered into a contract to purchase and sell the CBD Animal Products.  The contractual relationship was governed by a Master Exclusive Supply Agreement (the "MESA") and an initial Statement of Work No. 1 (the "SOW 1") (collectively, the "Agreement").

46.     Pursuant to the Agreement, Sage agreed to exclusively sell and EAV agreed to exclusively buy the CBD Animal Products. The SOW 1 governed the purchase and sale of the Zen Pen, which  was described as a "metered applicator for an over the counter packaged proprietary strain with certificate of analysis full spectrum cannabinoid oil transdermal gel with

'uptake' delivery." Under the SOW 1, EAV agreed to purchase a minimum of 400,000 units of the Zen Pen annually, and at least 40,000 units per calendar quarter, commencing on the effective date of January 1, 2019 and continuing for three years until December 31, 2021.

47.     Leading up to the MESA, Sage assured EAV that the CBD Animal Products would be free of defects, conform to the requirements of the parties (including the requirement of providing a working product that would dispense 30 equal metered doses per pen), and satisfy all industry standards, federal and state laws, rules and regulations.

48.     Per the Agreement, Sage specifically agreed and warranted as follows:

(a)     "all Products shall be free from defects in material and workmanship and shall conform to the standards set forth in a Statement of Work."  *See* MESA, ¶ 10;

(b)     "[Sage] shall conduct all necessary quality inspections to ensure that all Products conform to the specifications set forth in a Statement of Work," that it "agrees to produce and deliver the Products in accordance with applicable federal, state and local laws, rules and regulations, and that the Products shall be in compliance in all material respects with the specifications and formulas set forth in the Statement of Work."  *See* MESA, ¶ 7.1 & 7.2;

(c)     "[Sage] shall perform mock recalls and quality and pathogen testing of the Products ingredients and finished Products in accordance with usual and customary testing methods, procedures and standards."  *See* MESA, ¶ 7.4;

(d)     if "any portion of [Sage's] facility, or any of [Sage's] processes, inventories or equipment do not comply with all applicable laws and regulations or with the terms and conditions of this Agreement, [Sage] shall take such action to correct such deficiencies and bring such processes, inventories and/or equipment into compliance with applicable laws and regulations and with the material terms and conditions of this Agreement promptly but in no case more than 10 business days following delivery of a written notice of such deficiency by [EAV]."  *See* MESA, ¶ 7.6;

(e)     to timely notify EAV of any non-conforming or defective products that have been delivered to EAV within 48 hours of the time that Sage learns of same. *See* MESA, ¶ 7.8;

(f)     to "use commercially reasonable efforts to supply Products to [EAV]." *See* MESA, ¶ 16.4; and

(g)     that Sage's performance of the Agreement was subject to a time of the essence provision. *See* MESA, ¶ 15.14.

49.     Accordingly, it was Sage's contractual obligation and responsibility to ensure that the CBD Animal Products were timely delivered in accordance with the terms of the MESA and any and all SOWs, in compliance with all applicable laws and regulations, and in accordance with the warranties set forth in the Agreement. *See* MESA, ¶¶ 1.2, 6.3.

50.     Under the initial SOW 1, Sage was required to deliver the Zen Pens each calendar month based on a production schedule set forth in Product Orders. Time was of the essence, in part, because EAV sought to be an industry leader and innovator, as well as be first to introduce a pen applicator in the nascent CBD veterinary market. EAV's biggest distributor promised it could be a "focus brand", but only if quality products were shipped in a timely manner.

51.     The parties' contract called for the parties to negotiate unit prices over the course of the contract's term pursuant to subsequent statements of work. A new SOW and renegotiation of unit price would have necessarily been required for the new customized version of the Zen Pen, which Sage had promised to design, develop and procure within six months.

52.     The initial SOW 1 also memorialized the terms of EAV's advance of $250,000 to Sage and the obligation that Sage reimburse EAV through credits applied to EAV's purchases of CBD Animal Products. Specifically, Sage was required to provide a total credit in the amount of $312,500, applied equally over a six-month period (from May 2019 through October 2019). SOW 1, ¶ 4.

53.     Finally, the MESA provided the parties with certain rights to terminate the contractual relationship if the other party breached and then failed to cure the breach within 30 days of receipt of written notice. Specifically, the MESA provides that "[i]n the event that either party materially breaches this Agreement, the other party may give such party written notice

specifying such breach. Should the breaching party fail to cure such breach within 30 days (except where another cure period is specifically provided herein, and in which case such other cure period shall control), of receipt of such notice, the other party may terminate this Agreement and pursue all rights and remedies available at law and in equity." *See* MESA, ¶ 13.1.

54. The MESA also provided specific instances where the right of termination was immediate. For instance, EAV had the right to terminate immediately if Sage "adulterated any Product sold … or has otherwise willfully violated the provisions of this Agreement regarding quality, or … has altered or omitted an ingredient, component, process or procedure called for thereby which, in any such case, results in Products being sold to [EAV] that is not in compliance a Statement of Work." MESA, ¶ 13.2(b)

55. EAV also had the right to immediately terminate the Agreement if Sage "misbranded Products which are subject to regulatory agency recommended or ordered seizure, destruction, or recall not timely cured by [Sage]." MESA, ¶ 13.2(c).

