**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SAGE FULFILLMENT, LLC | : | |
| | : | |
| Plaintiff, | : | CASE NO. 3:20-CV-00444-VAB |
| | : | |
| V. | : | |
| | : | |
| EARTH ANIMAL VENTURES, INC., | : | |
| | : | |
| Defendant. | : | NOVEMBER 6, 2020 |

**EARTH ANIMAL VENTURES, INC.'S MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION FOR PREJUDGMENT REMEDY</u>**

**Page**

TABLE OF AUTHORITIES ...................................................................................II

FACTUAL BACKGROUND ................................................................................. 1

A.     EAV AND SAGE NEGOTIATED THE TERMS OF A BUSINESS RELATIONSHIP IN 2018................................................................... 1

B.     DURING THE CONTRACT NEGOTIATIONS, SAGE'S MEMBER AND PRINCIPAL MADE SEVERAL MISREPRESENTATIONS DESIGNED TO FRAUDULENTLY INDUCE EAV TO ENTER INTO THE CONTRACT ................... 2

C.     EAV AND SAGE EXECUTED THE AGREEMENT...................................... 5

D.     EVEN AFTER THE MESA AND THE SOW 1 HAD BEEN SIGNED, SAGE WAS SECRETLY STILL WORKING TO CREATE A WORKABLE PRODUCT ............................................................................................... 7

E.     EAV FULLY PERFORMED ITS OBLIGATIONS DURING THE FIRST TWO QUARTERS OF 2019, BUT EXPERIENCED UNTIMELY DELIVERIES BY SAGE ......................................................................................................... 9

F.     EAV EXPERIENCED LABELLING ISSUES WITH THE ZEN PENS PRODUCED BY SAGE ........................................................................... 10

G.     EAV AND SAGE AGREED TO SUSPEND CERTAIN OBLIGATIONS.................. 11

H.     STARTING IN MAY OF 2019, EAV BEGAN RECEIVING COMPLAINTS OF A PRODUCT DEFECT IN THE ZEN PENS ................................................ 13

I.     SAGE INFORMED EAV OF ITS DIRE FINANCIAL CONDITION AND SOUGHT EAV'S HELP.......................................................................... 16

J.     DESPITE SAGE'S ONGOING MATERIAL BREACHES OF THE AGREEMENT, SAGE DEMANDED THAT EAV CONTINUE ORDERING THE ZEN PENS ...................................................................................... 16

K.     EAV PLACED SAGE ON NOTICE OF ITS VARIOUS MATERIAL BREACHES OF THE AGREEMENT ............................................................ 17

L.     IN EARLY 2020, EAV BEGAN RECEIVING COMPLAINTS OF A PRODUCT DEFECT IN THE ZEN POTION ...................................................... 17

M.     IN MARCH 2020, EAV TERMINATED THE AGREEMENT ...................... 18

N.      EAV HAS BEEN DAMAGED AS A RESULT OF SAGE'S ACTIONS AND INACTIONS ............................................................................................................. 18

PROCEDURAL HISTORY ........................................................................................... 18

LEGAL STANDARD ..................................................................................................... 19

ARGUMENT .................................................................................................................. 20

A.      EAV IS ENTITLED TO JUDGMENT ON ITS BREACH OF WARRANTY CLAIMS ......................................................................................................... 20

      1.      Sage Breached Several Express Warranties ..................................... 21

      2.      EAV Suffered Damages as a Proximate Result of Sage's Breaches .................. 22

            (i)      EAV's Lost Profits Are Direct Damages ................................. 23

            (ii)      The Limitation of Remedies Provision Is Unconscionable ............ 25

B.      EAV IS ENTITLED TO JUDGMENT ON ITS REPUDIATION COUNTERCLAIM ...................................................................................... 26

      1.      Sage Repudiated the Agreement by Failing to Adequately Assure EAV of its Ability to Timely and Fully Perform .............................. 26

      2.      Sage Repudiated the Agreement by Indicating its Inability to Timely and Fully Perform ................................................................ 29

      3.      EAV Suffered Damages as a Result of Sage's Repudiations ............. 30

C.      EAV IS ENTITLED TO JUDGMENT ON ITS BREACH OF CONTRACT COUNTERCLAIM ...................................................................................... 31

      1.      EAV Fully Performed Its Obligations Under the Agreement and Did Not Breach the Agreement ............................................................. 31

      2.      Sage Breached the Agreement Causing EAV Damage ..................... 32

D.      EAV IS ENTITLED TO JUDGMENT ON ITS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM ................. 32

      1.      Sage Engaged in Subjective and Objective Bad Faith ..................... 33

      2.      Sage's Bad Faith Precludes Sage from Enforcing the Limitation of Remedies Provision .......................................................................... 34

E.      EAV IS ENTITLED TO JUDGMENT ON ITS MISREPRESENTATION CLAIMS ......................................................................................................... 34

      1.      Sage Knowingly Made False Representations of Material Fact ......... 35

            (i)      The Disclaimer of Warranties Provision Does Not Apply ............ 36

            (ii)      The Parol Evidence Rule Does Not Bar Evidence of Sage's Misrepresentations ................................................................ 37

2.    Sage's False Representations Were Intended to Induce and Did Induce EAV to Enter the Agreement .................................................................. 37

3.    EAV Suffered Damages as a Result of Sage's Misrepresentations .................... 38

    (i)    Sage Cannot Enforce the Limitation of Remedies Provision .................. 38

F.    SAGE IS ENTITLED TO JUDGMENT ON ITS CUTPA CLAIM .............................. 39

G.    SAGE IS NOT ENTITLED TO ANY SETOFFS ......................................................... 40

CONCLUSION ............................................................................................................ 41

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alexis v. PMM Enterprises LLC*,
  No. 3:17-CV-1622, 2018 WL 5456491 (D. Conn. Oct. 29, 2018) .........................................39

*AMF, Inc. v. McDonald's Corp.*,
  536 F.2d 1167 (7th Cir.1976) ......................................................................................26, 27

*ARB (Am. Research Bureau), Inc. v. E-Sys., Inc.*,
  663 F.2d 189 (D.C. Cir. 1980) ...........................................................................................27

*Atwood-Kellogg, Inc. v. Nickeson Farms*,
  602 N.W.2d 749 (S.D. 1999) .............................................................................................27

*Bank of Boston v. Schlesinger*,
  220 Conn. 152 (1991) ........................................................................................................20

*Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*,
  11 N.E.3d 676 (N.Y. 2014).........................................................................................23, 24

*Burkert v. Petrol Plus of Naugatuck, Inc.*,
  5 Conn. App. 296 (1985) ...................................................................................................20

*Capital Mortg. Associates, LLC v. Hulton*,
  No. NNICV065000431S, 2009 WL 567057 (Conn. Super. Ct. 2009),
  *reargument denied*, No. NNICV065000431S, 2009 WL 3284241 ........................................38

*Chaney v. Shell Oil Co.*,
  827 P.2d 196 (Or. Ct. App. 1992), *review denied*, 832 P.2d 455 (Or. 1992) .........................33

*Cohn v. MarineMax Ne., LLC*,
  No. FSTCV176031498S, 2019 WL 4733614 (Conn. Super. Ct. 2019) ...........................36, 38

*Conzelmann v. N.W.P. & D. Prod. Co.*,
  225 P.2d 757 (1950).............................................................................................................35

*Coppola Const. Co., Inc. v. Hoffman Enterprises Ltd. P'ship*,
  309 Conn. 342 (2013) .........................................................................................................35

*Deerfield Commodities, Ltd. v. Nerco, Inc.*,
  696 P.2d 1096 (Or. Ct. App. 1985), *review denied,* 702 P.2d 1111 (Or. 1985) .....................38

*Earls v. Condor Capital Corp.*,
No. CV980491748S, 2001 WL 1188248 (Conn. Super. Ct. 2001) ........................................39

*Farrell v. Johnson & Johnson*,
184 Conn. App. 685 (2018), *aff'd*, No. 20225, 2020 WL 1887720..........................................35

*George Packing Co., Inc. v. FMC Techs., Inc.*,
No. 3:10-CV-01055-PK, 2011 WL 7082545 (D. Or. Sept. 20, 2011).....................................37

*Gov't of Republic of China v. Compass Communications Corp.*,
473 F. Supp. 1306 (D.D.C. 1979) ("There can be little question that
defendant's notice of inability to perform by September, 1975, coupled with
its June, 1975, admissions to plaintiff of its bad financial condition were
sufficient to repudiate its performance.") .............................................................................30

*Gunderson LLC v. BCG Properties Group, Inc.*,
No. 3:19-CV-01569-AC, 2020 WL 1529356 (D. Or. March 30, 2020) ...........................20, 32

*Hinchcliffe v. American Motors Corp.*,
184 Conn. 607 (1981) ............................................................................................................40

*J.K. Scanlon Co. v. The Construction Group Inc.*,
80 Conn. App. 345 (2003) ......................................................................................................20

*Lanners v. Whitney*,
428 P.2d 398 (Or. 1967) .........................................................................................................30

*Marlin Broadcasting, LLC v. Law Office of Kent Avery, LLC*,
101 Conn. App. 638 (2007) ....................................................................................................19

*Martinez v. Zovich*,
87 Conn. App. 766, *cert. denied*, 274 Conn. 908 (2005)........................................................37

*McGinnis v. Wentworth Chevrolet Co.*,
668 P.2d 365 (Or. 1983) .........................................................................................................31

*McMullin v. Murphy*,
748 P.2d 171 (Or. Ct. App. 1988), *review denied*, 764 P.2d 552 (Or. 1988) .........................38

*Miller v. Appleby*,
183 Conn. 51 (1981) ...............................................................................................................38

*Miller v. Hubbard-Wray Co., Inc.*,
630 P.2d 880, *modified*, 633 P.2d 1 (Or. Ct. App. 1981), *review denied sub
nom.* 642 P.2d 310 (Or. 1981)................................................................................................36

*Montanez v. D & D Auto, LLC*,
No. 3:15-CV-397 (VAB), 2016 WL 1254199 (D. Conn. March 29, 2016) ...........................39

*Morasch Meats, Inc. v. Frevol HPP, LLC*,
  No. 3:16-CV-0269-PK, 2018 WL 1434814 (D. Or. March 22, 2018) ...................................35

*Nygren v. Greater New York Mut. Ins. Co.*,
  No. 3:07CV00462DJS, 2007 WL 4105327 (D. Conn. Nov. 16, 2007)...................................39

*Orester v. Dayton Rubber Manufacturing Co.*,
  126 N.E. 510 (N.Y. 1920).........................................................................................................24

*Paiva v. Vanech Heights Const. Co.*,
  159 Conn. 512 (1970) ...............................................................................................................37

*Pusztay v. Allstate Ins. Co.*,
  No. FSTCV065002425S, 2009 WL 2357958 (Conn. Super. Ct. 2009) ...................................39

*Rocheux Int'l, Inc. v. U.S. Merchants Fin. Grp., Inc.*,
  741 F. Supp. 2d 651 (D.N.J. 2010) ..........................................................................................27

*Saab Enterprises, Inc. v. Bruce Packing Co., Inc.*,
  No. CV-06-774-ST, 2007 WL 2746915 (D. Or. 2007) ............................................................34

*Santa Buckley Energy Ltd. v. Tiscia Corp.*,
  No. CV156052285S, 2016 WL 3179740 (Conn. Super. Ct. 2016) ..........................................39

