**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SAGE FULFILLMENT, LLC | : | |
| | : | |
| Plaintiff, | : | CASE NO. 3:20-CV-00444-VAB |
| | : | |
| V. | : | |
| | : | |
| EARTH ANIMAL VENTURES, INC., | : | |
| | : | |
| Defendant. | : | NOVEMBER 6, 2020 |

**DECLARATION OF STEWART SHANLEY IN SUPPORT OF EARTH ANIMAL**
**VENTURES, INC.'S  MOTION FOR A PREJUDGMENT REMEDY**

I, **STEWART SHANLEY**, hereby declare as follows pursuant to 28 U.S.C. § 1746:

1.   My name is Stewart Shanley. I am the Chief Executive Officer of Earth Animal

Ventures, Inc. ("EAV").

2.   I am over the age of eighteen (18). I believe in the obligations of an oath.

3.   This Affidavit is submitted in support of EAV's Cross-Application for a Prejudgment

Remedy against Sage Fulfillment, LLC ("Sage"), Sage Door, LLC ("Sage Door") and Richard

Calafiore ("Mr. Calafiore").

4.   I make this Affidavit based upon my personal knowledge of the facts surrounding the

claims asserted in this action and/or upon EAV's records and/or upon discussions I have had with

EAV personnel or my review of reports I have received as CEO in the regular and ordinary course

of EAV's business.

5.   I believe that there is probable cause that a final judgment will be rendered in EAV's

favor in this case. I also believe such judgment will be in at least the amount of the cross-

prejudgment remedy sought by EAV, taking account of the known defenses, claims and setoffs of each party, as identified in the parties' court filings to date.

6.    In or around April 2018, EAV and Sage Door, Sage's parent entity, began discussing a potential business relationship. EAV wanted to launch CBD products for pets. The parties contemplated that Sage would manufacture and sell to EAV a range of CBD products designed specifically for use on pets (the "CBD Animal Products"). Dr. Bob Goldstein, one of EAV's founders, took the lead for EAV.

7.    In or around June 2018, Sage Door proposed to manufacture and deliver a product that was comprised of a metered applicator pen (the "Pen") preloaded with Sage's proprietary blend of CBD oil and other ingredients (the "Gel") (collectively, the "Zen Pen"). The Pen contemplated the use of a plunger. The plunger was designed to be depressed to dispense multiple doses of the Gel in equal, metered quantities. The Pen was intended to dispense 30 doses per applicator for both a 10 mg CBD Pen and a 2 mg CBD Pen.

8.    EAV made it clear to Sage that the product would need to: (1) be shelf stable (2) have an aesthetically desirable consumer form factor, (3) dispense 30 equal metered doses per applicator, and (4) otherwise be free from any defects. We informed Sage that the intended use of the Zen Pen was to enable families with animals to be able to easily dispense to their pet 30 equal doses of CBD oil per applicator through the duration of the product's shelf life.

9.    Sage identified and presented us with several alternative options for the Pen from third-party medical device manufacturers. EAV was told that Sage (and/or an affiliated entity) had developed the Gel. The Gel contained a proprietary blend of ingredients. The Gel also utilized a

certain "Uptake Technology". The Uptake Technology was intended to improve the absorption of the CBD oil when it was applied to the pet's skin.

10. While EAV performed some internal tests to confirm the efficacy and safety of the Gel for use on animals, it relied entirely on Sage's purported industry experience and expertise to both design and procure the Pen and come up with an appropriate Gel. Dr. Bob Goldstein and Dr. Kris Hansen of EAV conducted these internal efficacy and safety tests. We also relied on Sage's representations and assurances that the Gel formulation was appropriate for its intended use, had a commercially viable shelf-life and could be dispensed by the Pen for 30 equal metered doses through the product's expiration date.

11. Sage represented that all of the alternative pen options or candidates it presented to EAV were appropriate for the intended use and that each of them would dispense 30 equal metered doses of the Gel through the product's expiration date.

12. Our pre-contract evaluation of the Pen options presented by Sage was limited solely to its form, comfort and ease of use from a consumer standpoint and was based on the fact that the Pen was only ever intended to be an interim solution.

13. In or around the latter part of September or early October of 2018, EAV and Sage began to negotiate the terms of a master supply agreement that would govern the purchase and sale of the CBD Animal Products.

14. Sage's principal and managing member, Mr. Calafiore, on behalf of Sage, made several representations to EAV during such negotiations.