56. EAV also had the right to immediately terminate the Agreement if Sage "fails to deliver at least 85% of Products required by the Statement of Work or Product Orders in any six-month period." MESA, ¶ 13.2(e).

57. EAV also had the right to immediately terminate the Agreement if Sage "failed to inform [EAV] of any known deficiency in the Products." MESA, ¶ 13.2(f).

**D.** ***Even After the MESA and the SOW1 Had Been Signed, Sage was Secretly Struggling to Create a Workable Product***

58. After the parties executed the MESA, and around the time the parties were executing the SOW 1, Sage was still scrambling to come up with a formulation of the Gel that would work consistently in the Pen.

59.     Sage's lead scientist, Aaron John, informed Calafiore on December 1, 2018 that he was still " ███████████████████████████████████████████████████████████ ███████████████ ."

60.     In response, Calafiore responded:

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

61.     Sage did not notify, or otherwise inform EAV that it did not have a " ███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████ on December 3, 2018.

62.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ .

63.     When Sage finally tested the Gel in the Pens, the results revealed additional issues. ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████

64.     Sage also learned of other problems with the product. On December 10, 2018, Sage's scientists acknowledged that there was the potential for ████████████████
████████████████████████████████████████████████████████████
████████████████████████

65.     Mr. John and Dr. Lauri Shultz noted that the Pen will "█████████████████████"

███████████████████████████████████████████████████████████████

███████████████████████████████████ Mr. John and Dr. Schultz stated their belief that

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████

66.     Sage never brought any of these issues to EAV's attention during this time. Instead, well-aware in December of 2018 that (1) the formulation of the Gel was still being altered post-contract, (2) the Gel could change viscosity at different temperatures which would impact their ability to dispense property, and (3) the Pens tended to jam, clog, or otherwise fail to properly dispense the Gel, Sage failed to inform EAV of these facts and instead shipped thousands of knowingly defective units of product to EAV.

**E.      *EAV Fully Performed Its Obligations During the First and Second Quarters of 2019, but Experienced Untimely Deliveries by Sage***

67.     Entirely unaware that Sage was experiencing serious issues with the Zen Pen, EAV began placing orders for the first and second quarters of 2019. In total, EAV ordered 85,000 units for the first two quarters, thereby satisfying the minimum purchase requirements under the Agreement for the first half of 2019.

68.     Sage's performance was riddled with problems from the start. During the first quarter of 2019, Sage struggled to timely deliver the units to EAV and was unable to fully satisfy the initial first quarter orders until April 12, 2019.

69.     As was the case during the first quarter of 2019, Sage continued to struggle to ramp up production and timely deliver the Zen Pens. Sage only made deliveries to EAV in small piecemeal orders over the course of several months.

70.     In fact, Sage could not fully satisfy EAV's purchase orders from the second quarter of 2019 until the very end of the third quarter on or about July 11, 2019. A total of 15,000 units ordered for the second quarter of 2019 (ending June 30 2019) were not delivered until July 2019.

71.     Based on the various delays by Sage during the first two quarters of 2019, Sage was not ready, willing, and able to produce and deliver the quarterly or annual minimum purchase requirements under the SOW throughout 2019.

72.     By contrast, EAV made substantial efforts to market the CBD Animal Products, including presenting the CBD Animal Products at various trade show, delivering samples of the product to trade partners and retail partners, creating advertising and marketing information to educate the marketplace on the benefits of CBD oil for pets.

73.     EAV marketed and sold the CBD Animal Products as the Nature's Comfort range under its well-known and respected Earth Animal brand name.

**G.     *EAV Encountered Labelling Issues With the Zen Pens Produced by Sage***

74.     When EAV began receiving product from Sage, it learned that Sage had been labelling all delivered Zen Pens with only a twelve-month expiration date. As Sage was well-aware, such a short period generally impeded the products' marketability, given the products' placement within EAV's traditional channels of distribution, the typical sales cycle, and the time required to launch a new product, particularly an innovative product in a nascent industry.

75. Critically, in or around April 2019, EAV discovered that Sage had not conducted any shelf-life stability testing to substantiate even the 12-month expiration date.

76. Sage was labelling the Zen Pens with shelf-life information that was entirely speculative and unsubstantiated.

77. Indeed, on April 1, 2019, Sage's own scientist, Dr. Shultz informed Steven Kushner, a consultant advising on the project. that she was only then ███████████ ███████████████████████████ clearly indicating that no such testing had been performed as of that date.

78. In response, Mr. Kushner informed Dr. Shultz that "███████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████

79. Dr. Shultz responded to Mr. Kushner by conceding that ██████████████ ████████████████████

80. This, however, was not the first time Sage had been placed on notice by Mr. Kushner that stability testing was necessary to comply with the industry standard of care and the legal and regulatory requirements for over-the-counter topical products such as the Zen Pens.