*Simms v. Seaman*,
  308 Conn. 523 (2013) ...............................................................................................................35

*Slover v. Oregon State Bd. of Clinical Soc. Workers*,
  927 P.2d 1098 (Or. Ct. App. 1996) ..........................................................................................31

*Slusher v. Ditech Financial, LLC*,
  No. 3:18-cv-00034-HZ, 2018 WL 4705547 (D. Or. 2018) ......................................................31

*State v. Triad Mechanical Inc.*,
  925 P.2d 918 (Or. App. Ct. 1996)..............................................................................................37

*Taylor v. Ramsay-Gerding Const. Co.*,
  226 P.3d 45, *opinion adhered to as modified on reconsideration*, 234 P.3d 129
  (Or. Ct. App. 2010) ...................................................................................................................22

*Teague Motor Co. v. Rowton*,
  733 P.2d 93 (Or. Ct. App. 1987)................................................................................................37

*Tokyo Ohka Kogyo Am., Inc. v. Huntsman Propylene Oxide LLC*,
  35 F. Supp. 3d 1316 (D. Or. 2014) ...........................................................................................25

*U.S. Fid. & Guar. Co. v. S.B. Phillips Co., Inc.*,
  359 F. Supp. 2d 189 (D. Conn. 2005)........................................................................................35

*United Concrete Prod., Inc. v. NJR Constr.*,
 LLC, No. CV176011932S, 2018 WL 5733720 (Conn. Super. Ct. Oct. 17,
 2018) ...........................................................................................................................40

*Wanke Cascade Distribution Ltd. v. Forbo Flooring Inc.*,
 Case No. 3:13–cv–768–AC, 2013 WL 6493099 (D. Or. Aug. 20, 2013), *report
 and recommendation adopted as modified*, No. 3:13-CV-00768-AC, 2013 WL
 6493106............................................................................................................32, 33

*Whitaker v. Taylor*,
 99 Conn.App. 719, 916 A.2d 834 (2007) ..............................................................38

*Wilkinson v. Carpenter*,
 554 P.2d 512 (Or. 1976) .......................................................................................37

*Wright Bros. Builders, Inc. v. Shuldman*,
 No. FSTCV054005897S, 2006 WL 3361461 (Conn. Super. Oct. 31, 2006) ..........39

## STATUTES

21 U.S.C. § 321 .............................................................................................................21

21 U.S.C. § 331 .............................................................................................................21

Conn. Gen. Stat. § 52-278d ..........................................................................................19

Connecticut Unfair Trade Practices Act ............................................................19, 39, 40

Food, Drug, and Cosmetic Act .....................................................................................21

General Statutes § 42a–1–103 (b)................................................................................39

Or. Rev. Stat. §§ 71.1010–.3100 ..................................................................................32

Or. Rev. Stat. § 71.2010(2)(t) ......................................................................................32

Or. Rev. Stat. § 71.3040...............................................................................................32

Or. Rev. Stat. §§ 72.1010–.8200 ..................................................................................32

Or. Rev. Stat. § 72.3130...............................................................................................21

Or. Rev. Stat. § 72.6090(4) .............................................................................26, 28, 29

Or. Rev. Stat. §§ 72.6090.................................................................................31, 32, 40

Or. Rev. Stat. § 72.6100...............................................................................................29

Or. Rev. Stat. § 72.7110.........................................................................................30, 40

Or. Rev. Stat. § 72.7120(3) ................................................................................30

Or. Rev. Stat. § 72.7130 ....................................................................................30

Or. Rev. Stat. § 72.7140 ....................................................................................22

Or. Rev. Stat. § 72.7190(3) ................................................................................25

Oregon U.C.C. ...................................................................................................32

ORS 72.7150[ ....................................................................................................30

U.C.C. .....................................................................................................27, 29, 32

U.C.C. § 2-609 ...................................................................................................26

Pursuant to Rule 64 of the Federal Rules of Civil Procedure, Rule 4(c) of the Local Rules of Civil Procedure for the District of Connecticut, and Sections 52-278a *et seq.* of the Connecticut General Statutes, Defendant Earth Animal Ventures, Inc. ("EAV" or "Counterclaimant") respectfully applies for a prejudgment remedy ("PJR") against Plaintiff Sage Fulfillment, LLC ("Sage"), Sage Door LLC ("Sage Door") and Richard Calafiore.

## FACTUAL BACKGROUND

### A.  *EAV and Sage Negotiated the Terms of a Business Relationship in 2018*

In early 2018, EAV and Sage Door, Sage's parent entity, first began discussing a potential business relationship whereby Sage would manufacture and sell to EAV a cannabinoid ("CBD") oil medical products designed specifically for use on pets (the "CBD Animal Products"). *See* Affidavit of Stewart Shanley ("Shanley Aff."), ¶ 6. As Sage and its members had no prior experience with manufacturing products for the pet market and EAV had no prior experience selling products containing CBD oil, the parties relied upon each other's purported respective knowledge, experience and expertise to launch a new product in a nascent market.

In or around June 2018, Sage Door proposed to manufacture and deliver a product that was comprised of a metered applicator pen (the "Pen") preloaded with Sage's own proprietary blend of CBD oil and other ingredients (the "Gel") (collectively, the "Zen Pen"). *Id.*, ¶ 7. The Pen contemplated the use of a plunger. *Id.* The plunger was designed to be depressed to dispense multiple doses of the Gel in equal, metered quantities. *Id.* The Pen was intended to dispense 30 doses per Pen. *Id.*

EAV made it clear that the end product would need to: (1) be shelf stable with a specified expiration date, (2) have an aesthetically desirable consumer form factor, (3) dispense 30 equal metered doses per Pen, and (4) otherwise be free from any defects. EAV expressly informed Sage that the intended use of the Zen Pen was to enable families with animals to be able easily dispense

to their pet 30 equal doses of CBD oil per applicator into the inner ear of their pet through the duration of the product's shelf life. *Id.*, ¶ 8.

With these requirements and the intended use in mind, Sage presented several Pen options from third-party medical device manufacturers. *Id.*, ¶ 9. Sage and/or its affiliated entities developed the Gel, which contained a proprietary blend of ingredients, including CBD oil and a licensed and proprietary blend called "Uptake Technology." *Id.* The Uptake Technology was intended to improve the absorption of the CBD oil when it was applied to the pet's skin. *Id.*

While EAV performed some tests to confirm the efficacy and safety of the Gel for use on animals, it relied entirely on Sage's purported industry experience and expertise to develop the Gel. *Id.*, ¶ 10. EAV also reasonably relied on Sage's representations and assurances that the Gel formulation was appropriate for its intended use, had a commercially viable shelf-life, and could be dispensed by the Pen for 30 equal metered doses through the product's stated shelf-life. *Id.*

Sage represented that <u>all</u> of the Pen options it presented to EAV were appropriate for the intended use in the Zen Pens and would work with the Gel to dispense 30 equal metered doses through the product's stated shelf-life. *Id.*, ¶ 11. EAV's pre-contract evaluation of the pen options presented to it by Sage was based solely on its form, comfort and ease of use. *Id.*, ¶ 12.

**B.**      ***During the Contract Negotiations, Sage's Member and Principal Made Several Misrepresentations Designed to Fraudulently Induce EAV to Enter Into the Contract***

In or around September or October of 2018, EAV and Sage began to negotiate the terms of a master supply agreement that would govern the purchase and sale of the CBD Animal Products. *Id.*, ¶ 13. In order to induce EAV to enter into a contractual agreement with Sage, Sage's principal and managing member, Richard Calafiore, on behalf of Sage and/or Sage Door, made several misrepresentations to EAV which he either knew to be false or misleading at the time or could not verify or substantiate. *Id.*, ¶ 14.

First, in or around September 2018, Mr. Calafiore represented to EAV that Sage needed an advance of $250,000 prior to or contemporaneous with the signing of the contract. *Id.* ¶ 15. On or around October 2, 2018, prior to execution of the contract with EAV, Mr. Calafiore again demanded that EAV pay more than half of the Advance Payment ($135,000) for "█████████ ██████████". *Id.*, Ex. A. He stressed that "████████████████████ █████████████████████████████████████████████████" *Id.*

Based on this representation and that Sage would provide a credit to EAV against future purchases of Zen Pens in the amount of the Advance Payment, plus interest of $62,500. *Id.*, ¶ 16. Despite written demands to do so, Sage never provided any credit to EAV for the $250,000 advance (and interest). *Id.* It also refused to return the Advance Payment or otherwise compensate EAV for the Advance Payment. *Id.* Upon information and belief, Sage did not solely use, and never intended to solely use, the Advance Payment to ███████████ for the CBD Animal Products or exclusively utilize it in support of Sage's contract with EAV. Instead, Sage diverted some of the biomass and/or funds to Sage's affiliated entities or its members.[1]

Second, between August and October of 2018, Mr. Calafiore repeatedly represented that the Pen Sage sourced from the third-party manufacturer for use in the Zen Pens was only a temporary, stop-gap solution and Sage would design, develop and/or procure a fully-customized Pen for EAV's intended usage within six (6) months after the signing of the contract. *Id.* ¶ 17, Ex. B. Sage never developed or offered a customized new version of the Pen. *Id.* ¶ 17. A customized Pen would have required the parties to negotiate a new price for the Pens. *Id.* Upon information and belief, Mr. Calafiore and Sage had no intention of securing a customized Pen for EAV within

---

[1] Sage's document production provides no evidence that the Advance was utilized for biomass deposit or that Sage's biomass supplier was demanding such a deposit.

the above time frame and made the misrepresentations with the sole intent of inducing EAV to enter into a contract with Sage and make the Advance Payment.

Third, Mr. Calafiore, on behalf of Sage and/or Sage Door, represented that Sage was an experienced, well-financed and adequately capitalized producer of CBD oil products for human use which wanted to expand into CBD pet products and would bring its full experience, expertise, staff, and resources to support EAV's proposed product line. *Id.* ¶ 18. In truth and in fact, and unbeknownst to EAV, Mr. Calafiore intended to create a new separate Sage limited liability company to perform its contract with EAV. *Id.* Nor did he disclose that the newly created company was under-funded, under-staffed and therefore lacked the capital and resources to fully and/or timely meet the demands of the EAV contract, or that the new entity was solely reliant on payments from EAV to cover its capital need, pay for the Pen, procure suppliers of the Gel and produce the CBD Animal Products. *Id.*

Fourth, Mr. Calafiore, on behalf of Sage, pushed EAV to include very aggressive, artificially-high minimum purchase requirements in the EAV contract as an accommodation to Sage in order, according to Mr. Calafiore, to secure an adequate or guaranteed supply of the Pens from a third-party manufacturer at an attractive price. *Id.* ¶ 19. Because of the high minimums, the parties reached an understanding on a remedy for failure to meet the minimums, namely that EAV would pay Sage for any inventory or the cost of supplies, such as the Pens or the Gel. *Id.* In response to Sage's request, EAV relied upon Mr. Calafiore's representation that he agreed on the proposed remedy and that he understood the "minimums" were aggressive and that EAV would likely need more time to ramp up sales and achieve the quarterly and annual purchase minimums, particularly in the beginning, as EAV launched, promoted and initially sold a new product in a nascent market. *Id.* In truth and in fact and unbeknownst to EAV, Mr. Calafiore sought to include the minimum purchase requirement in the contract as leverage against EAV.