15. First, in or around September 2018, Mr. Calafiore represented to EAV that Sage needed an advance of $250,000 prior to or contemporaneous with the signing of the contract. On October 2, 2018, prior to execution of the Agreement, Mr. Calafiore demanded that EAV pay more than half of the Advance Payment ($135,000). The stated need for the Advance Payment was for "securing biomass for CBD extraction" in order to enable Sage to supply EAV with the CBD Animal Products. He stressed that "[i]f we miss the deposit, I cannot guarantee that availability of the biomass and would be in a very tough spot to find the material." *See* Emails between R. Calafiore, B. Goldstein, and S. Shanley, dated October 2-3, 2018, true and accurate copies of which are attached hereto as **Exhibit A**.

16. Based on this representation, we agreed to provide Sage with the Advance Payment by transferring $125,000 to Sage prior to the signing of the contract and then transferring another $125,000 upon the signing of the contract. I agreed to do this based upon Sage's representation that it was necessary to lock down a supply of biomass, Sage would utilize the biomass for EAV's exclusive use and Sage would provide a credit to EAV against future purchases of CBD Animal Products in the amount of the Advance Payment, plus interest of $62,500. Despite our written demands to do so, Sage never provided EAV any credit for the $250,000 advance (and interest). It also refused to return the Advance Payment or otherwise compensate us for the Advance Payment when the current dispute could not be resolved.

17. Second, between August and October of 2018, Mr. Calafiore repeatedly represented that the Pen Sage ultimately sourced from the third-party manufacturer for use in the CBD Animal Products was only a temporary, stop-gap solution. Sage agreed that it would design, develop and/or procure a fully-customized Pen for EAV, with an improved form factor, within six (6) months after the signing of the contract. A true and accurate copy of an email from R. Calafiore to B.

4

Goldstein, copying me, dated October 5, 2018 is attached hereto as **Exhibit B**. A customized Pen would have required the parties to negotiate a new price for the Pens. However, Sage never developed or offered us a customized Pen option within six months of the signing the Agreement or at any other point in time, despite repeated requests from me.

18. Third, Mr. Calafiore represented that Sage was an experienced, well-financed and adequately capitalized producer of CBD oil products for human use, which wanted to expand into CBD pet products. He stated that Sage would bring its full experience, expertise, staff, and resources to support our proposed product line. Mr. Calafiore never told me or, to my knowledge, anyone else at EAV that he intended to create a new separate Sage limited liability company to perform our contract with Sage. Nor did he disclose that the newly-formed company was under-funded, under-staffed and therefore lacked the capital and resources to fully and/or timely meet the demands of the Agreement or that the new entity was solely reliant on payments from EAV to cover its capital needs, pay for the Pens, procure suppliers of the Gel and produce the Zen Pens.

19. Fourth, Mr. Calafiore pushed us to include very aggressive, artificially-high minimum purchase requirements in the Agreement. He sought such minimums as an accommodation to Sage in order, according to Mr. Calafiore, to secure an adequate or guaranteed supply of pens or applicators from a third-party manufacturer at an attractive price. Because of the high minimums, we reached an understanding with Mr. Calafiore on a remedy for failure to meet the minimums, namely that EAV would pay Sage for any inventory on hand and the cost of supplies, such as the Pens or the Gel. In response to Sage's request for the high minimums, we relied upon Mr. Calafiore's representation that he agreed on the proposed remedy and that he understood the "minimums" were aggressive and we would likely need more time to ramp up sales and achieve

the quarterly and annual purchase minimums, particularly at the beginning, as EAV launched, promoted and initially sold a new product in a nascent market.

20. Fifth, Mr. Calafiore assured us that Sage's prices to EAV would be discounted and be set favorably below market prices for both the Pens and CBD oils, in consideration for the exclusivity conferred on Sage by EAV. Mr. Calafiore represented such favorable pricing was possible in part because of the $250,000 Advance Payment, which would secure an adequate supply of CBD biomass, and the high contractual purchase minimums, which would secure an adequate supply of the Pens at an attractive price. Mr. Calafiore represented such savings would be passed on and reflected in the prices Sage would charge to EAV for the pens and other CBD products.