81. Specifically, on December 18, 2018 (prior to the effective date of the SOW 1), Mr. Kushner instructed Sage, by email to Calafiore, that Sage could label the Zen Pens with a 12-month expiration date, but "███████████████████████████████████████

82. In response to the December 18 correspondence, Brian Sward of Sage stated that ███████████████████████████████████████████████████████████

 The plain implication of Mr. Sward's statement is that Sage would label the products with a twelve-month shelf life with no support, conduct no stability testing and then address the issue later if and when the Gel 

83.     On December 19, 2018, Mr. Kushner again repeated that Sage "██████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████"

84.     None of this should have been news to Sage. In June of 2018, Sage acknowledged that its own procedures for new products require shelf life testing, that ██████████ ████████████████████████████████████████████████████ ████████████████████████.

85.     Despite this clear and repeated advice from Mr. Kushner and Sage's own internal procedures, no such shelf life stability testing was even commenced until April of 2019 – after Sage had already delivered thousands of units of Zen Pens to EAV that were labelled with expiration dates that were entirely unsubstantiated by data and could not be supported if the Food and Drug Administration or other regulators asked to verify the statements on the product's label.

**G.      *EAV and Sage Agreed to Suspend the Minimum Purchase Requirements***

86.     Upon learning that Sage had been labelling all delivered products with only a twelve-month expiration date and that Sage had not conducted any shelf-life stability testing to support the 12-month claim, EAV notified Sage that it required that all products contain commercially viable and supportable sell-by dates of at least eighteen months.

87. In May of 2019, the parties met to discuss various issues with the products, including that Sage was struggling to deliver the products in a timely manner and the expiration dates on the labels were too short and unsupported by any data. At the same time, EAV was starting to receive customer complaints that the Pens were malfunctioning.

88. Sage did not assure EAV that it could timely deliver conforming product with substantiated sell by dates. Because Sage did not or could not adequately assure EAV, the parties agreed to suspend several contractual obligations – including EAV's obligation to place minimum purchase orders – until 2020.

89. Following the parties May meeting, on May 23, 2019, EAV's CEO emailed Mr. Calafiore and others at Sage, documenting the parties' agreement to suspend purchase orders for the remainder of 2019.

90. Faced with a significant backlog of product orders, Sage's inability to substantiate its claimed expiration date with any shelf life stability data, and consistent with the parties' agreement, in May of 2019, EAV exercised its right to suspend making further purchase orders until the shelf life stability testing could be performed and the delivered product could be relabeled to reflect the actual shelf life of the product.

91. Consistent with the parties' agreement, on May 31, 2019, Mr. Calafiore emailed Medisca – Sage's third-party pen supplier – ██████████████████████████████████ ████████████████████████████████████████████████████.

92. Indeed, for the next several months, Sage did not issue any verbal or written demand for EAV to purchase the required minimums.

93. Instead, Sage engaged Advanced Laboratories, Inc. ("ALI") to perform shelf-life stability testing, but was otherwise unable to provide any assurance that it could timely deliver

properly labelled and substantiated products until such testing was complete. In fact, Sage's shelf-life stability testing could not substantiate an 18-month shelf-life until October 2019 – ten months after the effective date of SOW 1.

94.     To make matters worse, Sage also refused to bear any of the costs required to print new labels and engage a third-party company to relabel approximately 50,000 units of the Zen Pens previously delivered by Sage to EAV with new expiration dates.

95.     EAV was forced to arrange and pay for all the costs associated with the relabeling, despite Sage having been the direct cause of the issue. Sage only offered to oversee the logistics of the relabeling. Sage, however, provided incorrect guidance by saying it was okay to apply the label over the old label causing EAV to incur additional expenses.

96.     In total, the relabeling project cost EAV over $130,000.  Sage refused to bear any of the costs, despite having been the direct cause of the issue.

**H.**     ***Starting in May of 2019, EAV Began Receiving Complaints of a Product Defect in the Zen Pens***

97.     In or around May of 2019, EAV received multiple complaints from customers, trade partners, and retailers that the Zen Pens did not work as intended and that users were unable to dispense Gel from the Pen for up to 30 metered doses per Pen, as represented on the packaging of the products.

98.     EAV continued to receive similar complaints and feedback from its customers and trade partners throughout 2019 and 2020.

99.     In total, EAV directly received complaints or returns for approximately 4% of all CBD Animal Products sold in 2019, which is a complaint rate 4000x higher than the complaint rate of EAV's bestselling product.  It also received various feedback from its trade partners and retailers that customers were returning or making complaints about malfunctioning product.

100.     EAV notified Sage in writing of these complaints from customers, trade partners, and retailers as it received them. EAV notified Sage that it had received several defective Zen Pens that were returned to EAV's customer service department. EAV requested that Sage evaluate the problem to ensure that it could timely deliver non-defective products.