Fifth, Mr. Calafiore assured EAV that Sage's prices to EAV would be discounted and be favorably below market prices for both the Pens and CBD oils, in consideration for the exclusivity conferred on Sage. *Id.* ¶ 20. Mr. Calafiore represented such favorable pricing was possible in part because of the $250,000 Advance Payment, ███████████████████████████ ███████ and the contractual purchase minimums, which would secure an adequate supply of Pens at an attractive price. *Id.* Mr. Calafiore represented such savings would be passed on and reflected in the prices Sage would charge to EAV for the Zen Pens and other CBD Animal Products. *Id.* In truth and in fact, Mr. Calafiore and Sage did not intend to charge EAV prices that reflected discounts below the going market rate for either the Pens or the Gel and instead planned to charge EAV premium prices.

## C.     *EAV and Sage Executed the Agreement*

In late 2018, EAV and Sage entered into a contract to purchase and sell the CBD Animal Products. *Id.*, ¶ 21, Ex. C. The contractual relationship was governed by a Master Exclusive Supply Agreement (the "MESA") and an initial Statement of Work No. 1 for the temporary, stop gap version of the Zen Pen (the "SOW 1") (collectively, the "Agreement"). *Id.* Pursuant to the Agreement, Sage agreed to exclusively sell and EAV agreed to exclusively buy the CBD Animal Products. SOW 1 governed the purchase and sale of the Zen Pen, which was described as a "metered applicator for an over the counter packaged proprietary strain with certificate of analysis full spectrum cannabinoid oil transdermal gel with 'uptake' delivery." *Id.*, ¶ 22. Under SOW 1, EAV agreed to purchase a minimum of 400,000 units annually, and at least 40,000 units per calendar quarter, commencing on the effective date of January 1, 2019 and continuing for three years until December 31, 2021. *Id.*

Leading up to the Agreement, Sage assured EAV that the CBD Animal Products would be free of defects, conform to the requirements of the parties (including the requirement to dispense

30 equal, metered doses per Pen), and satisfy all applicable industry standards, federal and state

laws, rules and regulations. *Id.*, ¶ 23.

Per the MESA, Sage specifically agreed and warranted that:

- "all Products shall be free from defects in material and workmanship and shall conform to the standards set forth in a Statement of Work." *See* MESA, ¶ 10;

- "[Sage] shall conduct all necessary quality inspections to ensure that all Products conform to the specifications set forth in a Statement of Work," that it "agrees to produce and deliver the Products in accordance with applicable federal, state and local laws, rules and regulations, and that the Products shall be in compliance in all material respects with the specifications and formulas set forth in the Statement of Work." *See* MESA, ¶ 7.1 & 7.2;

- "[Sage] shall perform mock recalls and quality and pathogen testing of the Products ingredients and finished Products in accordance with usual and customary testing methods, procedures and standards." *See* MESA, ¶ 7.4;

- If "any portion of [Sage's] facility, or any of [Sage's] processes, inventories or equipment do not comply with all applicable laws and regulations or with the terms and conditions of this Agreement, [Sage] shall take such action to correct such deficiencies and bring such processes, inventories and/or equipment into compliance with applicable laws and regulations and with the material terms and conditions of this Agreement promptly but in no case more than 10 business days following delivery of a written notice of such deficiency by [EAV]." *See* MESA, ¶ 7.6;

- Timely notify EAV of any non-conforming or defective products delivered to EAV. *See* MESA, ¶ 7.8;

- "[U]se commercially reasonable efforts to supply Products to [EAV]." *See* MESA, ¶ 16.4; and

- Sage's performance of the Agreement was also subject to a time of the essence provision. *See* MESA, ¶ 15.14.

Under the initial SOW 1, Sage was required to deliver the Zen Pens each calendar month

based on a production schedule set forth in Product Orders. *Id.*, ¶ 25. Time was of the essence, in

part, because EAV sought to be an industry leader and innovator, as well as be first to market in

the nascent CBD veterinary market with a pen applicator. *Id.*

The Agreement called for the parties to negotiate unit prices over the course of the contract's term pursuant to subsequent statements of work. *Id.*, ¶ 26. A new SOW and renegotiation of unit price would have necessarily been required for the newer customized version of the Zen Pen, which Sage had promised to design, develop and procure within six months. *Id.*

The initial SOW 1 also memorialized the terms of EAV's advance of $250,000 to Sage and the obligation that Sage reimburse EAV through credits applied to EAV's purchases of CBD Animal Products. *Id.*, ¶ 27 Specifically, Sage was required to provide a total credit in the amount of $312,500, applied equally over a six-month period (from May 2019 through October 2019). *Id.*

Finally, the MESA provided the parties with certain rights to terminate the contractual relationship if the other party breached and then failed to cure the breach within 30 days of receipt of written notice. *Id.*, ¶ 28.

**D.** ***Even After the MESA and the SOW 1 Had Been Signed, Sage was Secretly Still Working to Create a Workable Product***

After the parties executed the MESA, and around the time the parties were executing the SOW 1, Sage was still scrambling to come up with a formulation of the Gel that would work consistently in the Pen. Sage's lead scientist, Aaron John, informed Richard Calafiore on December 1, 2018 that he was still "█████████████████████████████████ ████████████████████████████." *See* Declaration of Brian E. Moran ("Moran Decl."), Ex. 1. In response, Mr. Calafiore responded:



*Id.* (emphasis added). Sage did not notify or otherwise inform EAV that it did not have a "████" formulation one month prior to shipment of the product. Instead, Sage continued to make changes

to the formulation of the Gel until it, apparently, ██████████████████████ ██████████████. *See* Moran Decl., Ex. 2.

While Sage appears to have settled on the formulation of the Gel by ████████ ██ ██████████████████████████████. *See id.* (Sage's scientist noting that on December 3, 2018, she was just now "███████████████████████████████ ███████████████████████████████). When Sage tested the Gel in the Pens, the results revealed additional issues. Aaron John notified Richard Calafiore on December 10, 2018 ███████████████████████████ ███████████████████████████████████████ ██████████████████ *See* Moran Decl. Exs. 3-4. Mr. John, however, conceded that ████████ ████████████████████████████ *See* Moran Decl., Ex. 3.

Sage also learned of other problems with the product. On December 10, 2018, Sage's scientists acknowledged that there was the potential for air bubbles to enter the Pen during the filling process (i.e., when Sage was filling the Pen with the Gel), which would "████████ ███████" *See id.* Mr. John and Dr. Lauri Shultz noted that the Pen will "████████████ ███████████████████████████████████████ ████████████████████" *See* Moran Decl., Ex. 4. Mr. John and Dr. Shultz stated their belief that the Pen was "████████████████████████████ ███████████████████████████████████████ ██████████" *Id.* Mr. John and Dr. Shultz noted that the Pens "████████████ ███████████████████████████████████████ ████████████████████████" *Id.*

Sage never brought any of these issues to EAV's attention during this time. Shanley Aff., ¶ 47. Instead, Sage, well-aware in December of 2018, at the latest, that (1) the formulation of the

Gel was still being altered post-contract,[2] (2) the Gel could change viscosity at different temperatures which would impact their ability to dispense property, and (3) the Pens tended to jam, clog or otherwise fail to properly dispense the Gel, shipped thousands of knowingly defective units of product to EAV.

E.    ***EAV Fully Performed Its Obligations During the First Two Quarters of 2019, but Experienced Untimely Deliveries by Sage***

Entirely unaware that Sage was experiencing issues with the Zen Pens, EAV began placing orders for the first and second quarters of 2019. In total, EAV had placed orders for a total of 85,000 units for delivery during the first two quarters of 2019, thereby satisfying the minimum purchase requirements under the Agreement for the first half of 2019. Shanley Aff., ¶ 29.

Sage's performance was riddled with problems from the start. During the first quarter of 2019, Sage struggled to timely deliver the units to EAV and was unable to fully satisfy the initial first quarter orders until April 12, 2019. *Id.*, ¶ 30. As was the case during the first quarter of 2019, Sage continued to struggle to ramp up production and timely deliver the Zen Pens in the second quarter of 2019. *Id.*, ¶ 31. Sage made small piecemeal deliveries to EAV over the course of several months. *Id.* In fact, Sage could not fully satisfy EAV's purchase orders from the second quarter. *Id.* As a result of these delays, Sage failed to deliver at least 85% of the Zen Pens ordered for delivery within the first six months of 2019. *Id.*

By way of contrast, EAV made substantial efforts to market the CBD Animal Products, including presenting the Zen Pens at various trade shows, delivering samples of the product to trade partners and retail partners, and creating advertising and marketing information to educate

---

[2] Based on Sage's own internal communications, it is abundantly clear that Sage ███████████████████████████████████████████████████████████████████████████████ Thus, Sage's allegations in its complaint on this point are factually incorrect. *See* Compl., ¶¶ 28-29.

the marketplace on the benefits of CBD oil for pets. *Id.*, ¶ 32. EAV marketed and sold the CBD Animal Products as the Nature's Comfort range under its well-known and respected Earth Animal brand name. *Id.*

**F.      *EAV Experienced Labelling Issues With the Zen Pens Produced by Sage***

When EAV began receiving product from Sage, it learned that Sage had been labelling all delivered products with only a twelve-month expiration date. *Id.*, ¶ 33. As Sage was well-aware, such a short period greatly impeded the products' marketability, given the products' placement within EAV's traditional channels of distribution, the typical sales cycle, and the time required to launch a new product, particularly an innovative product in a nascent industry.[3] Shanley Aff., ¶ 33.

More critically, in or around April 2019, EAV discovered that Sage had not conducted <u>any</u> shelf-life stability testing to substantiate the 12-month expiration date. *Id.*, ¶ 34. Indeed, on April 1, 2019, Sage's own scientist, Dr. Lauri Shultz, stated that she was only then "███████████ ████████████████████████████████████████████████████████████████████████████ ███████████████. *See* Moran Decl., Ex. 6. In response, ██████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████" *Id.*

---

[3] In January of 2019, EAV notified Sage that 12-month expiration dates were fine for the initial batch of 5,000 units, but for all other products, EAV required a minimum 18-month shelf life. *See* Moran Decl., Ex. 5. ███████████████████████████████████████████████████ *Id.*

This was not the first time Sage had been placed on notice by Mr. Kushner that stability testing was necessary to comply with the industry standard of care and the legal regulatory requirements for over-the-counter topical products such as the Zen Pens. Specifically, on December 18, 2018 (prior to the effective date of the SOW 1), Mr. Kushner instructed Sage, by email to Richard Calafiore, that Sage could label the Zen Pens with a 1-year expiration date, but "████████████████████████████████████████" *See* Moran Decl., Ex. 7. In response to the December 18 correspondence, Brian Sward of Sage stated that "██████████████████████ ████████████████████████████████████████████████████████████" *Id.* The plain implication of Mr. Sward's statement is that Sage would label the products with a twelve-month shelf life, conduct no stability testing, and then address the issue only if the Gel "██████ ██████████"

On December 19, 2018, Mr. Kushner again repeated that Sage "████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████" *Id.* None of this should have been news to Sage. In June 2018, Sage acknowledged its own internal procedures for new products require shelf life testing, that Sage had not conducted any stability testing on the Gel, and that Sage was "blind" to what would happen when its components were mixed. *See* Shanley Aff., ¶ 35, Ex. D. Despite this clear and repeated advice and Sage's own internal procedures, no such shelf life stability testing was even commenced until April of 2019 – after Sage had already delivered thousands of Zen Pens to EAV.