21. In late 2018, EAV and Sage entered into a contract to purchase and sell the CBD Animal Products. The contractual relationship was governed by a Master Exclusive Supply Agreement (the "MESA") and an initial Statement of Work No. 1 for the initial temporary, stop-gap version of the Zen Pen (the "SOW 1") (collectively, the "Agreement"). A true and accurate copy of the MESA and SOW 1 are attached hereto as **Exhibit C**. We have since learned that at the time the Agreement was executed, Sage knew of defects in the product and did not disclose that information to EAV.

22. Pursuant to the Agreement, Sage agreed to exclusively sell and EAV agreed to exclusively buy the CBD Animal Products. The SOW 1 governed the purchase and sale of the Zen Pen, which was described as a "metered applicator for an over the counter packaged proprietary strain with certificate of analysis full spectrum cannabinoid oil transdermal gel with 'uptake' delivery." Under SOW 1, EAV agreed to purchase a minimum of 400,000 units annually, and at

least 40,000 units per calendar quarter, commencing on the effective date of January 1, 2019 and continuing for three years until December 31, 2021. However, both parties shared a common understanding that it would likely take some time for EAV to ramp up sales and satisfy such minimums early on during the three-year contract term.

23. Leading up to the Agreement, Sage also assured EAV that the CBD Animal Products would be free of defects, conform to the requirements of the parties (including the requirement to dispense 30 equal, metered doses per pen), and satisfy all applicable industry standards, as well as federal and state laws, rules and regulations.

24. Per the MESA, Sage specifically agreed and warranted that:

- "all Products shall be free from defects in material and workmanship and shall conform to the standards set forth in a Statement of Work." *See* MESA, ¶ 10;

- "[Sage] shall conduct all necessary quality inspections to ensure that all Products conform to the specifications set forth in a Statement of Work," that it "agrees to produce and deliver the Products in accordance with applicable federal, state and local laws, rules and regulations, and that the Products shall be in compliance in all material respects with the specifications and formulas set forth in the Statement of Work." *See* MESA, ¶ 7.1 & 7.2;

- "[Sage] shall perform mock recalls and quality and pathogen testing of the Products ingredients and finished Products in accordance with usual and customary testing methods, procedures and standards." *See* MESA, ¶ 7.4;

- If "any portion of [Sage's] facility, or any of [Sage's] processes, inventories or equipment do not comply with all applicable laws and regulations or with the terms and conditions of this Agreement, [Sage] shall take such action to correct such deficiencies and bring such processes, inventories and/or equipment into compliance with applicable laws and regulations and with the material terms and conditions of this Agreement promptly but in no case more than 10 business days following delivery of a written notice of such deficiency by [EAV]." *See* MESA, ¶ 7.6;

- Timely notify EAV of any non-conforming or defective products delivered to EAV. *See* MESA, ¶ 7.8;

7

- "[U]se commercially reasonable efforts to supply Products to [EAV]." *See* MESA, ¶ 16.4; and

- Sage's performance of the Agreement was also subject to a time of the essence provision. *See* MESA, ¶ 15.14.

25. Under the initial SOW 1, Sage was required to deliver the Zen Pens each calendar month based on a production schedule set forth in Product Orders. Time was made of the essence, in part, because EAV sought to be an industry leader and innovator, as well as an early entrant in the nascent CBD veterinary market with a pen applicator. EAV's biggest distributor promised it could be a "focus brand", but only if quality products were supplied in a timely manner.

26. The Agreement called for the parties to negotiate unit prices over the course of the contract's term pursuant to subsequent statements of work. MESA, ¶ 3. A new SOW and renegotiation of unit price would have necessarily been required for the newer customized version of the Zen Pen, which Sage had promised to design, develop and procure within six months.

27. The initial SOW 1 memorialized the terms of EAV's advance of $250,000 to Sage and the obligation that Sage reimburse EAV through credits applied to EAV's purchases of the Zen Pens. Specifically, Sage was required to provide a total credit in the amount of $312,500, applied equally over a six-month period (from May 2019 through October 2019). SOW, ¶ 4. Critically, the initial SOW 1 specifically noted the requirement for the pen to be a 'metered applicator.'

28. Finally, the MESA provided the parties with certain rights to terminate their contractual relationship if the other party breached and then failed to cure the breach within 30 days of receipt of written notice. MESA, ¶ 13.1. Under certain specified instances, the right to termination was immediate without any cure period. MESA, ¶ 13.2(b), (c), (e), and (f).

29. By June 30, 2019, EAV had placed orders for a total of 85,000 units of the Zen Pen for delivery during the first and second quarter of 2019. The understanding between the parties was that this satisfied in full the minimum purchase requirements for the first half of 2019 under the Agreement.