101.     For example, on or about June 25, 2019, EAV reported to Sage in writing that it had received 2 Zen-Pen units that were returned to EAV's Customer Service Department with the same issue. The customers reported that the " ███████████████████████████████ ███████████████████████████████████████████████████████████ █████████████████████████████████████████

102.     Sage initially stated it would look into the issue but ultimately did not take any action that would eliminate the jamming or clogging with the Zen Pens. The only "solution" that Sage offered was to provide EAV with a video whereby customers were instructed to unfold a paperclip and stick the paperclip into the back of the Zen Pen. The purported concept was that the paperclip would release an air bubble or other pressure that had built up in the Pen and would restore functionality, at least in the short term.

103.     Sage's proposed paperclip video was not an adequate or proper cure, nor was it a commercially viable solution given that EAV sold the Zen Pens as a high-end premium product for between $50 and $80 per pen to its retail customers. It was entirely unreasonable for EAV to ask customers to self-repair the Zen Pens themselves by employing a make-shift "fix" after they had already spent substantial money on a product that was marketed to dispense 30 metered doses of CBD oil per pen over the shelf-life of the product.

104.     Even Sage Door's managing member, John Thornton, acknowledged in an internal email to other Sage employees and officers that he is " ████████████████████████████

████████████████████████████████████████████████████████

████████████

105.     Although Sage pretended this "fix" was invented in response to the customer complaints that arose in May 2019, Sage had actually developed this "fix" in 2018 when it first learned of the product defect. Nevertheless, Sage never disclosed it until the Spring of 2019 when faced with the complaints of EAV's customers.

106.     Critically, Sage also notified its third-party Pen supplier of the customer complaints. After conducting its own internal review of the issue, the Pen supplier stated that

████████████████████████████████████████████████████████

████████████████████████████████████████████████ "

107.     In response to these various problems, EAV took a series of actions in good faith performance of the Agreement to mitigate the negative impact on the marketability of the Zen Pens.

108.     EAV immediately initiated a promotion whereby it provided retailers and trade partners with free Zen Pens so that they would have sufficient stock to replace any broken or defective products returned by customers. Sage never reimbursed EAV or provided any credit to EAV for such costs.

109.     EAV also increased its marketing efforts by increasing its digital marketing presence, promoting the Zen Pens online and beginning a free gift promotion with every purchase online.

110.     EAV also held monthly meetings with Sage's key employees to evaluate what could be done to resolve the outstanding product issues, re-label product with accurate expiration dates, and increase sales and marketing of the products.

111.     Sage, however, never remedied the situation. In 2019, after Sage had failed to address the problems with the Zen Pens, EAV conducted its own internal investigation into performance and functionality.

112.     EAV provided sample products to 261 customers who provided feedback on their experiences.  Approximately 20% of the customers reported that the Zen Pens had failed to properly dispense 30 metered doses, as expressly represented on the packaging of the product.

113.     In 2020, with the product defects still not fixed, EAV conducted its own in-house testing of the Zen Pens.  EAV performed tests of both the 2 mg and 10 mg versions of the product and tested fail rates when the pen was (a) pumped consecutively non-stop for 30 metered doses in a row, (b) pumped once per day for 30 days, and (c) pumped once per week for 30 weeks.  In total, EAV tested 30 units of each version of the Zen Pens for each of the three scenarios (180 units tested in total).

114.     The results of the internal study were staggering.  Of the 180 units tested, o*nly two* Zen Pen were able to properly dispense thirty metered doses without malfunctioning.  In fact, nearly half of the Zen Pens tested (58%) failed after less than 20 doses. The fail rates increased the longer the product was used (i.e., the failure rates for weekly testing were higher than daily testing and the failure rates for daily testing were higher than consecutive testing).  For instance, while 31% of units failed after less than 20 doses when pumped repeatedly, 43% of units failed after less than 20 doses when pumped once per day, and 95% failed after less than 20 doses when pumped once per week.

115.     EAV's trade partners and retailers also conducted tests and studies of the Zen Pens. They similarly concluded that many of the products malfunctioned or failed after less than the intended number of doses.

116.     Specifically, Pet Food Express, a trade partner of EAV, performed an internal test which revealed a 36% failure rate for the Zen Pens.  Upon conclusion of these findings, Pet Food Express decided not to sell the product.

117.     Pet People, another trade partner of EAV, experienced a high rate of complaints and returns from the Zen Pens and demanded a 38% credit of its order to account for the fact that several of the products were faulty or malfunctioning.  Pet People has since ceased selling the product.

118.     PetValue, another trade partner of EAV, made the decision not to sell the Zen Pens, citing the product's reputation in the industry that it was unreliable and prone to failure.

119.     Centinela, another trade partner of EAV, submitted several returns and credit requests to EAV related to purchases of the Zen Pens.  Centinela also decided to discontinue the product in early 2020.

120.     As a result, EAV has suffered substantial commercial and reputational damage as a result of the faulty performance of the Zen Pens.