## G.   *EAV and Sage Agreed to Suspend Certain Obligations*

Upon learning that Sage had been labelling all delivered products with only a twelve-month expiration date and that Sage had not conducted any shelf-life stability testing to support the 12-month claim, EAV notified Sage that it required that all products contain commercially viable and

supportable sell-by dates of at least eighteen months. Shanley Aff., ¶ 36. In May of 2019, the parties met to discuss various issues with the products, including that Sage was struggling to deliver the products in a timely manner and the expiration dates on the labels were too short and unsupported by any data. *Id.*, ¶ 37. Because Sage could not assure EAV that it could timely deliver product with substantiated expiration dates, the parties agreed to suspend several contractual obligations – including EAV's obligation to place minimum purchase orders – until 2020. *Id.* Following that meeting, on May 23, 2019, EAV's CEO emailed Mr. Calafiore and others documenting the parties' agreement to suspend purchase orders for the remainder of 2019. *Id.*, ¶ 38, Ex. E. Consistent with the parties agreement, on May 31, 2019, Mr. Calafiore emailed Sage's third-party Pen supplier to ████████████████████████████████████████ ███████████████████████████████████████. *See* Moran Decl., Ex. 8.

Indeed, for the next several months, Sage did not issue any demand for EAV to purchase the required minimums. *Id.*, ¶ 39. Instead, Sage engaged a company called Advanced Laboratories, Inc. ("ALI") to perform shelf-life stability testing, but was otherwise unable to provide any assurance that it could timely deliver properly labelled and substantiated products until such testing was completed. *Id.*, ¶ 40. In fact, Sage's shelf-life stability testing could not substantiate an 18-month shelf life until October 2019 (ten months after the effective date of SOW 1). *Id.*, ¶ 41. To make matters worse, Sage refused to bear any of the costs required to print new labels and engage a third-party company to relabel approximately 50,000 units of the Zen Pens previously delivered by Sage to EAV with new expiration dates. *Id.* EAV was forced to arrange and pay for all the costs associated with the relabeling, despite Sage having been the direct cause of the issue. *Id.*

**H.**    ***Starting in May of 2019, EAV Began Receiving Complaints of a Product Defect in the Zen Pens***

In or around May of 2019, EAV began receiving multiple complaints from customers, vital trade partners, and key retailers that the Zen Pens did not work as intended and that users were unable to dispense Gel from the Pen for 30 metered doses per pen, as represented on the packaging of the products. *Id.*, ¶ 43. EAV notified Sage of these issues as it learned of them from its customers. *Id.*, ¶ 44. For example, on May 2, 2019, EAV notified Sage that EAV had received complaint that the Zen Pens stopped working after approximately 10 or 15 doses. *Id.*, Ex. F. By way of further example, on June 25, 2019, EAV reported to Sage that it had received several defective Zen Pens returned to EAV's Customer Service Department. *Id.*, ¶ 45. One customer reported that the "████████████████████████████████████████████████████████ ████████████████████████" *Id.* Ex. G. Another customer stated that her Zen Pen "█████████ ████████████████████████████" *Id.* EAV requested that Sage evaluate the problem to ensure that it could timely deliver non-defective products. *Id.* Nevertheless, EAV continued to constantly receive similar complaints and feedback from its customers and trade partners throughout 2019 and 2020. *Id.*

Sage refused to take any action that would eliminate the jamming, clogging or other issues with the Zen Pens. *Id.*, ¶ 48. The only "solution" that Sage offered was to provide EAV with a video whereby customers were instructed to unfold a paperclip and stick the paperclip into the back of the Zen Pen. *Id.*, ¶ 49. Even Sage's managing member, John Thornton, acknowledged in an internal email to other Sage employees and officers that he is "████████████████████████████ ████████████████████████████████████████████████████████████████████████"

*See* Moran Decl., Ex. 9.[4] Although Sage pretended this "fix" was invented in response to the customer complaints that arose in May 2019, ███████████████████████████████ ████████████████████████ but never disclosed it until the spring of 2019 when EAV's customers encountered the defect. Shanley Aff., ¶ 50.

Critically, Sage also notified its third-party Pen supplier of the customer complaints. After conducting its own internal review of the issue, the Pen supplier stated that "███████████ ████████████████████████████████████████████████████ ██████████████████████████████████" *See* Moran Decl., Ex. 11. Again, Sage never disclosed these findings to EAV, who had relied upon Sage's representation that the Gel and the Pen would work together without issue. Shanley Aff., ¶ 50.

In response to these various problems, EAV took a series of actions in good faith performance of the Agreement to mitigate the negative impact on the marketability of the Zen Pen. *Id.*, ¶ 51. EAV immediately initiated a promotion whereby it provided retailers and trade partners with free Zen Pens so that they would have sufficient stock on hand to replace any broken or defective products returned by customers. *Id.* Sage never reimbursed EAV or provided any credit to EAV for such costs. *Id.* EAV also increased its marketing efforts by increasing its digital marketing presence, promoting the Zen Pens online, and beginning a free gift promotion with every purchase online. *Id.* EAV also held monthly meetings with Sage's key employees to evaluate what could be done to resolve the outstanding product issues, re-label product with accurate

---

[4] Mr. Thornton appears to have been the only person at Sage who took these product issues seriously. He stated that he "███████████████████" with the product and "███████████████████ ███████████████████████" *Id.* He told Mr. Calafiore that "███████████████ ██████████████" *See* Moran Decl., Ex. 10. While Sage opened up "Case Reports" for returned pens and acknowledged that "███████████████████" may be causing issues, it never provided any solution other than the "paperclip" solution to the problem.

expiration dates, and increase sales and marketing of the products. *Id.*, ¶ 52. Sage, however, never remedied the situation. *Id.* ¶ 53.

In late 2019, after Sage had failed to address the problems with the Zen Pens, EAV conducted its own internal investigation into performance and functionality. *Id.* EAV provided sample products to 261 customers and asked that they provide feedback on their experiences. *Id.*, ¶ 54. Approximately 20% of the customers reported that the Zen Pens failed to properly dispense 30 doses per pen, as expressly represented on the packaging of the product. *Id.*

In early 2020, with the product defects still not fixed, EAV conducted its own in-house testing of the Zen Pens. *Id.*, ¶ 55. EAV performed tests of both the 2 mg and 10 mg versions of the product and tested fail rates when the Zen Pen was (a) pumped consecutively non-stop for 30 doses in a row, (b) pumped once per day for 30 days, and (c) pumped once per week for 30 weeks. *Id.* In total, EAV tested 30 units of each version of the Zen Pens for each of the three scenarios (180 units tested in total). *Id.* The result of the internal study was that ███████ of the 180 units tested was able to dispense the full thirty (30) doses without malfunctioning. *Id.* In fact, a total of ███ of the 180 units of Zen Pens failed after less than 20 doses (███). *Id.* The fail rates increased the longer the product was used (i.e., the failure rates for weekly testing were higher than daily testing and the failure rates for daily testing were higher than consecutive testing). *Id.* For instance, ██% of all Zen Pens failed after less than 20 doses in consecutive testing, ██% of Zen Pens failed after less than 20 doses in daily testing, and ██% of Zen Pens failed after less than 20 doses in weekly testing. *Id.*

EAV's trade partners and retailers also conducted tests and studies of the Zen Pens. *Id.*, ¶ 56. They similarly concluded that many of the products malfunctioned or failed after less than the intended number of doses. *Id.* Specifically, Pet Food Express, a trade partner of EAV, performed an internal test which revealed a ██% failure rate for the Zen Pens. *Id.*, ¶ 57. Upon conclusion of

these findings, Pet Food Express decided not to sell the product. *Id.* Pet People, another trade partner of EAV, experienced a high rate of complaints and returns from the Zen Pens and demanded a ██% credit of their order in order to account for the fact that several of the products were faulty or malfunctioning. *Id.*, ¶ 58. Pet People has since ceased selling the product. *Id.* PetValu, another trade partner of EAV, made the decision not to sell the Zen Pens, citing the product's reputation in the industry that it was unreliable and prone to failure. *Id.*, ¶ 59. Centinela, another trade partner of EAV, submitted several returns and credit requests to EAV related to purchases of the Zen Pens. *Id.*, ¶ 60. Centinela also decided to discontinue purchasing the product in early 2020. *Id.*

**I.**      ***Sage Informed EAV of its Dire Financial Condition and Sought EAV's Help***

1.   In the midst of these product quality issues and EAV's attempts to get Sage to redress them, in August 2019, Sage informed EAV that it was in a grave financial position. *Id.*, ¶ 61. Sage asked EAV for its help. *Id.*, ¶ 62. EAV requested a business plan from Sage and additional clarity on what specifically Sage was looking for from EAV. *Id.*, ¶ 63. After initially agreeing to provide such information, Sage went silent. *Id.* Instead, it surprised EAV by issuing a "notice of breach" letter in November 2019. *Id.* The breach letter came on the heels of EAV paying Sage in full and in advance for a CBD potion (the "Zen Potion"), which the parties had shifted to in the Fall of 2019 as a temporary alternative to the still-defective Zen Pens.

**J.**      ***Despite Sage's Ongoing Material Breaches of the Agreement, Sage Demanded That EAV Continue Ordering the Zen Pens***

On November 13, 2019, despite the parties' May agreement to suspend the purchase minimums, Sage informed EAV in writing that it was in "material breach" of the Agreement because it supposedly had failed to purchase the minimum number of units during the first three

quarters of 2019 and purportedly had indicated an intention not to purchase the minimum number of units during the remainder of the Agreement's term. *Id.*, ¶ 64, Ex. H.

**K.**     ***EAV Placed Sage On Notice of its Various Material Breaches of the Agreement***

After repeated efforts by EAV to cooperate and work with Sage in good faith to resolve the various labelling and product quality issues, on or about December 6, 2019, EAV issued a written notice of material breach outlining Sage's material breaches under the Agreement. *Id.*, ¶ 67, Ex. I. Specifically, EAV notified Sage that it had materially breached the Agreement by failing and/or refusing to:

(a)     Provide credits or other reimbursements for the Advance Payment, as required by the initial SOW;

(b)     Deliver a product that was free from defects in materials and workmanship;

(c)     Deliver a customized "version 2" of the Pen within six months;

(d)     Test the product's shelf-life and deliver a product with a commercially viable and substantiated expiration date;

(e)     Notify EAV of known defects and/or performance issues with the products; and

(f)     Deliver at least 85% of the products required by the SOW and Product Orders in any six-month period.

*Id.*, ¶ 68. EAV stated in the notice of breach letter that it would exercise its rights to terminate the Agreement if Sage did not timely cure and resolve the above breaches. *Id.*, ¶ 69. In response, Sage did not address or cure any of the above breaches. *Id.*, ¶ 70.

**L.**     ***In Early 2020, EAV Began Receiving Complaints of a Product Defect in the Zen Potion***

The untimely delivery, improper labelling and clogging issues with Zen Pen were not the only problems EAV encountered with CBD Animal Products. *Id.*, ¶ 71. Sage also struggled to make timely deliveries of the Zen Potion. *Id.* Worse, in January 2020, EAV began receiving numerous complaints and returns from its distributors of both the 150mg and 600mg Zen Potion.