30. However, during the first quarter of 2019, Sage struggled to deliver the units to EAV in a timely manner.  It was unable to fully satisfy the initial first quarter orders until April 12, 2019.

31. As was the case during the first quarter of 2019, Sage struggled to ramp up production and timely deliver the Zen Pens in the second quarter of 2019. Sage made deliveries to EAV in small piecemeal orders over the course of several months. In fact, Sage did not fully and timely satisfy EAV's purchase orders from the second quarter of 2019. As a result of these delays, Sage failed to deliver at least 85% of the Zen Pens ordered for delivery within the first six months of 2019.

32. Nevertheless, EAV made substantial efforts to promote and market the CBD Animal Products. We highlighted and featured the Zen Pens at various trade shows. We delivered samples of the product to our trade partners and retail partners. We also created advertising and marketing information to educate the marketplace on the benefits of CBD oil for pets. We marketed and sold the CBD Animal Products as the Nature's Comfort range under our well-known and respected Earth Animal brand name with access to a distribution base of 7000 stores as well as online platforms.

33. Late deliveries by Sage were not the only problems we encountered. When EAV first began receiving the Zen Pens from Sage, we noticed that Sage was labelling the products with only a twelve-month expiration date.

34. Such a short period was a major problem for us. Given the products' placement within EAV's traditional channels of distribution, the typical sales cycle, and the time required to promote and launch a new product, particularly an innovative product in a nascent industry, a 12-month shelf life raised the prospect of us and our distributors having to discard product not sold within that tight time frame. Our distribution partners will not take product from us that has less than a 9-month remaining shelf life.

35. In or around April 2019, we discovered for the first time that Sage had not conducted any shelf-life stability testing or any other analysis to substantiate the product's actual expiration date. This was shocking because, in June of 2018, Sage acknowledged that its own internal procedures for new products required shelf life stability testing, that Sage had not yet conducted any shelf life testing on the finished product, and that Sage was "blind" to what would happen when the product components were mixed. *See* Emails from R. Calafiore to K. Hansen, dated June 6, 2018, a true and accurate copy of which are attached hereto as **Exhibit D**. We have since learned that Steve Kushner, who was consulting on the project repeatedly informed Sage that it was required to conduct shelf life stability testing.

36. Upon learning that Sage had been labelling all delivered products with only a twelve-month expiration date and that Sage had not conducted any shelf-life stability testing to support even the 12-month claim, EAV notified Sage that it required that all products contain commercially viable and supportable sell-by dates of at least 18 months.

37. During 2019, EAV and Sage conducted monthly status calls and performance reviews. Agendas and content for these meetings were prepared by EAV with little preparation by Sage. At one such review in May of 2019, the parties discussed the various issues that had arisen, including

10

the fact that Sage was struggling to deliver the products in a timely manner and the tight and unsubstantiated expiration dates on the labels. In order to redress these various issues, the parties agreed to suspend certain contractual obligations – including EAV's obligation to place minimum purchase orders – until 2020 (the "Suspension of the Purchase Minimums").

38. As a consequence of discussions in this meeting, on May 23, 2019, I emailed Mr. Calafiore and others documenting our agreement to suspend purchase orders for the remainder of 2019. A true and accurate copy of such email is attached hereto as **Exhibit E**. EAV's Head of Procurement (Kiersten Carey) then sent an email to Sage cancelling the purchase orders for the remainder of the calendar year.

39. As a consequence of such agreed-upon suspension, for the next several months, Sage did not issue any demand for EAV to purchase the minimums set forth in the Agreement.

40. In response to the shelf-life issue, Sage finally engaged a company called Advanced Laboratories, Inc. ("ALI") to perform shelf-life stability testing. Sage was otherwise unable to provide any assurance that it could timely deliver properly-labelled and substantiated products until such testing was completed.

41. Sage's shelf-life stability testing was not fully completed until October 2019 (ten months after the effective date of SOW 1). This testing established an 18-month shelf-life. Sage, however, refused to bear any of the costs required to print new labels and engage a third-party company to re-label approximately 50,000 units of the Zen Pens previously delivered by Sage to EAV with the new 18-month expiration dates. EAV was forced to arrange and pay for all the costs associated with the relabeling, despite Sage having been the direct cause of the issue. Sage only offered to help with the re-stickering project and oversee the logistics. EAV paid Sage $3,017.08

11

for Chaz Gilbert's daily per diem rate, his transportation and car rental. To make matters worse, Sage provided wrong guidance to our handling house, thereby incurring a further $19,830.60 in additional to the $13,770.00 initially paid to Sage in labor costs. Sage suggested it was okay to apply a new sticker or label over the old sticker/label, a practice not authorized by applicable laws and regulations and contrary to the written instructions we provided to Sage and to which Sage had agreed. The cost to print new stickers and boxes was $23,358.18.