**I.      *Sage's Principal Acknowledges that the Company is in a "Grave" Financial Position and Requires a Lifeline from EAV to Continue Performing Under the Agreement***

121.     In August 2019, in the midst of the product quality issues and EAV's attempts to get Sage to cure the defects, Sage's principal, Johnny Thornton, approached EAV's Chief Executive Officer, Stewart Shanley, at a trade show and revealed that Sage was in a "grave" financial position. Sage asked if EAV could provide Sage financial assistance so that Sage could remain in operation.

122.     Given EAV's significant investment in the CBD Animal Products, the threat to its business reputation and its desire to find a solution, Mr. Shanley expressed a willingness to help. Mr. Shanley inquired as to what Mr. Thornton was proposing in terms of financial support.  Mr.

Shanley asked whether Mr. Thornton was proposing that EAV provide a loan to Sage or proposing that EAV provide financing in exchange for an equity stake in the company.

123.    Mr. Thornton was non-committal as to a specific proposal, but agreed to send a business plan so that EAV could evaluate its options and see if there was a way to assist Sage to enable it to meet its contractual obligations.

124.    Mr. Thornton ultimately never sent the business plan to EAV.

125.    Instead, Sage issued a "notice of breach" letter in November 2019.

126.    The notice of breach letter came immediately following EAV paying in full and in advance for a CBD potion (the "Zen Potion"), which was another of the CBD Animal Products that the parties had shifted to in the Fall of 2019 as a temporary alternative to the still-defective Zen Pens. EAV agreed to provide the advance payment as a good faith gesture to help Sage with its cash flow issues.

**J.      *Despite Sage's Ongoing Material Breaches of the Agreement, Sage Demanded That EAV Continue Ordering the Zen Pens***

127.    On November 13, 2019, despite the parties' May agreement to suspend the purchase minimums and the ongoing product defects, Sage informed EAV in writing that it was in "material breach" of the Agreement because it supposedly had failed to purchase the minimum number of units during each of the first three quarters of 2019 and purportedly indicated an intention not to purchase the minimum number of units during the remainder of the Agreement's term.   Indeed, this claim was directly contradicted by Mr. Calafiore's own statement in September 2019 to Medisca that ████████████████████████████████████

████████████████████████████████████████████████████████████████

**K.** *EAV Placed Sage On Notice of its Various Material Breaches of the Agreement*

128. After repeated efforts by EAV to cooperate and work with Sage in good faith to resolve the various labelling and product quality issues with Sage, on December 6, 2019, EAV issued a written notice of material breach outlining Sage's various breaches under the Agreement.

129. Specifically, EAV notified Sage that it had materially breached the Agreement by failing and/or refusing to:

    (a)    Provide credits or other reimbursement for the Advance Payment, as required by the initial SOW 1;

    (b)    Deliver a product that was free from defects in materials and workmanship;

    (c)    Deliver a customized "version 2" of the Pen within six months;

    (d)    Test the product's shelf-life and deliver a product with a commercially viable and substantiated expiration date;

    (e)    Notify EAV of known defects or performance issues with the products; and

    (f)    Deliver at least 85% of the products required by the SOW and Product Orders in any six-month period.

130. EAV stated in the notice of breach letter that it would exercise its rights to terminate the Agreement if Sage did not timely cure and resolve the above breaches.

131. Additionally, EAV demanded that Sage provide the following:

    (a)    The immediate payment or credit of $250,000 that was advanced by EAV;

    (b)    Documentation reflecting Sage's use of the $250,000 Advance Payment to purchase biomass

132. In response, Sage did not address or cure any of the above breaches.

**L.** *In Early 2020, EAV Began Receiving Complaints of a Product Defect in the Zen Potion*

133. The untimely delivery, improper labelling and clogging issues with Zen Pen were not the only problems EAV encountered with CBD Animal Products.

134. Sage also struggled to make timely deliveries of the Zen Potion.

135. Worse, in January 2020, EAV began receiving numerous complaints and returns from its distributors of both the 150mg and 600mg Zen Potion.

136. EAV's distributors were reporting that the bottles were leaking inside the cases because they were not properly sealed.

137. It is an industry standard for products of this type to have safety seals placed to avoid leakage and as a way for the end consumer to see that the product was not opened or tampered with.

138. As a result of Sage's failure to properly seal the Zen Potions, EAV's distributors refused to accept the product.

139. In addition to the bottles of Zen Potion already in distribution, EAV had 9,264 bottles of the 150mg Zen Potion and 9,516 bottles of the 600 mg Zen Potion in its warehouse that needed to be sealed.

140. Sage agreed to take the product back, but EAV was forced to incur the cost of shipping all of the products to Sage and back to EAV's warehouse. Additionally, Sage charged EAV $7,854.00 to have safety seals placed on each bottle.

**M.** *In March 2020, EAV Terminated the Agreement*

141. As a result of Sage's numerous breaches and its failure to cure, on March 11, 2020, EAV formally terminated the Agreement with Sage by way of a written letter.