*Id.*, ¶ 72. EAV's distributors were reporting that the bottles were leaking inside the cases because they were not properly sealed. *Id.*, ¶ 73.

It is an industry standard for products of this type to have safety seals placed to avoid leakage and as a way for the end consumer to see that the product was not opened or tampered with. *Id.*, ¶ 74. As a result of Sage's failure to properly seal the Zen Potions in accordance with industry standards, EAV's distributors refused to accept the product. *Id.*, ¶ 75. In addition to the bottles of Zen Potion already in distribution, EAV had 9,264 bottles of the 150mg Zen Potion and 9,516 bottles of the 600 mg Zen Potion in its warehouse that needed to be sealed. *Id.*, ¶ 76. Sage agreed to take the product back, but EAV was forced to incur the cost of shipping all of the products to Sage and back to EAV's warehouse. *Id.*, ¶ 77. Additionally, Sage charged EAV ███████ to have safety seals placed on each bottle. *Id.*

**M.  *In March 2020, EAV Terminated the Agreement***

As a result of Sage's numerous breaches and its failure to cure, on March 11, 2020, EAV formally terminated the Agreement with Sage by way of a written letter. *Id.*, ¶ 78, Ex. J.

**N.  *EAV Has Been Damaged as a Result of Sage's Actions and Inactions***

As quantified in Mr. Shanley's Affidavit and Exhibit K thereto, EAV has been harmed by Sage's conduct in several respects. *Id.*, ¶¶ 79-88. First, it has hurt the reputation and good will of EAV. Second, it forced EAV to incur several costs which, owing to Sage's uncured breach, has yielded no benefits to EAV (including the extra promotional costs, the costs of returns, the relabeling costs, and the costs of the people hired to promote and launch the product, including directly to veterinarians). Third, it has resulted in lost profits.

**PROCEDURAL HISTORY**

Sage commenced this action by filing a four-count Complaint asserting causes of action against EAV for (1) breach of contract; (2) declaratory judgment; (3) anticipatory repudiation; and

(4) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). EAV moved pursuant to Rule 12(b)(6) to dismiss Counts II, III, and IV of the Complaint for failure to state a valid claim upon which relief may be granted. *See* EAV's Motion to Dismiss (ECF Nos. 18-19). The Court granted EAV's motion to dismiss as to Sage's declaratory judgment claim and denied EAV's motion – "for now" – as to Sage's anticipatory repudiation and CUTPA claim. *See* Order, dated October 31, 2020 (Dkt. No. 51).

On July 21, 2020 – five months into this case – Sage filed its Application for a Prejudgment Remedy (Dkt. Nos. 27-30) seeking a prejudgment attachment to secure the sum of $10,359,320. The Court has scheduled a tentative hearing on Sage's Application for a Prejudgment Remedy for November 16, 2020. EAV now cross moves for a prejudgment remedy on its counterclaims. EAV's draft counterclaims assert claims against Sage for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) fraud, (4) negligent misrepresentation and (5) violations of CUTPA and against Sage Door and Richard Calafiore for fraud, negligent misrepresentation and/or CUTPA.

## LEGAL STANDARD

The purpose of a prejudgment remedy "is security for the satisfaction of the plaintiff's judgment, should he obtain one. . . . It is primarily designed to forestall any dissipation of assets by the defendant and to bring those assets into the custody of the law to be held as security for the satisfaction of such judgment as the plaintiff may recover." *Marlin Broadcasting, LLC v. Law Office of Kent Avery, LLC*, 101 Conn. App. 638, 646-47 (2007).

Under Section 52-278d(a), when considering an application for prejudgment remedy, a court must determine "whether or not there is probable cause that a judgment . . . will be rendered in the matter in favor of the plaintiff." Conn. Gen. Stat. § 52-278d. The court must hold a hearing to determine whether there is sufficient evidence to support a finding of probable cause that the

plaintiff will win in a trial on the merits. *See, e.g., Bank of Boston v. Schlesinger,* 220 Conn. 152, 156 (1991) (holding that sufficient probable cause existed to grant the plaintiff's prejudgment remedy to secure the collection guaranty signed by the defendants); *J.K. Scanlon Co. v. The Construction Group Inc.,* 80 Conn. App. 345, 350 (2003) (upholding the trial court's decision that the plaintiff presented sufficient evidence on which to grant a prejudgment remedy). Connecticut courts have defined the requisite probable cause for purposes of a prejudgment remedy as a "bona fide belief in the existence of facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment . . . in entertaining it." *J.K. Sclanlon Co.,* 80 Conn. App. at 349 (citing *Three S. Development Co. v. Santore,* 193 Conn 174, 175(1984)). Thus, probable cause is a "flexible common sense standard," which "does not demand that a belief be correct or more likely true than false." *Id.*

"In an application for a prejudgment remedy, damages need not be established with precision but only on the basis of evidence yielding a fair and reasonable estimate." *Burkert v. Petrol Plus of Naugatuck, Inc.*, 5 Conn. App. 296, 301 (1985). The Court may estimate the probable amount of the damages involved. *Id.* The Plaintiff's or counterclaimant's burden is therefore a limited one.

## ARGUMENT

### A.      *EAV Is Entitled to Judgment on its Breach of Warranty Claims*

Under Oregon law, the elements of a cause of action for breach of warranty are: "(1) a warranty; (2) breach of that warranty; (3) notice to the warrantor of the breach; and (4) damages proximately caused by the breach." *Gunderson LLC v. BCG Properties Group, Inc.*, No. 3:19-CV-01569-AC, 2020 WL 1529356, at *5 (D. Or. March 30, 2020) (quoting *Wagner Tractor, Inc. v. Shields*, 381 F.2d 441, 443–44 (9th Cir. 1967)). An express warranty is created through "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and

becomes part of the basis of the bargain...." Or. Rev. Stat. § 72.3130. An oath or affirmation that is found to have been made a basis of the bargain creates an express warranty that the goods will conform in accordance with that oath or affirmation. *Id.* Formal words such as "warrant" or "guarantee" are not needed to create an express warranty, nor is the seller required "to have a specific intention to make a warranty." § 72.3130(2).

### 1. Sage Breached Several Express Warranties

Sage breached several express warranties that were the basis of the parties' bargain. First, Sage delivered products that did not comply with either industry standards of care and/or state and/or federal laws, regulations or rules, thereby breaching its warranties under the Agreement. It was Sage's contractual obligation and responsibility to ensure that the CBD Animal Products were delivered in compliance with all applicable laws and regulations, and in accordance with the warranties set forth in the Agreement. *See* MESA, ¶¶ 1.2, 6.3, 7.1, 7.2., 7.4, & 7.6.

Sage breached these provisions of the Agreement by labelling and delivering tens of thousands of units of the Zen Pens with shelf life and/or expiration dates that were unsubstantiated by any testing or analysis whatsoever. If the FDA or other regulators asked to verify the shelf-life, Sage would not have been able to do so. Representing that a product has a certain shelf life without substantiation and support for the representation is a violation of state and/or federal laws, regulations, or rules.[5] Sage's labelling of 12-month expiration dates misled EAV, and likely its customers and trade partners, into believing that the products had an established and proven shelf

---

[5] The Food, Drug, and Cosmetic Act (the "FDCA") provides that the following acts are prohibited: "the introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded" and "the adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce." *See* 21 U.S.C. § 331. Notably a drug is broadly defined to include "articles intended for use in the … cure, mitigation, treatment, or prevention of disease in man or other animals" and "articles intended to affect the structure or any function of the body of man or other animals." 21 U.S.C. § 321. The FDCA also provides that misbranding includes labeling of the product with misleading information. 21 U.S.C. § 321(n).

life of at least one year. Thus, by labelling the products with unsubstantiated expiration dates, Sage violated federal law (and potentially other federal and state laws) and could have subjected EAV to civil or regulatory action.

Second, despite time being of the essence (*see* MESA, ¶ 15.14), Sage failed to timely deliver the products to EAV, as required by the Agreement. As noted above, it took several months for Sage to deliver products after EAV submitted its purchase orders. Orders placed for the first quarter were not fulfilled in their entirety until the second quarter and orders placed in the second quarter were not fulfilled in their entirety until the third quarter.

Third, Sage delivered defective products to EAV in breach of its warranties under the Agreement. Sage specifically warranted that "all Products shall be free from defects in material and workmanship and shall conform to the standards set forth in a Statement of Work." *See* MESA, ¶ 10. Moreover, the product packaging expressly stated it would dispense CBD oil from the applicator pen for 30 metered doses per applicator. As discussed above, a substantial number of the Zen Pens jammed up and clogged after less than 30 doses, in breach of Sage's express warranties.

### 2. *EAV Suffered Damages as a Proximate Result of Sage's Breaches*

Where a buyer has accepted goods that are not as warranted by the seller, the buyer may recover as damages the loss resulting in the ordinary course of events from the seller's breach, measured as the difference between the value of the goods accepted and the value they would have had if they had been as warranted plus incidental and consequential damages. *See* Or. Rev. Stat. § 72.7140; *Taylor v. Ramsay-Gerding Const. Co.*, 226 P.3d 45, 55, *opinion adhered to as modified on reconsideration*, 234 P.3d 129 (Or. Ct. App. 2010).

### (i) *EAV's Lost Profits Are Direct Damages*

The limitation of remedies provision does not bar EAV's lost profit damages.[6] Paragraph 12 of the MESA, assuming it is enforceable, bars recovery of consequential damages. EAV's lost profit damages, however, are direct damages – not consequential. *See Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 11 N.E.3d 676, 679 (N.Y. 2014). In *Biotronik*, the reseller of medical stents manufactured by the defendant claimed lost profits for breach of contract by defendant. The New York Court of Appeals held that the profits were direct damages. *Id.* at 682-83. The court specified that a reseller, such as EAV, could recover lost profits as direct damages when the damage was "'caused by the breach,' or under 'an existing resale contract,' or under an 'exclusive distributorship agreement[.]'" *Id.* The *Biotronik* court determined that because the agreement contemplated that plaintiff would resell the stents and was essentially part of a joint or collaborative venture between the parties for such a resale, the lost profits were direct and not consequential. *Id.*

Applying *Biotronik*'s approach to the Agreement between the parties here, it is clear that EAV's lost profits constitute direct damages. Just like the seller and buyer in *Biotronik*, Sage and EAV were clearly involved in a collaborative venture to develop and resell a new product. That venture contemplated the resale of the CBD Animal Products through EAV's channels of distribution. The success of the venture was dependent on those resales.

Pursuant to the terms of the parties' Agreement, Sage was required to exclusively manufacture and deliver to EAV, and EAV was required to exclusively purchase from Sage, the products and then, in turn, market, promote, distribute, and resell the products. *See, e.g.*, MESA ¶

---

[6] Assuming *arguendo* that the Agreement does not expressly bar the parties from seeking lost profits, as Sage has argued in opposing EAV's pending motion to dismiss, EAV would be entitled to its lost profits as direct damages.