42. In addition to the late deliveries and the initial mislabeling of products, we ran into a more severe problem in the Second Quarter of 2019.

43. In or around May of 2019, we started to receive multiple complaints from customers, vital trade partners and key retailers that the Zen Pens did not work as intended. Users were unable to dispense Gel from the Pen for 30 metered doses per pen, as represented on the packaging of the products. Prior to this point, Sage had never notified us of any issues with the product.

44. We notified Sage of these issues as we received word from our customers. For example, on May 2, 2019, we notified Mr. Calafiore that EAV had received complaints that the Zen Pens stopped working after approximately 10 or 15 doses. We also reported to Mr. Calafiore that we had Pens returned to us with the same issue. *See*  Email from K. Carey to R. Calafiore, dated May 2, 2019, a true and accurate copy of which is attached hereto as **Exhibit F**.

45. By way of further example, on or about June 25, 2019, we reported to Sage in writing that EAV had received several defective Zen Pens that were returned to EAV's Customer Service Department. One customer reported that the "pens broke & started oozing the dose inside the pen mechanism, not allowing them to administer the dosage." Another customer stated that her Zen Pen "jammed and stopped working after [only] 3 uses [doses]." *See* Email from K. Carey to R.

Calafiore, dated June 25, a true and accurate copy of which is attached hereto as **Exhibit G**. We demanded that Sage evaluate the problem to ensure that it could timely deliver non-defective products. Nevertheless, EAV continued to constantly receive similar complaints and feedback from its customers and trade partners throughout 2019 and 2020.

46. We have only recently learned that Sage knew about these defects in December 2018 before the signing of the Agreement. Despite such internal knowledge, Sage allowed us to launch a product with a latent defect and then get hit with consumer and trade complaints. At no time prior to such complaints did Sage disclose the problem to us, acknowledge the problem or do anything about it.

47. In total, we received consumer complaints through customer service for approximately 4% of all Zen Pens sold in 2019. Such rate is 4000 times higher than that of our bestselling product. We also received several complaints from our trade partners regarding frequent returns and complaints by retail customers.

48. Faced with such consumer complaints, Sage refused to take any action that would eliminate the jamming, clogging or other issues with the Zen Pens.

49. Instead, the only "solution" Sage offered was to provide us with a video whereby customers were instructed to unfold a paperclip and stick the paperclip into the back of the Zen Pen. We were told the paper clip would help eliminate air bubbles in the Zen Pens. Such a make-shift "fix" was commercially unacceptable. Moreover, it did not eliminate the defect. It was inelegant to say the least and inappropriate for a high-end, premium priced product. We have only recently discovered that internally Sage acknowledged that the paper clip was neither a proper nor permanent fix.

50. Sage also pretended that this "fix" was invented in response to the complaints that arose in or around May of 2019. However, in reality, we recently learned that this "fix" was developed in December 2018 when Sage's own internal testing revealed the very product defect EAV's customers later encountered during the Spring of 2019. This product defect was not shared with EAV at that time. Instead, Sage provided EAV with products with a known latent defect that were destined to fail. EAV relied on these defective products in launching the Zen Pen in 2019. We never would have risked EAV's stellar reputation and good will by launching a product destined to fail had we known of the clogging issue. Sage's own documents show that it recognized internally that EAV would have rejected the Zen Pen had we known of the various issues.

51. In response to our learning of the product defect in the Spring of 2019, we took a series of actions in good faith to mitigate the negative impact on the marketability of the Zen Pen. We initiated a promotion whereby EAV provided retailers and trade partners with free Zen Pens so that they would have sufficient stock on hand to replace any broken or defective products returned by customers immediately in-store. Sage never reimbursed us or provided any credit for such mitigation costs. We also intensified our marketing efforts by increasing our digital marketing presence, promoting the Zen Pens online, and beginning a free Zen Pen promotion with every purchase online.

52. We also held monthly meetings with Sage's key employees to evaluate what could be done to quickly resolve the outstanding product issues, re-label product with accurate expiration dates, and increase sales of the products.