**N.** *EAV Has Been Damaged as a Result of Sage's Actions and Inactions*

142. EAV has been harmed by Sage's, Sage Door's and Calafiore's conduct in several respects. First, it has hurt the reputation and goodwill of EAV. Second, it forced EAV to incur several costs which, owing to Sage's uncured breach, has yielded no benefits to EAV (including the extra promotional costs, the costs of returns, the relabeling costs, and the costs of the people hired to promote and launch the product, including directly to veterinarians). Third, it has resulted in lost profits.

**COUNTERCLAIM ONE**
**Breach of Contract Against Counterclaim**
**Defendant Sage**

1-142. EAV hereby incorporates by reference the allegations of Paragraph 1 through 142 above as if fully set forth and realleged herein as paragraphs 1 through 142 of Counterclaim One.

143. The Agreement is a valid and enforceable contract under Oregon law.

144. EAV performed or substantially performed all of its material obligations under the Agreement, including but not limited to, purchasing the required minimum number of Zen Pens during the first half of 2019.

145. Sage materially breached the Agreement by labelling the Zen Pens with expiration dates that were unsubstantiated by any testing or analysis.

146. Representing that a product has a certain shelf life without substantiation and support for the representation is a violation of state and / or federal laws, regulations, or rules.

147. Moreover, Sage's own internal processes was to conduct shelf-life stability testing prior to the release of any new product, such as the Zen Pens.

148. Sage also materially breached the Agreement by failing to timely deliver CBD Animal Products, including both the Zen Pens and Zen Potion, that were free from defect as

required under the MESA, failing to adequately cure the defect, and failing to notify EAV on the defect.

149.     Sage also materially breach the Agreement by failing to notify EAV of defects in the Zen Pens that it was fully aware of in December 2018 and January 2019.

150.     Sage further materially breached the Agreement by failing and/or refusing to provide EAV with a credit or other consideration for the $250,000 Advance Payment that EAV provided to Sage.

151.     Sage further materially breached the Agreement by failing to deliver at least 85% of the Zen Pens during the first six months of 2019.  Indeed, of the total units ordered by EAV for delivery during the first and second quarters of 2019 (i.e., January 1, 2019 through June 30, 2019), Sage failed to deliver 15,000 units until July 1st and July 11th, 2019.

152.     Sage also breached the Agreement by failing to perform its obligations on a time is of the essence basis and by failing to use commercially reasonable efforts to supply the products to EAV and to take steps to secure a new improved customized Pen within the first six months of 2019.

153.     Sage was placed on notice of the above material breaches as EAV learned of them and no later than December 11, 2019.

154.     Each of the above breaches was material to the Agreement, as each breach impaired EAV's ability to effectively sell the CBD Animal Products and undermined EAV's standing in the marketplace.

155.     As a direct and proximate result of Sage's conduct, EAV has suffered and continues to suffer harm and monetary damages.

## COUNTERCLAIM TWO
### Breach of Implied Covenant of Good Faith and Fair Dealing (Or. Rev. Stat. §§ 71.2010(2)(t) and 71.3040) Against Counterclaim Defendant Sage

1-155.   EAV hereby incorporates by reference the allegations of Paragraph 1 through 147 above as if set forth and fully realleged herein as paragraphs 1 through 155 of the Second Counterclaim.

156.   The Agreement is governed by Oregon law, which imposes a duty of good faith and fair dealing upon contracting parties.

157.   Sage engaged in bad faith performance of the Agreement, including but not limited to, its refusal to compensate EAV for the Advance Payment, its decision to knowingly forgo shelf-life stability testing in December 2018, its decision in early 2019 to label and ship thousands of products to EAV with baseless and unsubstantiated expiration date information, its decision to ship thousands of knowingly defective products to EAV, its refusal to alter or modify the Zen Pens to address the defect or other issues, its willful refusal to assist EAV's vendors with relabeling of products with new expiration date information and pay for such costs, and its submission of a notice of breach letter when EAV had the right to suspend performance under the Agreement.

158.   Sage's bad faith actions and inactions deprived EAV of receiving the benefits of the Agreements; namely, CBD Animal Products that could be marketed and sold to the general public (i.e., commercially viable) and was otherwise free from defects, properly labelled, and in compliance with all applicable industry standards of care, rules and regulations.

159.   Upon information and belief, Sage's bad faith actions and inactions were motivated by an intent to maximize profits and avoid costs that would have had to have been

incurred to prevent or resolve the various issues EAV, its trade partners, and its customers experienced with the CBD Animal Products.

160.　　EAV had an objectively reasonable expectation that Sage, as the manufacturer and producer, would take all commercially reasonable steps necessary to deliver CBD Animal Products that could be sold in the marketplace without issue.

161.　　Thus, even if Sage's actions and inactions do not violate the express terms of the Agreement, Sage has violated its duty of good faith in the performance of the Agreement, which is a breach of contract under Oregon law.

162.　　As a direct and proximate result of Sage's conduct, EAV has suffered and continues to suffer harm and monetary damages.

## COUNTERCLAIM THREE
### Fraudulent Misrepresentation / Fraud in the Inducement
### Against Counterclaim Defendants Richard Calafiore, Sage Door, and Sage

1-162.　EAV hereby incorporates by reference the allegations of Paragraph 1 through 162 above as if set forth and realleged herein as paragraphs 1 through 162 of the Third Counterclaim.