1.1. The Agreement specifically contemplated that EAV would resell or distribute the products on an exclusive basis. *See, e.g.*, MESA, ¶ B ("[EAV] is engaged in the business of the wholesale marketing, selling and distributing various animal products.); *id.*, ¶ C. ("[EAV] desires to purchase from [Sage], on an exclusive basis, certain cannabinoid with Uptake (as defined below) chemistry products for Purchaser's marketing, sale and distribution for animal use."); *id.*, ¶ 16.5 (c) (permitting Sage to sell product in jurisdictions outside of the United States where "[EAV] does not make sales of CBD products" in certain circumstances). Indeed, the Agreement specifically required EAV to market and promote the sale of the products. *Id.*, ¶ 16.4 ("[EAV] agrees to use commercially reasonable efforts to promote the sale of the Products."); *see also Orester v. Dayton Rubber Manufacturing Co.*, 126 N.E. 510, 512 (N.Y. 1920) (holding that, where a manufacturer breached a contract, lost profits were direct damages if the contract contemplated that the distributor would "build[ ] up a business for the sale of the [product] and creat[e] a demand for that particular" product; under such circumstances, the distributor's anticipated resale profits are not the result of "collateral engagements or consequential damages.").

Indeed, as in *Biotronik*, the amount EAV was to pay Sage under the Agreement for the product was tied to the resale price. *Compare* MESA, ¶ 13.2(d) (permitting EAV to terminate the agreement "[w]here the price charged by [Sage] for the Products increases by more than [20% per annum,] above the price set forth in the initial Statement of Work No. 1 entered into between the parties; except where . . . (ii) [EAV] determines after reasonable inquiry that it can continue to maintain its sales of the Product at the same levels if [EAV] raises its price to account for [Sage's] price increase.") *with Biotronik A.G.*, 11 N.E.3d at 679 ("[T]he price plaintiff paid defendant reflected the actual sales, and sales price, of [the product]"). Therefore, the facts of this case come squarely within the holding of *Biotronik*.

### *(ii)     The Limitation of Remedies Provision Is Unconscionable*

Even if the Court finds that EAV's lost profits are consequential damages, the limitation of remedies provision is substantively unconscionable. *See* Or. Rev. Stat. § 72.7190(3). Under Oregon law, substantive unconscionability concerns the fundamental fairness of the provision itself. *Tokyo Ohka Kogyo Am., Inc. v. Huntsman Propylene Oxide LLC*, 35 F. Supp. 3d 1316, 1332 (D. Or. 2014). For purposes of analyzing substantive unconscionability in a commercial context, the Court is not limited to evaluating the provision at the time the contract was made, but must consider how the provision has operated and evaluate the provision after the contract has been breached. *Id.* at 1332, 1335–36.

Here, considering the post-formation evidence, it is clear that the limitation on consequential damages operates in an unconscionable manner. The knowledge and ability to detect the latent defects in the products (i.e., unsubstantiated sell by dates and clogging and jamming of the Zen Pen after less than 30 doses) was in Sage's sole control. Indeed, Sage had actual knowledge of the product defects and it was required to disclose such defects to EAV but failed to do so. In addition, Sage was obligated to, but had not, conducted shelf life stability testing by December 2018 or January 2019, at the latest, and specifically refused to disclose this information to EAV. *See* Moran Decl., Exs. 12, 3-4, 6.

EAV, unaware of these latent defects in the product, sold them to its customers and incurred significant consequential damages. Worse, when the defects were discovered by EAV, Sage refused to cure the defects or cover the costs. Accordingly, excluding consequential damages would operate in an unconscionable manner. *See Tokyo Ohka Kogyo Am., Inc.*, 35 F. Supp. 3d at 1337 (finding that the provision operated in an unconscionable manner because the plaintiff had no way to detect the latent defects in the products that the defendant sold the plaintiff before the plaintiff, unaware of the defect, sold the products to its customers and incurred significant

consequential damages and the "exclusion of incidental and consequential damages renders the available damages unconscionably low").

**B.**     *EAV Is Entitled to Judgment on its Repudiation Counterclaim*

EAV is entitled to damages for Sage's repudiations of the Agreement. The elements of a cause of action for anticipatory repudiation are: (1) an express or implied contract or agreement, (2) entirely or predominantly for the sale of goods; (3) a refusal by one party to perform (i.e., a failure to provide adequate assurances or an overt expression of intent not to perform) (4) a future obligation of that party under the contract, and (5) which substantially impairs the value of the contract or agreement to the other party. *See* 158 Am. Jur. Proof of Facts 3d 91. Sage repeatedly repudiated the Agreement.

**1.**     *Sage Repudiated the Agreement by Failing to Adequately Assure EAV of its Ability to Timely and Fully Perform*

Sage repudiated the Agreement by failing to timely provide adequate assurance of due performance of the Agreement. "After receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract." Or. Rev. Stat. § 72.6090(4).

EAV had reasonable grounds for insecurity that Sage would – or could – timely perform its obligations under the Agreement. The delayed delivery of defective and nonconforming products outlined above provided ample reasonable grounds for insecurity. Courts applying U.C.C. § 2-609 have routinely found that the delivery of defective or nonconforming goods was reasonable grounds for insecurity. *See, e.g.*, *AMF, Inc. v. McDonald's Corp.,* 536 F.2d 1167, 1170 (7th Cir.1976) (holding evidence sufficient to support a finding of reasonable grounds for insecurity where product never performed properly, the seller failed to meet its delivery

projections, and the seller's own personnel had reservations about the design); *ARB (Am. Research Bureau), Inc. v. E-Sys., Inc.*, 663 F.2d 189 (D.C. Cir. 1980) (holding that a buyer had reasonable grounds for insecurity where the products at issue suffered from performance issues and defects). This is especially true where there have been multiple or repeated defects, as the case is here, because the U.C.C. "recognizes that repeated delinquencies must be viewed as cumulative." § 72.6090, *comment 4*. Therefore, by April 2019, when EAV learned that Sage had delivered products that contained commercially unviable and unsupported sell-by dates, or May 2019, at the latest, when began to learn of the clogging and jamming issues with the Zen Pens, EAV had reasonable grounds to believe, and did believe, that Sage's performance of the contract had become uncertain.

Upon learning of the various product defects, EAV sought assurances, in writing and in person, from Sage that it would be able to timely deliver non-defective products with a shelf-life stability that was commercially viable and substantiated. *See Rocheux Int'l, Inc. v. U.S. Merchants Fin. Grp., Inc.*, 741 F. Supp. 2d 651, 674 (D.N.J. 2010) ("[C]ourts have generally eschewed applying formalistic requirements for the demand of adequate assurances, instead opting for a case-specific approach that considers a party's demands in the context of its course of dealings with the adverse party[.]"); *see also Atwood-Kellogg, Inc. v. Nickeson Farms*, 602 N.W.2d 749, 753 (S.D. 1999) ("[A] demand for adequate assurances may be either written or oral[.]"); *AMF, Inc.*, 536 F.2d at 1170-71 (same). At the time that EAV demanded adequate assurance from Sage, EAV had performed all of its material obligations under the Agreement, including, but not limited to, purchasing the required minimum number of Zen Pens during the first two quarters of 2019.

In response to EAV's communications, Sage did not provide adequate assurance that it could timely perform. *See* Or. Rev. Stat. § 72.6090, *comment 4* ("[W]here a delivery has defects, even though easily curable, which interfere with easy use by the buyer, no verbal assurance can be

deemed adequate which is not accompanied by replacement, repair, money-allowance, or [an]other commercially reasonable cure. . . ."). Although Sage finally engaged a company to commence shelf-life stability testing in April 2019, Sage could not assure timely delivery of products with a commercially-viable and properly-substantiated shelf-life because the stability testing was not completed until October 2019. Sage not only failed to assure EAV, but also refused to bear any of the costs associated with relabeling approximately 50,000 units of the Zen Pens that were labelled with unsubstantiated sell by dates.

Sage also refused to provide adequate assurances that it could deliver non-defective products that would not jam or clog. The only "fix" that Sage offered was to provide EAV with a video whereby customers were instructed to unfold a paperclip and stick the paperclip into the back of the applicator. The purported concept was that the paperclip would release an air bubble or other pressure that had built up in the Pen and would restore functionality, at least in the short term. Sage's proposed paperclip video was an inappropriate make-shift "fix" (of doubtful efficacy). As Sage's own principal, John Thornton, admitted in an internal email, the paper clip "fix" was not a proper cure or commercially viable solution, particularly given that EAV sold its CBD product as a high-end premium product for between $50 and $80 to its retail customers. It was commercially untenable and unreasonable for EAV to ask customers to conduct a make-shift repair of the Zen Pens themselves, after they had already spent substantial money on a product that was marketed to dispense 30 equal metered doses of CBD oil. *See* § 72.6090(2) ("Between merchants the reasonableness of . . . the adequacy of any assurance offered shall be determined according to commercial standards"); *id.*, *comment 4* ("What constitutes 'adequate' assurance of due performance is subject to the same test of factual conditions."). As a result of Sage's failure to timely provide adequate assurances of due performance of the Agreement, Sage thereby repudiated the Agreement. *See* § 72.6090(4).

After repeated good faith, albeit unsuccessful, efforts by EAV to cooperate and work with Sage to resolve the various labelling and product quality issues, on or about December 6, 2019, EAV issued a written notice to Sage outlining Sage's various material breaches under the Agreement. EAV stated in the notice letter that it would exercise its right to terminate the Agreement if Sage did not fully and timely cure and resolve the product defects and Sage's various material breaches of the Agreement. At the time of the December 6, 2019 written notice to Sage, EAV had fully complied with its obligations under the Agreement, including the minimum purchase requirements, because it had previously exercised its right to suspend performance and/or Sage concurred that EAV should hold up future orders. Sage did not adequately address or cure any of the product defects or its various material breaches of the Agreement. As a result of Sage's failure to timely and fully cure any of the produce defects or otherwise adequately assure EAV, Sage again repudiated the Agreement. *See* § 72.6090(4).

### 2. *Sage Repudiated the Agreement by Indicating its Inability to Timely and Fully Perform*

Even assuming Sage did not repudiate the agreement by failing to provide adequate assurances, Sage overtly repudiated the agreement many times over. *See* Or. Rev. Stat. § 72.6100. Although the U.C.C. does not define what constitutes an "anticipatory repudiation," the comments to that section make clear that an anticipatory repudiation is when a party clearly manifests it intent in advance of the time for performance that the required performance will not be rendered or tendered at the required time. In particular, *comment 1* provides that an anticipatory repudiation is "an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." Similarly, *comment 2* provides "repudiation can result from action which reasonably indicates a rejection of the continuing obligation."

Here, Sage overtly communicated its inability to timely perform its obligations by (1) notifying EAV that it would not or could not timely deliver products containing a commercially viable and substantiated sell-by date, (2) refusing to bear any of the costs associated with relabeling products labelled with commercially unviable and unsubstantiated sell-by dates, despite having been the direct cause of the issue, (3) notifying EAV that it would not or could not timely deliver non-defective products that would not jam or clog prior to dispensing 30 equal metered doses per pen (as expressly warranted on the product packaging), and/or (4) informing EAV in August 2019 that Sage was in dire financial straits and unable to perform the Agreement without an infusion of capital. *See, e.g.*, *Gov't of Republic of China v. Compass Communications Corp.*, 473 F. Supp. 1306, 1309 (D.D.C. 1979) ("There can be little question that defendant's notice of inability to perform by September, 1975, coupled with its June, 1975, admissions to plaintiff of its bad financial condition were sufficient to repudiate its performance.").