53. Sage, however, never remedied the situation. After Sage failed to address the defect, we conducted our own internal investigation into the performance and functionality of the product.

14

54. In late 2019, we provided sample products to 261 customers. We asked them to provide feedback on their experiences. Approximately 20% of the customers reported that the Zen Pens failed to properly dispense 30 doses per pen, as expressly represented on the packaging of the product. This was appalling.

55. In early 2020, with the product defects still not fixed, we conducted our own in-house testing of the Zen Pens. These tests were conducted by Kiersten Carey and Heather Rhode of EAV at my direction. We performed tests of both the 2 mg and 10 mg versions of the product and tested fail rates when the Pen was (a) pumped consecutively non-stop for 30 doses in a row, (b) pumped once per day for 30 days, and (c) pumped once per week for 30 weeks. In total, we tested 30 units of each version of the Zen Pens for each of the three scenarios (180 units tested in total). The result of the internal study was that ***only two*** of the 180 units tested were able to dispense the full thirty (30) doses without malfunctioning. In fact, a total of 103 of the 180 units of Zen Pens failed after less than 20 doses (57%). The fail rates increased the longer the product was used (i.e., the failure rates for weekly testing were higher than daily testing and the failure rates for daily testing were higher than consecutive testing). For instance, 31% of all Zen Pens failed after less than 20 doses in consecutive testing, 43% of Zen Pens failed after less than 20 doses in daily testing, and 95% of Zen Pens failed after less than 20 doses in weekly testing. These results were disastrous, and it was at this point that our worst fears were confirmed on the full extent of the Pen defects. Since this test, we have commissioned a replication of this study using external experts in the field with disappointingly similar results.

56. EAV was also advised that some of our trade partners and retailers conducted their own tests of the Zen Pens. They similarly concluded that many of the products malfunctioned or failed after less than the intended number of doses.

57. Pet Food Express, a trade partner of EAV, performed an internal test which revealed a 36% failure rate for the Zen Pens. Upon conclusion of these findings, Pet Food Express decided not to sell the product.

58. Pet People, another trade partner of EAV, experienced a high rate of complaints and returns from the Zen Pens and demanded a 38% credit of their order to account for the fact that several of the products were faulty or malfunctioning. Pet People has since decided to stop selling the product.

59. PetValu, another trade partner of EAV, made the decision not to sell the Zen Pens, citing the product's reputation in the industry that it was unreliable and prone to failure.

60. Centinela, another trade partner of EAV, submitted several returns and credit requests to EAV related to purchases of the Zen Pens. Centinela also decided to discontinue the product in early 2020.

61. In the midst of these product quality issues and our attempts to get Sage to redress them, in August 2019, John Thornton of Sage informed me at a trade show that Sage was in a grave financial position.

62. Mr. Thornton asked me for help.

63. Given our investment in the CBD Animal Products and our desire to find a solution, I expressed a willingness to consider doing so. I stated to him that I needed to understand the magnitude of monies required and their preferred investment instrument (i.e., debt v. equity v. product orders). I requested a business plan from Sage and clarity on what specifically Sage was looking for from EAV. After Mr. Thornton initially agreed to provide such information, Sage went

silent. Instead, it issued a "notice of breach" letter on November 13, 2019. This letter came with little notice, as we were continuing to work in good faith with Sage to get the product turned around. The letter came on the heels of EAV paying Sage in full and in advance for a CBD potion (the "Zen Potion"), which the parties had shifted to in the Fall of 2019 as a temporary alternative to the still-defective Zen Pens. EAV had agreed to provide the advance payment as a good faith gesture to help Sage with its cash flow issues.

64. Despite the parties' earlier Suspension of the Purchase Minimums, Sage's "notice of breach" asserted EAV was in "material breach" of the Agreement because we supposedly had failed to purchase the minimum number of units during the first three quarters of 2019 and purportedly had indicated an intention not to purchase the minimum number of units during the remainder of the Agreement's term. A true and accurate copy of such letter is attached hereto as **Exhibit H**.

65. EAV had not breached the purchase minimums. We, in fact, met those minimums during the first half of 2019 when we placed orders for 85,000 units. We did so despite the fact that we were faced with late and incomplete deliveries, mislabeled product and severe product defects.