163.　　Calafiore, both individually and on behalf of Sage and Sage Door, made several misrepresentations of fact in 2018, including but not limited to, his promises and/or representations and/or assurances that: (a) Sage was a well-funded and capitalized company with industry experience in manufacturing and supplying CBD oils, gels and products for human use that was capable of satisfying EAV's need for a reliable CBD gel supplier to launch its new CBD pet products, (b) the $250,000 Advance Payment was required to secure "biomass" for the CBD Animal Products and was in fact used for that purpose, (c) the Advance Payment would be credited or otherwise returned to EAV, (d) Sage would design, develop and procure a new customized applicator pen for EAV within six months, (e) Sage needed what Calafiore

acknowledged were aggressive artificially-high annual and quarterly purchase minimums in the contract so Sage could secure an adequate or guaranteed supply of Pens at an attractive price and further acknowledged and understood that such minimums were not realistic or likely to be met by EAV early on during the initial product launch, promotion and sales effort, (f) in the event EAV could not meet the purchase minimum, Sage's remedy would be limited to recovery of its out-of-pocket costs for any raw materials on hand, (g) Sage, in consideration for exclusivity, would provide EAV with favorable pricing below market prices for applicators and CBD oils, and (h) Sage would ensure that the CBD Animal Products were functional and in compliance with all industry standards of care, and applicable laws, rules, and regulations.

164. Mr. Calafiore made these false and misleading representations and assurances to EAV's officers and employees prior to the formation of the Agreement.

165. Upon information and belief, Mr. Calafiore made these representations and assurances knowing that they were false at the time and that Sage had no intention of fulfilling the promises.

166. Upon information and belief, Calafiore made these representations and assurances with the sole intent of inducing EAV to enter into the Agreement, which was an exclusive three-year contract potentially committing EAV to purchase millions of dollars in products from Sage.

167. EAV reasonably relied upon these representations and assurances in entering into the Agreement.

168. As a direct and proximate result of Mr. Calafiore's misrepresentations of fact, EAV has suffered and continues to suffer harm and monetary damages over and above the breach of contract damages.

## COUNTERCLAIM FOUR
### Negligent Misrepresentation
### Against Counterclaim Defendants Calafiore, Sage Door, and Sage

1-168.  EAV hereby incorporates by reference the allegations of Paragraph 1 through 168 above as if set forth and realleged herein as paragraphs 1 through 168 of the Fourth Counterclaim.

169.  Calafiore, both individually and on behalf of Sage and Sage Door, made several misrepresentations of fact in 2018, including but not limited to, his promises and/or representations and/or assurances that: (a) Sage was a well-funded and capitalized company with industry experience in manufacturing and supplying CBD oils, gels and products for human use that was capable of satisfying EAV's need for a reliable CBD gel supplier to launch its new CBD pet products, (b) the $250,000 Advance Payment was required to secure "biomass" for the CBD Animal Products, (c) the Advance Payment would be credited or otherwise returned to EAV, (d) Sage would design, develop and procure a new customized applicator Pen for EAV within six months, (e) Sage needed what Calafiore acknowledged were aggressive artificially-high annual and quarterly purchase minimums in the contract so Sage could secure an adequate or guaranteed supply of Pens at an attractive price and further acknowledged and understood that such minimums were not realistic or likely to be met by EAV early on during the initial product launch, promotion and sales effort, (f)  in the event EAV could not meet the purchase minimum, Sage's sole remedy would be recovery of its out-of-pocket costs for any inventory or raw materials on hand, (g) Sage, in consideration for exclusivity, would provide EAV with favorable pricing below market prices for applicators and CBD oils, and (h) Sage would ensure that the CBD Animal Products were functional and in compliance with all industry standards of care, and applicable laws, rules, and regulations.

170.    Calafiore knew or should have known that these representations and assurances were false.

171.    EAV reasonably relied upon these representations and assurances.

172.    As a direct and proximate result of Calafiore's misrepresentations of fact, EAV has suffered and continues to suffer harm and monetary damages over and above the breach of contract damages.

**COUNTERCLAIM FIVE**
**Innocent Misrepresentation**
**Against Counterclaim Defendants Calafiore, Sage Door, and Sage**

1-172.    EAV hereby incorporates by reference the allegations of Paragraph 1 through 172 above as if set forth and realleged herein as paragraphs 1 through 172 of the Fifth Counterclaim.