### 3. EAV Suffered Damages as a Result of Sage's Repudiations

In addition to cancelling the Agreement, EAV is entitled to damages pursuant to Or. Rev. Stat. § 72.7130. *See* Or. Rev. Stat. § 72.7110 (1) ("Where the seller . . . repudiates . . ., the buyer may cancel *and* whether or not the buyer has done so may *in addition* to recovering so much of the price as has been paid: . . . (b) Recover damages for nondelivery as provided in ORS 72.7130.") (emphasis added); *see also Lanners v. Whitney*, 428 P.2d 398, 404 (Or. 1967) ("Under ORS 72.7110, both cancellation and damages are available concurrently and not in the alternative."). Or. Rev. Stat. § 72.7130 (1) provides that "the measure of damages for … repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in ORS 72.7150[.]" *See also* Or. Rev. Stat. § 72.7120(3) ("Failure of the buyer to effect cover within this

section does not bar the buyer from any other remedy."); *McGinnis v. Wentworth Chevrolet Co.*, 668 P.2d 365, 369 (Or. 1983) (stating buyer is not obligated to "cover").

## C. EAV Is Entitled to Judgment on its Breach of Contract Counterclaim

EAV is entitled to damages for Sage's material breaches of the Agreement. To state a claim for breach of contract under Oregon law, a plaintiff or counterclaimant must allege the existence of a valid and enforceable contract, its relevant terms, plaintiff's or counterclaimant's full performance and lack of breach, and defendant's breach proximately resulting in damage to plaintiff or counterclaimant. *Slover v. Oregon State Bd. of Clinical Soc. Workers*, 927 P.2d 1098, 1101 (Or. Ct. App. 1996); *Slusher v. Ditech Financial, LLC*, No. 3:18-cv-00034-HZ, 2018 WL 4705547, at *3 (D. Or. 2018).

### 1. EAV Fully Performed Its Obligations Under the Agreement and Did Not Breach the Agreement

To the extent the Agreement is a valid and enforceable contract, EAV has fully performed its obligations thereunder.[7] By the end of the second quarter of 2019, EAV had placed orders for 85,000 units in full compliance with the minimum purchase requirements. As for the second half of 2019 and the first quarter of 2020, EAV properly suspended its performance pursuant to an agreement reached in May 2019 and/or Or. Rev. Stat. §§ 72.6090 & 72.6100. *See* EAV's Opp. Br. to PJR, at pp. 22-28.

---

[7] The Agreement is unenforceable because Sage fraudulently induced EAV to agree to its terms. *See* EAV's Memorandum in Opposition to Sage's Motion for Prejudgment Remedy (ECF No. 43) ("EAV's Opp. Br. to PJR"), at pp. 30-34. Additionally, even if EAV was not fraudulently induced to agree to the terms of the MESA, the MESA is an unenforceable agreement to agree because the purchase price for future purchases of units during the term of the MESA is an omitted material term, which the parties were obligated to negotiate in good faith via subsequent "statements of work", subject to Sage's obligation to provide EAV with favorable, below-market prices in consideration for the exclusivity conferred on Sage under the MESA. *See* EAV's Opp. Br. to PJR, at p. 34 n. 4.

## 2. *Sage Breached the Agreement Causing EAV Damage*

In addition to breaching its warranties and repudiating the Agreement, Sage materially breached the Agreement by failing or refusing to credit EAV for the $250,000 Advance Payment (plus interest) that EAV provided to Sage. The SOW acknowledges that EAV advanced $250,000.00 to Sage to assist Sage in building the capacity necessary to comply with this Agreement. SOW, ¶ 4. The SOW explicitly provides that "the $250,000.00 advance shall be a credit in favor of Purchaser and shall be applied to reduce Purchaser's payments due to Seller over 6 months beginning May 2019." *Id.* To date, Sage has not provided EAV with any credit. Indeed, Sage concedes that it has not provided any credit to EAV. *See* Memorandum in Support of Application for Prejudgment Remedy (ECF No. 28) ("Sage's PJR Br."), p. 10. Accordingly, Sage breached the Agreement and EAV is entitled to recoup its $250,000.00 Advance Payment (plus interest). *See Gunderson LLC*, 2020 WL 1529356, at *5 ("Damages for breach of contract are the sum that will put the plaintiff in as good a position as if the contract had been performed fully.").

## D. *EAV Is Entitled to Judgment on its Breach of the Implied Covenant of Good Faith and Fair Dealing Claim*

Sage engaged in bad faith performance of the Agreement, depriving EAV of receiving the benefits of the Agreement. The Oregon U.C.C. has adopted the common law principle that every contract imposes a duty of good faith and fair dealing. *See* Or. Rev. Stat. § 71.3040. "Good faith" is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." Or. Rev. Stat. § 71.2010(2)(t).[8] The U.C.C. does not contain a definition of "honesty in fact", but Oregon case law makes clear that the definition includes a "subjective" (honesty in fact)

---

[8] The general provisions of the U.C.C., found in Or. Rev. Stat. §§ 71.1010–.3100, apply to transactions governed by the remainder of the U.C.C., including chapter 72, codified as Or. Rev. Stat. §§ 72.1010–.8200. *Wanke Cascade Distribution Ltd. v. Forbo Flooring Inc.*, Case No. 3:13–cv–768–AC, 2013 WL 6493099, at *4 (D. Or. Aug. 20, 2013), *report and recommendation adopted as modified*, No. 3:13-CV-00768-AC, 2013 WL 6493106.

and an "objective" component (observance of reasonable commercial standards). *Chaney v. Shell Oil Co.*, 827 P.2d 196, 203 (Or. Ct. App. 1992), *review denied*, 832 P.2d 455 (Or. 1992) (citing Bailey, *Oregon Uniform Commercial Code* 22, § 1.12 (2d ed 1990)); *Wanke Cascade Distribution Ltd.*, 2013 WL 6493099, at *4.

### 1. *Sage Engaged in Subjective and Objective Bad Faith*

Sage engaged in bad faith performance of the Agreement, including but not limited to, its refusal to compensate EAV for the Advance Payment, its decision to knowingly forgo shelf-life stability testing in December 2018, its decision in early 2019 to label and ship thousands of products to EAV with baseless and unsubstantiated expiration date information, its refusal to alter or modify the Zen Pens to address the defect or other issues, its willful refusal to assist EAV's vendors with relabeling of products with new expiration date information and pay for such costs, its failure and/or refusal to provide a new customized Zen Pen and to negotiate a subsequent SOW covering the new version of the Zen Pen, its failure to notify EAV of any of the known defects, and its submission of a notice of breach letter when EAV had the right to suspend performance under the Agreement and/or Sage had waived the minimum purchase obligation. Accordingly, while a plaintiff need only prove facts that fall within either the objective or subjective component (*see Chaney*, 827 P.2d at 203), Sage was dishonest in fact and acted contrary to the EAV's reasonable contractual expectations.

Sage's bad faith actions and inactions deprived EAV of receiving the benefits of the Agreements, namely, a CBD Animal Product that could be marketed and sold to the general public (i.e., commercially viable) and was otherwise free from defects, properly labelled, and in compliance with all applicable industry standards of care, rules and regulations.

### 2. Sage's Bad Faith Precludes Sage from Enforcing the Limitation of Remedies Provision

Even assuming EAV's lost profit damages are consequential damages and the limitation of remedies provision is not unconscionable, EAV is entitled to recover its lost profits notwithstanding the limitation of remedies provision because of Sage's bad faith. *See Saab Enterprises, Inc. v. Bruce Packing Co., Inc.*, No. CV-06-774-ST, 2007 WL 2746915, at *11 (D. Or. 2007) (recognizing that "a party's bad faith conduct may prevent that party from enforcing a clause that limits damages.") (citing *W.L. May Co., Inc. v. Philco–Ford Corp.*, 543 P.2d 283, 288 (Or. 1975); *Potomac Plaza Terraces Inc. v. QSC Prods., Inc.*, 868 F. Supp. 346, 353 (D. D.C. 1994)). In *Saab*, the court found evidence that the defendant overstated its experience prior to entering the contract and then delivered significantly less product than the agreement contemplated was sufficient to support a breach of the implied covenant of good faith and fair dealing." *Id.*, at *12. Therefore, the court concluded that such a breach "precluded [the defendant] from enforcing the consequential damages provision." *Id.*

Here, as discussed above, the evidence supports a finding that Sage breached the implied covenant of good faith and fair dealing. Therefore, Sage cannot enforce the limitation of remedies provision and EAV is entitled to recover its lost profits.[9]

### E. EAV Is Entitled to Judgment on its Misrepresentation Claims

Motivated by an opportunity in 2018 to secure a potential multi-million-dollar contract with EAV, Mr. Calafiore, on behalf of Sage and/or Sage Door, made several misrepresentations to EAV that were designed to, and did, induce EAV to enter into the parties' contract. None of these statements turned out to be true or non-misleading.

---

[9] Although not sought in connection with this application, EAV will be entitled to recover its attorneys' fees as a prevailing party under its contract and warranty claims. *See* MESA, ¶ 15.8.

Sage made innocent, negligent, and fraudulent misrepresentations. The elements of fraudulent misrepresentation are that: "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury.... [T]he party to whom the false representation was made [must claim] to have relied on that representation and to have suffered harm as a result of the reliance." *Simms v. Seaman*, 308 Conn. 523, 548 (2013).[10] The elements of a negligent misrepresentation claim are "(1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Coppola Const. Co., Inc. v. Hoffman Enterprises Ltd. P'ship*, 309 Conn. 342, 351–52 (2013). Under Connecticut law, the tort of innocent misrepresentation is separate and distinct from the tort of negligent misrepresentation. *See Farrell v. Johnson & Johnson*, 184 Conn. App. 685, 702–03 (2018), *aff'd*, No. 20225, 2020 WL 1887720. Therefore, Sage may be held liable for misrepresentations even though they were not made fraudulently or negligently. *Id.*

### 1. *Sage Knowingly Made False Representations of Material Fact*

Among the misrepresentations, were Mr. Calafiore's promises and/or assurances that: (a) Sage was "engaged in the business of manufacturing and the wholesale distribution of certain cannabinoid products" and was a well-funded and capitalized company with adequate resources

---

[10] The choice of law provision in the Agreement is narrow, providing that the "Agreement shall be governed and construed in accordance with the laws of the State of Oregon[.]" *See U.S. Fid. & Guar. Co. v. S.B. Phillips Co., Inc.*, 359 F. Supp. 2d 189, 205 (D. Conn. 2005) (contracts that are "governed by and construed in accordance with" the laws of a state are deemed too narrow to apply to tort claims related to the contract). Whether Connecticut or Oregon law applies to EAV's tort claims is immaterial to EAV's fraudulent misrepresentation claim because the law is the same in both jurisdictions. *See Conzelmann v. N.W.P. & D. Prod. Co.*, 225 P.2d 757, 764 (1950) (defining the elements of fraud under Oregon law); *Morasch Meats, Inc. v. Frevol HPP, LLC*, No. 3:16-CV-0269-PK, 2018 WL 1434814, at *4 (D. Or. March 22, 2018) (same).

and industry experience to meet EAV's needs, (b) EAV needed to pay Sage a $250,000 advance payment that was necessary to and ███████████████████████████ ███████ (the "Advance Payment"), (c) the Advance Payment would be credited or otherwise returned to EAV with interest, (d) Sage would design, develop and/or procure a customized new version of the Zen Pen for EAV within six to nine months, (e) Sage needed the parties' contract to specify aggressive, artificially-high annual and quarterly purchase minimums to allow Sage to secure an adequate or guaranteed supply of pens at an attractive price, but Sage understood that EAV would likely need more time, particularly at the beginning, to launch, promote and sell the new product in a nascent market; (f) in the event EAV did not meet the purchase minimums, Sage's sole remedy would be payment for any then-existing inventory CBD gel, CBD biomass and Pens; (g) Sage would charge EAV prices below market for pens and CBD gels, in exchange for exclusivity, and (h) Sage would ensure that the CBD Animal Products were functional, satisfied their intended use (including dispensing 30 equal metered doses per pen), were properly labeled and otherwise were in compliance with all industry standards, laws, rules, and regulations. *Id.*, ¶¶ 15-20.