66. In the face of those troubling issues which threatened our ability to market the Zen Pens successfully and which were damaging our reputation in the market place and which were all of Sage's own making, Sage had agreed at our May performance review meeting to the Suspension of the Purchase Minimums. It was only after Sage was unable or failed to rectify all those issues and after EAV paid in full and in advance for the CBD potions that Sage reversed course and sent its notice of breach letter.

17

67. After our repeated efforts to cooperate with Sage in good faith to resolve the various labelling and product quality issues and following receipt of Sage's unfounded breach letter, on or about December 6, 2019, we issued a written notice of material breach outlining Sage's material breaches under the Agreement. A true and accurate copy of such letter is attached as **Exhibit I**.

68. Specifically, EAV notified Sage that it had materially breached the Agreement by failing and/or refusing to:

<div style="margin-left:2em">

(a)      Provide credits or other reimbursements for the Advance Payment, as required by the initial SOW;

(b)      Deliver a product that was free from defects in materials and workmanship;

(c)      Deliver a customized "version 2" of the Pen within six months;

(d)      Test the product's shelf-life and deliver a product with a commercially viable and substantiated expiration date;

(e)      Notify EAV of known defects and/or performance issues with the products; and

(f)      Deliver at least 85% of the products required by the SOW and Product Orders in any six-month period.

</div>

69. EAV stated in its notice of breach letter that we would exercise our right to terminate the Agreement if Sage did not timely cure and resolve the above breaches.

70. In response, Sage did not address or cure any of the above breaches.

71. The untimely delivery, improper labelling and clogging issues with Zen Pen were not the only problems EAV encountered with CBD Animal Products. Sage also struggled to make timely deliveries of the Zen Potion.

72. Worse, in January 2020, EAV began receiving numerous complaints and returns from its distributors of both the 150mg and 600mg Zen Potion.

73. EAV's distributors were reporting that the bottles were leaking inside the cases because they were not properly sealed.

74. It is an industry standard for products of this type to have safety seals placed to avoid leakage and as a way for the end consumer to see that the product was not opened or tampered with.

75. As a result of Sage's failure to properly seal the Zen Potions, EAV's distributors refused to accept the product.

76.  In addition to the bottles of Zen Potion already in distribution, EAV had 9,264 bottles of the 150mg Zen Potion and 9,516 bottles of the 600 mg Zen Potion in its warehouse that needed to be sealed.

77. Sage agreed to take the product back, but EAV was forced to incur the cost of shipping all of the products to Sage and back to EAV's warehouse. Additionally, Sage charged EAV $7,854.00 to have safety seals placed on each bottle.

78. As a result of Sage's failure to cure its breaches and the continued issues with the CBD Animal Products, on March 11, 2020, EAV formally terminated the Agreement with Sage by way of a written letter. A true and accurate copy of such letter is attached hereto as **Exhibit J**.

79. Sage's breaches have caused direct harm to EAV in several respects. First, they have hurt the reputation and goodwill of our brand. Second, they forced EAV to incur out-of-pocket

costs which, owing to Sage's uncured breach, have not yielded benefits to EAV (including the extra promotional costs, the costs of returns, the relabeling costs, and the costs of two people hired to promote and launch the product, including directly to veterinarians). Third, they have resulted in lost profits. EAV has historically achieved a 15-20% return of net profits on its products. We fully expected to do the same with our CBD Animal Products.

80. EAV's net profits on our anticipated revenue for sales of the Zen Pens during the first three quarters of 2019 would have been lower than over the balance of the MESA's remaining three-year period owing to the significant upfront costs incurred for advertising and promotion during the initial launch of the Zen Pens. As the Zen Pens were sold, EAV reasonably anticipated that defective-free Zen Pens would have found acceptance among EAV's loyal existing base of customers. Such base would have also grown. Those customers would have continued to purchase the Zen Pens regularly, monthly or bi-monthly. At the same time, EAV would have been able to reduce its advertising and promotional spending, thereby yielding a higher profit margin starting in the fourth quarter of 2019 and continuing throughout 2020 and 2021.

81. I estimate that EAV would have achieved higher net profits on sales from the fourth quarter of 2019 through 2021 (taking into account the availability of a new customized version of the Zen Pen and the likelihood of a retail price decrease of 40% for the Zen Pens as a consequence of the massive drop in the price of CBD biomass that occurred during the Summer of 2019). Such drop would have compelled Sage to cut its price of the Zen Pens to EAV. Sage was obliged to provide EAV with competitive pricing below the market rate in exchange for exclusivity. This would have necessitated a new SOW with newly-negotiated pricing. It would also have coincided with Sage's provision of a new customized version of the Zen Pen, which would have triggered a newly-negotiated SOW.