173.    Calafiore, both individually and on behalf of Sage and Sage Door, made several misrepresentations of fact in 2018, including but not limited to, his promises and/or representations and/or assurances that: (a) Sage was a well-funded and capitalized company with industry experience in manufacturing and supplying CBD oils, gels and products for human use that was capable of satisfying EAV's need for a reliable CBD gel supplier to launch its new CBD pet products, (b) the $250,000 Advance Payment was required to secure "biomass" for the CBD Animal Products, (c) the Advance Payment would be credited or otherwise returned to EAV, (d) Sage would design, develop and procure a new customized applicator pen for EAV within six months, (e) Sage needed what Mr. Calafiore acknowledged were aggressive artificially-high annual and quarterly purchase minimums in the contract so Sage could secure an adequate or guaranteed supply of Pens at an attractive price and further acknowledged and understood that such minimums were not realistic or likely to be met by EAV early on during the initial product launch, promotion and sales effort, (f) in the event EAV could not meet the purchase minimum,

Sage's sole remedy would be recovery of its out-of-pocket costs for any inventory or raw materials on hand, (g) Sage, in consideration for exclusivity, would provide EAV with favorable pricing below market prices for applicators and CBD oils, and (h) Sage would ensure that the CBD Animal Products were functional and in compliance with all industry standards of care, and applicable laws, rules, and regulations.

174.    These representations and assurances were untrue.

175.    Mr. Calafiore made these representations and assurances with the sole intent of inducing EAV to enter into the Agreement to purchase the CBD Animal Products.

176.    EAV reasonably relied upon these representations and assurances in entering into the Agreement.

177.    As a direct and proximate result of Mr. Calafiore's misrepresentations of fact, EAV has suffered and continues to suffer harm and monetary damages over and above the breach of contract damages.

## COUNTERCLAIM SIX
**(Violations of the Connecticut Unfair Trade Practices Act against Counterclaim Defendants Richard Calafiore, Sage Door, and Sage)**

1-177.    EAV hereby incorporates by reference the allegations of Paragraph 1 through 177 above as if set forth and realleged herein as paragraphs 1 through 177 of the Sixth Counterclaim.

178.    At all relevant times, EAV, Sage, and Calafiore were engaged in trade and commerce, as that term is defined in Conn. Gen. Stat. § 41-110a, within the State of Connecticut.

179.    By virtue of Sage's willful and intentional breaches of the Agreement, coupled with Sage's bad faith, including knowingly delivering a product containing an undisclosed latent defect to EAV, and Calafiore's fraudulent (or, at a minimum, negligent) misrepresentations of

fact, the Counterclaim Defendants have engaged in unfair methods of competition and deceptive acts or practices in the conduct of trade or commerce.

180.    Specifically, the conduct of the Counterclaim Defendants has offended public policy; was immoral, oppressive, unethical, and unscrupulous; and caused substantial injury to EAV, thereby violating the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, *et seq*.

181.    As a direct and proximate result of said conduct, Plaintiff has suffered and continues to suffer ascertainable harm and monetary damages.

182.    Pursuant to Conn. Gen. Stat. § 42-110g(c), a copy of this counterclaim is being mailed to the Attorney General and the Commissioner of Consumer Protection.

## PRAYER FOR RELIEF

**WHEREAS**, EAV demands judgment in its favor and against Sage as follows:

1.    On Counts One, Three and Four of the Complaint:

    (a)    a denial of all relief sought by Sage;

    (b)    an order declaring EAV as the "prevailing party" as that term is defined in the MESA;

    (c)    Court costs, expenses, and reasonable attorneys' fees pursuant to the MESA; and

    (d)    such other and further relief as this Court deems just and proper.

2.    On EAV's First, Second, Third, Fourth, Fifth and Sixth Counterclaims:

    (a)    an award of money damages in EAV's favor;

    (b)    an order declaring the MESA and SOW as properly terminated and, thus, void and unenforceable;

    (c)    such other and further relief as this Court deems just and proper.

3. On EAV's First and Second Counterclaims

    (a) an award of court costs, expenses, and reasonable attorneys' fees as recoverable under the MESA;

    (b) an award of interest pursuant to Conn. Gen. Stat. § 37-3; and

4. On EAV's Third Counterclaim:

    (a) an award of punitive damages to the extent of EAV's entitlement thereto under applicable law.

5. On EAV's Sixth Counterclaim:

    (a) an award of pre-and post-judgment interest;

    (b) an award of costs and reasonable attorney's fees;

    (c) an award of actual damages; and

    (d) an award of punitive damages to the extent of EAV's entitlement thereto under applicable law.

## DEMAND FOR JURY TRIAL

DEFENDANT HEREBY DEMANDS A JURY TRIAL ON ALL CLAIMS AND ISSUES RAISED BY THE PLEADINGS THAT ARE TRIABLE TO A JURY

DEFENDANT
**EARTH ANIMAL VENTURES, INC.**

/s/ *Brian E. Moran*
Brian E. Moran (ct05058)
Andrew A. DePeau (ct30051)
Trevor L. Bradley (ct29993)
ROBINSON & COLE LLP
1055 Washington Blvd., 9th Floor
Stamford, Connecticut 06901
Phone: 203-462-7512
Fax: 203-462-7599
Email: bmoran@rc.com
      adepeau@rc.com
      tbradley@rc.com

## **CERTIFICATION**

I hereby certify that on November 6, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent via e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing though the Court's CM/ECF System.

*/s/ Trevor L. Bradley*
Trevor L. Bradley