### *(i)* *The Disclaimer of Warranties Provision Does Not Apply*

The disclaimer of warranties provision in the Agreement does not apply to Sage's pre-formation fraudulent misrepresentations.[11] *See Cohn v. MarineMax Ne., LLC*, No. FSTCV176031498S, 2019 WL 4733614, at *10 (Conn. Super. Ct. 2019) ("[A]llegations of

---

[11] Even if Sage's representations were not fraudulent (they are), under Oregon law, general disclaimers must yield to express warranties – whether written or oral. *Miller v. Hubbard-Wray Co., Inc.*, 630 P.2d 880, 883–84, *modified*, 633 P.2d 1 (Or. Ct. App. 1981), *review denied sub nom.* 642 P.2d 310 (Or. 1981) (noting that "where the conflict is between a written disclaimer and other written assertions which are part of the contract, courts have generally held that the disclaimer is ineffective" and holding that where a conflict exists between an oral express warranty and a written disclaimer, "the disclaimer . . . must yield to the express warranty.") (citing Or. Rev. Stat. § 72.3160(1)).

common-law fraud constitute a non-contractual basis for recovery; therefore, any disclaimer of warranties or consequential damages under the purchase agreement should not apply."); *Wilkinson v. Carpenter*, 554 P.2d 512, 514 (Or. 1976) (stating that a disclaimer of any prior warranties or representations does not preclude relief upon a showing of fraud).

### (ii)    The Parol Evidence Rule Does Not Bar Evidence of Sage's Misrepresentations

Even if the parties intended the Agreement to be a fully integrated final expression of their agreement,[12] the parol evidence rule does not bar the admissibility of the pre-formation oral representations designed to induce an agreement. *See Paiva v. Vanech Heights Const. Co.*, 159 Conn. 512, 521 (1970); *Teague Motor Co. v. Rowton*, 733 P.2d 93, 96 (Or. Ct. App. 1987). Accordingly, the parol evidence rule does not preclude evidence of Sage's misrepresentations.

### 2.    Sage's False Representations Were Intended to Induce and Did Induce EAV to Enter the Agreement

Mr. Calafiore made these false and misleading representations to EAV prior to the formation of the Agreement. Mr. Calafiore made these representations knowing that they were false at the time and/or that Sage had no intention of fulfilling the promises. Mr. Calafiore made these representations with the sole intent of inducing EAV to enter into the Agreement, which was an exclusive three-year contract potentially "committing" EAV to purchase millions of dollars in products from Sage. EAV reasonably relied upon these representations in entering into the Agreement. *See Martinez v. Zovich*, 87 Conn. App. 766, 778, *cert. denied*, 274 Conn. 908 (2005)

---

[12] An express integration clause "is an indication that the writing was intended to be a complete integration, but it is not conclusive." *State v. Triad Mechanical Inc.*, 925 P.2d 918, 923 (Or. App. Ct. 1996); *see also George Packing Co., Inc. v. FMC Techs., Inc.*, No. 3:10-CV-01055-PK, 2011 WL 7082545, at *9–11 (D. Or. Sept. 20, 2011), *report and recommendation adopted in part, rejected in part on other grounds*, No. 3:10-CV-1055-PK, 2012 WL 195523 (holding, despite the existence of an integration clause and some factors favoring integration, "that the parties' conduct indicates the parties did not intend for the written lease to embody their final agreement.").

(holding that claim that a seller's misrepresentations caused a buyer to enter into a contract is a valid, even if the contract includes a disclaimer of any prior representations).

### 3. *EAV Suffered Damages as a Result of Sage's Misrepresentations*

The general rule of damages for misrepresentations is that a plaintiff is entitled to such damages that "are the natural and proximate consequence of the fraudulent representation complained of[.]" *Miller v. Appleby*, 183 Conn. 51, 57–58 (1981); *Capital Mortg. Associates, LLC v. Hulton*, No. NNICV065000431S, 2009 WL 567057, at *24 (Conn. Super. Ct. 2009), *reargument denied*, No. NNICV065000431S, 2009 WL 3284241 (citing *Miller* and applying the same standard to negligent misrepresentation claim). Connecticut law permits a buyer to recover its incidental and consequential damages under a negligent or fraudulent misrepresentation theory. *See Miller*, 183 Conn. at 57; *Capital Mortg. Associates, LLC*, 2009 WL 567057, at *24; C.G.S. §§ 42a-2-715, 42a-2-721.

### (i) *Sage Cannot Enforce the Limitation of Remedies Provision*

Even assuming the limitation on consequential damages provision contained in Paragraph 12 of the MESA is not unconscionable, it does not apply to EAV's misrepresentation claims. *Cohn*, 2019 WL 4733614, at *10; *Deerfield Commodities, Ltd. v. Nerco, Inc.*, 696 P.2d 1096, 1112 (Or. Ct. App. 1985), *review denied,* 702 P.2d 1111 (Or. 1985) (holding that lost profits are recoverable in an action for material misrepresentation and expressly rejecting argument that damages are limited to "the difference between the value of what the [injured party] has parted with and the value of what he has received in the transaction."). Therefore, EAV is entitled to recover all of its damages under its fraud claim, including lost profits.[13]

---

[13] Although not sought in connection with this application, EAV will be entitled to punitive damages under either Connecticut or Oregon law. *Whitaker v. Taylor,* 99 Conn.App. 719, 730, 916 A.2d 834 (2007); *McMullin v. Murphy*, 748 P.2d 171, 173 (Or. Ct. App. 1988), *review denied*, 764 P.2d 552 (Or. 1988) (holding that punitive damages are available to a plaintiff that proves fraud).

## F.    *Sage Is Entitled to Judgment on its CUTPA Claim*

Sage's repeated repudiations, breaches of contract, breaches of warranty, bad faith, and misrepresentations constitute unfair trade practices in violation of CUTPA. Although simple breach of contract and breach of warranty claims do not amount to a violation of CUTPA, a breach of contract or breach of warranty accompanied by sufficient aggravating factors does. *See, e.g.*, *Earls v. Condor Capital Corp.*, No. CV980491748S, 2001 WL 1188248, *5 (Conn. Super. Ct. 2001); *Pusztay v. Allstate Ins. Co.*, No. FSTCV065002425S, 2009 WL 2357958, at *10 (Conn. Super. Ct. 2009). In *Ulbrich v. Groth*, the Connecticut Supreme Court concluded that "a CUTPA claim involving a breach of contract accompanied by aggravating circumstances is not displaced by the particular provisions of the UCC; General Statutes § 42a–1–103 (b); and is not inconsistent with the provisions of the UCC. Rather, CUTPA *supplements* the remedies provided by [the UCC]." 310 Conn. 375, 413 n. 32 (2013) (emphasis original).

Connecticut courts have universally held that a fraudulent misrepresentation can constitute an aggravating circumstance that would allow a simple breach of contract claim to be treated as a CUTPA violation. *See, e.g.*, *Santa Buckley Energy Ltd. v. Tiscia Corp.*, No. CV156052285S, 2016 WL 3179740, at *5 (Conn. Super. Ct. 2016); *Wright Bros. Builders, Inc. v. Shuldman*, No. FSTCV054005897S, 2006 WL 3361461, at *4 (Conn. Super. Oct. 31, 2006); *Nygren v. Greater New York Mut. Ins. Co.*, No. 3:07CV00462DJS, 2007 WL 4105327, at *4 (D. Conn. Nov. 16, 2007). Indeed, negligent misrepresentations have been held sufficient for purposes of CUTPA. *See Alexis v. PMM Enterprises LLC*, No. 3:17-CV-1622, 2018 WL 5456491, at *5 (D. Conn. Oct. 29, 2018); *Montanez v. D & D Auto, LLC*, No. 3:15-CV-397 (VAB), 2016 WL 1254199, at *14 (D. Conn. March 29, 2016) (collecting cases).

Here, Sage violated CUTPA because its repeated breaches of warranty and contract were accompanied by sufficient aggravating factors, including negligent and fraudulent

misrepresentations of material fact and bad faith. As a result of Sage's deceptive conduct, EAV has suffered an ascertainable loss.[14] *See United Concrete Prod., Inc. v. NJR Constr.*, LLC, No. CV176011932S, 2018 WL 5733720, at *9 (Conn. Super. Ct. Oct. 17, 2018).

**G.     *Sage Is Not Entitled to Any Setoffs***

Sage is not entitled to any setoffs because its claims against EAV are without merit. Sage's claims are addressed in detail in EAV's Memorandum in Opposition to Sage's Application for Prejudgment Remedy. Therefore, EAV simply summarizes those arguments here. First, EAV did not breach the minimum purchase requirements because: (1) by the end of the second quarter of 2019, EAV had purchased 85,000 units of product meeting the minimum purchase requirements, (2) as a result of the ongoing issues with the product (e.g. untimely delivery, unsubstantiated sell-by dates, and product defects), in May 2019, the parties agreed EAV could pause submitting product orders until 2020, and (3) even assuming Sage did not waive the minimum purchase requirements for the second half of 2019 (it did), EAV properly suspended its performance pursuant to Or. Rev. Stat. §§ 72.6090 & 72.6100, as a result of Sage's repeated repudiations.

Second, EAV did not repudiate the Agreement, but, instead properly cancelled the Agreement pursuant to Or. Rev. Stat. § 72.7110 and/or terminated the Agreement, pursuant to Paragraph 13 of the MESA, as a result of Sage's repeated repudiations, breaches, and failures to cure.

---

[14] Although not sought in connection with this application, EAV will be entitled to its attorneys' fees and CUTPA punitive damages. *See Hinchcliffe v. American Motors Corp.,* 184 Conn. 607, 617 (1981) ("The plaintiff who establishes CUTPA liability has access to a remedy far more comprehensive than the simple damages recoverable under common law. The ability to recover both attorneys' fees ... and punitive damages ... enhances the private CUTPA remedy and serves to encourage private CUTPA litigation.").

**CONCLUSION**

For the foregoing reasons, EAV respectfully requests that this Court grant its Motion for a

Prejudgment Remedy.

**DEFENDANT**
**EARTH ANIMAL VENTURES, INC.**

/s/ *Brian E. Moran*
Brian E. Moran (ct05058)
Andrew A. DePeau (ct30051)
Trevor L. Bradley (ct29993)
ROBINSON & COLE LLP
1055 Washington Blvd., 9th Floor
Stamford, Connecticut 06901
Phone:  203-462-7512
Fax:  203-462-7599
Email: bmoran@rc.com
           adepeau@rc.com
           tbradley@rc.com

*Attorneys for Defendant*

## **CERTIFICATION**

I hereby certify that on November 6, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent via e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing though the Court's CM/ECF System.

*/s/ Trevor L. Bradley*
Trevor L. Bradley