20

82. The price cut by Sage would have compelled EAV, in turn, to drop the price of the Zen Pens to its distributors, as well as the price at which EAV would have sold the Zen Pens at retail, online and directly to veterinarians. Such a major price drop by EAV would have increased the demand for the Zen Pens and likely have created greater sales in years 2 and 3 of the MESA.  We also anticipated that, with a non-defective Zen Pen, we would have significantly increased our direct sales of the Zen Pens to veterinarians year over year. Our inroads with veterinarians undoubtedly would have led to cross-selling of our other CBD Animal Products.

83. I estimate that the revenues from the sale of non-defective Zen Pens alongside a diversified Nature's Comfort range would have yielded net profits for EAV of $2,201,477 (15%) in 2019, $2,761,244 (19%) in 2020 and $5,669,667 (21%) in 2021. Over the three-year period of the MESA, the overall sales have yielded a net profit for EAV of $10,662,388 (19%), based on higher rates of return in 2020 or 2021 for the various reasons noted above.  Attached as **Exhibit K** is a chart summarizing my lost profits calculation for the CBD Animal Products during MESA's three-year contract term.

84. I have also calculated EAV's out-of-pocket costs directly attributed to Sage's breach of the MESA.  In 2019 alone, EAV spent a total of $786,736.57 in marketing and promotion for the Pens.  That figure breaks down as follows:  $79,000 for consumer events; $36,250 for Pet Parade; $9,000 for the Earth Animal Website; $253,391 in giveaways at trade shows, consumer events, and donated products to non-profit organizations; $13,740 for trade shows; $14,734 for giveaways; $106,385 in everyday marketing collateral; $53,923.30 for marketing displays; $73,813 for trade advertising; $131,500 for retailer employee sample program; $10,000 for instructional videos; and $5,000 for retailer trainings.  In 2020, EAV committed an additional $292,883.36 for the Pens, which was comprised of $77,500.00 spent on efforts through Pet Parade;

$3,811.36 spent on marketing collateral, and $211,572.00 spent on giveaways at trade shows, consumer events, and product donations. Directly because of the defect in the Pens, EAV experienced a total loss of value of the monies it spent on promotions, advertising and launching the new products. We have essentially realized no return on such investment inasmuch as the Zen Pen product has been discontinued. EAV also incurred unanticipated and unplanned out-of-pocket expenses directly caused by Sage's mislabeling of the expiration dates on the initial batches of Zen Pens shipped by Sage. We spent $23,358.19 on stickers and boxes and re-packaging of the short-dated inventory of Zen Pens.  EAV also paid $3,017.08 to Sage in respect of Chaz Gilbert's work on the repackaging project. EAV paid $13,770.00 to a company called Wear The Best in respect of the re-packaging project. In all, 27,000 of Zen Pens were double-stickered upon the incorrect advice of Chaz Gilbert of Sage. They had to be redone at an additional cost of $19,830.60 for additional re-packaging supplies and $29,700 of  labor costs. All totaled, EAV paid 59,975.86 directly because of Sage's mislabeling of the Zen Pens.

85. EAV also paid for two additional staff members who were specifically hired to launch the CBD products directly to veterinarians. The cost of these two employees was $96,122.76. EAV realized no benefit for these costs as a direct consequence of Sage's breach, including the product defects, which forced EAV to drop the product and terminate the two staff members.

86. EAV also lost monies directly by reason of Sage's improper packaging of the CBD Potions. We paid Sage $312,000.00 for the Zen Potions. Of that, we paid Sage $50,000.00 on August 28, 2019, $50,000.00 on September 18, 2019, and $106,000.00 on October 28, 2019 all in advance of the product shipping. The balance of $106,000.00 was paid on November 6, 2019 when Sage shipped the product.  As discussed above, we were required to pay Sage an additional $7,854.00 to take back the bottles of Zen-Potion and place safety seals around the neck of the

bottle, plus the costs for shipping the product back to Sage, and then shipping it to our warehouse Sage completed their correction.

87. Adding up the losses and harm caused by Sage's various breaches as quantified above and, in the exhibits attached hereto, EAV seeks a PJR remedy in the amount of $12,528,744.50.

Executed this 6th day of November 2020 at Southport, Connecticut.

  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


                          Stewart Shanley

24